IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:20-cv-00518-FDW-DCS

MARJORIE ACEVEDO,

       Plaintiff,

    -vs-

TEUPEN NORTH AMERICA, INC.,

       Defendant.

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

VIDEOCONFERENCE DEPOSITION

OF

MARTIN BORUTTA

October 15, 2021

Charlotte, North Carolina

MARTIN BORUTTA                                    2

A P P E A R I N G

FOR PLAINTIFF

Ms. Michelle Gessner

Ms. Nicole Haynes

GESSNER LAW, PLLC

P.O. Box 78161

Charlotte, NC 28271

FOR DEFENDANT

Mr. David Klass

FISHER & PHILLIPS, LLP

227 West Trade Street

Suite 2020

Charlotte, NC 28202

ALSO PRESENT

Ms. Marjorie Acevedo - Remotely

INDEX

EXAMINATION BY MS. GESSNER                         5

www.thompsonmi
1
1
s.com

---

MARTIN BORUTTA                                    4

Pl. 20    Response to Plaintiff's Second Set of      263
          Interrogatories

Pl. 21    AT&T Bill and Credit Card Statements        270

Pl. 22    Acevedo Credit Card Statement               271

Pl. 23    Signed Verification Page                    274

Pl. 24    Interrogatory Verification Page             277

Pl. 25    Teupen NC Secretary of State Document       276

(Quoted verbiage is transcribed verbatim and may reflect

an imprecise reading thereof.)

NOTES

[1]       Marked for reference at the request           24
          counsel for plaintiff

www.thompsonmi
1
1
s.com

---

MARTIN BORUTTA                                    3

EXHIBITS

Pl. 1     Order Filed 09/09/2021                        21

Pl. 2     Email from Klass to Gessner 10/15/2021        28

Pl. 3     Email - Settlement Demand Rejected            64
          10/13/2021

Pl. 4     2019 Teupen Employee Census                  102

Pl. 5     2020 Teupen Employee Census                  116

Pl. 6     12/30/2019 Demotion Letter from              142
          Borutta to Acevedo

Pl. 7     12/30/2019 Email re: New Role from           150
          Acevedo to Borutta

Pl. 8     Doctor's Note in Text                        159

Pl. 9     Doctor's Note Emailed to Borutta             160

Pl. 10    01/03/2020 Termination Letter                167

Pl. 11    01/07/2020 Representation letter             169

Pl. 12    Employment Agreement                         174

Pl. 13    Emails Regarding Personal Checks             183

Pl. 14    01/13/2020 Letter from Borutta to            188
          Gessner

Pl. 15    Performance Reviews for Acevedo              191

Pl. 16    2019 Teupen Terminations                     204

Pl. 17    Emails re: Litigation Hold Notice            226

Pl. 18    Teupen Verizon Phone Statements              249

Pl. 19    Employee Hand-Over Form - Geraghty           257

www.thompsonmi
1
1
s.com

---

MARTIN BORUTTA                                    5

1       On October 15, 2021, at 9:06 a.m., the deposition
2   of MARTIN BORUTTA was taken at the offices of FISHER &
3   PHILLIPS, LLP, 227 West Trade Street, Suite 2020,
4   Charlotte, North Carolina, via videoconference.
5       The following proceedings were had, to wit:
6
7                      MARTIN BORUTTA
8   HAVING first been duly sworn, was examined and testified
9   as follows:
10  BY MS. GESSNER
11  Q.  Good morning, Mr. Borutta.  My name is Michelle
12      Gessner.  I don't think that we've ever officially
13      met.
14  A.  Good morning, Ms. Gessner.  How are you today?
15  Q.  Will you please state your full name for the
16      record?
17  A.  Yes.  My full name is Martin Hans Borutta.
18  Q.  And, Mr. Borutta, where are you located right now?
19  A.  In the U.S. and in Germany.
20  Q.  Where are you sitting right now?
21  A.  Now I am at the Fisher Phillips office.
22  Q.  Who's present with you in the same room?
23  A.  Nobody.
24  Q.  Where is your lawyer?
25  A.  In another room.

www.thompsonmi
1
1
s.com

## Sheet 3  Page 6

MARTIN BORUTTA    6

1  Q.  And is your lawyer today for this deposition
2      Mr. Klass, whose video is off?
3  A.  Yes, ma'am.
4  Q.  Mr. Borutta, can you understand English?
5  A.  I think so.  I am not native, but I should
6      understand English.
7  Q.  At any point today you do not understand anything
8      I'm saying, will you please let me know?
9  A.  I will, yes.
10 Q.  Have you ever been deposed before?
11 A.  No.
12 Q.  Have you ever provided sworn testimony before?
13 A.  Maybe in German lawsuits for companies, maybe.  I
14     don't remember.
15 Q.  Have you provided sworn testimony in the United
16     States before?
17 A.  No.
18 Q.  Have you ever signed a declaration or an affidavit
19     under oath?
20 A.  No.
21 Q.  You sat through Ms. Acevedo's deposition yesterday,
22     correct?
23 A.  Yes.  That's correct.
24 Q.  Were you there the entire day?
25 A.  No.

www.thompsonmills.com

## Page 7

MARTIN BORUTTA    7

1  Q.  When did you leave?
2  A.  At 3:50 p.m.
3  Q.  You're aware that the videos were off, so Mr. Klass
4      did not show his face to Ms. Acevedo, nor was your
5      video on during the day, is that correct?
6  A.  Yes.
7  Q.  Why did you leave at 3:50 yesterday?
8  A.  I had a private appointment.
9  Q.  Mr. Borutta, what's your date of birth?
10 A.  11/02/67.
11 Q.  Are you a U.S. citizen?
12 A.  No.
13 Q.  Do you pay taxes in the United States?
14 A.  Yes.
15 Q.  As an ex-pat, or under what circumstances do you
16     pay taxes?
17 A.  Investor's visa.
18 Q.  I'm sorry?
19 A.  I have an investor's visa.
20 Q.  Did anyone assist you in obtaining the investor's
21     visa?
22 A.  Yes.
23 Q.  Who?
24 A.  I think it was AGG in Atlanta.
25 Q.  How long have you held an investor's visa in the

www.thompsonmills.com

## Page 8

MARTIN BORUTTA    8

1      United States?
2  A.  Since November '19.
3  Q.  Is that November of 2019?
4  A.  Yes.
5  Q.  Prior to holding an investor's visa in the United
6      States you were spending time and operating Teupen
7      in the U.S., correct?
8  A.  No.
9  Q.  So is it your testimony you were not at all in the
10     United States before another November of 2019?
11 A.  I did not operate Teupen.  I spent time in the U.S.
12 Q.  And how is it that you were able to enter the
13     United States prior to receiving your investor's
14     visa?
15 A.  With an Esta.
16 Q.  I'm sorry.  Please repeat that.
17 A.  ESTA, E-S-T-A.  That's for German citizens or other
18     European nationals.
19 Q.  And how often were you in the United States in
20     2019?
21 A.  From July to December, seven times, and before, I
22     think two times.  I'm not sure, but probably close
23     to 10 times.
24 Q.  Do you own a home in the United States?
25 A.  Sorry.  I didn't understand that.

www.thompsonmills.com

## Page 9

MARTIN BORUTTA    9

1  Q.  Do you own a home in the United States?
2  A.  No.
3  Q.  Where do you reside?
4  A.  In Charlotte in a house, in a rented house.
5  Q.  What is the address of that house?
6  A.  18345 Calabash Road, Charlotte, North Carolina
7      28278.
8  Q.  And I think I heard you say that is a rental, is
9      that correct?
10 A.  Yeah.  That's correct.
11 Q.  Is the lease in your name?
12 A.  Yes.
13 Q.  Does anyone reside at that address with you?
14 A.  No.
15 Q.  Are you married?
16 A.  Divorced.
17 Q.  When were you divorced?
18 A.  I don't remember.  I am two times divorced.  I
19     think it was in '18, '17.  I don't know.
20 Q.  Have you been divorced more than two years?
21 A.  Yeah.  I think it was in '18.  I don't know.
22 Q.  Where does your second ex-wife live?
23 A.  In Germany.
24 Q.  Has she ever lived --
25         MS. GESSNER:  Strike that.

www.thompsonmills.com

MARTIN BORUTTA                                10

1  Q.  (By Ms. Gessner) Were you married to a woman?
2  A.  Yes.
3  Q.  Has she ever lived with you in the United States?
4  A.  She's been traveling with me in the United States,
5      not living.
6  Q.  And your first ex-wife, where does she live?
7  A.  In Germany.
8  Q.  What is her name?
9  A.  Christiane.
10 Q.  Please spell that for the record.
11 A.  Christiane, C-h-r-i-s-t-i-a-n-e.
12 Q.  And is her last name Borutta?
13 A.  Yep.
14 Q.  It's still -- is it Borutta to this day?
15 A.  I don't know.  I did not see her a long time.
16 Q.  What is your second ex-wife's name?
17 A.  That's more difficult.  That's Naowarat, N-a-o-w-a-
18     r-a-t.
19 Q.  Thank you.  And is her last name also Borutta?
20 A.  Yes.
21 Q.  Do you have any children, Mr. Borutta?
22 A.  I have a son.
23 Q.  How old is he?
24 A.  22.
25 Q.  Where does he live?

---

MARTIN BORUTTA                                11

1  A.  Germany.
2  Q.  Has he ever lived in the United States with you?
3  A.  No.
4  Q.  What is his name?
5  A.  Yannick.
6  Q.  Please spell that for the record.
7  A.  Y-a-n-n-i-c-k.
8  Q.  Last name Borutta?
9  A.  Yep.
10 Q.  So, Mr. Borutta, can you hear me okay right now?
11 A.  Yes, I can.
12 Q.  So a couple rules of the road today, I think you
13     should be familiar given that you sat through
14     Ms. Acevedo's deposition from 9:00 a.m. until after
15     3:00 yesterday, correct?
16 A.  Yes.  That's correct.
17 Q.  The court reporter is going to take down everything
18     I say and everything you say today, so it is very
19     important that we have a verbal response, so she
20     can't take down head nods, yes or no.  Will you
21     agree to give me verbal responses to all my
22     questions?
23 A.  I am.
24 Q.  Also, she can't take down your testimony if we're
25     talking over one another, so I'd ask that you let

---

MARTIN BORUTTA                                12

1      me finish my question before you answer and I'll
2      give you the same courtesy and let you answer
3      before I start my next question.  Is that fair?
4  A.  Sounds fair.
5  Q.  If at any time you need a break today I ask you
6      just let me know.  We'll probably take a break once
7      an hour, and I just ask that you answer any
8      question that I have on the table before you ask to
9      take that break.  Is that also fair?
10 A.  Yes.
11 Q.  Are you under the influence of any medication or
12     drugs that would influence your ability to
13     understand my questions?
14 A.  No.
15 Q.  And did you get enough sleep last night?
16 A.  Yes.
17 Q.  I think earlier I said if you don't understand
18     anything that I'm asking of you, you're going to
19     let me know, is that correct?
20 A.  I answered the question yes.
21 Q.  And if you answer the question I am going to
22     operate under the understanding that you understand
23     it.  Is that fair?
24 A.  If I don't understand I will ask a second time.
25     Yes, it's fair.

---

MARTIN BORUTTA                                13

1  Q.  What did you do to prepare for this deposition?
2  A.  Meet with David Klass.
3  Q.  Anyone else present for that meeting?
4  A.  No.
5  Q.  Did you meet with Mr. Klass more than one time to
6      prepare for the deposition?
7  A.  No.
8  Q.  When did you meet with Mr. Klass?
9  A.  Wednesday.
10 Q.  Is that last Wednesday or this past Wednesday which
11     would be October 13?
12 A.  13th.
13 Q.  How long did the meeting last?
14 A.  I don't remember.
15 Q.  Was it all day?
16 A.  No.
17 Q.  Where did the meeting take place?
18 A.  In the Fisher Phillips office.
19 Q.  Did the meeting last more than four hours?
20 A.  I don't remember.
21 Q.  You are paying Fisher Phillips by the hour for
22     representation in this case, aren't you?
23 A.  I think so.  Yes.
24 Q.  Or is Teupen paying or are you paying personally?
25 A.  Teupen.

MARTIN BORUTTA                    14

1  Q.  You say you think so.  Who would know whether or
2      not you're paying Fisher Phillips by the hour other
3      than you?
4          MR. KLASS:  Object to the form.
5  Q.  (By Ms. Gessner) You can answer.
6  A.  It's just me.
7  Q.  So do you know whether or not you're paying Fisher
8      Phillips by the hour?
9  A.  Yes, I know.
10 Q.  And you have more than one lawyer representing
11     Teupen on this case, correct?
12 A.  At the beginning I think it was a second lawyer,
13     yes, at the beginning.
14 Q.  Do you know Ben Morrell?
15 A.  No.
16 Q.  Do you know how much you have spent on legal fees
17     in this matter to date?
18         MR. KLASS:  I'm going to object to
19     this line of questioning at this point.
20     This has nothing to do with the case, and
21     what his attorney's fees are I believe
22     would fall under any number of privilege
23     or protection and I'm directing him not
24     to answer.
25         MS. GESSNER:  It absolutely does not

---

MARTIN BORUTTA                    15

1      fall under protection.  Please have
2      someone do the research.
3  Q.  (By Ms. Gessner) I'm not asking you, Mr. Borutta,
4      anything that you told your lawyers or that they
5      told you, but how much you've spent on legal fees
6      is 100 percent a valid question that in no way
7      breaches privilege, so I'd like you to answer the
8      question.
9          MR. KLASS:  Also object to the form.
10 Q.  (By Ms. Gessner) Do you understand my question,
11     Mr. Borutta?
12 A.  Yeah, I understand the question, and the answer is
13     I don't know.
14 Q.  Do you have any idea?
15         MR. KLASS:  Object to the form.
16     He's answered your question.
17 Q.  (By Ms. Gessner) You can answer -- answer it again.
18     I asked you a different question.
19 A.  I don't --
20 Q.  Do you have any idea how much you have spent on
21     legal fees in this case matter to date?
22 A.  No.
23 Q.  Has it been more than $20,000?
24         MR. KLASS:  Object to the form.
25     Asked and answered.

---

MARTIN BORUTTA                    16

1  Q.  (By Ms. Gessner) Do you understand my question,
2      Mr. Borutta?
3  A.  Yes, I understand the question.
4  Q.  Please answer it.
5  A.  I don't know.
6  Q.  Who would know if you don't?
7          MR. KLASS:  Object to the form.
8  Q.  (By Ms. Gessner) Mr. Borutta, did you understand my
9      question?
10 A.  Yep.
11 Q.  Please answer it.
12 A.  I would be the person to know if I would want to
13     know what I spent till today, but I don't know
14     because I didn't check it.
15 Q.  When was the last time you paid an invoice from
16     Fisher Phillips?
17         MR. KLASS:  Object to the form.
18 Q.  (By Ms. Gessner) Did you understand my question,
19     Mr. Borutta?
20 A.  Yes, I understood.
21 Q.  Please answer it.
22 A.  Last month.
23 Q.  And do you recall anything about the amount of that
24     invoice?
25 A.  No.

---

MARTIN BORUTTA                    17

1  Q.  Is there any document that would help refresh your
2      recollection as to exactly how much you've spent in
3      legal fees in this case?
4  A.  If you could show me a document.
5  Q.  No, I'm asking you.  Are aware of any documents
6      that would provide you with the information you say
7      you can't remember?
8  A.  For sure our accounting can show it.
9  Q.  And who is accounting at Teupen?
10 A.  An external company.
11 Q.  Who is that external company?
12 A.  CPH.
13 Q.  What does CPH stand for?
14 A.  Catrakilis and two other names.  I don't know.
15 Q.  Spell the first name that you can remember.
16 A.  Catrakilis.
17 Q.  Can you spell it?
18 A.  C-a-t-r-a-k-i-l-i-s.
19 Q.  Is this a United States company or German?
20 A.  It's a United States company.
21 Q.  Are you aware that the court ordered Teupen to
22     provide certain documents to plaintiffs in this
23     case?
24 A.  Yes.
25 Q.  And are you aware that the court ordered Teupen to

MARTIN BORUTTA                                    18

1    provide certain answers to interrogatories in this
2    case?
3 A. Yes.
4 Q. Are you aware that Teupen is in contempt of that
5    order?
6         MR. KLASS:  Object to the form.
7 Q. (By Ms. Gessner) Do you understand my question,
8    Mr. Borutta?
9 A. I understand the question, and the answer is no.
10 Q. No, you're not aware that Teupen is in contempt?
11        MR. KLASS:  Object to the form.
12 Q. (By Ms. Gessner) It seems, Mr. Borutta, that
13   Mr. Klass is going to be obstructive today and
14   continue to object to every question that I ask,
15   but each time he objects you still must answer that
16   question.  So each time we have to pause and I have
17   to say do you understand that question and say
18   please answer it, it's going to get really long
19   really fast.  So any time he objects do you
20   understand that you have an obligation to still
21   answer that question unless he instructs you not
22   to?
23 A. I know, and the answer is no.
24 Q. So again, no, you're not aware that Teupen is in
25   contempt of a court order sitting here today, is

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                                    19

1    that correct?
2         MR. KLASS:  Object to the form.
3 A. That was a different question than the one before.
4    Can you ask it again, please?
5 Q. (By Ms. Gessner) Are you aware sitting here today
6    that Teupen is in contempt of a court order?
7         MR. KLASS:  Object to the form.
8 A. No, I'm not aware.
9 Q. (By Ms. Gessner) Do you know what the word contempt
10   means?
11 A. I would explain it as not fulfilling or not
12   fulfilling a demand, correct?
13 Q. You sat through Ms. Acevedo's deposition until
14   3 o'clock yesterday, correct?
15 A. Yes.
16 Q. Was there anything that Ms. Acevedo said yesterday
17   that you do not believe was truthful?
18 A. Yes.
19 Q. Tell me everything that you believe Ms. Acevedo
20   said yesterday that you believe was not truthful.
21        MR. KLASS:  Object to the form.
22 Q. (By Ms. Gessner) You understood my question, didn't
23   you, Mr. Borutta?
24 A. Yes.
25        MR. KLASS:  Object to the form.

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                                    20

1 A. Yes, I understood your question.
2 Q. (By Ms. Gessner) Please answer it.
3 A. She said I think sometimes that I did not have time
4    to talk to her.  That is incorrect and that is not
5    the truth.  And she did not discuss things with me
6    she explained yesterday, but there were several
7    things I cannot recall.
8 Q. Well, the deposition was just yesterday, right?
9 A. Yes.
10 Q. And your lawyers paid or Teupen paid to have it
11   videotaped, correct?
12        MR. KLASS:  Object to the form.
13 Q. (By Ms. Gessner) Is that correct?
14        MR. KLASS:  Object to the form.
15 A. Yes.
16 Q. (By Ms. Gessner) And you sitting here today, those
17   are the only two things that you can recall that
18   she said that you don't believe was truthful?
19        MR. KLASS:  Object to the form.
20   Mischaracterizes his testimony.
21 Q. (By Ms. Gessner) I'm just going to ignore Mr. Klass
22   because his objections really have no meaning
23   whether you have to answer or not, so please answer
24   the question.
25 A. I did not see the video.

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                                    21

1 Q. Do you recall anything else sitting here today less
2    than 24 hours later that you believe Ms. Acevedo
3    said that wasn't true?
4 A. I will try to recall.  That's -- I told you what I
5    can recall, actually, and answered your question.
6 Q. What is your understanding as to what this lawsuit
7    is about?
8 A. My understanding, I told you in January 2020, it is
9    a frivolous lawsuit based on wrong accusations.
10   That is what this lawsuit is about, and I told you
11   that in different times pre now.
12 Q. I'm going to show you a document.  Mr. Borutta, do
13   you see a document on the screen?
14 A. I see a document on the screen.
15 Q. Do you have any issues viewing it on the computer?
16 A. No.
17   It's a two-page document that we've marked as
18   Exhibit 1 to your deposition.  There's page 1 and
19   there's page 2.  Do you see that?
20 A. I see that it has two pages.
21 Q. Have you ever seen this document before that is an
22   order from the court ordering Teupen to respond to
23   plaintiff's discovery requests?
24        MR. KLASS:  Objection.  This calls
25   for disclosure of attorney-client

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                               22

1   privilege and attorney work product and
2   I'm directing the witness not to answer.
3         MS. GESSNER:  Again I disagree.
4   This is a public document that has been
5   ordered by the court.  My question is has
6   he ever seen it before.  I didn't ask
7   whether his lawyer gave it to him or
8   whether you had any conversations with
9   him about it.  I simply asked if he had
10  seen it before.  Counsel, your objection
11  is improper.  So again --
12        MR. KLASS:  I maintain -- I'm sorry.
13        MS. GESSNER:  Wait --
14  Q.  (By Ms. Gessner) Mr. Borutta, are you going to
15  refuse to answer whether or not you saw this public
16  document that is an order of the court before at
17  the advice of your counsel?
18        MR. KLASS:  I'm going to renew my
19  objection that it calls for disclosure of
20  attorney-client privileged communications
21  and attorney work product.  Mr. Borutta
22  is directed not to answer to the extent
23  that he has seen this order through his
24  communications with counsel.  To the
25  extent that he has seen the order outside

MARTIN BORUTTA                               23

1   of communications with counsel he may
2   answer.
3         MS. GESSNER:  Counsel, your
4   objection is wholly improper.  Any
5   documents he saw in preparation for this
6   deposition including this order are fair
7   game.  Any public documents that he saw
8   in preparation for this deposition are
9   fair game.  Any public documents that he
10  saw at all in this case are fair game.
11  So again, Michelle -- Ms. Thompson,
12  please mark any time that Mr. Klass makes
13  these improper objections so that we can
14  take it up with the court and bring
15  Mr. Borutta back to answer these very
16  basic questions that Mr. Klass is going
17  to obstruct this deposition just like he
18  did yesterday and instruct his witness
19  not to answer.
20  Q.  (By Ms. Gessner) So again, Mr. Borutta, are you
21  going to follow the instruction of your lawyer and
22  refuse to answer whether you've seen this document
23  before or not?
24        MR. KLASS:  I am advising my client
25  not to answer that question.

MARTIN BORUTTA                               24

1         MS. GESSNER:  We understand what
2   you're advising.  I'm asking him if he's
3   going to follow your advice, counsel.
4   Q.  (By Ms. Gessner) Mr. Borutta, are you going to
5   follow your lawyer's advice and not answer my very
6   basic question about whether you've seen this
7   document before?
8   A.  I will follow Mr. Klass' advice.  That's why he's
9   my lawyer.
10        MS. GESSNER:  Michelle, please mark
11  this and any going forward. [1]
12  Q.  (By Ms. Gessner) Okay.  Well, now we're seated
13  today, Mr. Borutta, together, so if you need time
14  to review this two-page document, please let me
15  know.  Do you?
16  A.  Sure, in time to review it.
17  Q.  Okay.
18  A.  I cannot read it fully because -- can you --
19  Q.  Just a second, Mr. Borutta.  I have just given you
20  control to be able to scroll the document.  It is
21  9:32 a.m. and I've given you control to scroll a
22  two-page document and read it to prepare to answer
23  any questions I may have.
24  A.  What does compel mean again?
25  Q.  Do you have any understanding what the word compel

MARTIN BORUTTA                               25

1   means?
2   A.  No.
3   Q.  Have you ever researched what the word means?
4   A.  No.
5   Q.  Do you have any just even basic understanding what
6   the word compel means?
7         MR. KLASS:  Object to the form to
8   the extent it calls for a legal
9   conclusion.
10  A.  No.
11  Q.  (By Ms. Gessner) Do you have any reason to dispute
12  that the word compel means required you to provide?
13        MR. KLASS:  Object to the form to
14  the extent it calls for a legal
15  conclusion.
16        MS. GESSNER:  I'm providing him the
17  definition of compel, but okay.  He asked
18  me for it, so I don't know how the
19  definition of the word compel is a legal
20  conclusion.  It's a word.  It's in the
21  dictionary.
22        MR. KLASS:  You're attempting to
23  have him --
24  Q.  (By Ms. Gessner) Mr. Borutta, would you like to
25  take a break and research the word compel so that

BORUTTA

## Sheet 8  Page 26

MARTIN BORUTTA                                         26

```
 1      you better understand the court's order?
 2  A.  Yeah.  That's a good idea.
 3  Q.  Okay.  We'll take five minutes.
 4  (RECESS)
 5  Q.  (By Ms. Gessner) We're back on the record after a
 6      short break.  Mr. Borutta, did you speak with
 7      Mr. Klass during the break?
 8  A.  Yes.
 9  Q.  What did he tell you?
10  A.  That I should research the word.
11  Q.  Anything else?
12  A.  No.
13  Q.  You understand you're under the penalty of perjury
14      today, correct?
15  A.  I understand, yes.
16  Q.  You know what the word perjury means?
17  A.  The -- I -- I don't know how to explain.  Yeah, I
18      understand what it means.
19  Q.  Is that all that Mr. Klass said to you during the
20      break?
21          MR. KLASS:  Object to the form.
22  Q.  (By Ms. Gessner) Did you understand my question?
23  A.  Yes, and the answer is yes.
24  Q.  He just simply told you that you needed to research
25      the word compel and nothing else, is that correct?
```

www.thompsonmi
l
l
s.com

## Page 27

MARTIN BORUTTA                                         27

```
 1          MR. KLASS:  Object to the form.
 2  A.  He confirmed to look it up.  Yes.
 3  Q.  (By Ms. Gessner) Please say that again.  I didn't
 4      hear you.
 5  A.  Mr. Klass confirmed, yes, go ahead and look it up.
 6  Q.  Do you have an understanding what the word compel
 7      means now?
 8  A.  Yes, I have.
 9  Q.  What's your understanding of what it means?
10  A.  That in -- I cannot express it in English, but in
11      German words I need -- I understand it's -- or I --
12      if I translate it, that is a court order I have to
13      follow, like a rules of the court or whatever how
14      you want to explain.  That would be my
15      understanding.
16  Q.  Do you believe that Teupen has followed the court's
17      order?
18          MR. KLASS:  Object to the form.
19  A.  I think it's not about what I believe.  It's about
20      what we did.  And I have a lawyer to explain me
21      things and to request things from me and that's
22      what I do because I'm not a lawyer.
23  Q.  (By Ms. Gessner) I'm going to show you -- did you
24      have enough time to review Exhibit 1, the court's
25      order regarding what you are supposed to do?
```

www.thompsonmi
l
l
s.com

## Page 28

MARTIN BORUTTA                                         28

```
 1          MR. KLASS:  Object to the form.
 2  A.  I had enough time to review it, but it doesn't make
 3      sense.  If you show me other documents,
 4      Ms. Gessner, because I didn't review them in the
 5      past because therefore I'm paying lawyers.  You
 6      asked me before whether I pay my lawyers.  Yes, I
 7      pay my lawyers and they take care and they tell me
 8      what to do.  I'm not English, I'm not a lawyer, and
 9      I need a lawyer for that.  That's what we did in
10      that case.
11  Q.  (By Ms. Gessner) I'm going to share another
12      document with you, Mr. Borutta, that's been marked
13      as Exhibit 2 to your deposition.  Do you see a
14      document on the screen?
15  A.  I see a document.
16  Q.  It's a five-page document.  You're on page 1 right
17      now.  Page 5, this is the bottom.  It's a letter
18      received from your lawyer, David Klass.  Look at
19      what time it was received today.  Do you see in the
20      email that it was received at 8:53 a.m. today?
21          MR. KLASS:  Object to the form.
22  A.  No, I don't see that.
23  Q.  (By Ms. Gessner) Well, do you see at the very top
24      of page 1 on the right-hand corner -- can you see
25      that on the screen?
```

www.thompsonmi
l
l
s.com

## Page 29

MARTIN BORUTTA                                         29

```
 1  A.  I see the date but no time.
 2  Q.  Do you see Friday, October 15, 2021, at 8:53 a.m.?
 3  A.  I see the date.  I don't see the time.
 4  Q.  Why can't you see the time?
 5  A.  Because the Zoom window is over it.
 6  Q.  Do you know how to move the Zoom window so that
 7      would be outside of the view?  You just click on
 8      the bar and it will move it to the top.
 9  A.  I don't know how to move it, but if you explain it,
10      because I never use Zoom.
11  Q.  Do you see the three or the five black boxes that
12      are down the right-hand side?  Is that what you see
13      right now?
14  A.  No.
15  Q.  Well, let me try a different way.  Now do you see
16      on your screen in very big letters October 15,
17      2021, at 8:53 a.m.?  Do you see that?
18  A.  Yes, I see the date and the time.
19  Q.  And today is October 15, correct?
20  A.  Yes.
21  Q.  And your deposition was set to start at 9:00 a.m.
22      this morning, correct?
23  A.  Yes.
24  Q.  And on Exhibit 1, taking you back there, you see
25      that the court ordered Teupen to provide complete
```

www.thompsonmi
l
l
s.com

```
                        MARTIN BORUTTA            30
1    responses within 30 days of the date of this order?
2    Did you see that, Mr. Borutta?
3  A.  I see the paper.
4  Q.  Did you read and see that the date in which that it
5    had to be provided was within 30 days from the date
6    of this order, which is September 9?
7  A.  I didn't see that because I was looking for the
8    word compel.
9  Q.  So you were reading this beforehand, but let's make
10    sure that you were aware that Teupen had to provide
11    complete responses as requested by plaintiff within
12    30 days from the court's order.  So do you see on
13    page 1 of Exhibit 1 of your deposition the words
14    plaintiff's motion to compel is granted?  Do you
15    see that?
16  A.  I see that.
17  Q.  And do you see number 3, "within 30 days of this
18    order each party shall serve complete supplemental
19    response to the opposing party's discovery
20    requests"?  Do you see that?
21  A.  Yes.
22  Q.  And what is 30 days after September 9, Mr. Borutta?
23  A.  I do not have a calendar.  I don't know.
24  Q.  Do you have any reason to reject that it is at
25    least October 9, 2021?
```

```
                        MARTIN BORUTTA            31
1       MR. KLASS:  Object to the form.
2  A.  I don't know.
3  Q.  (By Ms. Gessner) Mr. Borutta, do you need to look
4    at a calendar to count the days?
5  A.  No.
6  Q.  Do you believe that 30 days after September 9 is at
7    least October 9, 2021?
8       MR. KLASS:  Object to the form.
9  A.  Yes.
10  Q.  (By Ms. Gessner) Are you aware that Teupen has not
11    provided complete responses to plaintiff in
12    response to the court's order of September 9?
13       MR. KLASS:  Object to the form.
14  A.  No, I am not aware.
15  Q.  (By Ms. Gessner) I'm going to show you again what
16    we marked as Exhibit 2 to your deposition of the
17    letter received from your lawyer today just seven
18    minutes before your deposition where your lawyer is
19    claiming -- let me let you read it.  I'm going to
20    give you the controls again.  Have you --
21       MS. GESSNER:  Well, strike that.
22  Q.  (By Ms. Gessner) Have you seen this letter dated
23    October 15, 2021, that was sent to us seven minutes
24    before your deposition prior to me showing it to
25    you on the screen?
```

```
                        MARTIN BORUTTA            32
1  A.  No.
2  Q.  So your lawyer sent this letter without you
3    reviewing it, is that correct?
4       MR. KLASS:  Object to the form.
5  A.  I don't know.
6       MR. KLASS:  And I'm going to also
7    direct the witness not to answer as it
8    would reveal attorney-client
9    communications.
10       MS. GESSNER:  Again, your objection
11    is noted.
12  Q.  (By Ms. Gessner) So you're going to refuse to
13    testify whether you saw a document that's being
14    marked as your exhibit before today?  Is that
15    accurate, Mr. Borutta?
16       MR. KLASS:  He already testified.
17       MS. GESSNER:  No, he didn't,
18    counsel.
19  A.  I already said --
20       MS. GESSNER:  I counted time I even
21    spoke yesterday, counsel.  You have
22    exceeded my number of objections already
23    in the first hour, so I have --
24       MR. KLASS:  You have made a number
25    of objectionable questions.
```

```
                        MARTIN BORUTTA            33
1       MS. GESSNER:  Counsel, counsel,
2    object to form is all you're permitted to
3    say and you need to stop.  Other than
4    object to form, stop.
5  Q.  (By Ms. Gessner) Mr. Borutta, this document that's
6    been marked as Exhibit 2 -- my question is simple.
7    Have you seen this document prior to me showing it
8    right now, yes or no?
9  A.  Ms. Gessner, I don't know because I have not read
10    this document, so I cannot tell what's the content
11    and whether I know the content of the document.
12  Q.  Okay.  So, Mr. Borutta, I have given you the
13    controls to review this document that's been marked
14    as Exhibit 2 to your deposition and the time is
15    9:51 a.m.  Please let me know when you've finished
16    reading it.
17  A.  (Reviews document.)  Yes.
18  Q.  Have you finished reading, Mr. Borutta?
19  A.  I have finished reading, yes.
20       MS. GESSNER:  At 9:56.  Took him
21    five minutes to read.
22  Q.  (By Ms. Gessner) Mr. Borutta, you said you had an
23    understanding what the word compel means, which is
24    you're required to produce, correct?
25  A.  Yes.
```

MARTIN BORUTTA                    34

1  Q.  And nowhere in Exhibit 1 does it say from the court
2      that you don't have to produce and that we have to
3      ask you questions during a deposition.  The court
4      required you to produce certain information,
5      correct?
6          MR. KLASS:  Object to the form.
7  A.  Yes.
8  Q.  (By Ms. Gessner) And on Exhibit 2 your lawyer is
9      basically not providing the information, instead
10     saying we can request it at this deposition; isn't
11     that accurate?
12         MR. KLASS:  Object to the form.
13 A.  I don't know.  I'm not a lawyer.
14 Q.  (By Ms. Gessner) Does Teupen have an organizational
15     chart?
16 A.  You provided the Teupen organizational chart
17     yesterday.
18 Q.  That's not my question.  I asked you does Teupen
19     have an organizational chart in its possession.
20 A.  No.
21 Q.  So you say we provided an organizational chart.  Is
22     it your position that Ms. Acevedo created that
23     chart?
24 A.  I don't know if she --
25 Q.  Go ahead.  I'm sorry.  Well, then, Mr. Borutta, you

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                    35

1      said that I provided an -- or we provided an
2      organizational chart.  What chart are you talking
3      about?
4  A.  You provided an organizational chart.  I don't know
5      what the -- how do you call that, the bench
6      numbers, I don't recall what's that called.
7  Q.  Is it your testimony that Teupen does not have an
8      organizational chart at all sitting here today?
9          MR. KLASS:  Object to the form.
10 A.  You have the organizational chart.  Ms. Acevedo
11     took -- it looks like she took my organizational
12     chart.  I don't have another one and you provide --
13 Q.  (By Ms. Gessner) You're aware that the court has
14     ordered you to produce the organizational chart
15     from Teupen, aren't you?
16         MR. KLASS:  Object to the form.
17 A.  No.
18 Q.  (By Ms. Gessner) Are you aware of that now sitting
19     here today?
20         MR. KLASS:  Object to the form.
21 A.  I fulfilled all my requests of my lawyer, so that's
22     what I'm aware of.  That's what I can tell you.
23 Q.  (By Ms. Gessner) And do you have any understanding
24     of the difference between a request for discovery
25     and a court order?

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                    36

1  A.  No.  I'm not a lawyer.
2  Q.  Your lawyer seems to be greatly confused in that he
3      says this isn't a meet and confer, but are you
4      aware of any rule or law or anything that required
5      plaintiff to meet and confer and to make you comply
6      with the court?
7          MR. KLASS:  Object to the form.
8  A.  No.  I am not -- I am not a lawyer.
9  Q.  (By Ms. Gessner) Are you aware that when we seek
10     court relief that Teupen could be forced to pay our
11     legal fees and costs as a result of Teupen's lack
12     of compliance with the court's order?
13         MR. KLASS:  Object to the form.
14 A.  Nope, I'm not aware.
15 Q.  (By Ms. Gessner) Looking on page 2 of
16     interrogatory 10, do you see at the bottom -- at
17     the top of your screen you see the words
18     interrogatory 10?
19 A.  Yes.
20 Q.  Do you see the bottom next-to-last sentence of that
21     paragraph where it says, "As for your complaint
22     regarding the response that plaintiff made comments
23     or statements about her work duties from time to
24     time, this is an appropriate response to this
25     interrogatory.  You're also free to ask Mr. Borutta

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                    37

1      about any alleged complaints at his deposition."
2      Did you see that?
3  A.  Yes, I see that.
4  Q.  Are you aware that you have responded to discovery
5      that says that you are aware that Ms. Acevedo made
6      complaints to you from time to time about her work
7      duties?
8          MR. KLASS:  Object to the form.
9  A.  That's too broad.  She made complaints and I can't
10     tell you the exact complaints she made.
11 Q.  (By Ms. Gessner) Okay.  Tell me every complaint
12     that you believe that Ms. Acevedo made while she
13     was working at Teupen.
14         MR. KLASS:  Object to the form.
15 A.  I remember one complaint so that from time to time
16     is maybe not correct, and that was maybe in October
17     and she told me her workload is too high, she needs
18     -- or she asked me to hire an additional person to
19     take off all the stuff for invoices and bills.
20     That was her complaint.
21 Q.  (By Ms. Gessner) Any others that you can recall?
22 A.  We had a short complaint during the Christmas
23     party, but I don't know whether that was a
24     complaint.  That was just her expression, and her
25     words were she doesn't like to work with Mr. Liebl

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                    38

```
1   and with Ms. Molyn.
2  Q.  Did you ask her why?
3  A.  She didn't explain.  She doesn't like them.  That
4      was her expression.
5  Q.  Did you ask her why?
6  A.  She told me she doesn't like them.
7  Q.  Did you ask her why she doesn't like them?
8  A.  I don't remember.
9  Q.  Did you do any investigation whatsoever as to why
10     Ms. Acevedo was complaining to you about Mr. Liebl
11     or Ms. Molyn?
12 A.  She was not complaining about.  She told me she
13     doesn't like them and she doesn't like to work with
14     them.  That's a different story for me.  That's not
15     a complaint about the people.  It's a complaint
16     about that she doesn't like them and doesn't like
17     to work with them.  It was December 20 after the
18     Christmas party.
19 Q.  And again, you didn't do anything to investigate
20     Ms. Acevedo's complaint, did you?
21         MR. KLASS:  Object to the form.
22 A.  I don't remember.
23 Q.  (By Ms. Gessner) Well, is that a you didn't do
24     anything or you could have done something but you
25     don't remember?
```

MARTIN BORUTTA                    39

```
1          MR. KLASS:  Object to the form.
2  A.  I don't remember means I don't remember.
3  Q.  (By Ms. Gessner) What is the normal process when
4      you have an employee complain to you about her
5      working conditions?
6  A.  I listen to the complaint and then I do an
7      investigation.
8  Q.  Did you do an investigation when Ms. Acevedo
9      complained to you about Mr. Liebl and Ms. Molyn?
10 A.  I did an investigation.
11 Q.  Tell me everything you did as part of your
12     investigation regarding Ms. Acevedo's complaints.
13 A.  I recalled all of Ms. Acevedo's mistakes she made,
14     the money she costed me at that time, and took my
15     decision to demote her.
16 Q.  So instead of investigating Ms. Acevedo's
17     complaints, you instead took retaliatory action
18     against her by demoting her?
19         MR. KLASS:  Object to the form.
20 A.  You got to ask your question again because I did
21     not do anything that was retaliation, so --
22 Q.  (By Ms. Gessner) My question, Mr. Borutta -
23     Mr. Borutta, my question to you was very clear.
24     Tell me everything you did to investigate
25     Ms. Acevedo's complaints.  And I believe your
```

MARTIN BORUTTA                    40

```
1      testimony was you were looking for Ms. Acevedo's
2      mistakes and demoted her.  Is that accurate?
3          MR. KLASS:  Object to the form.
4  A.  It was -- the decision was already taken in the
5      morning before I talked with her in the afternoon,
6      because she did the final mistake and that's why I
7      took my decision, so I didn't have to investigate
8      anything.  I just had to take my decision and the
9      decision was taken before our meeting.
10 Q.  (By Ms. Gessner) So again, Mr. Borutta, you're not
11     responding to my question.  Did you investigate
12     Ms. Acevedo's complaints to you about her working
13     conditions?
14         MR. KLASS:  Object to the form.
15 A.  I don't remember.
16 Q.  (By Ms. Gessner) Did you follow up with Ms. Acevedo
17     and ask her for more details about how she was
18     being treated by Mr. Liebl?
19 A.  I couldn't have asked Ms. Acevedo because she was
20     on vacation and I was not in the office to ask her,
21     and the decision was taken to demote her, to get
22     her a job she could fulfill, and the decision was
23     taken by me.
24 Q.  We're going to talk about that demotion in just a
25     bit, but I would ask that you answer the question
```

MARTIN BORUTTA                    41

```
1      I'm asking of you regarding your statement that you
2      investigated Ms. Acevedo's complaints about how she
3      was being treated by Mr. Liebl and Ms. Molyn.  So I
4      still haven't heard anything that you said you did
5      to investigate.
6  A.  Yeah, because the question --
7          MR. KLASS:  Object to the form.
8          MS. GESSNER:  We're all talking over
9      each other and I'd ask that we stop.
10     David, let your client speak before you
11     object.  Let me finish speaking before
12     you object.
13 Q.  (By Ms. Gessner) And, Mr. Borutta, I did not hear
14     your answer, so could you please restate your
15     answer?
16         MR. KLASS:  Object to the form.
17 A.  I can restate my answer, but your question was
18     incorrect.  You've got to recall your question and
19     ask it again because I did not tell you that she
20     claimed that she was mistreated.  I told you that
21     she told me she does not like to work together with
22     Mr. Liebl and Ms. Molyn.  That's what she said.
23 Q.  (By Ms. Gessner) Let's break it down.  When she
24     told you this --
25 A.  No.
```

MARTIN BORUTTA                    42

1  Q.   -- did you do anything to follow up with her about
2       why she did not like working with Mr. Liebl or
3       Ms. Molyn?
4            MR. KLASS:  Object to the form.
5  A.   In that conversation I told Ms. Acevedo that they
6       got to find a way to work as a team because they
7       are a team, and the main thing she told me and I
8       think you will find that also in her email on
9       December 30, that she does not trust Ms. Molyn, and
10      I told her that she could trust her because that is
11      my decision to trust her.
12 Q.   (By Ms. Gessner) Anything else that you did -- when
13      Ms. Acevedo told you that she did not like working
14      with Mr. Liebl or Ms. Molyn, what did you do to
15      find out why?
16           MR. KLASS:  Object to the form.
17 A.   I don't remember.
18 Q.   (By Ms. Gessner) Did you ever speak with Mr. Liebl
19      about Ms. Acevedo's complaints about him?
20 A.   I don't remember.
21 A.   I didn't hear your answer.
22 A.   I don't remember.
23 Q.   Did you ever discuss Mr. Liebl -- how do you say
24      his name?  Is it Liebl or Liebl?
25 A.   Liebl.

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                    43

1  Q.   Did you ever discuss Ms. Acevedo with Mr. Liebl at
2       all?
3  A.   I don't remember.
4  Q.   I think that you earlier said that you had only
5       made I think seven trips to the United States from
6       Germany between July 2019 and December 2019, is
7       that correct?
8  A.   That is correct.
9  Q.   At any point during those trips did you make any
10      effort to meet with Ms. Acevedo regarding her
11      working conditions?
12 A.   We met several times, but I cannot recall specific
13      matters and we had no specific discussions about
14      working conditions.
15 Q.   So in your response to interrogatories that you
16      verified and in your lawyer's letter of this
17      morning it expressly says that you were aware that
18      Ms. Acevedo had made comments or statements about
19      her work duties from time to time.  Do you see that
20      on the screen?
21 A.   Yes, I see that.
22 Q.   And you've only told me about one instance on
23      December 20 at the Christmas party that Ms. Acevedo
24      complained to you about not liking working with
25      Mr. Liebl and Ms. Molyn and you've referenced a

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                    44

1       December 3 email.  What other complaints, comments
2       or statements about Ms. Acevedo's work duties are
3       you referring to in your answer that you provided
4       from time to time?
5            MR. KLASS:  Object to the form.
6  A.   First of all, it wasn't correctly said because
7       Ms. Acevedo's email from December 13, not 3rd.
8  Q.   (By Ms. Gessner) Thank you for that clarification.
9       It wasn't clear when you said it the first time.
10      But regardless --
11 A.   No.
12 Q.   Wait.  Other than December 13 and other than the
13      Christmas party, what are you referring to when you
14      answered the court-ordered interrogatories by
15      saying from time to time?
16 A.   I already --
17           MR. KLASS:  Object to form.
18 A.   -- gave you the answer before, but she -- I don't
19      remember exactly.  I think it was in October that
20      she said she needs somebody else to support her to
21      fulfill her work duties because she is overloaded
22      and she has too long.  I don't remember exactly.  I
23      just know that she asked me for like an assistant
24      in a 13-people company, for our company.  That's
25      what I remember.

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                    45

1  Q.   (By Ms. Gessner) Well, at all times you haven't had
2       13 people.  You've had in excess of 20 people,
3       isn't that correct?
4  A.   That is not correct.  That was before '19.
5  Q.   Well, over the last two years prior to your
6       unlawful termination of Ms. Acevedo, Teupen had 20
7       employees on average, correct?
8            MR. KLASS:  Object to the form.
9  A.   No, that's not correct.
10 Q.   (By Ms. Gessner) Well, we'll take a look at that
11      document here in a minute and maybe that will
12      refresh your recollection.
13           You heard Ms. Acevedo's testimony yesterday
14      indicating that she had complained to you about how
15      she was being treated several times and attempted
16      to speak with you several times and you ignored
17      her.  Do you recall that testimony?
18           MR. KLASS:  Object to the form.
19 A.   That is not what I recall from yesterday.  She
20      couldn't remember and she thought she tried
21      sometime, but it's not correct because I have an
22      open-door policy and as soon as I am in the office
23      employees can come in and talk to me, but you've
24      got to do it.  You've got to just come in and talk
25      to me.

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                                    46

1  Q.  (By Ms. Gessner) But on December 20 when
2      Ms. Acevedo exercised your, quote, open-door
3      policy, you didn't do anything to follow up with
4      her or Mr. Liebl at all, did you?
5          MR. KLASS:  Object to the form.
6  A.  I explained it before already that the demotion of
7      Ms. Acevedo was already -- my decision was already
8      taken and that it has nothing to do with any
9      treatment or whatever.  That was just the poor work
10     performance of Ms. Acevedo.
11 Q.  (By Ms. Gessner) When did you decide to demote
12     Ms. Acevedo?
13 A.  In the morning of December 20.
14 Q.  So the morning of the company Christmas party you
15     decide to demote Ms. Acevedo?
16 A.  Yes.
17 Q.  How is it that --
18         MS. GESSNER:  Strike that.
19 Q.  (By Ms. Gessner) Tell me all the reasons that you
20     decided to demote Ms. Acevedo.
21         MR. KLASS:  Object to the form.
22 Q.  (By Ms. Gessner) You understand my question,
23     Mr. Borutta?
24 A.  I understand your question, Ms. Gessner.  It was
25     ongoing mistakes she made that cost the company a

www.thompsonmi
s.com

---

Page 47                                           47

MARTIN BORUTTA

1      lot of money.  For example, the Taft mistake
2      Ms. Acevedo made and other mistakes regarding sales
3      tax, late payments and other things that added up,
4      and in the morning of the December or evening
5      before she sent out the financial statement of
6      November that was just $100,000 off in the profit,
7      and that was the final thing for me to understand
8      that she's not able to perform her work duties as
9      an accountant in the way she has to.
10 Q.  Who brought to your attention those alleged
11     mistakes that you just testified to?
12 A.  I found them myself.
13 Q.  When did you find the mistake regarding the sales
14     tax late payment?
15 A.  That was I think in October or November.  We had
16     some other payments that were late and later on I
17     figured out that -- I think that was after
18     Ms. Acevedo that we had a tax lien in Ohio.  Nobody
19     informed me and now you can ask me the question,
20     who's the responsible accountant at Teupen that
21     should normally inform the CEO of Teupen that I get
22     a tax lien?
23 Q.  So your testimony is you found out in October or
24     November of --
25 A.  No.  The other one was the -- the tax lien was

www.thompsonmi
s.com

---

Page 48                                           48

MARTIN BORUTTA

1      later and there were some small things that just
2      added up.  The main thing was the problem with
3      Mr. Taft.  I think that was -- I don't recall the
4      exact date, but I think it was in October or
5      November when the problems with Mr. Taft came up.
6      I don't recall exactly.
7  Q.  Anything else?
8          MR. KLASS:  Object to the form.
9  A.  Different things, a lot of small things.
10 Q.  (By Ms. Gessner) Again, anything else that you can
11     recall that you have testified were the mistakes
12     that Ms. Acevedo made?
13         MR. KLASS:  Object to the form.
14 A.  I told you wrong financial statement, the Ben Taft
15     case, late payment fees, small stuff.  It's three
16     years ago.  I don't recall all the stuff, but that
17     was a lot of things that added up and my
18     decision --
19 Q.  (By Ms. Gessner) I'm sorry.  I keep thinking you're
20     done when you're not.  Can you bring yourself
21     closer to the microphone because you're sitting too
22     far back and I'm having a difficult time hearing
23     you.
24 A.  The microphone is here.
25 Q.  Well, can you bring your face a little closer so I

www.thompsonmi
s.com

---

Page 49                                           49

MARTIN BORUTTA

1      could read your lips then because I'm not able to
2      hear you clearly.
3          So you remembered with specificity
4      Ms. Acevedo's December 13 email.  Did you review
5      that email prior to your deposition?
6          MR. KLASS:  Object to the form.
7  A.  It was December 30, not 13.  Thirty, three zero.
8  Q.  (By Ms. Gessner) Say it again, please.
9  A.  It was December 30, three zero.
10 Q.  So after she had complained to you about Mr. Liebl
11     and Ms. Molyn, telling you that she was having
12     trouble working with them at the Christmas party,
13     she complains to you again on December 30, is that
14     correct?
15 A.  No, that is not correct.  She had sent me an email
16     on December 30 regarding her demotion because I was
17     not in the office and that's why I could not
18     explain her when she was being demoted, and then
19     she sent me that email, and as I had no email
20     access, I did not answer.
21 Q.  Well, Mr. Borutta, were you in person at the
22     Christmas party on December 20?
23 A.  Yes, I was.  I told you before.
24 Q.  And your testimony is that you allegedly made the
25     decision to demote her before the Christmas party,

www.thompsonmi
s.com

MARTIN BORUTTA                          50

1     correct?
2  A.  Yes, that is correct.
3  Q.  Well, why didn't you have a conversation about this
4     demotion with Ms. Acevedo in person on December 20?
5  A.  Because that is not my style to do that before
6     Christmas and she was on Christmas vacation the
7     next week.  That's why I didn't do it.
8  Q.  When did you inform Ms. Acevedo that she was
9     demoted?
10  A.  I did not inform Ms. Acevedo.  As I said before, I
11     was not in the office.  I handed that task over to
12     Ms. Molyn and Mr. Liebl.
13  Q.  But it was after Ms. Acevedo had directly
14     complained to you about Mr. Liebl and Ms. Molyn,
15     correct?
16         MR. KLASS:  Object to the form.
17  A.  She had not directly complained about Ms. Molyn and
18     Mr. Liebl.  She said she doesn't like them.
19  Q.  (By Ms. Gessner) Mr. Borutta, you were on notice
20     that Ms. Acevedo was having trouble with Mr. Liebl
21     and Ms. Molyn at least as early as December 20,
22     correct?
23         MR. KLASS:  Object to the form.
24  A.  No, I was not aware.
25  Q.  (By Ms. Gessner) You just testified on December 20

www.thompsonmi
1
1
s.com

MARTIN BORUTTA                          51

1     at the Christmas party Ms. Acevedo told you that
2     she did not like working with Mr. Liebl and
3     Ms. Molyn, correct?
4  A.  That is correct.
5  Q.  And you didn't do anything to follow up prior to
6     informing her of her demotion as to why she was
7     having trouble with Mr. Liebl and Ms. Molyn,
8     correct?
9         MR. KLASS:  Object to the form.
10  A.  First of all, you're asking the same question five
11     times.  Second of all, it is not correct what
12     you're saying.  You're trying to turn my words in
13     my mouth and that is not correct.  I'll explain
14     again what Ms. Acevedo said during our meeting at
15     the Christmas party, she doesn't like Mr. Liebl and
16     Ms. Molyn and she doesn't like to work together
17     with them.  That's what she said December 20 in the
18     afternoon when the decision was already taken to
19     demote her.  That's the only thing that happened
20     during that afternoon during that meeting, and she
21     did not complain any time before that she has
22     problems with Mr. Liebl or with Ms. Molyn.
23  Q.  (By Ms. Gessner) Ms. Acevedo was not aware that any
24     potential demotion was going to happen when she
25     complained to you about Mr. Liebl and Ms. Molyn,

www.thompsonmi
1
1
s.com

MARTIN BORUTTA                          52

1     correct?
2         MR. KLASS:  Object to the form.
3  A.  I don't know if she was aware or not because I am
4     not Ms. Acevedo.
5  Q.  (By Ms. Gessner) Well, Mr. Borutta, you had not
6     informed Ms. Acevedo that she was going to be
7     demoted prior to December 20, correct?
8  A.  No, I did not.
9  Q.  Mr. Borutta, you had not even given Ms. Acevedo any
10     type of performance feedback indicating that she
11     was going to be demoted if things didn't improve
12     prior to December 20, correct?
13  A.  That is not true for Ms. Acevedo.  That is the same
14     thing you can count on that is for Ms. Acevedo,
15     Mr. Taft, Mr. Kesser, you know, and everybody else,
16     because I don't do performance reviews.  You know
17     your job duties, you do your tasks, you fulfill
18     them, everything is fine.  That's how it works with
19     me and at Teupen.  I don't have any obligation to
20     give you any reviews.  Or do I?
21  Q.  So Ms. Acevedo was not informed that you had made a
22     decision to demote her until after she had
23     complained to you about Mr. Liebl and Ms. Molyn,
24     correct?
25         MR. KLASS:  Object to the form.

www.thompsonmi
1
1
s.com

MARTIN BORUTTA                          53

1  A.  I don't know whether she knew it, I told you
2     before, because I am not Ms. Acevedo.  I don't know
3     what she knew.
4  Q.  (By Ms. Gessner) But, Mr. Borutta, you did not tell
5     her that she was going to be demoted before
6     December 20, correct?
7         MR. KLASS:  Object to form.
8  A.  No, I did not tell her and I said it already
9     before.
10  Q.  (By Ms. Gessner) You had not instructed Mr. Liebl
11     to tell Ms. Acevedo that she was going to be
12     demoted before December 20, correct?
13  A.  That is correct.
14  Q.  And you had not instructed anyone to inform
15     Ms. Acevedo that she was going to be demoted prior
16     to her complaint about Mr. Liebl and Ms. Molyn,
17     correct?
18  A.  That is correct.
19  Q.  When did you return to Germany after December 20?
20  A.  I think it was January 14 or 16.  I don't remember.
21  Q.  Insperity was your PEO at the time --
22         MS. GESSNER:  Strike that.
23  Q.  (By Ms. Gessner) Insperity was the PEO supporting
24     Teupen in December 2019, correct?
25  A.  Yes.

www.thompsonmi
1
1
s.com

MARTIN BORUTTA                          54

1  Q.  Did you instruct Ms. Acevedo to speak with anyone
2      at Insperity about her complaints regarding
3      Mr. Liebl or Ms. Molyn?
4  A.  No.
5  Q.  Did you ask anyone from Insperity to conduct any
6      type of investigation on behalf of Teupen following
7      Ms. Acevedo's complaint to you that you testified
8      about that occurred on December 20?
9  A.  We're talking about December 20 in the afternoon.
10     No, I did not.  It was Friday afternoon.
11 Q.  Well, the next day is December 21, correct?
12 A.  Yeah.  That was a Saturday.
13 Q.  And then Sunday is the 22nd, correct?
14 A.  Looks like.
15 Q.  And December 23, 2019, is a Monday, right?
16 A.  That is correct.
17 Q.  And it's still under your contract with Insperity
18     that you could have picked up the phone and called
19     someone from Insperity and asked them to
20     investigate her complaints, correct?
21         MR. KLASS:  Object to form.
22 A.  Why should I --
23 Q.  (By Ms. Gessner) Mr. Borutta, you're not being
24     responsive.  I asked you, on Monday, December 23,
25     Insperity was still your PEO, correct?

MARTIN BORUTTA                          55

1  A.  That's correct.
2  Q.  And you didn't pick up the phone at any point in
3      time before the end of 2019, in between the 23rd
4      and 31st and ask anybody to investigate
5      Ms. Acevedo's complaints to you, did you?
6  A.  No.
7  Q.  And you didn't investigate them yourself, either,
8      did you?
9         MR. KLASS:  Object to the form.
10 A.  I don't remember.
11 Q.  (By Ms. Gessner) Is there any document that would
12     help refresh your recollection to remind you
13     whether you conducted an investigation or not?
14 A.  I don't know.
15        MS. GESSNER:  We've been going about
16     an hour, 20 minutes.  Let's take a
17     10-minute break.
18 (RECESS)
19 Q.  (By Ms. Gessner) So, Mr. Borutta, as a reminder,
20     you're under oath and subject to the penalty of
21     perjury.  Are you aware of that?
22 A.  Yes, I am.
23 Q.  Prior to the break you testified that you had made
24     the decision to demote Ms. Acevedo prior to
25     December 20, is that correct?

MARTIN BORUTTA                          56

1         MR. KLASS:  Object to the form.
2  A.  No, that is not correct.
3  Q.  (By Ms. Gessner) When did you make the decision to
4      demote Ms. Acevedo?
5  A.  December 20.
6  Q.  That's what I just said.
7  A.  No, you said prior, so not prior.  I made the final
8      decision December 20.
9  Q.  Was the decision made before or after the Christmas
10     party?
11 A.  It was made in the morning, December 20, before
12     lunch.
13 Q.  What evidence of any sort do you have in your
14     possession indicating that you made this decision
15     to demote Ms. Acevedo on December 20?
16        MR. KLASS:  Object to form.
17 A.  There will be no evidence, but I am the only one in
18     the whole company who can take personnel decisions.
19 Q.  (By Ms. Gessner) So you didn't make any notes
20     anywhere that you were going to demote her on that
21     day, correct?
22 A.  Should I write a note to myself?  That doesn't make
23     sense.
24 Q.  I get to ask the questions today, Mr. Borutta.  I'm
25     trying to understand.  Right now you, for the first

MARTIN BORUTTA                          57

1      time, are informing us that you made this decision
2      on the morning of the 20th.  It seems very suspect
3      considering that's the same day that Ms. Acevedo
4      complained to you in person about Mr. Liebl and
5      Ms. Molyn, so I'm trying to understand.  What proof
6      or evidence do you have to back up that the
7      decision was made prior to the Christmas party on
       th
8      December 20 ?
9         MR. KLASS:  Object to the form.
10 Q.  (By Ms. Gessner) Do you understand?  Do you
11     understand the context of my question now,
12     Mr. Borutta?
13 A.  I told you before that I got Ms. Acevedo's
14     financial statement of November in the morning of
15     20th of December -- that's what I explained before
16     -- and the profit was $100,000 off, and that was
17     the last mistake for me to take the decision.
18     That's what I explained before, and if that's not
19     evidence enough, I don't have more evidence.
20     You've got to believe my decision.
21 Q.  So are there any other documents of any sort that
22     supports that you made the decision on that day?
23        MR. KLASS:  Object to the form.
24 A.  I don't know.  Are there any other documents?
25 Q.  (By Ms. Gessner) Have you given us all the

MARTIN BORUTTA                    58
1   documents that you used in support of this decision
2   prior to December 20 or on December 20?
3        MR. KLASS:  Object to the form.
4   A.  I don't know if you got the financial sheet, but I
5       think you got it.
6   Q.  (By Ms. Gessner) Did you speak with Mr. Liebl
7       before December 20 telling him that you were going
8       to demote Ms. Acevedo?
9   A.  You already asked that before and I said, no, I did
10      not recall --
11  Q.  Mr. Borutta, I get to ask the questions.  Your
12      answer isn't clear, so by saying you've asked that
13      before, it doesn't really change whether I get to
14      ask it or not.  So I don't think I've asked that
15      before and I'm asking it again because it isn't
16      clear.  Did you speak with Mr. Liebl about this
17      alleged decision you made to demote Ms. Acevedo on
18      December 20?
19           MR. KLASS:  Object to the form.
20  A.  No, I did not.
21  Q.  (By Ms. Gessner) And we've already -- just to be
22      clear for the record, you did not communicate in
23      any way to Ms. Acevedo that you'd made this
24      decision until December 30, correct?
25           MR. KLASS:  Object to the form.

MARTIN BORUTTA                    60
1   ask anyone to investigate Ms. Acevedo's claims
2   between December 20 and December 30, correct?
3        MR. KLASS:  Object to the form.
4   A.  I did not call Insperity.
5   Q.  (By Ms. Gessner) Did you email Insperity between
6       December 20 and December 30, 2019?
7   A.  No, I did not email Insperity.
8   Q.  Did you ask your lawyers or any other third-party
9       investigator, not privileged, any third party to
10      come in and investigate the problems Ms. Acevedo
11      was having with Mr. Liebl and Ms. Molyn?
12  A.  I don't remember.
13  Q.  You had access to Parker Poe or even Fisher
14      Phillips or some other law firm to seek assistance
15      in conducting an investigation, didn't you?
16  A.  Maybe I had access, yes.
17  Q.  Parker Poe, at least until late 2020, was the
18      registered agent on file with the Secretary of
19      State for Teupen, correct?
20  A.  I think so.  I cannot tell you the exact date, but
21      yeah, they have been the registered agent.
22  Q.  So as a result of Ms. Acevedo complaining about her
23      demotion, that's why you fired her?
24           MR. KLASS:  Object to the form.
25  A.  It's not a result complaining about her demotion.

MARTIN BORUTTA                    59
1   A.  That is correct.  I did not communicate with
2       Ms. Acevedo.
3   Q.  (By Ms. Gessner) And at all times you were demoting
4       Ms. Acevedo in December 20, 2019, correct?
5            MR. KLASS:  Object to the form.
6   A.  Please ask the question again.
7   Q.  (By Ms. Gessner) You had not made a decision to
8       terminate Ms. Acevedo on December 20, correct?
9   A.  That's correct.
10  Q.  When did you make the decision to terminate
11      Ms. Acevedo?
12  A.  After I got a report about the scene Ms. Acevedo
13      made to Mr. Liebl and Ms. Molyn when she got her
14      demotion paper and after I told her on December 20
15      that they have to work together as a team in
16      future, and it looks like she refused to follow my
17      orders.  I took the decision to terminate, because
18      if you don't follow what I tell you, I got to
19      terminate.  That's how it works.
20  Q.  And again I think we've already established you did
21      nothing to investigate Ms. Acevedo's complaints
22      about Mr. Liebl and Ms. Molyn, correct?
23           MR. KLASS:  Object to the form.
24  A.  You asked the question.  I don't remember.
25  Q.  (By Ms. Gessner) And you didn't call Insperity and

MARTIN BORUTTA                    61
1   It is a result of, first of all, not being able to
2   fulfill the duties of an accountant in the right
3   way.  That means that the company loses money
4   through an accountant that is not able to fulfill
5   its duties.  Second of all, not following my
6   instructions on December 20 after the or during the
7   Christmas party, however you want to see the
8   timing.  When I told her that she got to work
9   together with Mr. Liebl and Ms. Molyn as a team in
10  future, and then she sends me an email where she
11  says she doesn't want to work with Ms. Molyn and
12  she doesn't trust her, so that's disrespectful
13  against me and that's why I took the decision.  She
14  disrespects me and she did that in former times
15  already.  That was the final decision to terminate
16  her contract.
17  Q.  (By Ms. Gessner) Mr. Borutta, you were aware that
18      Ms. Acevedo was complaining to you about the way
19      Mr. Liebl and Ms. Molyn were treating her because
20      she is Latino; you were aware of that, weren't you?
21           MR. KLASS:  Object to the form.
22  A.  No, and your question is incorrect.  You tried to
23      put something in my mouth I never said, so please
24      rephrase it.
25  Q.  (By Ms. Gessner) Mr. Borutta, you know that

MARTIN BORUTTA                    62

1     Ms. Acevedo is Latino, correct?
2 A.  No.  I learned it during the EEOC claim.  I didn't
3    know which origin Ms. Acevedo is and it doesn't
4    matter at Teupen which origin you are.  Teupen is a
5    company working worldwide.  We got employees in
6    every country of the world, so why should I care
7    which origin you are?
8 Q.  You had seen Ms. Acevedo prior to December 20,
9    correct?
10 A.  Sure, I saw her from time to time in '19.
11 Q.  You saw that she has darker skin, correct?
12 A.  Yes.
13 Q.  You saw that she has black hair, correct?
14 A.  Yes, she has black hair.
15 Q.  You've spoken to her and she has a Spanish accent,
16    correct?
17 A.  No, that's not correct, because I'm not native.  I
18    cannot tell you which accent Ms. Acevedo has and
19    you can tell me that I'm German maybe or maybe you
20    don't know.  I could be Russian, Polish, I could be
21    Hungarian.  Can you tell me what I am?  Do you know
22    where I'm from?  No.  That's my problem.
23 Q.  Ms. Acevedo -- is it your testimony that you had
24    absolutely no knowledge that Ms. Acevedo, including
25    her last name, was of Latino descent?

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                    63

1 A.  That is correct.
2 Q.  Are you aware of any other Latino employees who
3    have complained about how they were being treated
4    at Teupen?
5 A.  I'm not aware of any complaints at Teupen of
6    mistreatment or whatever you want to ask.
7 Q.  If an employee complained to Insperity, did
8    Insperity inform you of such complaints?
9 A.  No, because I was not the supervisor in Insperity
10    and I was not the administrator.  That was
11    Ms. Acevedo, and I was added very late just to
12    support or whatever.  I don't remember.  No.
13 Q.  So is it your testimony that even though you are
14    the person who does the hiring and firing, which
15    you've already testified about, that Insperity
16    doesn't report to you any employee complaints that
17    have come in to them?
18       MR. KLASS:  Object to the form.
19 A.  That is 100 percent correct, because HR was done by
20    Ms. Acevedo.  She was the senior contact for
21    Insperity.
22 Q.  (By Ms. Gessner) When did Ms. Acevedo become the
23    senior contact with Insperity?
24 A.  When Ms. Geraghty left she took over her duties.
25 Q.  So Ms. Acevedo testified as she did yesterday that

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                    64

1    she is aware that other Latino women had complained
2    about the way they were treated at Teupen.  You
3    have no information or ability to reject that as
4    being false, correct?
5       MR. KLASS:  Object to the form.
6 A.  I don't know it.
7 Q.  (By Ms. Gessner) So is that a no, you cannot in
8    any way refute whether that's true or not?
9       MR. KLASS:  Object to the form.
10 A.  I cannot confirm whether it's true or wrong because
11    I did not have any information about that.
12 Q.  (By Ms. Gessner) So Ms. Acevedo would be the one
13    with the most information because of her connection
14    with -- of her responsibilities with Insperity as
15    to what internal complaints had been made by other
16    employees, correct?
17       MR. KLASS:  Object to the form.
18 A.  Yeah, I think that's correct.
19 Q.  (By Ms. Gessner) Let me show you a document.
20    Mr. Borutta, showing you a document we've marked as
21    Exhibit 3 to your deposition.  Do you see a
22    document on the screen?
23 A.  I see a document on the screen.
24 Q.  It's a two-page document that is an email between
25    me and your lawyer, David Klass, regarding

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                    65

1    potential resolution of this matter.  Have you seen
2    this email before today?
3 A.  I don't know because I have not read it yet, so I
4    cannot tell you whether I've seen it or not.
5 Q.  Please take a few minutes --
6 A.  I can't read it.
7 Q.  Please take a few minutes and scroll through and
8    let me know when you're finished.  The time is
9    10:53.  You have the ability to scroll.
10 A.  I know.  Thank you. (Reviews document.)  Okay.
11 Q.  Have you seen this document prior to today,
12    Mr. Borutta?
13 A.  No.
14 Q.  Are you aware that Ms. Acevedo had made a
15    settlement demand on October 12 that you rejected?
16 A.  Yes.
17 Q.  And it says that you want to wait until mediation
18    to discuss settlement, is that correct?
19 A.  Yes.
20 Q.  Why?
21       MR. KLASS:  Object to -- I'm going
22    to object based on attorney-client
23    privilege and work product and direct my
24    client not to answer the question.
25 Q.  (By Ms. Gessner) Mr. Borutta, I don't want to know

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                66

1   anything your lawyer said to you or you said to you
2   lawyer.  I want to understand why it is that you
3   want to wait until mediation to discuss settlement.
4   A.   That's a strategic decision I will not tell you.
5   Q.   A strategic --
6   A.   And it's a question I cannot ask with -- answer
7   with yes or no, so --
8   Q.   It's a strategic decision.  What is it that you
9   think is going to change in this case between
10   yesterday and November 9 at mediation?
11   MR. KLASS:  I'm going to object on
12   the basis of attorney-client
13   communications and attorney work product
14   and instruct the client -- my client not
15   to answer the question.
16   Q.   (By Ms. Gessner) Again so that Mr. Klass can stop
17   hearing himself speak, I don't want to know
18   anything your lawyers have said to you,
19   Mr. Borutta, or that you've said to your lawyers.
20   But your lawyer wrote to me and said that he's
21   talked to you and that you want to wait until
22   mediation to discuss settlement.  I am entitled to
23   ask you your thoughts, your opinions, your why, so
24   help me understand what it is that you believe is
25   going to change between October 12 or 13, when this

MARTIN BORUTTA                67

1   discussion, and November 9 at mediation.
2   A.   Ms. Gessner, maybe nothing will change, but it's my
3   decision.  I do not have to explain you my
4   decision, correct?
5   Q.   Again, you understand that if we prevail for
6   Ms. Acevedo that Teupen would have to pay all of
7   her legal fees.  Do you understand that?
8   MR. KLASS:  Object to the form.
9   A.   Ms. Gessner, I answered your question.  I will not
10   answer any more question because I told you that's
11   in my discretion and I did my decision.  That's
12   what I did.  That's all I did.
13   Q.   (By Ms. Gessner) And you are aware that depositions
14   are expensive, correct?
15   A.   Yes.
16   Q.   And you're aware that you could possibly have to
17   pay for Ms. Acevedo's fees and costs, correct?
18   A.   Yes, I know that.
19   Q.   And can you recall how much money you've spent on
20   legal fees to date?
21   MR. KLASS:  Objection to the form of
22   the question.  Asked and answered.
23   A.   I think you asked me that a third time.  No, I
24   cannot.
25   Q.   (By Ms. Gessner) Do you know if you've spent more

MARTIN BORUTTA                68

1   than $60,000 on legal fees?
2   MR. KLASS:  Objection.  Asked and
3   answered.
4   A.   I don't remember, Ms. Gessner.
5   Q.   (By Ms. Gessner) Do you know if you've spent $5,000
6   on legal fees?
7   MR. KLASS:  Objection.  Asked and
8   answered.
9   MS. GESSNER:  Your objection is
10   improper.  That's a totally different
11   question.  Mr. Klass, I'm going to have
12   to start having her mark the record
13   because your objections are becoming
14   incredibly obstructive to the deposition
15   and they're completely improper.  You get
16   to say object to the form.  That's it.
17   MR. KLASS:  I object to the form and
18   I agree generally that that is the case
19   and I wish you would have followed it
20   yesterday instead of making several
21   speaking objections.
22   MS. GESSNER:  I did not.
23   MR. KLASS:  So I object to the
24   form --
25   MS. GESSNER:  The record -- wait,

MARTIN BORUTTA                69

1   wait, wait.  The record from yesterday
2   will speak for itself.  This is my
3   deposition.  You need to render your
4   objections to form.
5   MR. KLASS:  I object to the form of
6   your question.
7   Q.   (By Ms. Gessner) Mr. Borutta, have you spent more
8   than $5,000 on legal fees with Fisher Phillips?
9   MR. KLASS:  Object to the form.
10   A.   I don't know.  I don't remember.
11   Q.   (By Ms. Gessner) You have no recollection
12   whatsoever as to how much you've spent on this
13   case?
14   MR. KLASS:  Object to the form.
15   A.   No, I have no idea how much we spent on that case.
16   I told you before.
17   Q.   (By Ms. Gessner) Mr. Borutta, how many employees
18   currently work for Teupen in the United States?
19   MR. KLASS:  Object to the form.
20   A.   I think 14, 13 or 14.
21   Q.   (By Ms. Gessner) Please tell me their names.
22   A.   I cannot tell you the names.  I have 180 employees
23   worldwide, so I cannot tell you the names.  If
24   you've got to have something you can show me I can
25   tell me the people are working at Teupen or not,

MARTIN BORUTTA                                                70

1    but I cannot tell you the exact names of the people
2    at Teupen.
3 Q. (By Ms. Gessner) Well, Mr. Borutta, you have
4    refused to give us the current org chart even
5    though the court has compelled you to do so.  So
6    your lawyer says we have to ask you these questions
7    and we're going to take that up with the court.
8    But tell me, you are at the top of the food chain
9    in Charlotte, is that correct?  You're the top in
10   the U.S. with Teupen?
11        MR. KLASS:  Object to the form.
12 Q. (By Ms. Gessner) Is that correct?
13        MR. KLASS:  Same objection.
14 A. I'm not -- I'm on the top of Teupen worldwide, yes,
15   and also in the U.S.
16 Q. (By Ms. Gessner) Who reports directly to you in the
17   United States?
18 A. Mr. Jason Rogers.
19 Q. Please spell the names for the court reporter as
20   you go.
21 A. Jason Rogers, R-o-g-e-r-s.
22 Q. Anyone else?
23 A. No.
24 Q. What is Mr. Rogers' role?
25 A. Operations manager.

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                                                72

1 A. Morgan, M-o-r-g-a-n, E-l-d-e-r, I think.
2 Q. Anyone else?
3 A. No.  I don't recall more names.
4 Q. How long has Mr. Taylor been employed by Teupen?
5        MR. KLASS:  Form.
6 A. I don't know.
7 Q. (By Ms. Gessner) Did Mr. Taylor become -- was he
8    employed with Teupen before you were hired?
9 A. He was, I think so, employed with Teupen before I
10   had the responsibility for the U.S., and that
11   started in August '19.
12 Q. How about Megan Bennett?
13 A. She was with Teupen between before '19, yes.
14 Q. Allen Bennett?
15 A. Same for Allen Bennett.
16 Q. James Crawford?
17 A. Same for James Crawford.
18 Q. And Morgan Elder?
19 A. She started this year.  I think so.
20 Q. Did you hire Ms. Elder?
21 A. I told somebody to accept or to give her an offer.
22 Q. Who did you tell to give her an offer?
23 A. Mr. Rogers, because he is the operations manager.
24 Q. Does Mr. Liebl not work for you anymore?
25 A. No.

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                                                71

1 Q. When was Mr. Rogers hired?
2        MR. KLASS:  Object to the form.
3 A. I don't know.
4 Q. (By Ms. Gessner) Did you hire Mr. Rogers?
5 A. No.
6 Q. Who did?
7        MR. KLASS:  Object to the form.
8 A. I don't know.
9 Q. (By Ms. Gessner) You said a minute ago that you're
10   the only person who does the hiring and firing, so
11   how is it possible that someone else hired
12   Mr. Rogers?
13 A. There was a time at Teupen before my lifetime and
14   my time started in December '16, so there are some
15   things I cannot tell you because I don't know them.
16 Q. So Mr. Rogers was employed by Teupen before you
17   became employed by Teupen?
18        MR. KLASS:  Object to the form.
19 A. That is correct.
20 Q. (By Ms. Gessner) Tell me the names of anyone else
21   of the 13 or 14 people that you can remember
22   sitting here today.
23 A. Mr. James Taylor, Ms. Megan Bennett, Mr. Allen
24   Bennett, Mr. James Crawford, and Ms. Morgan Elder.
25 Q. Spell the last person's name.

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                                                73

1 Q. When did Mr. Liebl cease to work for Teupen?
2 A. I fired Mr. Liebl end of June 2020.
3 Q. June 2020, is that correct?
4 A. Yeah.
5 Q. Why did you fire Mr. Liebl?
6 A. Because of not performing his job duties.
7 Q. Did Mr. Liebl have a contract with Teupen?
8 A. No, I don't think so.
9 Q. Did you pay Mr. Liebl any severance?
10 A. I think so.  I don't remember.
11 Q. Does Ms. Molyn still work for Teupen?
12 A. No.
13 Q. When did Ms. Molyn cease to work for Teupen?
14 A. Ms. Molyn left the company end of 2020.
15 Q. December 2020?
16 A. Yes.
17 Q. Did she quit?
18 A. She quit, yes.
19 Q. You didn't fire her?
20 A. She quit.
21 Q. Just making sure the record is clear as to whether
22   she quit.
23 A. Yeah.
24 Q. Did she complain to you about her working
25   conditions?

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                    74

1  A.   No.
2  Q.   Do you know why she quit?
3  A.   She's from South Carolina and she didn't like the
4       travel, the whole time traveling over the I-85 one
5       and a half hours in the morning and one and a half
6       hours in the evening.  That's what she told me.
7  Q.   Does Teupen currently have a CFO?
8  A.   You've got to be more specific.  Teupen who?
9  Q.   Does Teupen --
10 A.   The group, the Teupen Group or Teupen USA?
11 Q.   Both.  So does Teupen Germany have a CFO?
12 A.   Teupen Germany has a CFO, yes.
13 Q.   Is it the same CFO who's been in place the entire
14      time that you have been the CEO in the United
15      States?
16 A.   Yes.
17 Q.   What's this person's name?
18 A.   Ulf Birkenkamp.
19 Q.   Please spell it.
20 A.   U-l-f B-i-r-k-e-n-k-a-m-p.
21 Q.   Is there a CFO currently in the United States at
22      Teupen?
23 A.   No.
24 Q.   You're using the outsourcing group, is that
25      correct?

---

MARTIN BORUTTA                    75

1  A.   No.
2            MR. KLASS:  Object to the form.
3  Q.   (By Ms. Gessner) You've given me the name of a
4       group.  I think it was CPH or something like that
5       earlier today.
6  A.   CPH is the name and they are doing accounting.
7       They're doing the accounting, is that correct?
8  A.   Yeah.  That's correct.
9  Q.   Are they doing any other kind of financial work for
10      Teupen other than just accounting?
11 A.   No.
12 Q.   Tell me everything CPH is doing for Teupen.
13           MR. KLASS:  Object to the form.
14 A.   The daily accounting business.
15 Q.   (By Ms. Gessner) And how is what they're doing
16      different than what a CFO would do?
17 A.   Do we really need to start to explain what a CFO
18      and accounting is doing?  That would take too long
19      because a CFO is a way different position than just
20      an accountant.  We never had a CFO in U.S., so I
21      don't know why I should explain that.  They are
22      doing accounting, the daily business of an
23      accountant.
24 Q.   Mr. Borutta, I get to ask the questions.  Please
25      answer them.  I don't need commentary.

---

MARTIN BORUTTA                    76

1  A.   Yeah.
2  Q.   So again, please explain to me the difference
3       between what a person who would be in the CFO role
4       in United States would do differently than what the
5       outsourcing CPH is going.
6  A.   CPH is doing daily work of an accountant, and a CFO
7       would do controlling.  He would be responsible for
8       budgets and he would communicate with Germany
9       regarding numbers.
10 Q.   Weren't those some of the same job tasks that you
11      had given to Ms. Acevedo, to be doing the
12      controlling, budgeting, and communicating with
13      Germany regarding the numbers?
14           MR. KLASS:  Object to the form.
15 Q.   (By Ms. Gessner) Is it your testimony that those
16      were not her responsibilities?
17 A.   It's part of her responsibilities.  You cannot put
18      them together.  Ms. Acevedo was not responsible for
19      any budget.  Ms. Acevedo did not do controlling as
20      we understand controlling.  She just sent a form to
21      Germany.  That was all controlling she did, so
22      nothing else.  No comparisons, nothing else.  That
23      was not her job duties.
24 Q.   What was Ms. Sheri Geraghty doing for Teupen in
25      2019?

---

MARTIN BORUTTA                    77

1  A.   I don't know.
2  Q.   You don't know?  You don't know Sheri Geraghty?
3  A.   I know Sheri Geraghty.
4  Q.   How do know Sheri Geraghty?
5  A.   I met her.
6  Q.   You don't know anything about her job
7       responsibilities when she was employed at Teupen?
8  A.   No.
9  Q.   Did Sheri Geraghty leave Teupen while you were the
10      CEO?
11 A.   It was before I became the CEO of Teupen Germany,
12      yes; the CEO of Teupen in the U.S., no.
13 Q.   What is the difference between Teupen Germany and
14      Teupen U.S. other than location?
15 A.   Teupen USA is a legal entity with its own
16      president, own financial everything, so it's a
17      legal entity, and Germany is also a legal entity
18      and Germany is the mother company.
19 Q.   Do they do anything different businesswise?
20 A.   Yes.
21 Q.   Tell me everything that the Teupen German company
22      does that's different than the U.S.
23           MR. KLASS:  Object to the form.
24 A.   German -- Teupen Germany is a production facility.
25      Teupen North America, Inc. is the sales and service

MARTIN BORUTTA                                    78

1    presales facility, so it's just service and sales.
2    There's no production.  It's way less people.
3    Small company.  That's a big difference.
4  Q.  (By Ms. Gessner) So does the sales and service in
5    the U.S. only sell Teupen equipment in the U.S.?
6  A.  Yes.
7  Q.  Is there any sales or selling of equipment in
8    Germany?
9  A.  Teupen Germany sells equipment in Germany.
10 Q.  And produces the equipment, correct?
11 A.  Correct.  Teupen -- Teupen North America is the
12    importer of Teupen machines from Germany.
13 Q.  Right, so they're connected.  You can't sell
14    something that's not being made in the U.S. because
15    you sell it in the U.S. but it has to be shipped
16    from Germany, correct?
17        MR. KLASS:  Object to the form.
18 A.  That is correct.
19 Q.  (By Ms. Gessner) They are not two distinct
20    businesses as far as what they do, correct?  One
21    sells the equipment that the other makes; isn't
22    that true?
23        MR. KLASS:  Object to the form.
24 A.  It's like -- Teupen North America is like all our
25    other service and sales partners in the world.  The

www.thompsonmi
l
l
s.com

---

MARTIN BORUTTA                                    79

1    difference is just that we own Teupen North
2    America.
3  Q.  (By Ms. Gessner) That didn't answer my question,
4    Mr. Borutta.  In the United States, the equipment
5    that is sold here by individuals who work here,
6    they don't make equipment here.  They have to sell
7    it here and it gets shipped from Germany to the
8    United States for any sales that have been made; is
9    that accurate?
10 A.  That is accurate.  Yeah, that's correct.
11 Q.  And you can't recall anything about what Sheri
12    Geraghty did for Teupen North America?
13 A.  No, because I was not in the operational business
14    before '19.
15 Q.  Who was?
16 A.  Mr. David Michael Kesser.
17 Q.  And who is Mr. Kesser?
18 A.  The former president, vice president, sales
19    manager, whatever.  He made a career at Teupen.
20 Q.  He made a career at Teupen?
21 A.  Yeah, he made it.
22 Q.  Did Mr. Kesser hire Ms. Geraghty?
23        MR. KLASS:  Object to the form.
24 A.  I don't know.
25 Q.  (By Ms. Gessner) So prior to you --

www.thompsonmi
l
l
s.com

---

MARTIN BORUTTA                                    80

1        MS. GESSNER:  Well, strike that.
2  Q.  (By Ms. Gessner) Didn't Mr. Kesser report to you?
3  A.  He did.
4  Q.  And he reported to you when he was the person in
5    charge of North America, correct?
6  A.  That is correct.
7  Q.  So it isn't as if you didn't have some
8    responsibility for North America even when you were
9    in Germany because you were responsible for
10    Mr. Kesser, correct?
11        MR. KLASS:  Object to the form.
12 A.  That is correct, but not operational.  Only
13    strategic.
14 Q.  (By Ms. Gessner) Prior to you taking over
15    Mr. Kesser's role in 2019, how much time did you
16    spend in the United States?
17        MR. KLASS:  Object to the form.
18 A.  I don't know exactly, but not very much.  I've been
19    here twice a year, maximum three times a year, but
20    I think twice a year.  I don't remember.
21 Q.  (By Ms. Gessner) How long have you worked for
22    Teupen?
23        MR. KLASS:  Object to the form.
24 A.  As I said before, since December '16.
25 Q.  (By Ms. Gessner) Well, that's Teupen -- is that

www.thompsonmi
l
l
s.com

---

MARTIN BORUTTA                                    81

1    Teupen North America or Teupen generally?
2  A.  You've got to ask me specific, please.  Teupen
3    Germany I started with December 1, 2016, and with
4    the role in Teupen Germany I took over as the sole
5    director of Teupen North America.
6  Q.  Where did you work before Teupen?
7  A.  I had my own company in Germany.
8  Q.  What's the name of it?
9  A.  My name business consulting.
10 Q.  Borutta Business Consulting?
11 A.  Martin Borutta.
12 Q.  Borutta.  I'm sorry.
13 A.  The German name, Unternehmensberatung, but that's
14    business consulting.  It's a German word, so
15    doesn't really matter.
16 Q.  What type of business consulting were you engaged
17    in?
18 A.  Everything, financial, strategic, production.
19 Q.  How long did you own your own company?
20 A.  From 2015 -- or I did that job from 2015 to end of
21    '16 when I started at Teupen.
22 Q.  What was your job -- were you employed before you
23    started your own business?
24 A.  Before my consulting company?  Yes.
25 Q.  Where were you employed before you started your

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                            82

1   consulting company?
2   A.  At Rofa Industrial Automation AG.
3   Q.  Please spell that.
4   A.  Rofa, R-o-f-a, Industrial Automation AG.
5   Q.  And where was this business located?
6   A.  In Germany.
7   Q.  Where in Germany?
8   A.  In -- Kolbermoor is the city, K-o-l-b-e-r-m-o-o-r.
9   Q.  How long were you employed there?
10  A.  From 2007 till 2015, I think.
11  Q.  Have you ever been employed with an employer in the
12      United States prior to Teupen?
13  A.  No, not directly.  I've been working for U.S.
14      companies in my function as CFO, CEO, whatever, so
15      I had already the function as a CEO in the U.S.,
16      but I was not employed by the USA.
17  Q.  What companies were you employed with that had a
18      U.S. entity?
19  A.  Rofa.
20  Q.  Anything else?
21  A.  No.  It was Rofa Conveyor Technology in Greer,
22      South Carolina.
23  Q.  Any other U.S. presence for other employees?
24  A.  The same employer, a company in Ohio.
25  Q.  For Rofa?

MARTIN BORUTTA                            83

1   A.  For Rofa.
2   Q.  Did you grow up in Germany?
3   A.  Yes.
4   Q.  Where?
5   A.  Southern Germany, Bavaria.
6   Q.  Spell it, please.
7   A.  In the state Bavaria, B-a-v-a-r-i-a.
8   Q.  Do you have a college degree?
9   A.  I have a university -- I'm -- how do you call it in
10      the United States?  I'm an engineer, university of
11      applied sciences.  I'm an automotive engineer.
12  Q.  I didn't hear that last part.  A what type of
13      engineer?
14  A.  I'm an automotive engineer and I have an MBA.
15  Q.  Where is your MBA from?
16  A.  Germany and United States.
17  Q.  Where did you go to school in the United States?
18  A.  Katz Business School in Pittsburgh.
19  Q.  Spell that again.
20  A.  Katz, K-a-t-z.
21  Q.  When did you attend Katz?
22  A.  I think in 2000.  I don't recall.  I think it was
23      in 2000.  Couple of years ago.
24  Q.  Were you working in the U.S. at the time that you
25      were attending school?

MARTIN BORUTTA                            84

1   A.  No.
2   Q.  So did you come to the U.S. on a student via?
3   A.  I think so, yes.
4   Q.  Were you a full-time student at Katz?
5   A.  It was only for three months, I think.  It was only
6       part of the MBA program.
7   Q.  Have you had any type of human resources training
8       regarding U.S. laws?
9   A.  No.
10  Q.  Was Insperity in place when you took over for
11      Mr. Kesser?
12  A.  I think, yes.  Mr. -- yeah.  It was in place when I
13      took over from Mr. Kesser.
14  Q.  Why did you decide to end the relationship with
15      Insperity?
16  A.  Because of the high costs of Insperity.
17  Q.  And you didn't replace Insperity with any type of
18      HR function, is that correct?
19  A.  That is correct.
20  Q.  Did you distribute or communicate in any way any
21      company policies after you ceased having a
22      relationship with Insperity regarding how to
23      complain about discrimination or harassment?
24  A.  I think we have the labor law process in the
25      company as we're required to.  That's what we do,

MARTIN BORUTTA                            85

1       yeah.  We display that.
2   Q.  When you say labor laws are you talking about the
3       poster that you get from the Department of Labor?
4   A.  I think so, yes.
5   Q.  Have you produced a copy of all of the company's
6       employment policies in this case?
7   A.  I -- you got to specify that.  I don't know what
8       you're talking about.
9   Q.  Well, once you stopped -- Insperity was the
10      outsourced human resources, correct?
11  A.  Maybe.  I don't know exactly what Insperity did and
12      what they were hired for because it was before my
13      time.
14  Q.  So you just ended the relationship not knowing what
15      they did because of the cost, correct?
16          MR. KLASS:  Object to the form.
17  A.  Yes, because are not having companies like
18      Insperity in Germany.  They are not used there.
19  Q.  (By Ms. Gessner) And you didn't hire a human
20      resources person after you ended the relationship
21      with Insperity, correct?
22  A.  No, I did not.
23  Q.  Did anyone under your supervision hire someone to
24      serve as a human resources representative for
25      Teupen in the U.S.?

Sheet 23  Page 86

MARTIN BORUTTA                                      86

1  A.  No.  It's a 13-people company.  We do not have an
2      HR department.
3  Q.  How do employees know where they should go to make
4      a complaint if they're being discriminated against
5      at Teupen?
6  A.  They're informed -- they're informed by their
7      supervisor.
8  Q.  How do they know, if they have a complaint about
9      their supervisor, who to go to?
10         MR. KLASS:  Object to the form.
11  A.  They know the chain of command, they know the
12      supervisor and they know the CEO because it's a 13-
13      people company.
14  Q.  (By Ms. Gessner) So an employee, you're saying like
15      Ms. Acevedo, her job was to come to you to complain
16      about discrimination and harassment just like she
17      did, at least on December 20?
18         MR. KLASS:  Object to the form.
19  A.  She did not complain.  You're trying to -- putting
20      words in my mouth I never said, so please rephrase
21      your question.  I cannot answer the question
22      because it's not correct.
23  Q.  (By Ms. Gessner) Mr. Borutta, you've already
24      testified Ms. Acevedo complained to you about
25      Mr. Liebl and Ms. Molyn at least as early as

Page 87

MARTIN BORUTTA                                      87

1      December 20, correct?
2         MR. KLASS:  Object to the form.
3  A.  I testified and I told you that Ms. Acevedo said
4      she doesn't like to work with Mr. Liebl and
5      Ms. Molyn and she doesn't like them.  That's all I
6      said before and that's all I have to say today to
7      you.
8  Q.  (By Ms. Gessner) And if her testimony --
9  A.  The question was different.  Try again.
10  Q.  Are you finished?
11  A.  Now I am.
12  Q.  Mr. Borutta, if Ms. Acevedo's testimony is
13      different, her recollection of her conversation
14      with you is that she expressly told you she was
15      being treated and treated poorly by Mr. Liebl and
16      discriminated against, it would be your word
17      against hers; no one else heard this conversation,
18      correct?
19         MR. KLASS:  Object to the form.
20  A.  If I -- if I recall correctly, that's one of the
21      things I recall from yesterday that I found very
22      interesting, that Ms. Acevedo said that Mr. Liebl
23      was arrogant and he was talking German and then he
24      felt -- she felt offended.  It's very interesting
25      that when I'm talking German then I am harassing

Page 88

MARTIN BORUTTA                                      88

1      people.  That's very strange for me.  Sorry to say
2      that today, but I cannot follow up, and she did not
3      understand what he was saying because she's not
4      speaking German, but after that she wants to try to
5      say she was offended by him and mistreated?  Sorry,
6      no.  And she never, ever had any issue.  Instead,
7      the only one I told you before, when she told me
8      December 20 that she doesn't like them and doesn't
9      want to work with them, and that's not a complaint
10      about harassment or anything else.  That's -- I
11      told you in the beginning everything in that case
12      is frivolous.  That's just made up and that's all I
13      have to say.
14  Q.  (By Ms. Gessner) Well, Mr. Borutta, isn't it true
15      that Ms. Acevedo told you that she did not like
16      working with them because of the way they were
17      treating her?
18         MR. KLASS:  Object to the form.
19  A.  That is not true.  I just told you.
20  Q.  (By Ms. Gessner) And no one else was present for
21      this conversation between you and Ms. Acevedo,
22      correct?
23         MR. KLASS:  Object to the form.
24  A.  No, no one else was present.
25  Q.  (By Ms. Gessner) Excuse me?

Page 89

MARTIN BORUTTA                                      89

1  A.  No one else was present.
2  Q.  No one else heard this conversation other than you
3      and Ms. Acevedo; is that accurate?
4         MR. KLASS:  Object to the form.
5  A.  That is accurate.
6  Q.  (By Ms. Gessner) And if she says the conversation
7      is completely different, it's your word against
8      hers, correct?
9         MR. KLASS:  Object to the form.
10  A.  I think so, yes.
11  Q.  (By Ms. Gessner) And, Mr. Borutta, again we've been
12      through this, but just so we have a clear record,
13      once Ms. Acevedo complained to you that you just
14      testified about, you didn't do anything to
15      investigate her claims, did you?
16         MR. KLASS:  Object to the form.
17  A.  Ms. Gessner, that is a question of understanding
18      whether somebody complains or just tells you I
19      don't want to do something.  So I didn't understand
20      that in any way as a claim and she didn't express a
21      claim and she never sent me any -- never sent me
22      anything in written -- any statement that she feels
23      mistreated.  That was a two- or three-minute
24      conversation on December 20 in my office.  That's
25      -- I told you before.

**Sheet 24   Page 90**

MARTIN BORUTTA                                    90

1  Q.  (By Ms. Gessner) Well, was it in your office or was
2      it at the Christmas party?
3  A.  It was at -- during the Christmas party in my
4      office.
5  Q.  And no one else was present in your office other
6      than you and Ms. Acevedo, correct?
7  A.  No.  You heard from Ms. Acevedo that I had my
8      antisocial day, so social day, that's what she
9      testified yesterday.  Very funny, because I am not
10     antisocial.  I had a conversation with her and that
11     was a short conversation.
12 Q.  You didn't record this conversation, did you?
13 A.  I normally have witnesses.  Not that day.  No, I
14     did not record the conversation.
15 Q.  And again, you didn't do anything to follow up and
16     determine or find out why Ms. Acevedo had
17     complained to you about how she was being treated
18     by Mr. Liebl and Ms. Molyn, correct?
19     MR. KLASS:  Object to the form.
20 A.  And again, Ms. Gessner --
21 Q.  (By Ms. Gessner) Mr. Borutta, Mr. Borutta, you are
22     wasting time that we're going to have to add to the
23     end of this deposition.  You're being
24     nonresponsive.  Did you do anything to follow up
25     with Ms. Acevedo about the complaint she made to

www.thompsonmi
1
1
s.com

**Page 91**

MARTIN BORUTTA                                    91

1      you on that day?
2      MR. KLASS:  Object to the form.
3  A.  She did not made a complaint of treatment, so --
4  Q.  (By Ms. Gessner) Mr. Borutta, not my -- that wasn't
5      my question.  Did you have any other conversations
6      at all with Ms. Acevedo about what she told you on
7      December 20?
8      MR. KLASS:  Object to the form.
9  A.  No, I did not, because Ms. Acevedo was on vacation
10     from December 23 to 20 -- I think 30 was the first
11     workday for her.
12 Q.  (By Ms. Gessner) On December 30, did you have a
13     conversation with Ms. Acevedo about the complaint
14     she made had to you about Mr. Liebl and Ms. Molyn?
15 A.  No, I did not, because I didn't see her.
16 Q.  Have you ever hired in the United States an
17     employee who is Latino?
18 A.  I don't know.
19 Q.  Have you ever hired an employee who is black?
20 A.  I had black employees.
21 Q.  Who are the black employees that you have currently
22     employed?
23 A.  In the company in Ohio and one in the company in
24     South Carolina, but that's a couple of years ago.
25 Q.  Currently employed with Teupen, do you have any

www.thompsonmi
1
1
s.com

**Page 92**

MARTIN BORUTTA                                    92

1      black employees in the United States?
2  A.  No.
3  Q.  And since you took over for Mr. Kesser have you
4      hired a black employee in the United States?
5  A.  No.
6  Q.  And how is it that you know when someone is black?
7  A.  I guess when I see the color of the skin that I can
8      imagine that it's black people.  Is that correct?
9  Q.  Just like you can tell with the color of the skin
10     if someone is of descent they have darker skin and
11     darker hair just like Ms. Acevedo, correct?
12     MR. KLASS:  Object to the form.
13 A.  No, that is not correct.  I disagree with that.
14 Q.  (By Ms. Gessner) So again it's your testimony that
15     you don't know whether you've hired anyone of Latin
16     descent in the U.S. before, correct?
17     MR. KLASS:  Object to the form.
18 A.  That is correct.  Yes.
19 Q.  (By Ms. Gessner) Is everyone who currently works --
20     of the 14, 13, 14 people who work for Teupen today,
21     is everyone white?
22     MR. KLASS:  Object to the form.
23 A.  I don't know.
24 Q.  (By Ms. Gessner) Have you seen all 13 or 14
25     employees who work in the U.S. under your

www.thompsonmi
1
1
s.com

**Page 93**

MARTIN BORUTTA                                    93

1      supervision?
2  A.  I see them from time to time.  In operational they
3      are working under Mr. Rogers' supervision.
4  Q.  During your time to time seeing these 13 to 14
5      employees, have you ever seen anyone who wasn't
6      white that currently works there?
7      MR. KLASS:  Object to the form.
8  A.  I don't know.
9  Q.  (By Ms. Gessner) You don't know whether you have
10     any employee who is not white?
11     MR. KLASS:  Object to the form.
12 A.  No, because I cannot follow your description of
13     nonwhite.  I don't know.
14 Q.  (By Ms. Gessner) Well, do you know the difference
15     between someone who is Caucasian and white versus
16     someone is dark skinned and either black or brown?
17     MR. KLASS:  Object to the form.
18 A.  I think it's easy to see a difference between black
19     and white.  Anything else I cannot tell you.
20     That's why I don't understand why you're asking me
21     that.  That doesn't matter.  No, I don't know.
22 Q.  (By Ms. Gessner) Do you have anyone who is employed
23     currently with Teupen who has a last name that
24     sounds as if it perhaps could be Latino?
25     MR. KLASS:  Object to the form.

www.thompsonmi
1
1
s.com

MARTIN BORUTTA                                94
1  Q.  (By Ms. Gessner) Like Ms. Acevedo.
2  A.  I don't know.
3  Q.  And you haven't produced an org chart for us to be
4      able to go through and determine; is that accurate?
5          MR. KLASS:  Object to the form.
6  A.  No, I think that's not accurate because the org
7      chart doesn't say nothing about people.  It says
8      something about the organization.  You're talking
9      about two different things.
10 Q.  (By Ms. Gessner) Is it your testimony, Mr. Borutta,
11     that that org chart doesn't have people's names on
12     it?
13         MR. KLASS:  Object to the form.
14 A.  If you'd let me finish -- if you would let me
15     finish I could explain what I was talking about, so
16     please let me finish.  An org chart is an org chart
17     that shows organization.  I provided personal
18     information of all people working with names since
19     been there at Teupen and whether they are full-time
20     employed or not.  That's what I provided, and
21     anything else, I don't know what you're asking me.
22 Q.  (By Ms. Gessner) Do you not understand my question,
23     Mr. Borutta?
24 A.  I think you did not understand my answer.  Maybe
25     you'd better ask again.
www.thompsonmi
1
1
s.com

MARTIN BORUTTA                                95
1  Q.  No, I understood your answer.  It was
2      nonresponsive.  I'm asking if you didn't understand
3      my question.  You didn't provide us a list of an
4      org chart reflecting each person's position and
5      their name, have you?
6          MR. KLASS:  Object to the form.
7  A.  I don't know whether you were provided it.  I
8      provided it, so that's why I cannot answer your
9      question.
10 Q.  (By Ms. Gessner) So you don't know what your
11     lawyers have given us and what they haven't?
12         MR. KLASS:  Object to the form.
13 A.  No, because I'm not a lawyer.
14 Q.  (By Ms. Gessner) But you are the person who hired
15     Fisher Phillips to represent Teupen, correct?
16 A.  That's correct.
17 Q.  And it's your testimony they send us things and you
18     don't have a clue what they send or don't send?
19         MR. KLASS:  Object to the form.
20 A.  I send my information to my lawyer and my lawyer
21     will send you whatever he has to send you.
22 Q.  (By Ms. Gessner) Did you review the discovery
23     responses before that were served in this case?
24         MR. KLASS:  Object to the form.
25 A.  I think so.  I don't remember.
www.thompsonmi
1
1
s.com

MARTIN BORUTTA                                96
1  Q.  (By Ms. Gessner) When do you recall last reviewing
2      discovery responses in this case?
3          MR. KLASS:  Object to the form.
4  A.  I don't remember, Ms. Gessner.
5  Q.  (By Ms. Gessner) Did you review discovery responses
6      last week?
7          MR. KLASS:  Object to the form.
8  Q.  (By Ms. Gessner) Counsel is talking over you, so
9      please repeat your question --
10 A.  I don't --
11 Q.  -- I mean, sorry -- please repeat your answer.
12 A.  I don't remember.
13 Q.  And you don't remember whether you were provided a
14     copy of the court's order requiring you to give us
15     documents in this case, correct?
16         MR. KLASS:  Object to the form.
17 A.  I don't remember.
18 Q.  (By Ms. Gessner) Do all employees at Teupen have
19     employment agreements?
20         MR. KLASS:  Object to the form.
21 A.  Which Teupen you're talking about?
22 Q.  (By Ms. Gessner) Teupen North America.
23 A.  Okay.  No.
24 Q.  Which employees under your supervision right now
25     currently have employment agreements?
www.thompsonmi
1
1
s.com

MARTIN BORUTTA                                97
1          MR. KLASS:  Object to the form.
2  A.  I think I -- it's only one person.
3  Q.  (By Ms. Gessner) Okay.  Who is it?
4  A.  It's -- it's good you asked me.  Patrick Blackburn.
5      He's also the national sales manager.  He's also
6      since, I don't know, with Teupen, '16, '15.  I
7      don't know.  He has one.
8  Q.  What's Patrick's last name again?  Please spell it
9      for the record.
10 A.  Blackburn, B-l-a-c-k, burn.
11 Q.  And what's Patrick's race?
12         MR. KLASS:  Object to the form.
13 A.  He's a white male.
14 Q.  (By Ms. Gessner) Is Morgan Elder a white woman?
15         MR. KLASS:  Object to the form.
16 A.  I don't know.  I didn't hire her.
17 Q.  (By Ms. Gessner) Have you ever met her?
18 A.  I see her from time to time.
19 Q.  Is she white?
20         MR. KLASS:  Object to the form.
21 A.  I cannot tell you, Ms. Gessner.  You're asking the
22     same thing again.
23 Q.  (By Ms. Gessner) Does she have black skin?
24 A.  She does not have black skin.  That's what I --
25 Q.  Does she have brown skin?
www.thompsonmi
1
1
s.com

MARTIN BORUTTA                                    98

1  MR. KLASS:  Object to the form.
2  A.  I don't know.
3  Q.  (By Ms. Gessner) So it's your testimony you don't
4      know what color her skin is?
5  A.  Yes, that's my testimony.
6  Q.  Are you colorblind, Mr. Borutta?
7  A.  No, but I'm not really looking very deep in colors
8      of my employees because I'm running a company with
9      200 people, worldwide business, and I don't care
10     which color your skin is.
11 Q.  And, Mr. Borutta, you keep making me distinguish
12     between, so you do consider yourself as having all
13     of the employees under your watch, right?  So all
14     of Germany and all of U.S., it's all under your
15     watch, correct?
16     MR. KLASS:  Object to the form.
17 A.  Ms. Gessner, however you want to call under your
18     watch, I take -- I always take a decision.  That
19     doesn't mean that I know every employee.
20 Q.  (By Ms. Gessner) But you just said a minute ago, at
21     least in the U.S., you don't have human resources
22     and you say all employees know that if they have a
23     problem they're supposed to come to the CEO; is
24     that accurate?
25     MR. KLASS:  Object to the form.

MARTIN BORUTTA                                    99

1  A.  That's accurate.
2  Q.  (By Ms. Gessner) And you are the CEO, correct?
3  A.  Correct.
4      MR. KLASS:  I'd like to take a
5      break.
6      MS. GESSNER:  Excuse me?
7      MR. KLASS:  I'd like to take a
8      break.
9      MS. GESSNER:  Sure.  How long do you
10     need?  Ten minutes.
11     MR. KLASS:  Yeah, 10 minutes.  Thank
12     you.
13     MS. GESSNER:  Off the record.
14 (RECESS)
15 Q.  (By Ms. Gessner) We're back on the record after a
16     short break requested by your counsel.  Did you
17     speak with Mr. Klass during the break?
18 A.  Yes, I spoke with Mr. Klass during the break.
19 Q.  What did you speak with Mr. Klass about?
20 A.  Strictly confidential.  No, I talked to him about
21     my flight to Las Vegas, my next exhibition next
22     week.
23 Q.  Anything else?
24 A.  Yeah, that I love Las Vegas.  It's pretty warm
25     there.

MARTIN BORUTTA                                    100

1  Q.  Anything else?
2  A.  There was not enough time to talk more about Las
3      Vegas and my flight.
4  Q.  Are you going to Las Vegas on vacation?
5  A.  No, exhibition.
6  Q.  What kind of exhibition?
7  A.  American Rental Association.
8      MR. KLASS:  Before we go further I
9      would just like to note that we'd like to
10     take a lunch break at around 12:45 if
11     that's okay.
12     MS. GESSNER:  Sure, that's fine.
13     How long do you want?
14     MR. KLASS:  I think 45 minutes
15     worked well yesterday, so we'd ask for
16     that again today.
17     MS. GESSNER:  Sure.  No problem.
18     Just remind me if we get close and I
19     haven't stopped yet because I don't tend
20     to look at the clock.
21     MR. KLASS:  Okay.  Thank you.
22 Q.  (By Ms. Gessner) Mr. Borutta, I'm going to show you
23     a document.  Is there a document on your screen,
24     Mr. Borutta?
25 A.  There's a document on my screen.

MARTIN BORUTTA                                    101

1  Q.  It's a one-page document.  It has been introduced
2      by Teupen in this case, Bates label 2Teupen0003.
3      Have you seen this document before, Mr. Borutta?
4  A.  Yes, I think so.
5  Q.  When did you last see this document?
6  A.  I don't remember.
7  Q.  Did you request this document be prepared by
8      Insperity on May 18, 2021?
9  A.  I don't remember.  Maybe.  I don't remember.
10 Q.  Did you contact Insperity about this case in order
11     to get this information?
12 A.  I contacted Insperity to get some other
13     information.  That's what I remember.
14 Q.  So you have seen this as early as May 18, 2021,
15     correct?
16     MR. KLASS:  Object to the form.
17 A.  I don't remember.
18 Q.  (By Ms. Gessner) Did you review this document in
19     preparation for your deposition today?
20 A.  No.
21 Q.  Since we had some difficulty remembering who people
22     are and what their race is and their different
23     positions, does this document refresh your
24     recollection?
25 A.  It does not because I don't know the races of

MARTIN BORUTTA                    102

1  people because I told you before.
2  Q.  Do you see in the far right corner under the word
3      race the race listed for each employee?
4  A.  Yeah.  There's a column.
5  Q.  And do you see that Ms. Acevedo is referenced as
6      being Hispanic or Latino?
7  A.  I can see that.
8  Q.  And you see Jason Rogers -- I'm sorry -- yeah,
9      Jason Rogers is listed as American Indian?
10 A.  I see that listed, yes.
11 Q.  And you see that Cassandra Traveso is also listed
12     as Hispanic or Latino?
13 A.  I see that listed.
14 Q.  And everyone else is white, correct?
15 A.  On the list?
16 Q.  Yeah, on the list in front of you that's Exhibit 4
17     to your deposition, everyone else is white,
18     correct?
19 A.  Correct.
20 Q.  Who was Cassandra Traveso?
21 A.  She was the former marketing associate.  I met her,
22     I don't know, two times, three times.  I don't
23     remember.
24 Q.  Did you terminate her?
25 A.  No.

www.thompsonmi
                    1
                    1
                s.com

MARTIN BORUTTA                    103

1  Q.  Do you know why she left Teupen?
2  A.  No, I don't know.
3  Q.  Are you aware that Ms. Traveso had complained about
4      the way she was being treated at Teupen?
5  A.  No, I do not.
6  Q.  You're not aware of that?
7  A.  No, I am not aware.
8  Q.  Are you aware that she had complained about how she
9      was being treated because she is Latino?
10 A.  As I said before, I am not aware of any claims for
11     her, so how should I be aware of that claim?
12 Q.  Are you aware that Ms. Traveso had complained
13     specifically about you smoking in the building and
14     affecting her health?
15 A.  No, I am not aware of that.
16 Q.  No one ever investigated her claims, is that
17     correct?
18         MR. KLASS:  Object to the form.
19 A.  I don't know because I'm not aware of her claim, so
20     I cannot tell you whether it was investigated or
21     not and whether there were claims or not.  I don't
22     know the claim, so you can tell me anything.  I
23     don't know.
24 Q.  (By Ms. Gessner) Were you the CEO of Teupen North
25     America on September 25, 2019?

www.thompsonmi
                    1
                    1
                s.com

MARTIN BORUTTA                    104

1  A.  I think so, yes.
2  Q.  And it's your testimony that you had no knowledge
3      of Ms. Traveso's complaints?
4  A.  Yes, I had no knowledge of any complaint.  That is
5      correct.
6  Q.  And you mentioned Patrick Blackburn.  Isn't it true
7      that Ms. Traveso was dating Mr. Blackburn and you
8      were aware of that?
9  A.  Maybe.
10 Q.  Is that a maybe you were aware?
11 A.  I think they had an apartment together, but I don't
12     know.  I don't ask people about their private life.
13     That's not my business.
14 Q.  How is it that you think they had an apartment
15     together?
16 A.  Because I think Patrick told me once.
17 Q.  Do you socialize with some employees outside of
18     work?
19 A.  I do not.
20 Q.  You never socialized with Mr. Blackburn outside of
21     work?
22 A.  Just when we are outside for an exhibition, for
23     example, but then it's work-related.
24 Q.  Is Mr. Blackburn going to Vegas with you?
25 A.  He's on the sales team.  Yes, he is going.  Yes.

www.thompsonmi
                    1
                    1
                s.com

MARTIN BORUTTA                    105

1  Q.  Does he still live with Ms. Traveso?
2          MR. KLASS:  Object to the form.
3  A.  I don't know.
4  Q.  (By Ms. Gessner) When is the last time you saw
5      Ms. Traveso?
6  A.  I don't know.  Mid of '19.  I don't remember.
7  Q.  Take a look.  All of the folks listed on this
8      Exhibit 4, it indicates that their term date was
9      12/31/2019.  Is that accurate?
10         MR. KLASS:  Object to the form.
11 A.  No, but I -- I didn't check this.  It was produced
12     by Insperity, so no, it's not right.  I think that
13     because they renewed the policy the next year or
14     because we cancelled the policy, that's why they
15     were terminated at Insperity may be the reason.  I
16     don't know.
17 Q.  (By Ms. Gessner) Take a look at this list, and my
18     question -- I have two questions for you.  The
19     first question is, who on this list did you
20     terminate, and the second question will be, when
21     and why?
22 A.  Ms. Acevedo, beginning of 2020, lack of
23     performance.  Mr. Ralph Baer, I don't remember
24     when, mid of '19, lack of performance, damages to
25     the company.  Mr. Robert Blackburn in 20 -- this

www.thompsonmi
                    1
                    1
                s.com

MARTIN BORUTTA                      106

1  year, I think, so -- lack of performance.
2  Mr. Christopher Collins, April or May 2020, lack of
3  performance.  I do not know who Steven Fore is.
4  That was before my time.  Misty Goins, lack of
5  performance.  Mr. David Kesser, I not allowed to
6  talk about that.  It's confidential, but he was
7  terminated by me.  Mr. Andreas Liebl, lack of
8  performance, mid of '20.  Mr. Benjamin Taft, lack
9  of performance, mid of '19.  Mr. Trainer, it's also
10 confidential.  Made a severance agreement, mid '19,
11 lack of performance.  I think Mr. Walbridge left on
12 himself.  He was for a couple of months.  I don't
13 know.  He was in training.  And Mr. Bradley Welch,
14 that was in summer last year, I think, so lack of
15 performance.  He was a termination.
16 Q.  So of those people that you named that you
17     terminated, tell me, other than Ms. Acevedo, anyone
18     who had complained to you about how they were being
19     treated before you terminated them.
20 A.  As I said before, there was not a single complaint
21     regarding treatment as I was aware of from nobody.
22 Q.  Other than Ms. Acevedo, correct?
23 A.  Yeah, she did not complain how she was treated.
24     I told you that before.  Don't try to put my words.
25 Q.  Ms. Acevedo complained and then was terminated.

MARTIN BORUTTA                      107

1      All the people you just listed, none of those
2      people had made any prior complaints, is that
3      correct?
4          MR. KLASS:  Object to the form.
5  A.  No, that's not correct.
6  Q.  (By Ms. Gessner) And Ms. Acevedo, you had no
7      performance problems whatsoever prior to Mr. Liebl
8      being brought into Teupen, correct?
9          MR. KLASS:  Object to the form.
10 A.  No, that's not correct.
11 Q.  (By Ms. Gessner) Tell me every performance issue
12     that Ms. Acevedo had prior to bringing in your
13     friend Mr. Liebl.
14         MR. KLASS:  Object to the form.
15 A.  You've got to rephrase your question, knowing that
16     Mr. Liebl is a friend of mine.
17 Q.  (By Ms. Gessner) That Mr. Liebl is not a friend of
18     yours?
19 A.  I cannot answer the question because maybe the
20     content is wrong, so please ask the question again.
21 Q.  Tell me what part of the question you do not
22     understand, Mr. Borutta.
23 A.  You said I have to answer a question that I brought
24     in a friend of mine.  You can ask me about
25     Mr. Liebl, yes, and then I will answer your

MARTIN BORUTTA                      108

1      question.
2  Q.  Mr. Liebl was a friend prior to you bringing him on
3      at Teupen, correct?
4  A.  That's the question?  How do you define friend?  So
5      that's fine.  Just ask about Mr. Liebl, not whoever
6      your friends are.
7  Q.  Were you friends -- were you social acquaintances
8      with Mr. Liebl before you hired him?
9  A.  In former times.
10 Q.  And when were you friends with Mr. Liebl before you
11     hired him?
12 A.  2015.  I met him last in 2015.
13 Q.  Where did you --
14 A.  I saw before I hired him.
15 Q.  I'm having a little bit of a tough time hearing
16     you, so I'd ask you to speak and maybe lean
17     forward.
18 A.  It was the last -- it was the last -- it was the
19     time I met him during my former job, so --
20 Q.  How is it that you came to meet Mr. Liebl during
21     your former job?
22 A.  He was an employee.
23 Q.  What was the name of that company again?
24 A.  Rofa.
25 Q.  So you worked with Mr. Liebl at Rofa, correct?

MARTIN BORUTTA                      109

1  A.  That's correct.
2  Q.  In the United States or in Germany?
3  A.  In the United States.
4  Q.  And how is it that you decided to hire Mr. Liebl to
5      come to work for you at Teupen?
6  A.  I needed a person that I can trust because I had to
7      fire some people I couldn't trust and I didn't know
8      whether I can trust Ms. Acevedo.
9  Q.  How is it -- why is it that you trusted Mr. Liebl?
10 A.  I know him from my -- from his former job and his
11     former job duties.  That's why I trusted Mr. Liebl.
12 Q.  I think a minute ago you said you fired Mr. Liebl
13     because he wasn't doing his job, is that right?
14 A.  I fired him in 2020 from Teupen, but I did not fire
15     him from Rofa, so you see the difference in
16     between.  It's a couple of years ago.
17 Q.  Well, what changed?  You trusted him when you hired
18     him at Teupen, but then at some point you didn't
19     trust him enough, you fired him?
20 A.  He didn't perform.  It didn't work out, so --
21 Q.  What exactly was Mr. Liebl not doing that you
22     thought he should be that caused his termination?
23 A.  He did not fulfill the role as he should fulfill
24     his role, so --
25 Q.  What was his role?

MARTIN BORUTTA                          110
1  A.  Operations manager.
2  Q.  What is it that he should have been doing?
3  A.  He should have been more technically involved in
4      our product and understand our product and support
5      customers and service.  That's what his role would
6      have been mainly.
7  Q.  And what is it that Mr. Liebl did that was not
8      fulfilling those roles?
9  A.  All that what I just explained he did not fulfill.
10 Q.  And you think you paid him severance, correct?
11 A.  I think so.
12 Q.  Did he have a contract with Teupen at the time you
13     terminated him?
14 A.  No.
15 Q.  Was he terminated for cause?
16         MR. KLASS:  Object to the form.
17 A.  No.
18 Q.  (By Ms. Gessner) Who is performing Mr. Liebl's job
19     duties?  Is that Mr. Jackson?
20 A.  Mr. Rogers.
21 Q.  Rogers?
22 A.  (Nods head.)
23 Q.  Where does Mr. Liebl work now?  Do you know?
24 A.  I don't know.
25 Q.  So you knew Mr. Liebl before you brought him into

www.thompsonmi
1
1
s.com

MARTIN BORUTTA                          111
1      Teupen and you brought him in believing you could
2      trust him more than anyone else, correct?
3  A.  That is correct.
4  Q.  And so when Ms. Acevedo complained to you about
5      Mr. Liebl, who you knew before, you didn't believe
6      her, did you?
7          MR. KLASS:  Object to the form.
8  A.  She didn't complain about Mr. Liebl.  She said she
9      doesn't like him and she doesn't want to work with
10     him.  That's not a complaint about him.  That's an
11     impression of her own emotions, not a complaint.
12 Q.  (By Ms. Gessner) But that's your word against hers,
13     isn't it, because no one else was present for what
14     she actually said to you?
15 A.  You can repeat that 10 times a day.
16         MR. KLASS:  Object to the form.
17 A.  Yes.  If you want to repeat it 10 times, please do
18     it.  It will be always the same.
19 Q.  (By Ms. Gessner) I just want to make sure the
20     record is clear each time you bring it up what your
21     version of the facts are compared to what she says
22     happened.
23 A.  Yeah.
24 Q.  If Ms. Acevedo had complained to you about the fact
25     that she was being treated poorly by Mr. Liebl

www.thompsonmi
1
1
s.com

MARTIN BORUTTA                          112
1      because of her -- the color of her skin and because
2      of her heritage, what would you have done?
3          MR. KLASS:  Object to the form.
4  A.  Would have started an investigation about the
5      mistreatment because that's what we normally do if
6      somebody claims that.
7  Q.  (By Ms. Gessner) Walk me through the investigation
8      process as to what you just testified you normally
9      do.
10         MR. KLASS:  Object to the form.
11 A.  I can tell you what we do in Germany when we get a
12     complaint, but in Germany we also have, how is it
13     called, I think a workers committee.  We talk to
14     the people --
15 Q.  (By Ms. Gessner) Mr. Borutta, I want to know what
16     you do in the United States, not Germany.
17 A.  Okay.
18 Q.  So what do you do in the United States at Teupen
19     when an employee is complaining of discrimination
20     or harassment?
21         MR. KLASS:  Object to the form.
22 A.  Yes.  The protocol, they complain and do an
23     interview with the parties that are involved and
24     then we will discuss it and then we will find a
25     way, whether we get to take legal actions or what

www.thompsonmi
1
1
s.com

MARTIN BORUTTA                          113
1      we have to do.
2  Q.  (By Ms. Gessner) Who is we?
3  A.  We, that's me and the involved supervisor if a
4      supervisor is involved.  I don't do interviews on
5      my own because I always want to have a witness.
6  Q.  So when an employee complains about their
7      supervisor, you're saying part of your
8      investigation process are you and that supervisor
9      to conduct the investigation?
10         MR. KLASS:  Object to the form.
11 A.  Yeah.  As that does not make sense, that supervisor
12     will not be involved.
13 Q.  (By Ms. Gessner) So in the event that Ms. Acevedo
14     was complaining about Mr. Liebl, who should have
15     been involved in the investigation?
16         MR. KLASS:  Object to the form.
17 A.  Ms. Acevedo did not complain about Mr. Liebl, so
18     nobody was involved in the investigation because
19     she said she doesn't like him and she doesn't want
20     to work with him.
21 Q.  (By Ms. Gessner) But, Mr. Borutta, for a clear
22     record, that's your version of what was said during
23     this meeting between you and Ms. Acevedo, correct?
24         MR. KLASS:  Object to form.
25 A.  Correct.

www.thompsonmi
1
1
s.com

MARTIN BORUTTA                          114

1  Q.  (By Ms. Gessner) You didn't tape record or audio
2      record or in any way record what was said during
3      this meeting, correct?
4  A.  Correct.
5  Q.  I'm asking you -- I'm trying to understand Teupen's
6      policy under you as the CEO.  When an employee like
7      Ms. Acevedo complains to you, the CEO, about her
8      immediate supervisor, what would normally happen?
9      I know you think she didn't.  Your testimony is it
10     didn't happen; her testimony is it did.  I'm asking
11     you, if she complained to you, what should have
12     happened as far as part of Teupen's policy or
13     practice?
14         MR. KLASS:  Object to the form.
15 A.  If an employee at Teupen would claim that he's
16     being whatever, it's harassment or retaliation or
17     whatever, and people claim it at me and it is his
18     supervisor, there will be an investigation,
19     interviews with the employee and the supervisor,
20     and then I would have to think about what the next
21     steps are with legal counsel consultation.  That's
22     what I would do.
23 Q.  (By Ms. Gessner) And at no point did you do any
24     type of investigation regarding Ms. Acevedo's
25     complaints, correct?

MARTIN BORUTTA                          115

1          MR. KLASS:  Object to the form.
2  A.  Ms. Gessner, we are running in a circle.  She had
3      no complaints.
4  Q.  (By Ms. Gessner) And is this policy written
5      anywhere that an employee can go and take a look at
6      it that you just described about how an
7      investigation is conducted when someone complains?
8  A.  I don't know.
9  Q.  Have you ever looked?
10 A.  I don't know.
11 Q.  And again, just for a clear record, you never had
12     another conversation with Ms. Acevedo after
13     December 20, correct?
14         MR. KLASS:  Object to the form.
15 A.  What do you mean with another conversation?
16 Q.  (By Ms. Gessner) Did you ever meet with Ms. Acevedo
17     after December 20?
18 A.  No.
19 Q.  Did you ever Zoom call Ms. Acevedo after
20     December 20?
21 A.  No.
22 Q.  Did you ever pick up the phone and call Ms. Acevedo
23     after December 20?
24 A.  I could not pick up the phone because I had no
25     possibility of talking to her on the phone.  No, I

MARTIN BORUTTA                          116

1      did not.
2  Q.  Well, why couldn't you talk to her on the phone?
3  A.  That depends on the specific day, but the days
4      you're talking about following after December 20 I
5      was not available, so I did not talk to her.
6  Q.  So you were not available, therefore you did not
7      make any effort to speak to Ms. Acevedo, correct?
8  A.  She did not make any effort to talk to me.
9  Q.  I didn't ask you about what she did.  I'm asking
10     about what you did.  You didn't --
11 A.  I did not -- I did not --
12 Q.  Let me finish my question first and I'll let you
13     answer.  You didn't make any effort to reach out
14     and speak with Ms. Acevedo at any point in time
15     after December 20, correct?
16         MR. KLASS:  Object to the form.
17 A.  I did not.
18 Q.  (By Ms. Gessner) I'm going to share another
19     document with you, Mr. Borutta, that's been marked
20     as Exhibit 5 to your deposition.  Do you recognize
21     this document?  It's 2Teupen00006.
22 A.  I don't remember.  It looks like an Insperity
23     document.  I don't know.
24 Q.  Well, Insperity ceased to be your PEO on
25     12/31/2019, correct?

MARTIN BORUTTA                          117

1  A.  Yep, that's correct.  Insperity ended '19.
2  Q.  Who prepared this document?
3  A.  I think I did, but I don't remember.
4  Q.  Do you have the original --
5          MS. GESSNER:  Well, strike that.
6  Q.  (By Ms. Gessner) Was this an Excel spreadsheet that
7      you prepared?
8  A.  Possibly, yes.
9  Q.  Do you have the original spreadsheet in your
10     possession?
11 A.  I don't know.  I would have to check.
12 Q.  Are all the individuals on this Exhibit 5 still
13     employed with Teupen other than those that have a
14     date in the termination column?
15 A.  We talked before about Robert Blackburn.  Randy
16     Green is not any longer with the company.  Tim
17     Hickman left the company.  We talked about
18     Mr. Liebl was fired.  Marc MacAlpine is not any
19     longer with Teupen.  Ms. Molyn we talked about is
20     not any longer with Teupen.  Mr. Turner, he has a
21     date, so -- and James Wood, he was like an intern.
22     He's not any longer with the company.
23 Q.  Of these employee who are no longer with the
24     company other than Mr. Liebl and Mr. Blackburn, did
25     you terminate any of the others or did they quit?

## Sheet 31 Page 118

MARTIN BORUTTA 118

1 A. Let me see. Mr. Hickman left because of medical
2 conditions. He has problems with his leg.
3 Q. Who was that? You faded out. It was Mr. who?
4 A. Mr. Hickman. And Randy Green was terminated
5 because of performance issues and he's a white
6 male.
7 Q. Had Mr. Green complained to you about the way his
8 supervisor was treating him before you terminated
9 him?
10 A. No.
11 Q. And Mr. Green, was he your direct report?
12 A. He was service technician, so he was Mr. Rogers'
13 report.
14 Q. And had Mr. Green complained about his manager?
15 A. No, he had not.
16 Q. And had Mr. Green had performance issues that you
17 documented?
18 A. Yeah. He was a couple of times not on time so he
19 missed a lot of time and it was documented.
20 Q. Did you consult or investigate any claims made by
21 Mr. Green before terminating him?
22 A. There were no claims, so nothing to investigate.
23 Q. But again, Ms. Acevedo had made a claim against her
24 supervisor and you didn't investigate that,
25 correct?

www.thompsonmi
l
l
s.com

## Page 119

MARTIN BORUTTA 119

1 MR. KLASS: Object to the form.
2 A. No. She made not a claim against her supervisor,
3 Ms. Gessner.
4 Q. (By Ms. Gessner) Again, your word against hers,
5 correct?
6 MR. KLASS: Object to the form.
7 A. The whole day.
8 Q. (By Ms. Gessner) You can just keep answering it all
9 day. Thank you.
10 A. Yeah.
11 Q. Have you hired anyone --
12 MS. GESSNER: Well, that strike
13 that.
14 Q. (By Ms. Gessner) How was it that you know the race
15 of each of these people that are on the Exhibit 5
16 given that Insperity no longer is your PEO?
17 A. Because it was copied from the former things.
18 Q. Well, look at Michael Clamp. He was hired on
19 March 23, 2020. Do you see that?
20 A. Michael Clamp, yeah, I see that.
21 Q. So he was hired after Insperity was long gone,
22 right?
23 A. Yeah. Yeah.
24 Q. And you've captured his race?
25 A. I don't know his race. It was I think copy and

www.thompsonmi
l
l
s.com

## Page 120

MARTIN BORUTTA 120

1 paste, so maybe that's wrong. I cannot tell you.
2 Q. What do you mean copy and paste?
3 A. You have on the former Excel sheet, I think so. I
4 don't know. I think he was white. He was male,
5 that's for sure. I never met him.
6 Q. So 13 to 14 employees and you had not met
7 Mr. Clamp?
8 A. No. When you look at the time he worked for Teupen
9 and he was in the service department, I'm traveling
10 a lot.
11 Q. Did anyone complain about Mr. Liebl before you
12 terminated him other than Ms. Acevedo?
13 MR. KLASS: Object to the form.
14 Q. (By Ms. Gessner) I didn't hear your answer,
15 Mr. Borutta.
16 A. No, nobody complained about Mr. Liebl.
17 Q. Anyone complain to you about Mr. Liebl that they
18 didn't like working with him because of the way he
19 treated them?
20 A. No, not to my knowledge.
21 Q. Well, you would be the person that employees would
22 complain to, correct?
23 A. I told you there were no complaints, so I cannot
24 know about them. There were no complaints.
25 Q. Are you aware of any single employee who's ever

www.thompsonmi
l
l
s.com

## Page 121

MARTIN BORUTTA 121

1 made a single complaint about how they were being
2 treated while working at Teupen other than
3 Ms. Acevedo?
4 MR. KLASS: Object to the form.
5 A. Ms. Acevedo did not claim her treatment. She
6 claimed that she doesn't like the people. That's
7 what she said, so -- and the rest of your question,
8 no, nobody ever claimed that he was being
9 mistreated at Teupen. Nobody claimed to me.
10 Q. (By Ms. Gessner) Just so we're sure we're clear,
11 it's not just Mr. Liebl my question. In the now
12 five years that you've been working for Teupen and
13 in the last two years, almost three years you've
14 been working as Teupen's CEO in North America, are
15 you aware of a single employee who has complained
16 about the way they were being treated at work?
17 MR. KLASS: Object to the form.
18 Q. (By Ms. Gessner) Do you understand my question,
19 Mr. Borutta?
20 A. I understand your question, but you've got to be
21 more precise. I told you at the beginning the
22 first years I was not involved in daily business so
23 I never could know about it. It was the
24 responsibility of Mr. Kesser. And since I'm
25 responsible in July or August 2019, no, there was

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                    122

1  no complaint about any mistreatment, no single
2  complaint from no employee to me.
3  Q.  Okay.  So you said something I have to break down.
4      You were Mr. Kesser's supervisor, correct?
5  A.  I was a -- I told you I was the director and I saw
6      Mr. Kesser three times a year.  Yeah.
7  Q.  You were ultimately responsible for Teupen North
8      America at all times even when Mr. Kesser was the
9      CEO, correct?
10        MR. KLASS:  Object to the form.
11 A.  Yes.  I was the president and Mr. Kesser was
12     responsible for all the daily business.  I wasn't
13     involved in any daily business.
14 Q.  (By Ms. Gessner) Mr. Kesser reported to you,
15     though, correct?
16 A.  Correct.
17 Q.  Who do you report to?
18 A.  To myself.
19 Q.  So Mr. Kesser may have been the president and he
20     was operating the business, but he reported to you
21     at all times, correct?
22 A.  He reported to me all times.  That's correct.
23 Q.  And are you aware of anyone who came to you and
24     complained about Mr. Kesser?
25 A.  No.

www.thompsonmi
1
1
s.com

MARTIN BORUTTA                    123

1  Q.  Are you aware of anyone who complained to you about
2      any other employee at Teupen while Mr. Kesser was
3      the president?
4  A.  No.
5  Q.  Are you aware of any employee who complained to you
6      about their supervisor after Mr. Kesser was
7      terminated?
8  A.  No.
9  Q.  Are you aware of any other lawsuits that have been
10     filed against Teupen?
11 A.  There have been lawsuits.  I don't remember.  Not
12     -- yeah.  You remembered Mr. Kesser, but I don't
13     know whether we had other lawsuits.  I don't know.
14 Q.  For the record, I think you're testifying that
15     Mr. Kesser filed a lawsuit against Teupen, correct?
16 A.  I think that is correct.
17 Q.  And are you aware of any other employees who have
18     filed lawsuits against Teupen other than Mr. Kesser
19     and Ms. Acevedo?
20 A.  No, I'm not.
21 Q.  Would you be aware if a lawsuit was filed against
22     the company?
23 A.  As long as it is served and as long as I'm the CEO
24     responsible, yes.  Not before my time.
25 Q.  Even when Mr. Kesser was the president, if a

www.thompsonmi
1
1
s.com

MARTIN BORUTTA                    124

1  lawsuit was filed is it your testimony you would
2  know about it?
3  A.  No, that doesn't mean that I know about it, because
4      that was the reason why I fired Mr. Kesser.
5  Q.  Are you aware of any other employees who have filed
6      EEOC charges against Teupen?
7  A.  No.
8  Q.  Are you aware of any other employee who has filed
9      any other types of complaints against Teupen?
10 A.  That's pretty broad what you're asking.
11 Q.  Again, you are the owner of Teupen, correct?
12 A.  I'm the majority shareholder, that is correct, and
13     the CEO.
14 Q.  And you're talking about 13 to 14 people that --
15     you've said it's a small business, so I'm asking
16     would you be aware if there was an employee who had
17     hired a lawyer and made a complaint?
18 A.  Since I am operationally responsible in 2019, yes,
19     I would be aware.
20 Q.  And is it your testimony that you're not aware of a
21     single other employee other than Mr. Kesser and
22     Ms. Acevedo who have filed a complaint against
23     Teupen?
24 A.  You asked a lawsuit, not a complaint.
25 Q.  No, I'm talking any type of complaint that was

www.thompsonmi
1
1
s.com

MARTIN BORUTTA                    125

1  brought to your attention.
2  A.  Yeah, then you got to talk about complaints, not of
3      lawsuits.  I think there were other personal stuff
4      with Mr. Taft, and I don't remember.  I think
5      Mr. Trainer, he was also one of your clients.  You
6      should remember that.  So I don't know.  I just
7      remember Mr. Taft, Mr. Trainer, and Mr. Kesser.
8  Q.  What do you remember about Mr. Taft?
9  A.  That I terminated Mr. Taft's contract and -- in
10     July when I was here to terminate Mr. Kesser's
11     employment contract.
12 Q.  I didn't hear the last part.  What?
13 A.  It was the time when I terminated Mr. Kesser's
14     contract, the same week.
15 Q.  Did you pay Mr. Taft severance?
16 A.  I think he had a contract.  Yeah, we had to pay him
17     some.
18 Q.  And you said that he had filed a complaint.  Did he
19     hire a lawyer?
20 A.  He hired a lawyer, yeah.
21 Q.  And what happened with that case?
22 A.  He got a severance agreement.  We paid his
23     severance, and couple of weeks later I learned that
24     we also had to pay medical charges for him.
25 Q.  How is it that you learned you had to pay medical a

www.thompsonmi
1
1
s.com

MARTIN BORUTTA                126
1  few weeks later?  You didn't know that when you
2  fired him?
3  A.  No, because I didn't even know how that works in
4      the U.S. when I did that in July.  I just
5      terminated his employment agreement and the letter
6      for his termination was drafted by an attorney,
7      Parker Poe, you know very well.  That was all I did
8      and I signed that letter and instructed Ms. Acevedo
9      to send that letter via certified mail to Mr. Taft.
10     That was all I did.
11 Q.  And she followed your instructions, correct?
12     MR. KLASS:  Object to the form.
13 A.  She sent the letter via certified mail.  That's
14     what I know.
15 Q.  (By Ms. Gessner) So those were your instructions
16     and she followed them, correct?
17 A.  It was my instruction.
18 Q.  And Ms. Acevedo followed your instruction, correct?
19     MR. KLASS:  Object to the form.
20 A.  Ms. Acevedo sent the letter via certified mail.
21 Q.  (By Ms. Gessner) And that's what you instructed her
22     to do, correct?
23 A.  That was the same thing I instructed her to do and
24     then it's an instruction, not instructions.  I
25     instructed her to send the termination letter via

MARTIN BORUTTA                127
1  certified mail for Mr. Taft.  That's what I
2  instructed her.
3  Q.  And Ms. Acevedo followed your instructions,
4      correct?
5  A.  To send the letter via certified mail, correct.
6  Q.  Who was Mr. Taft's lawyer?
7  A.  I don't remember.
8  Q.  Did Mr. Taft file a lawsuit?
9  A.  No, I don't think so.  I don't remember.
10     MS. GESSNER:  Counsel, I'm going to
11     ask that you turn on your video because
12     it seems you keep going off and on mute
13     and I can't tell whether you're coaching
14     this witness or not because you've chosen
15     to leave your camera off.  It's very
16     distracting, your constant on and off, so
17     are you in the same room with
18     Mr. Borutta?
19     MR. KLASS:  I am not, and when I
20     turn my microphone off it's because I'm
21     coughing and I didn't want to interrupt
22     the deposition.
23     MS. GESSNER:  Well, again it's --
24     either leave it off and then turn it on
25     when you need to, because it's very

MARTIN BORUTTA                128
1  distracting to have you continue to click
2  on and off.
3  Q.  (By Ms. Gessner) So, Mr. Borutta, who have you
4      hired, if anyone, who is not reflected on
5      Exhibit 5?
6  A.  Which year are you talking about?
7  Q.  Well, you've only provided us with employee lists
8      for 2019 and 2020, not 2021.  I'm asking you who
9      have you hired that is not -- who currently works
10     for Teupen who is not on this list that is
11     Exhibit 5?
12 A.  I don't know because I give them permission to hire
13     people, but I don't have to know their names
14     exactly.
15 Q.  Who do you give permission to to hire people?
16 A.  To Mr. Rogers.  When he shows me a resume, we
17     discuss the position.  I see the people maybe one
18     time.  Sometimes I don't see the people and they
19     start at Teupen.
20 Q.  Do you know who the owner is of CHP, the accounting
21     firm that you use?
22 A.  Mr. Harry Catrakilis, CPA.  That's the name.
23 Q.  Is he a personal friend of yours?
24 A.  I know -- no.  I know him a couple of years.  We
25     have been working in another company.

MARTIN BORUTTA                129
1  Q.  What company was that?
2  A.  At Rofa.  He was CPA of Rofa U.S.
3  Q.  And he started his own company and now you're
4      hiring him as your CPA?
5  A.  No.  He has his own company since 18 years.
6  Q.  Why didn't you hire CHP when Ms. Geraghty resigned?
7  A.  That name is CKH, just to have the correct name on
8      file.
9  Q.  Are you saying -- I think it's C as in Charles --
10 A.  CK -- CK -- I can look it up.  It's CKH.  It's
11     Catrakilis and I don't remember the other names,
12     but I think it's CKH.  But it doesn't matter, the
13     accounting firm, because I wanted to have my
14     accounting how I want to have it and that's how
15     it's done now, in a correct form, in the right time
16     and the way we need it for our reporting in
17     Germany.
18 Q.  When Ms. Geraghty resigned and Ms. Acevedo assumed
19     some of her responsibilities in the interim, why
20     didn't you hire your friend at CKH to help?
21 A.  Why do you ask me whether I didn't hire my friend?
22     I did not tell you that he's my friend.  Please
23     rephrase your question.
24 Q.  He's your former coworker, correct?
25 A.  No.  He was hired as a -- it's an accounting firm

```
                    MARTIN BORUTTA              130
1    outside and he is one of 60 employees.  It's an
2    independent company, firm.
3  Q.  That you worked with in a prior employer, correct?
4  A.  He worked for me as a CPA as an accounting firm, so
5      I know him, yes.
6  Q.  So you didn't know him for the first time when you
7      worked for Teupen?
8  A.  Yeah, but that doesn't mean that he's my friend, so
9      please ask the right questions.
10 Q.  Please don't tell me how to ask questions.  You're
11     being combative unnecessarily, Mr. Borutta.  I
12     asked you a question and you've continuously been
13     combative today unnecessarily.
14 A.  Yeah.
15 Q.  I asked you a question.  When Ms. Acevedo was
16     seeking your help because you had dumped too many
17     tasks on her when Ms. Geraghty quit, did you seek
18     to get her any help including with your now
19     accounting firm CKH?
20         MR. KLASS:  Object to the form.
21 A.  I did not dump too many tasks.  Ms. Acevedo was
22     asked whether she can take over the
23     responsibilities in the week Ms. Geraghty left and
24     she asked for a raise and that she's able to do all
25     that to fulfill her duties, so that's what
```

```
                    MARTIN BORUTTA              131
1    happened.
2  Q.  (By Ms. Gessner) And in fact, it wasn't until after
3      she complained about Mr. Liebl that you decided she
4      could no longer do the job, is that right?
5          MR. KLASS:  Object to the form.
6  A.  Ask the question again, please.
7  Q.  (By Ms. Gessner) What part of my question did you
8      not understand?
9  A.  The whole question.
10 Q.  It wasn't until after Ms. Acevedo had complained
11     about how she was being treated by Mr. Liebl and
12     Ms. Molyn that you decided she couldn't do the job,
13     correct?
14         MR. KLASS:  Object to the form.
15 A.  I told you already five times when I decided that I
16     demote her.
17 Q.  (By Ms. Gessner) But you demoted her; but you never
18     let her come back to work.  Why?
19         MR. KLASS:  Object to the form.
20 A.  Because she refused the demotion in a very
21     unprofessional way.  She disrespected my decision
22     and that means she disrespects me, so why should
23     she come back to work?
24 Q.  (By Ms. Gessner) Tell me everything you mean when
25     you say she refused the demotion.
```

```
                    MARTIN BORUTTA              132
1  A.  I never heard that recording, but you provided the
2      recording and maybe you can play it that I heard
3      the first time, here the first time, that she made
4      a scene and didn't want to follow the instructions
5      that were clearly written down what she has to do
6      and to be demoted and what her new job duties.  I
7      would have explained her if she would have reacted
8      in a professional manner and she didn't do that.
9      She was just disrespectful and I don't accept to be
10     disrespected.
11 Q.  Ms. Acevedo had complained that she was being
12     disrespected and treated poorly by Mr. Liebl, but
13     you did nothing when she complained --
14 A.  No, she did not -- she did not --
15         MR. KLASS:  Objection to the form of
16     the question.
17 A.  No, she --
18 Q.  (By Ms. Gessner) Mr. Liebl (sic), did you
19     understand my question?
20 A.  That is not the correct question.  You always try
21     to put words in my mouth that are not correct.
22     Ms. Acevedo --
23 Q.  Mr. Borutta, Mr. Borutta, you just told me that you
24     demoted her one week, you didn't even see her or
25     talk to her, and then you terminate her because she
```

```
                    MARTIN BORUTTA              133
1    was upset because when she complained to you about
2    how she was being treated you fired her.  You fired
3    her.  You demoted her and then you fired her when
4    she came forward and complained that she was being
5    discriminated against.
6  A.  Ms. Gessner, you completely --
7  Q.  You didn't even have a single conversation with her
8      after December 20, correct?
9          MR. KLASS:  Object to the form.
10         MS. GESSNER:  Counsel, that's not an
11     objectionable question.
12 Q.  (By Ms. Gessner) Mr. Borutta, answer this question:
13     You never spoke at all to Ms. Acevedo after
14     December 20, yes or no?
15         MR. KLASS:  Object to the form.
16 A.  So what is your last question?
17 Q.  (By Ms. Gessner) What part about my question did
18     you not understand?
19 A.  You ask different questions and you mix them up and
20     that makes it very --
21 Q.  Mr. Borutta, did you speak with Ms. Acevedo at any
22     time after December 20, 2019?
23         MR. KLASS:  Object to the form.
24 A.  You asked that -- that's the twelfth time now and I
25     said no.
```

## Sheet 35   Page 134

MARTIN BORUTTA                                          134

1  Q.  (By Ms. Gessner) Mr. Borutta, I'm going to keep
2      asking this as long as you the answer the question,
3      so please answer the question.  Yes or no, did you
4      speak with Ms. Acevedo at any point in time after
5      December 20?
6          MR. KLASS:  Object to the form.
7  A.  No, I did not.
8  Q.  (By Ms. Gessner) In fact, you personally did not
9      communicate her demotion to her, did you?
10 A.  No, I did not.
11 Q.  In fact, you sent in the person who she had
12     complained to you about to tell her that she was
13     being demoted, Mr. Liebl, correct?
14 A.  No, that's not correct.
15 Q.  Well, who informed Ms. Acevedo of her demotion?
16 A.  No, your question is not correct because she did
17     not complain about the person.
18 Q.  Well, again, that is her word against his.  You
19     keep saying that.  No one was present as to who
20     Ms. Acevedo complained about, correct?
21         MR. KLASS:  Object to form.
22 A.  Yeah, but tell me how should I answer a wrong
23     question with yes or no when you put words in my
24     mouth that are not correct?  So I can just tell you
25     it's a wrong question.

www.thompsonmi
1
1
s.com

## Page 135

MARTIN BORUTTA                                          135

1  Q.  (By Ms. Gessner) Mr. Borutta, it's a totally --
2      you're tying in these questions and being
3      unnecessarily combative.  We'll have to take it to
4      the court and let the court review exactly what
5      you're doing because it's actually very, very
6      disrespectful to me.  So I am telling you a
7      different question and you keep coming back.
8          You sent in Andy Liebl to tell Ms. Acevedo
9      that you were demoting her, correct?
10         MR. KLASS:  Object to the form.
11 A.  I sent -- I sent Mr. Liebl and Ms. Molyn because I
12     was not present and I was not able to talk to
13     Ms. Acevedo.
14 Q.  (By Ms. Gessner) And Ms. Acevedo had complained to
15     you about working with Mr. Liebl and Ms. Molyn on
16     December 20 prior to having them communicate to her
17     that she was being demoted, correct?
18         MR. KLASS:  Object to the form.
19 A.  She has complained that she doesn't like to work
20     with them.
21 Q.  (By Ms. Gessner) And you sent the two people that
22     she complained to you about in to tell her that she
23     was being demoted; you didn't did do it yourself,
24     right?
25         MR. KLASS:  Object to the form.

www.thompsonmi
1
1
s.com

## Page 136

MARTIN BORUTTA                                          136

1  A.  I didn't do it myself because I was not available.
2  Q.  (By Ms. Gessner) And you didn't make yourself
3      available, correct?
4  A.  I had no possibility to be available and that's why
5      I did it.
6  Q.  Mr. Borutta, did your phone not work at the end of
7      December 2019?
8  A.  I don't remember.
9  Q.  Is it your testimony that you don't remember
10     whether or not you had access to a working phone
11     between December 20 and December 30?
12 A.  I don't remember 2019.  I have sometimes problems
13     with my phone.
14 Q.  Do you recall having any problems with your phone?
15 A.  I don't know.  I don't remember.
16 Q.  Do you have access to a payphone?
17 A.  Are there any payphone out there?  I don't know.
18 Q.  You're the one who's made this incredulous
19     statement that you don't think you had access to a
20     telephone for 10 days.
21 A.  No, I just said I don't remember whether my phone
22     was working or not.
23 Q.  Did you make any effort to find a working phone to
24     call Ms. Acevedo?
25 A.  I did not call Ms. Acevedo.

www.thompsonmi
1
1
s.com

## Page 137

MARTIN BORUTTA                                          137

1  Q.  Did you make any effort to call Ms. Acevedo?
2  A.  No, I did not make any effort to call Ms. Acevedo.
3  Q.  And again, you weren't present in any way for the
4      conversation that was had with Ms. Acevedo by
5      Mr. Liebl and Ms. Molyn when they were
6      communicating this demotion, right?
7  A.  I was not present.
8  Q.  And based upon Mr. Liebl and Ms. Molyn's statements
9      to you decided to terminate Ms. Acevedo?
10         MR. KLASS:  Object to the form.
11 A.  That is correct.
12 Q.  (By Ms. Gessner) What day did you decide to
13     terminate Ms. Acevedo?
14 A.  The same day the demotion happened and I got the
15     reaction, the information of the reaction.
16 Q.  Why didn't you communicated the termination to
17     Ms. Acevedo on December 30, then?
18 A.  Because it's not my style to do that.
19 Q.  It's not what?
20 A.  It's not my style to do it.  I didn't do it.
21 Q.  Well, what is your style on how to communicate
22     terminations?
23 A.  It was sent to her, so -- it was also sent to
24     Mr. Taft.  I did not have a possibility to talk to
25     her, so I had to send it to her.  I did not have a

www.thompsonmi
1
1
s.com

MARTIN BORUTTA                    138
1    possibility to send the -- to present the
2    termination in person to Mr. Taft, so I sent it to
3    him.  I didn't think --
4  Q.  How did -- go ahead.  Sorry.
5  A.  No, I'm done.  Go ahead.
6  Q.  How did you send the termination to Ms. Acevedo?
7  A.  I think it was sent via certified mail on my
8    instruction or via email.  I don't know.  I don't
9    remember.
10       MR. KLASS:  Counsel, it's 12:43.  I
11   just wanted to give you a heads up as to
12   the time.
13       MS. GESSNER:  Okay.  So I have just
14   two more questions and then we'll take
15   that break.
16 Q.  (By Ms. Gessner) So again, you didn't make any
17   effort to call Ms. Acevedo and hear her side of
18   what had happened with Mr. Liebl and Ms. Molyn
19   during the demotion meeting before you terminated
20   her, correct?
21 A.  No, I did not.
22 Q.  And Ms. Acevedo had no one else to complain to
23   about the way that you had treated her above you,
24   right?  The buck stops with you?
25       MR. KLASS:  Object to the form.

www.thompsonmi
1
1
s.com

MARTIN BORUTTA                    139
1  Q.  (By Ms. Gessner) Do you understand what I mean?
2  A.  No, I don't.  Do you mean like I had to --
3  Q.  Well, you didn't investigate her complaints about
4    Mr. Liebl, correct?
5       MR. KLASS:  Object to the form.
6  A.  Yeah.  We just -- the discussion again.
7  Q.  (By Ms. Gessner) Mr. Borutta, you didn't
8    investigate her complaints about Mr. Liebl,
9    correct?
10      MR. KLASS:  Object to the form.
11 A.  If you tell me that you don't like somebody, that's
12   not a complaint for me.  No, I didn't investigate
13   it because I didn't take it as a claim.  It was not
14   a written claim and it was not a claim and it was
15   not formulated as a claim.  It was just the
16   statement I don't like to work with them and I
17   don't like them.  That's all that happened.
18 Q.  (By Ms. Gessner) And the very people that she was
19   complaining about was who you sent to communicate
20   the demotion, correct?
21      MR. KLASS:  Object to the form.
22 Q.  (By Ms. Gessner) After that communication you never
23   spoke with her again before you decided to
24   terminate her on the day after you become aware
25   that she had taken a medical leave, correct?

www.thompsonmi
1
1
s.com

MARTIN BORUTTA                    140
1       MR. KLASS:  Object to the form.
2  A.  You want me to answer the first or the second
3    question?
4  Q.  (By Ms. Gessner) Both, please.
5  A.  Okay.  Yeah.  The very people I sent were both
6    people I could trust in the company because I knew
7    them the longest time and they made no mistakes
8    from my point of view.  Yes, that was my decision.
9    And I did not contact Ms. Acevedo after
10   December 20.  That should answer all the questions
11   regarding the time we had.
12 Q.  And you communicated to Ms. Acevedo she was being
13   terminated on the day after you learned she had
14   taken a medical leave, correct?
15      MR. KLASS:  Object to the form.
16 A.  I did not -- yeah, it was -- it was communicated --
17   no, I don't -- it was not -- it was the day -- the
18   day of -- I think it was the day of refusing her
19   demotion.  I don't remember, but maybe you have it
20   there and we can look the date up.  I don't
21   remember.  It's two years ago.
22 Q.  (By Ms. Gessner) And you didn't look at any
23   documents to refresh your recollection on those
24   dates prior to today?
25 A.  No, I did not.

www.thompsonmi
1
1
s.com

MARTIN BORUTTA                    141
1       MS. GESSNER:  We'll take that lunch
2    break.  It's 12:46.
3       MR. KLASS:  Thank you.
4  (RECESS)
5  Q.  (By Ms. Gessner) So we just had about a 50 minute
6    break.
7  A.  Good.
8  Q.  Is there anything about this morning's testimony
9    you would like to change?
10 A.  No.
11 Q.  Did you meet with your attorney during the lunch
12   break?
13 A.  I had lunch with him, yes.
14 Q.  What did you discuss?
15 A.  We discussed the sandwiches from Panera Bread and
16   Las Vegas.
17 Q.  Did you discuss this case at all?
18 A.  No, we did not.
19 Q.  So prior to the break we were talking about that
20   you had made the decision to demote Ms. Acevedo on
21   December 20, correct?
22      MR. KLASS:  Object to the form.
23 A.  That is correct.
24 Q.  (By Ms. Gessner) In fact, I think your testimony is
25   the morning of the Christmas party you had decided

www.thompsonmi
1
1
s.com

## Sheet 37  Page 142

MARTIN BORUTTA                                    142

1   you were going to demote Ms. Acevedo, is that
2   right?
3   A.  That is correct.
4   Q.  When did you --
5       MS. GESSNER:  Strike that.
6   Q.  (By Ms. Gessner) Did you prepare a letter to
7   Ms. Acevedo communicating the demotion?
8   A.  I don't remember.
9   Q.  Have you seen a letter to Ms. Acevedo regarding her
10  demotion?
11  A.  I think so, but I don't remember.
12  Q.  Do you remember typing a letter to Ms. Acevedo
13  regarding her demotion?
14  A.  No.  That's two years ago.  I don't know how many
15  letters I had at that time.  No, I don't remember.
16  No.  Maybe you have a document you can show me.
17  Q.  I'm sharing with you what we've marked as
18  Exhibit 6.  Do you see that on the screen?
19  A.  I see it on the screen.
20  Q.  And it's Bates number 1Teupen00027.  You see that?
21  A.  I see that.
22  Q.  You've got this document marked as pursuant to a
23  protective order.  What is confidential about this
24  document that has trade secrets or information
25  related to Teupen?

## Page 143

MARTIN BORUTTA                                    143

1       MR. KLASS:  Object to the form.
2   A.  I don't know.
3   Q.  (By Ms. Gessner) Is there anything that -- I mean
4   isn't this letter one that you've written to
5   Ms. Acevedo?
6   A.  I think so.  I don't remember.
7   Q.  Is that your signature at the bottom, Mr. Borutta?
8   A.  It is definitely my signature.
9   Q.  Did you type this letter?
10  A.  I don't remember whether I typed it, but I signed
11  it.
12  Q.  Well, who has the original copy of this letter in
13  original state, not this PDF?
14  A.  It must be in one of the files at Teupen.  I don't
15  know.
16  Q.  Do you use Word at Teupen?
17  A.  Sometimes.
18  Q.  Did you use Word to prepare this document?
19  A.  I don't know because I cannot remember whether I
20  typed it, so I don't know.
21  Q.  Do you remember delegating someone else to type
22  this letter?
23  A.  No.  I don't remember.
24  Q.  If you didn't type that, who would?
25  A.  I don't know.  I don't remember.

## Page 144

MARTIN BORUTTA                                    144

1   Q.  What is the process that you have --
2       MS. GESSNER:  Well, strike that.
3   Q.  (By Ms. Gessner) Do you have this letter still on
4   your computer at Teupen?
5   A.  Maybe.  As I said before, I don't know.
6   Q.  Has anyone asked you to look and see if you have
7   this letter in its original state, a forensic copy
8   or copy in Word of this letter?
9       MR. KLASS:  Objection to the extent
10  it calls for disclosure of attorney-
11  client communications.  To the extent
12  that the witness can testify without
13  disclosing such communications, he may do
14  so.
15      MS. GESSNER:  Counsel, I have not
16  asked him anything you said to him and
17  I've repeatedly told him he doesn't have
18  to tell me anything you told him.  But
19  whether he typed this letter or not he
20  should know, and whether he has it still
21  in his possession or not he should know.
22      MR. KLASS:  Well, you're --
23  Q.  (By Ms. Gessner) Mr. Borutta, do you have this
24  letter in your possession, on your computer or
25  Teupen's server in Word?

## Page 145

MARTIN BORUTTA                                    145

1       MR. KLASS:  Object to the form.
2   A.  I don't know.
3   Q.  (By Ms. Gessner) And have you looked?
4   A.  No, I did not look.
5   Q.  Will you look for this letter and see if you have
6   it in Word or Googledocs or some other format on
7   the way it was typed?  Could you do that?
8   A.  Why should I look for it?
9   Q.  We're asking you to.  Are you refusing to look for
10  and see if you have it?
11      MR. KLASS:  Object to the form.
12  A.  When should I look for it?  If it's on the Teupen
13  server, it's on the Teupen server.  I have no
14  access to the Teupen server, so --
15  Q.  (By Ms. Gessner) Again, we're going to send you an
16  official request and ask the court to make you
17  produce the official copy of this letter.  Okay?
18  I'm just giving you on Friday, October 15, at 1:45
19  -- your lawyer should have asked you for this
20  already.  We're asking you for it because it hasn't
21  been produced in its original format.  So will you
22  please agree to go and see if you have this letter
23  and, if not, explain why it was deleted?
24  A.  If we have to produce it, sure.  Yes, we will.
25  Q.  When do you recall preparing this letter?

BORUTTA

MARTIN BORUTTA                146

1  MR. KLASS:  Object to the form.
2  A.  I don't remember.
3  Q.  (By Ms. Gessner) Well, where were you on
4      December 30, 2019?
5  A.  In Charlotte, not in the office.
6  Q.  Who else did you tell that you were going to
7      provide Ms. Acevedo with this letter of demotion on
8      December 30, 2019?
9  A.  I don't remember if I informed anybody on
10     December 29 or on December 30, but if I informed
11     anybody, then I informed Mr. Liebl about that
12     because he had to provide the letter, so --
13 Q.  And Mr. Liebl and Ms. Molyn were both terminated
14     after this lawsuit had been filed, correct?
15     MR. KLASS:  Object to the form.
16 A.  That's correct.
17 Q.  (By Ms. Gessner) Well, they both had been
18     terminated after you were aware that Ms. Acevedo
19     had filed an EEOC charge, correct?
20     MR. KLASS:  Object to the form.
21 A.  Ms. Molyn was not terminated.
22 Q.  (By Ms. Gessner) Well, both have left the
23     employment of Teupen after Ms. Acevedo filed her
24     claims, correct?
25     MR. KLASS:  Object to the form.

www.thompsonmi
1
1
s.com

---

MARTIN BORUTTA                147

1  A.  That is correct.
2  Q.  (By Ms. Gessner) Did you do anything to preserve
3      their hard drives, computer systems, emails, any
4      documents they have in their possession regarding
5      this case?
6  A.  We did everything you requested in your litigation
7      hold memo I remember you sent me on January 7,
8      maybe, 2020.
9  Q.  So again, when Mr. Liebl and Ms. Molyn ceased to be
10     employed with Teupen, what did you do with their
11     computers?
12 A.  They are still there.
13 Q.  And no one is using them?
14 A.  Mr. Liebl is not and Ms. Molyn is not either.  No.
15     They are both there.
16 Q.  Were they reissued to anyone else?
17 A.  No.
18 Q.  So you still have copies of the hard drives of each
19     of those computers?
20 A.  Mr. Liebl did not have a computer.  He had terminal
21     access, but the files are there.  And Ms. Molyn's
22     is locked up and that is still there and, yeah,
23     it's in the office.
24 Q.  So same thing:  have you deleted anything from your
25     computer since December 30, 2019, when you wrote

www.thompsonmi
1
1
s.com

---

MARTIN BORUTTA                148

1      this letter or you sent this letter?
2      MR. KLASS:  Object to the form.
3  A.  You got to be specific because for sure I deleted
4      stuff from my computer, but that's not related to
5      the case.
6  Q.  (By Ms. Gessner) Again, anything related to
7      Ms. Acevedo's performance, her termination or her
8      demotion, have you preserved all original copies of
9      that information in your possession?
10 A.  I have preserved everything I had at that time I
11     was asked for.
12 Q.  Well, do you delete emails and communications daily
13     after you write it?
14 A.  No.
15 Q.  Do you have any reason to believe that you deleted
16     the December 30, 2019, email at any point in time
17     before January 7, 2020?
18     MR. KLASS:  Object to the form.
19 A.  I don't know.  I have to check.
20 Q.  (By Ms. Gessner) Have you checked prior to today
21     whether or not you have the original copies of this
22     letter?
23 A.  No, I did not check.
24 Q.  So just to be sure I understand, you don't remember
25     whether you typed this email or this letter to

www.thompsonmi
1
1
s.com

---

MARTIN BORUTTA                149

1      Ms. Acevedo or not, correct?
2  A.  Correct.
3  Q.  And you don't know who possibly could have typed
4      it, is that correct?
5  A.  That's also correct.
6  Q.  Who potentially would have typed up letters for you
7      in December 2019?
8      MR. KLASS:  Object to the form.
9  Q.  (By Ms. Gessner) Do you understand my question,
10     Mr. Borutta?  If you didn't type it, who could
11     have?
12 A.  I understand the question.  If anybody typed
13     letters for me that would have been Ms. Acevedo --
14     that doesn't make any sense in that case -- or
15     Ms. Molyn or Mr. Liebl.
16 Q.  Ms. Molyn or who?  I didn't hear the last part.
17 A.  Mr. Liebl.
18 Q.  So either Ms. Molyn, Mr. Liebl or you prepared this
19     letter to Ms. Acevedo, is that correct?
20 A.  That is correct.
21 Q.  And I think you've already testified you did not
22     deliver this letter to Ms. Acevedo; instead you had
23     Mr. Liebl and Ms. Molyn do it, correct?
24     MR. KLASS:  Object to the form.
25 A.  That is correct.

www.thompsonmi
1
1
s.com

Sheet 39   Page 150

MARTIN BORUTTA                           150

1  Q.  (By Ms. Gessner) Do you know when Mr. Liebl and
2      Ms. Molyn delivered this letter to Ms. Acevedo?
3  A.  I think December 30, but I don't know the time.
4  Q.  Do you recall when you decided to write Ms. Acevedo
5      a letter?
6  A.  No, I don't recall.
7  Q.  Isn't it true that after Ms. Acevedo received this
8      letter she immediately reached out to you and asked
9      to meet with you?
10         MR. KLASS:  Object to the form.
11 A.  It's not true.
12 Q.  (By Ms. Gessner) It's not true that Ms. Acevedo
13     contacted you asking to meet with you to discuss
14     her newly demoted position?
15         MR. KLASS:  Object to the form.
16 A.  She did not ask for a meeting.
17 Q.  (By Ms. Gessner) I'm going to show you what we're
18     marking as Exhibit 7.  You see a document in front
19     of you that is Exhibit 7 that is a two-page
20     document?  The Bates numbers are 00039 and 00040.
21     Do you see that?
22 A.  Yeah.
23 Q.  Is your email address mborutta@teupen.com?
24 A.  That is my email address.
25 Q.  Do you see this email is dated Monday, December 30,

www.thompsonmi
1
1
s.com

Page 151

MARTIN BORUTTA                           151

1      at 9:32 a.m.?
2  A.  Yeah, I see that.
3  Q.  And it's from Ms. Acevedo?
4  A.  It looks like it's from Ms. Acevedo.
5  Q.  And it's to you and Ulf Birkenkamp.  Do you see
6      that?
7  A.  I see that.
8  Q.  Who is Ulf?
9  A.  That's the German controller I told you before, the
10     CFO.
11 Q.  The subject line is "Go over my new role."  You see
12     that?
13 A.  I see that.
14 Q.  And it says, "Good morning, Martin.  If you could
15     please give me the time today to go over my new
16     role since you have decided to change my duties."
17     You see that?
18 A.  I see that.
19 Q.  Would you like to change your testimony that now
20     you know that Ms. Acevedo did reach out to you on
21     the same day she received the letter that you wrote
22     demoting her?
23 A.  If she reached out to me, that is correct.
24 Q.  But a minute ago you said no, that it wasn't
25     correct?

www.thompsonmi
1
1
s.com

Page 152

MARTIN BORUTTA                           152

1          MR. KLASS:  Object to the form.
2  Q.  (By Ms. Gessner) Excuse me?
3  A.  I did not.
4  Q.  You've already testified you made no effort to
5      contact Ms. Acevedo even though she reached out to
6      you at 9:32 a.m. on December 30, correct?
7          MR. KLASS:  Object to you the form.
8  A.  I testified that I did not have the possibility
9      during the whole day to read my email, so I had not
10     the possibility to contact her that day because I
11     could not read my emails.  That's what I testified
12     about.
13 Q.  (By Ms. Gessner) And at no point in time from
14     December 30 until the day that Ms. Acevedo was
15     fired did you make any effort to reach out to
16     Ms. Acevedo, correct?
17 A.  I did not contact Ms. Acevedo.
18 Q.  Because that's not your style, correct?
19         MR. KLASS:  Object to the form.
20 Q.  (By Ms. Gessner) Well, isn't that what you said?
21 A.  I said I did not call her and give her the
22     demotion.  If you scroll down that email, then you
23     see what's not my style.  That's what I explained
24     you before.
25 Q.  Well, actually, how do you know what the email says

www.thompsonmi
1
1
s.com

Page 153

MARTIN BORUTTA                           153

1      if you hadn't reviewed it before?
2          MR. KLASS:  Object to the form.
3  A.  You showed it to me before.  You see that line?
4      You just need to read that line.
5  Q.  (By Ms. Gessner) No, no.  You told me just a minute
6      ago that Ms. Acevedo didn't email you, and until I
7      showed you this email you kept saying, no, no, no,
8      no, she never contacted you.  Now you have an email
9      in front of you that says she did, so you've now
10     changed your testimony.
11         MR. KLASS:  Object to the form.
12 A.  I don't remember.
13 Q.  (By Ms. Gessner) So Ms. Acevedo contacted you
14     December 30 at 9:32 and you made no effort
15     whatsoever to contact her before you fired her,
16     correct?
17         MR. KLASS:  Object to the form.
18 A.  I did not contact Ms. Acevedo.  Yeah, that's
19     correct.
20 Q.  (By Ms. Gessner) You just ignored this email,
21     didn't you?
22         MR. KLASS:  Object to the form.
23 A.  That's not correct.
24 Q.  (By Ms. Gessner) Well, what did you do when you
25     received the email?

www.thompsonmi
1
1
s.com

MARTIN BORUTTA                    154
1  A.  That's what I explained to you before.  I decided
2      to terminate her.
3  Q.  After she sent you this email you decided to
4      terminate her?
5  A.  Yes.
6  Q.  After she requested to meet with you to discuss the
7      demotion?
8          MR. KLASS:  Object to the form.
9  A.  The complete email in the sentence that she does
10     not trust Ms. Molyn.
11         COURT REPORTER:  Excuse me.  I'm
12     getting a lot of like reverberation and
13     feedback and I'm not getting this answer.
14         THE WITNESS:  Let me see you get it
15     now.  Is it better?
16         COURT REPORTER:  We'll see.  I don't
17     know.
18         THE WITNESS:  Can you hear me now?
19         COURT REPORTER:  Yes.
20 A.  Okay.  After reading the whole email I decided,
21     because if you or -- Ms. Acevedo questioned my
22     decision to take on her new role because she
23     doesn't trust Ms. Molyn, so it was a logical
24     consequence for me to terminate if she doesn't want
25     to do that.
                    www.thompsonmi
                          1
                          1
                      s.com

MARTIN BORUTTA                    155
1  Q.  (By Ms. Gessner) So Ms. Acevedo complained to you
2      on December 20.  She's complaining to you again in
3      writing on December 30 about someone who she
4      believes is making mistakes for Teupen, and as a
5      result of that complaint you retaliate and
6      terminate her, is that correct?
7          MR. KLASS:  Object to the form.
8  A.  That is not correct because I did not retaliate, or
9      I took my decision based on the mistakes
10     Ms. Acevedo made the month before, the money we
11     lost from Ms. Acevedo and my personal opinion what
12     I think about her duties and how she's fulfilling
13     her duties.  That's how my decision is based on,
14     nothing else.  And she didn't want to accept my
15     decision that she got go back to her old job
16     because she didn't want to report to Geraldine
17     Molyn.  So that's the decision.
18 Q.  (By Ms. Gessner) But again, this testimony you're
19     giving, you didn't write it down anywhere at all
20     about this decision you allegedly made to demote
21     her before December 30, correct?
22         MR. KLASS:  Object to the form.
23 A.  I do not write my decisions down.  I can take the
24     decisions.
25 Q.  (By Ms. Gessner) You didn't make any notes or any
                    www.thompsonmi
                          1
                          1
                      s.com

MARTIN BORUTTA                    156
1      -- you didn't begin to prepare the letter of
2      December 30 that is Exhibit 6 -- I'm sorry, where
3      are we? -- Exhibit 6 -- you didn't begin preparing
4      this on December 20, did you?
5  A.  I don't remember.
6  Q.  Did you begin preparing this before December 30?
7          MR. KLASS:  Object to the form.
8  A.  I think so.
9          MS. GESSNER:  Well, counsel, we're
10     going to be asking for the metadata and
11     it is in the definitions and needs to be
12     produced in this case, and ask that you
13     produce the information as requested.
14     We've only received the PDF and we have
15     not received the actual metadata,
16     forensic data related to this letter and
17     we need it.  Do you hear me, Mr. Klass?
18         MR. KLASS:  I heard you.  This is
19     the first time you've requested this.
20         MS. GESSNER:  That isn't true.  That
21     isn't true.  We have requested all of,
22     including the forensic data, and this is
23     the first time that we have asked you
24     more specifically to follow up on data
25     that we've asked you for since the
                    www.thompsonmi
                          1
                          1
                      s.com

MARTIN BORUTTA                    157
1      beginning of this case.  So clearly it's
2      relevant and it's probative and this
3      witness had a duty to preserve, and so
4      we're asking that you produce it.
5          MR. KLASS:  We'll review it.
6          MS. GESSNER:  What objections do you
7      have to producing the metadata to this
8      letter?
9          MR. KLASS:  You can ask your
10     questions.  We're not going to get into a
11     discovery dispute in this deposition.
12 Q.  (By Ms. Gessner) Mr. Borutta, what objections, if
13     any, do you have to producing this letter in its
14     original state off of your system?
15         MR. KLASS:  Object to the form.
16 A.  I don't know whether we have it on the system, but
17     we will find out.
18 Q.  (By Ms. Gessner) And again, you already testified
19     no one -- you have never looked to see whether you
20     have it on the system, is that correct?
21 A.  That's what I said before.  Yes.
22 Q.  Has anyone ever asked you to look?
23         MR. KLASS:  Objection based on --
24     I'll back up.  To the extent the question
25     seeks testimony revealing attorney-client
                    www.thompsonmi
                          1
                          1
                      s.com

# BORUTTA

## Sheet 41   Page 158

MARTIN BORUTTA                    158

1  communications which are privileged I am
2  directing the witness not to answer.  To
3  the extent that someone other than legal
4  counsel has asked, then you can answer.
5  Q.  (By Ms. Gessner) Please answer the question,
6      Mr. Borutta.
7  A.  I will not answer the question.
8  Q.  So the only person who's ask you is your lawyers;
9      nobody else has asked you to go look for this
10     document?
11 A.  (No response.)
12 Q.  Mr. Borutta.
13 A.  That's the same question.  I don't remember.
14 Q.  And again, just so we have the full and complete
15     record, after receiving Ms. Acevedo's email on
16     12/30 at 9:32, you never responded to her or made
17     any effort to have any communication with her
18     whatsoever, correct?
19         MR. KLASS:  Object to the form.
20 A.  That is correct.
21 Q.  (By Ms. Gessner) I'm going to show you another
22     document.  When did you first learn that
23     Ms. Acevedo had suffered a medical event and needed
24     a medical leave?
25         MR. KLASS:  Object to the form.

## Page 159

MARTIN BORUTTA                    159

1  A.  I don't remember when it was first -- I received a
2      copy of her email about that, but I don't remember
3      the date.
4  Q.  (By Ms. Gessner) I'm going to show you another
5      document.  This is an exhibit to your deposition,
6      Exhibit Number 8.  Have you seen this document
7      before?
8  A.  Yeah.  I think it was not an email.  It was a
9      message, but -- yeah, it was a message from her.  I
10     think so.  I've seen that before.
11 Q.  Do you recall receiving a text message from
12     Ms. Acevedo --
13 A.  Text message or email.
14 Q.  -- on December 30 indicating that she had suffered
15     -- she was being treated by Novant Health, seen in
16     a clinic on 12/30, and asked to be excused from
17     work until January 6, 2020?  Do you see that?
18 A.  That is the content of that message in the picture.
19     Yes.
20 Q.  And again, do you have any reason to dispute that
21     this was sent to you on December 30?
22 A.  I don't dispute it.  I just didn't know when I
23     received it.
24 Q.  And this was the same day that she had been
25     informed by Mr. Liebl and Ms. Molyn that she was

## Page 160

MARTIN BORUTTA                    160

1  being demoted, correct?
2  A.  Yeah, December 30.
3  Q.  And on the same day that she at 9:32 a.m. had
4      reached out to you asking you to speak with her and
5      you never followed up, correct?
6         MR. KLASS:  Object to the form.
7  A.  I did not read my emails until late evening that
8      day or maybe the next day.  That's all I know.
9  Q.  (By Ms. Gessner) Did you make any effort after you
10     read the emails either late on the 30th or on the
11     31st to contact Ms. Acevedo in any way?
12        MR. KLASS:  Object to the form.
13 A.  No, I did not.
14 Q.  (By Ms. Gessner) Do you recall getting this text
15     below from Ms. Acevedo that's reflected on
16     Exhibit 7?
17 A.  I don't recall.
18 Q.  But you don't dispute receiving it, correct?
19 A.  I don't dispute.
20 Q.  I'm going to show you another document.  This is
21     Exhibit Number 9 to your deposition.  It is a one-
22     page document that is Acevedo000047.  You see the
23     number at the bottom?
24 A.  No, I don't see the number, but -- it's covered.
25 Q.  Do see at the top that it is an email from

## Page 161

MARTIN BORUTTA                    161

1  Ms. Acevedo's personal email account to you,
2  Mr. Liebl, Patrick Blackburn?
3  A.  I see that.
4  Q.  And it's dated Monday, December 30, 2019, at 10:44?
5  A.  I don't see the time.  I just see the date.
6  Q.  Do you not see the time because it's covered
7      somehow?
8  A.  Yeah.
9  Q.  Can you move what's covering it on the desktop?
10 A.  I don't know.
11 Q.  Let me see if I can't move it for you.
12 A.  No, if you go back -- just go back.
13 Q.  Do you see right here, Monday, December 30, 2019,
14     at 10:44?
15 A.  Yeah.
16 Q.  Do you see that now?
17 A.  Yeah, I see it.
18 Q.  And this is Ms. Acevedo following up again with the
19     doctor's note that you saw on the text message,
20     correct?
21 A.  It's the same thing, so yes.
22 Q.  And again, you said you didn't check your email
23     until late on the 30th or maybe the next day.  This
24     is 10:44 p.m.  You had received an email from her
25     at 9:32 and at 10:44 and you never made any effort

www.thompsonmi
l
l
s.com

## Sheet 42   Page 162

MARTIN BORUTTA                                              162

1  to contact her in any way during that day or after,
2  correct?
3      MR. KLASS:  Object to the form.
4  A.  Yeah, that is correct.
5  Q.  (By Ms. Gessner) So what time of the day did you
6  make the decision to terminate Ms. Acevedo on
7  December 30?
8      MR. KLASS:  Object to the form.
9  A.  I don't know the time, but it was pretty, pretty
10  late in the afternoon and evening.  I'm sure about
11  that, but I don't know exactly.
12 Q.  (By Ms. Gessner) Isn't it true you didn't decide to
13  terminate Ms. Acevedo until you received her
14  doctor's note?
15      MR. KLASS:  Object to the form.
16 A.  I cannot answer that question the way -- can you
17  please ask the question again?
18 Q.  (By Ms. Gessner) What part of my question did you
19  not understand?
20 A.  Your question is it true and I don't understand how
21  to answer that.  Please ask the correct question.
22 Q.  Is it true that you terminated Ms. Acevedo after
23  you learned that she needed a medical leave?
24 A.  I terminated Ms. Acevedo after she came back on the
25  30th.  That should answer your question.

www.thompsonmi
l
l
s.com

## Page 163

MARTIN BORUTTA                                              163

1  Q.  On what day?
2  A.  On December 30 -- no, on -- I think it was
3  January 3, sorry, of the -- the demotion was
4  December 30.
5  Q.  So you demote her on December 30 and then you
6  terminate her on January 3 during her medical
7  leave, correct?
8      MR. KLASS:  Object to the form.
9  A.  I don't remember.  I did not look at her doctor's
10  note.
11 Q.  (By Ms. Gessner) Wait a minute.  You got a text at
12  5:32 on December 30 and you didn't read it?
13 A.  My decision is based on not taking on the new job.
14 Q.  I didn't ask you about the decision.  I asked you
15  when you received the email or the text message
16  regarding Ms. Acevedo's need for medical leave.
17      MR. KLASS:  Object to the form.
18 A.  I really don't know.
19 Q.  (By Ms. Gessner) Do you still have your text
20  messages and your emails related to Ms. Acevedo
21  from December 2019?
22 A.  I don't know.
23 Q.  Has anyone asked you to look?
24      MR. KLASS:  Objection to the extent
25  it calls for disclosure of attorney-

www.thompsonmi
l
l
s.com

## Page 164

MARTIN BORUTTA                                              164

1  client communications.  The witness can
2  answer the question only to the extent
3  anyone other than legal counsel --
4      MS. GESSNER:  Well, David, we're
5  going to litigate this because the
6  request of discovery responses isn't
7  privileged.
8  Q.  (By Ms. Gessner) I didn't say what did David say to
9  you, what did Ben, who you don't even know is your
10  lawyer, say to you.  I'm asking did anyone ask you
11  to go and look and see if you have documents
12  relative to this case on your system.  So Mr. Klass
13  likes to talk and he likes to hear himself talk so
14  he's making these unnecessary objections just to
15  take up time and so those are definitely
16  obstructing this deposition.
17      So once again -- Mr. Borutta, you're a really
18  smart guy, aren't you?
19      MR. KLASS:  Object to the form.
20 Q.  (By Ms. Gessner) Mr. Borutta, you're a really smart
21  guy, aren't you?
22      MR. KLASS:  Object to the form.
23  Harassing.
24 A.  I don't know what the question --
25      MS. GESSNER:  Right.  Not harassing.

www.thompsonmi
l
l
s.com

## Page 165

MARTIN BORUTTA                                              165

1  Oh, my gosh, I'm giving him a compliment.
2  Q.  (By Ms. Gessner) You're a really smart guy, aren't
3  you, Mr. Borutta?
4      MR. KLASS:  Object to the form.
5  A.  I don't know.
6  Q.  (By Ms. Gessner) Do you think you're smart?
7      MR. KLASS:  Object to the form.
8  A.  It's not related to the case.  I will not answer
9  that question.
10 Q.  (By Ms. Gessner) Okay.  It is related to the case.
11  Do you understand the difference between a
12  communication with your lawyer and a request to go
13  find documents that you're required to preserve and
14  find in litigation?
15      MR. KLASS:  Object to the form.
16 Q.  (By Ms. Gessner) Do you understand the difference
17  between the two?
18      MR. KLASS:  Object to the form.
19 A.  I understand the difference.  Please ask the
20  question again.
21 Q.  (By Ms. Gessner) Okay.  Have you gone to look for
22  whether or not you have a copy of the text message
23  or the email that Ms. Acevedo sent to you on
24  December 30 on your devices?
25 A.  And my answer was I don't remember.

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                    166

1  Q.   You don't remember whether you've looked or not?
2  A.   No.  That's -- the case is three years old.  I
3       don't remember.
4  Q.   Have you deleted anything related to Ms. Acevedo
5       from December of 2019?
6            MR. KLASS:  Object to the form.
7  A.   I don't remember.
8  Q.   (By Ms. Gessner) Do you still have the same cell
9       phone that you were using in December of 2019?
10 A.   I don't remember.  There was a new iPhone coming.
11      I don't know.  Maybe.
12 Q.   You mumbled.  I didn't hear your testimony.  Say it
13      again.
14 A.   Maybe I don't remember or I don't know because
15      maybe I got a new iPhone.  I don't know.
16 Q.   So when you received a new iPhone did you back up
17      the old phone to make sure you didn't destroy any
18      documents related to this case?
19            MR. KLASS:  Object to the form.
20 A.   If the documents are related to the case and it was
21      requested by the litigation hold memo, then they
22      are still on that phone.  If they were not
23      requested by your hold memo, they are not on that
24      phone.
25 Q.   (By Ms. Gessner) Well, you understood that text

MARTIN BORUTTA                    167

1       messages were included in the litigation hold,
2       didn't you?
3            MR. KLASS:  Object to the form.
4  A.   Sure, I understood.  Yes.
5  Q.   (By Ms. Gessner) And we're going to ask that you
6       produce copies of your actual iPhone did you
7       these text messages on it as well as your computer
8       that would have the doctor's notes, the date and
9       time that you received on it.  Do you have any
10      objection to that, Mr. Borutta?
11            MR. KLASS:  Object to the form.
12 A.   No, I have no objections.
13 Q.   (By Ms. Gessner) Did you prepare the termination
14      letter for Ms. Acevedo?
15 A.   I don't remember.
16 Q.   I'm going to share my screen with you again.  This
17      is Exhibit Number 10.  Do you see a document on the
18      screen, Mr. Borutta?
19 A.   I see a document.
20 Q.   And it's two pages.  It is lTeupen00024 and 00025.
21      You see that?
22 A.   I see that.
23 Q.   Did you prepare Exhibit 10, this letter?
24 A.   I didn't agree that I prepared it.  I don't
25      remember whether I prepared it.

MARTIN BORUTTA                    168

1  Q.   Did you ask Andy Liebl to prepare this letter?
2  A.   I don't remember who prepared it.
3  Q.   Well, do you see Mr. Liebl's name on the left-hand
4       side?
5  A.   Yeah.
6  Q.   And I think you earlier testified that you were the
7       only -- that it was you who terminated Ms. Acevedo,
8       correct?
9  A.   It's me that takes a decision, but I testified
10      earlier that doesn't mean that I signed every
11      termination letter.  That's a different story.
12 Q.   So did you see this letter dated January 3, 2020,
13      prior to Mr. Liebl giving it to Ms. Acevedo?
14 A.   I'm sure.
15 Q.   Excuse me?
16 A.   I am sure that I saw it before, yes.
17 Q.   And on January 3, 2020, Ms. Acevedo was on a
18      medical leave, correct?
19            MR. KLASS:  Object to the form.
20 A.   I don't remember because I don't know from which
21      date to which date the medical leave was.
22 Q.   (By Ms. Gessner) Well, again, let me refresh your
23      recollection.  You recall getting this letter from
24      her medical provider that said that she was going
25      to be out on January 2 and January 3 and could only

MARTIN BORUTTA                    169

1       return to work on January 6?  Do you see that?
2  A.   I see that.
3  Q.   On January 3 she was still on an approved leave by
4       her medical providers, correct?
5            MR. KLASS:  Object to the form.
6  A.   She was on a medical leave, yes.
7  Q.   (By Ms. Gessner) So the same -- within three days
8       of being informed that she was on a medical leave
9       you make the decision to terminate her during the
10      medical leave?
11            MR. KLASS:  Object to the form.
12 Q.   (By Ms. Gessner) Is that accurate?
13            MR. KLASS:  Object to the form.
14 A.   I took a decision, yes.
15 Q.   (By Ms. Gessner) I'm going to show you what we are
16      marking as Exhibit 11.  I'm sorry.  I have to hit a
17      bunch of buttons to get these to come up.  Okay.
18      Exhibit 11 is a letter that was sent to you on
19      January 7, 2020, correct?
20 A.   I don't remember the exact date and when I received
21      it, but looks like it.
22 Q.   Do you see the word January and the number 7 at the
23      top of Exhibit 11?
24 A.   I see that, yeah, but I don't recall when I
25      received it.

```
                    MARTIN BORUTTA              170
1  Q.  And it was a two-page letter received by -- it was
2      sent to you from my office, correct?
3  A.  It looks like, yes.
4  Q.  What actions did you take when you received this
5      email to preserve all documents and all data
6      related to Ms. Acevedo?
7  A.  I first got to read the document again.  Then I can
8      tell you what actions I took.  You got to give me
9      some time.
10 Q.  Go right ahead.  It's 2:18.
11 A.  (Reviews document.)
12 Q.  Have you had a chance to read the document,
13     Mr. Borutta?
14 A.  Yeah.
15 Q.  Do you recall my question?
16 A.  Can you repeat it?
17 Q.  What actions, if any, did you take to preserve the
18     data requested in this letter once you received it?
19 A.  I informed the employees who had access to all that
20     mentioned information that nobody's allowed to
21     delete anything that's covered by your letter.
22 Q.  Did you include all text messages, emails, all
23     documents in that communication?
24 A.  I think I -- sorry.  I think I showed a copy of
25     your letter to everybody.
```

```
                    MARTIN BORUTTA              171
1  Q.  And you made it sound like earlier that maybe you
2      didn't receive this document on January 7.  But do
3      you see up above that it was sent to you by email
4      and certified mail?  You see that?
5  A.  I see that, but doesn't mean that I received it 7,
6      but it's dated 7 and that would be correct.  Yes.
7  Q.  And again, can you recall --
8          MS. GESSNER:  Well, strike that.
9  Q.  (By Ms. Gessner) Are you aware of any documents or
10     information regarding Ms. Acevedo that were deleted
11     between December 30 and January 7?
12 A.  I don't remember.
13 Q.  So everything regarding Ms. Acevedo should be
14     available to Teupen, is that correct?
15         MR. KLASS:  Object to the form.
16 A.  I don't know.  Everything after January 7 after
17     your notice will be available if it has to be, yes.
18 Q.  (By Ms. Gessner) So why did you have Andy author
19     the letter terminating Ms. Acevedo that is in
20     Exhibit 10?
21 A.  I was not in the office.
22 Q.  Again, you could have signed the email and sent it
23     to Ms. Acevedo yourself, couldn't you?
24 A.  I decided to give the job just to sign the
25     termination notice.
```

```
                    MARTIN BORUTTA              172
1  Q.  And again, I know what you're going to say to this
2      because you've said it throughout the day, but
3      you're aware that Ms. Acevedo had complained to you
4      about Andy and Ms. Molyn on December 20
5      specifically, correct?
6          MR. KLASS:  Object to the form.
7  A.  She did not complain about them, but we were
8      talking them on December 20 I am aware of.
9          MS. GESSNER:  Did you get that,
10     Michelle?  It broke up on me.  As long
11     you got it, that's all that matters.
12         COURT REPORTER:  I did not.  Thank
13     you.
14 Q.  (By Ms. Gessner) Could you please complete your
15     answer?
16 A.  Yeah.  Ms. Acevedo did not complain about Ms. Molyn
17     and Mr. Liebl, but yeah, Mr. Liebl signed the
18     termination letter.
19 Q.  That isn't what you said, but let me ask it again.
20     Ms. Acevedo on December 20 specifically named Andy
21     Liebl and Ms. Molyn as the two people that she was
22     complaining to you about on December 20, correct?
23         MR. KLASS:  Form.
24 A.  We were talking about Andy Liebl and Ms. Molyn
25     December 20.  That's correct.
```

```
                    MARTIN BORUTTA              173
1  Q.  (By Ms. Gessner) Have you terminated employees who
2      had a contract that you did not pay the severance
3      in the contract?
4          MR. KLASS:  Object to the form.
5  A.  I don't know.
6  Q.  (By Ms. Gessner) Do you understand my question?
7  A.  Yeah, I understand the question.  I don't know or I
8      don't remember it, no.  I don't know.
9  Q.  Are there any documents that would help you refresh
10     your recollection of employees that you had
11     terminated and did not pay the contract?
12 A.  If you have any documents, I don't remember.  A lot
13     of things were done by attorneys, not by myself, so
14     I -- I -- it happened a lot in three years, so I
15     don't recall.
16 Q.  What happened a lot in two years, terminating
17     people who had a contract?
18 A.  We changed a lot of personnel.  That's what you saw
19     and you know because you got some clients, so --
20     and I don't recall.
21 Q.  When Ms. Acevedo was terminated she was terminated
22     without cause, correct?
23         MR. KLASS:  Object to the form.
24 A.  That is correct.  She was terminated without cause.
25 Q.  (By Ms. Gessner) Yet now you claim that she was not
```

MARTIN BORUTTA                    174
1    performing her job?
2         MR. KLASS:  Object to the form.
3    Q.   (By Ms. Gessner) Is that true?
4    A.   Yeah, that is correct.
5    Q.   I'm going to show you a document.  Do you see an
6         employment agreement on your screen, Mr. Borutta?
7    A.   I see part of an employment agreement on my screen.
8    Q.   It's an eight-page document that starts with
9         1Teupen9 through 1Teupen16.  You see that?
10   A.   I see that, yes.
11   Q.   And on the left-hand corner on page 8 do you see
12        PPAB1544587V1?
13   A.   I see that.
14   Q.   What does that stand for?
15        MR. KLASS:  Object to the form.
16   A.   I don't know.  I have no idea.
17   Q.   (By Ms. Gessner) Did you draft -- did you prepare
18        the employment agreement that is marked as
19        Exhibit 11?
20   A.   If you would --
21   Q.   Sorry, 12, Exhibit 12.
22   A.   How should I?  It's 2017.
23   Q.   Well, you were still working for Teupen in 2016
24        although it was in Germany, correct?
25        MR. KLASS:  Object to the form.

MARTIN BORUTTA                    175
1    A.   Okay.  I was not operational working for Teupen
2         North American from December '16 until July 2019
3         and that means that I did not sign contracts for
4         employees and I wasn't involved in drafting
5         contracts, I was not involved in terminating
6         contracts, and I was just informed or asked for
7         permission.
8    Q.   (By Ms. Gessner) Well, who hired lawyers at Teupen?
9         MR. KLASS:  Object to the form.
10   Q.   (By Ms. Gessner) Who had the authority in 2017 to
11        hire a lawyer at Teupen?
12   A.   Can you scroll down to the last page, please?
13   Q.   In a minute I will.  Please answer my question.
14        Who at Teupen had the authority to hire lawyers in
15        2017?
16        MR. KLASS:  Object to the form.
17   A.   Mr. Kesser was the president and depending on what
18        he has to do.
19   Q.   (By Ms. Gessner) Did you hire Parker Poe Adamson
20        and Bernstein or did Mr. Kesser?
21        MR. KLASS:  Object to the form.
22   A.   Parker Poe were already the lawyers for Teupen when
23        I recall it correct since 2009, so I don't know who
24        hired them.
25   Q.   (By Ms. Gessner) Did you ask Parker Poe to draft

MARTIN BORUTTA                    176
1    employment agreements for the U.S. -- for Teupen
2    U.S.?
3         MR. KLASS:  Object to the form.
4    A.   Maybe I asked them in 2019, but I don't recall it.
5    Q.   (By Ms. Gessner) So do you recall asking them to do
6         any work for Teupen USA in 2017?
7    A.   I was not operationally working for Teupen, so no,
8         I did not.
9    Q.   We're gone through this.  You were working for
10        Teupen in Germany in the production environment in
11        the German company that provides all of the
12        equipment for the United States sales, correct?
13   A.   That is correct.
14   Q.   So do you have any reason to deny that PPAB and
15        that number stands for Parker Poe Adams and
16        Bernstein and that is an internal number at the law
17        firm?
18        MR. KLASS:  Object to the form.
19   A.   I don't know what it is so I cannot tell you what
20        it is.
21   Q.   (By Ms. Gessner) Have you ever asked anyone what it
22        is?
23   A.   Sorry?
24   Q.   Have you ever asked anyone what that number stands
25        for?

MARTIN BORUTTA                    177
1    A.   No.  I had no reason to ask anyone for that number.
2    Q.   And looking at Ms. Acevedo's employment agreement,
3         I want to refer to you the section about
4         termination for cause, and there is a cause
5         definition I think down here.  Let's back up.  The
6         termination without cause, could you read
7         paragraph (d)?
8    A.   (Reviews document.)
9    Q.   Did you finish reading it, Mr. Borutta?
10   A.   Yeah.
11   Q.   Isn't it true that you wanted Ms. Acevedo to be
12        terminated without cause because you wanted her to
13        sign a release and releasing the company from her
14        claims of discrimination and retaliation in order
15        to get paid?  Isn't that correct?
16        MR. KLASS:  Object to the form.
17   A.   You got to re-ask the question because you asked
18        again isn't it.  I cannot answer isn't it.  Can you
19        please --
20   Q.   (By Ms. Gessner) Is it true -- is it true that you
21        wanted her to sign -- you wanted to terminate her
22        without cause because you had hoped that she would
23        sign a release and therefore not be able to sue the
24        company as she has done, claiming discrimination
25        and retaliation that she suffered at the company?

BORUTTA

Sheet 46  Page 178

MARTIN BORUTTA                    178

1       MR. KLASS:  Object to the form.
2  A.  First of all, that is what she says what she
3      suffered at the company.  No, it's not true.
4       COURT REPORTER:  I'm sorry.  I did
5      not get that answer.  There was
6      distortion.
7  A.  Okay.  I said first of all, that is what
8      Ms. Acevedo said that she suffered at the company,
9      and second, no, it's not true.
10 Q.  (By Ms. Gessner) Tell me all evidence you have that
11     Ms. Acevedo was not discriminated against.
12      MR. KLASS:  Object to the form.
13 A.  I don't know.  I have my meeting and I'm the
14     witness for that meeting, so that's all evidence I
15     have, but I have no evidence from Ms. Acevedo that
16     she was discriminated.
17 Q.  (By Ms. Gessner) Well, she complained to you about
18     being discriminated against, that your position is
19     that she didn't, but we understand that that's your
20     testimony.  But again, it's your word against hers,
21     correct?
22      MR. KLASS:  Object to the form.
23 A.  That is correct.
24 Q.  (By Ms. Gessner) So you weren't present for
25     Ms. Acevedo's day in and day out working

www.thompsonmi
l
l
s.com

Page 179

MARTIN BORUTTA                    179

1      environment with Mr. Liebl, were you?
2       MR. KLASS:  Object to the form.
3  A.  -- time --
4  Q.  (By Ms. Gessner) Again your lawyer talked over you
5      because he is incessant with his object to form
6      unnecessarily.  Please repeat your answer.
7  A.  I was present from time to time.  We were talking
8      about my presence in the U.S. earlier in the day
9      already.
10 Q.  So I think you testified you were in the U.S. only
11     seven times in 2019, correct?
12 A.  I think that's what I said before.
13 Q.  Of those seven times how often were you present
14     with both Ms. Acevedo and Mr. Liebl in the same
15     room?
16 A.  I don't remember.
17 Q.  Was it more than once?
18 A.  I don't remember.
19 Q.  Was it often?  You say time to time.  What does
20     that mean to you?
21 A.  In a daily business there are days you meet five
22     times a day and there are other days you meet one
23     time a day, and so I don't remember.  I cannot give
24     you a number.  I might be wrong.
25 Q.  But it is accurate that you were not present for

www.thompsonmi
l
l
s.com

Page 180

MARTIN BORUTTA                    180

1      all of the interactions between Ms. Acevedo and
2      Mr. Liebl, correct?
3  A.  On a daily business, that was their daily business
4      what they had to do together if they have to do
5      business together, so --
6  Q.  And you're aware that Ms. Acevedo had brought to
7      you concerns about Mr. Liebl's use of the company
8      credit card for his personal joy and benefit and as
9      well as commingling his personal money with the
10     company's money; you're aware of that, correct?
11      MR. KLASS:  Object to the form.
12 A.  That is not correct because it's incorrect what
13     you're just explaining.  That's why it's not
14     correct.
15 Q.  (By Ms. Gessner) What part is not correct that I'm
16     just explaining?
17 A.  Yeah, the part is not correct that he was mixing up
18     private money with company money because he asked
19     me for when he wanted to do a transaction and I
20     permitted him that transaction.
21 Q.  And Ms. Acevedo brought to your --
22      MS. GESSNER:  Well, strike that.
23 Q.  (By Ms. Gessner) Did you tell Ms. Acevedo that you
24     had permitted Andy to commingle personal money with
25     the company's money?

www.thompsonmi
l
l
s.com

Page 181

MARTIN BORUTTA                    181

1       MR. KLASS:  Object to the form.
2  A.  I don't understand what your commingling does mean.
3      I think my mic doesn't work.  Okay.  I don't
4      understand that word.  You got to explain me that.
5  Q.  (By Ms. Gessner) Well, Mr. Borutta, you just gave
6      an example of what you think I'm talking about,
7      that you claim you gave Andy express permission to
8      do what he just did.  Is that the testimony you
9      just gave a minute ago?
10      MR. KLASS:  Object to the form.
11 A.  I gave Mr. Liebl the permission because he
12     requested it.  The company would issue him a
13     counter check and he would get private checks to
14     the company and I give him the permission to get
15     that done.  Yeah.  If that's commingle, then it's
16     commingle.  I don't know that word.
17 Q.  (By Ms. Gessner) So you gave him permission to get
18     private checks in his name on the company account,
19     is that correct?
20      MR. KLASS:  Object to the form.
21 A.  Okay.  Let me explain the deal.  Maybe then it's
22     more clear for you and I won't have the problem
23     that I'm not able to explain.  Mr. Liebl sold his
24     private truck to Carmax and there was exact that
25     situation, and he asked me, because the Carmax

www.thompsonmi
l
l
s.com

THOMPSON & MILLS COURT REPORTERS
Case 3:20-cv-00518-FDW-DSC   Document 57-1   Filed 12/02/21   Page 46 of 72

Sheet 47   Page 182

                    MARTIN BORUTTA                182
1   check took five days or seven days before he
2   received the money on his account, whether he could
3   get a company check for the same amount of money
4   the same day or the next day, and I said yes, I
5   accept that.  That was the whole story.
6   Q.  (By Ms. Gessner) And Ms. Acevedo was responsible
7       for making sure that the company's money was
8       accounted for, wasn't she?
9   A.  I am responsible that the company's money is
10      accounted for, nobody else.  Ms. Acevedo is an
11      accountant.  If she needs something to report to
12      me, she can.  I take the decisions, not
13      Ms. Acevedo.
14  Q.  And when Ms. Acevedo, watching out for the
15      company's money, reported it to you, you didn't
16      tell her, oh, yeah, he's doing that with my
17      permission, correct?
18  A.  I told Ms. Acevedo that he is allowed to do that,
19      that I gave him the permission.
20  Q.  How did you tell Ms. Acevedo that he was allowed to
21      do that and you gave him permission?
22  A.  I don't remember whether I sent her an email or I
23      talked to her, but I told her that he had my
24      permission.
25  Q.  I'm going to show you what I'm marking as
                    www.thompsonmi
                          l
                          l
                        s.com

Page 183

                    MARTIN BORUTTA                183
1       Exhibit 13.  Do you see a document on the screen,
2       Mr. Borutta?
3   A.  I see a document on the screen.
4   Q.  It's a multipage document.  It's three pages.  It
5       starts with Acevedo73 and it ends with Acevedo75.
6       Do you see that?
7   A.  Yes, I see that.
8   Q.  Have you seen this email exchange before,
9       Mr. Borutta?
10  A.  I don't remember.  Maybe, yes.  I don't remember.
11  Q.  Well, let's look at it together.  Do you recall
12      receiving an email from Ms. Acevedo on October 16,
13      2019?
14  A.  I told you before I don't remember, but yeah,
15      maybe.
16  Q.  Do you see the email on the screen?
17  A.  I see the email on the screen.
18  Q.  Ms. Acevedo was informing you that a deposit for
19      $45,000 that included a check from Carmax was
20      deposited.  Do you see that?
21  A.  Yeah, I see.
22  Q.  And that she had to cut two checks and she just
23      wanted you to know for auditing purposes that it
24      was a personal transaction, correct?
25  A.  It doesn't matter to me which transaction it was,
                    www.thompsonmi
                          l
                          l
                        s.com

Page 184

                    MARTIN BORUTTA                184
1       yeah.
2   Q.  I didn't ask you whether it mattered to you,
3       Mr. Borutta.  I'm asking you do you see on
4       Exhibit 13 the communication from Ms. Acevedo on
5       October 16?
6   A.  I see it.  I see it, yes.
7   Q.  Had you told Ms. Acevedo prior to October 16 that
8       you had given Andy permission to do what he was
9       doing?
10  A.  I don't remember.
11  Q.  Well, at any place in this email does Ms. Acevedo
12      say to you, as you mentioned to me the transaction
13      has taken place?
14  A.  Say that again, please.  I didn't understand what
15      you're asking.
16  Q.  Let me ask you a different question.  Why do you
17      believe that Ms. Acevedo was sending you this email
18      on October 16, 2019, at 1:43 a.m.?
19          MR. KLASS:  Object to the form.
20  A.  Why I believe that, that's a good question because
21      she sent that, took business on that's not her
22      business.  That's what I believe.  I don't know.
23  Q.  (By Ms. Gessner) Well, it says expressly says "just
24      wanted to let you know for auditing purposes."
25      Didn't Ms. Acevedo tell you why she was sending you
                    www.thompsonmi
                          l
                          l
                        s.com

Page 185

                    MARTIN BORUTTA                185
1       this email about this transaction?
2           MR. KLASS:  Objection.  Object to
3       the form.
4   A.  Yeah.  That's fine.  That's an email.  I got the
5       email, I read that email, and that's an email.
6       Okay.
7   Q.  (By Ms. Gessner) And you responded on October 16 at
8       4:05 a.m. and said, "Marjie, that's okay.  Thanks
9       for the information, Martin," correct?
10  A.  Here we go.  Thank you for not showing me that.
11      That's what I told you before.  I think I -- that's
12      not very nice.
13  Q.  (By Ms. Gessner) Mr. Borutta, excuse me.
14      Mr. Borutta, nowhere in this communication did you
15      say I approved what Andy did, did you?
16  A.  Ms. Gessner, when I sent an email back and that
17      says that's okay, what does that mean?  It does
18      not --
19  Q.  I have no idea what it means.
20  A.  Yeah, it does mean it is approved.  If you read
21      that email, what you wanted to tell me before, that
22      means that's okay.  That means that is okay.
23  Q.  Mr. Borutta, what I'm attempting to try to get you
24      to comprehend and answer questions about is that
25      Ms. Acevedo did not know it was okay until you told
                    www.thompsonmi
                          l
                          l
                        s.com

BORUTTA

Sheet 48  Page 186

MARTIN BORUTTA                    186

1  her after the fact, correct?
2       MR. KLASS:  Object to the form.
3  A.  That doesn't matter anyhow.  What is the problem
4      with that?
5  Q.  (By Ms. Gessner) Well, she is informing you on how
6      the transaction was handled so that she would not
7      have any issues from you in allowing Andy to
8      commingle money, isn't she?
9       MR. KLASS:  Object to the form.
10 A.  I approved the transaction, said it's okay, so --
11 Q.  (By Ms. Gessner) But, Mr. Borutta, you did not
12     inform Ms. Acevedo prior to her telling you about
13     the transaction that it had been approved; it was
14     after, correct?
15      MR. KLASS:  Object to the form.
16 A.  Can you scroll down again?
17 Q.  (By Ms. Gessner) Yeah.
18     Yeah, it looks like it was after.  And what is the
19     problem with approving the transaction?
20 Q.  So did you forward the email that she sent to you
21     to Mr. Liebl?
22 A.  I don't remember.  That's two years ago.
23 Q.  Read the notes that Ms. Acevedo wrote to herself
24     that are on the first page of Exhibit 13 and tell
25     me what, if anything, is not true about what she

www.thompsonmi
l
l
s.com

Page 187

MARTIN BORUTTA                    187

1  has written.
2       MR. KLASS:  Object to the form.
3  Q.  (By Ms. Gessner) You can read, right, Mr. Borutta?
4  A.  I try to.
5  Q.  And you can understand my question?
6  A.  Let me read the email and I will get back to your
7      question.  (Reviews document.)  Okay.  I am done
8      with it.
9  Q.  Is there anything that Ms. Acevedo wrote that isn't
10     true?
11      MR. KLASS:  Object to the form.
12 A.  I don't know about the first thing because that was
13     between them.  I was not attending their meeting,
14     so I can't tell you whether it's true or not
15     because I was not present.  The second, I don't
16     know whether I talked to Mr. Liebl or not.  We had
17     a business talk and he just talked to me about and
18     I can't recall it.  That's three years ago.  And
19     the third one, yes, as an accountant she has to
20     inform me about that, that's all, but she has no
21     decide whether it's to be done or not.
22 Q.  (By Ms. Gessner) Well, is her job to inform you, or
23     I think you said even her informing you was
24     basically giving you information that wasn't any of
25     her business.  Which is it?

www.thompsonmi
l
l
s.com

Page 188

MARTIN BORUTTA                    188

1  A.  No.
2  Q.  Did she have a duty to inform you of the way the
3      company's money is spent or is it you get to pick
4      and choose what she can and can't do?
5  A.  It's not what I said before.  I said it's not her
6      business to take the decision.  The information is
7      fine, but it's not her business to take the
8      decision who can make the transaction.  I would
9      like to take a break now.
10 Q.  Okay.  No problem.  You want 10 minutes?
11 A.  Yeah.  Ten minutes.
12      MR. KLASS:  Thank you.
13 (RECESS)
14 Q.  (By Ms. Gessner) I'm going to show you another
15     document, Number 14, I think.  Do you see a
16     document on your screen, Mr. Borutta?
17 A.  I see a document.
18 Q.  This is a letter from you to me dated January 13,
19     correct?
20 A.  It looks like, yes.
21 Q.  It's a one-page letter.  Is that your signature?
22 A.  That's my signature.
23 Q.  Did you type this letter yourself?
24 A.  I think so.  I cannot recall, but I think so.
25 Q.  Do you have the original copy of this letter

www.thompsonmi
l
l
s.com

Page 189

MARTIN BORUTTA                    189

1  anywhere?
2  A.  I think so.
3  Q.  Excuse me?
4  A.  Yeah, I think so.
5  Q.  Where do you think it is?
6  A.  In the office.  I think you will have the original
7      because I sent you the letter, so I could have a
8      copy.
9  Q.  Let's define original.  Mr. Borutta, did you type
10     this letter in Word?
11 A.  I think so, yes.
12 Q.  Is the Teupen letterhead something you have to
13     actually print on or is it something that you can
14     use on electronic mail?
15 A.  I don't remember whether I printed it on or I had
16     an electronic.  I don't remember.
17 Q.  So the content of this letter, is it on your system
18     somewhere?
19 A.  I think so.
20 Q.  You sent this letter indicating that you personally
21     drafted the termination letter and advised
22     Mr. Liebl, the operations manager, to execute it as
23     you were not in the office that day.  Do you see
24     that?
25 A.  I see that.

www.thompsonmi
l
l
s.com

THOMPSON & MILLS COURT REPORTERS
Case 3:20-cv-00518-FDW-DSC  Document 57-1  Filed 12/02/21  Page 48 of 72

MARTIN BORUTTA                    190

1  Q.  So does that help refresh your recollection as to
2      who drafted the termination letter and whose system
3      it should be on?
4  A.  No, it doesn't help.  I can look it up, but maybe I
5      draft 50 percent of it, but it doesn't say I
6      drafted the whole termination letter.  I don't
7      recall.
8  Q.  Well, it doesn't say you personally drafted 50
9      percent of the termination letter, does it?
10 A.  No, I don't know who draft that, so I cannot recall
11     as I said before.
12 Q.  And you reference for the first time the ongoing
13     financial damages of thousands of dollars caused by
14     Ms. Acevedo's mistakes.  Did you ever provide any
15     written feedback to Ms. Acevedo giving her specific
16     information of what you claim is thousands of
17     dollars caused by her mistakes?
18 A.  No, I didn't.
19 Q.  In fact, prior to you bringing on Mr. Liebl,
20     Ms. Acevedo had really great performance according
21     to Teupen, correct?
22         MR. KLASS:  Object to the form.
23 A.  I cannot answer the question because I don't know.
24 Q.  (By Ms. Gessner) Did you ever look at her
25     performance reviews?

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                    191

1  A.  No, I did not.
2  Q.  Well, let's look at them together.  Do you see
3      what's been marked as Exhibit 15 on your screen?
4  A.  (No response.)
5  Q.  Mr. Borutta, do see a document on your screen?
6  A.  I see a document.
7  Q.  It's four pages.  It begins with Teupen32 and ends
8      with Teupen35.  Do you see that?
9  A.  (No response.)
10 Q.  Is that a yes?
11 A.  Yes, I see it.
12 Q.  And this appears to be the 2017 and 2018
13     performance evaluations that were given to
14     Ms. Acevedo from Teupen.  Do you have any reason to
15     disagree with that statement?
16 A.  I disagree.  Prepared by Sheri Geraghty or
17     Mr. Kesser, but not by Teupen.  So yeah, they were
18     given to her.  Yeah.  okay.
19 Q.  Do you see the words Teupen in the top right-hand
20     corner?
21 A.  Yeah.  Sheri Geraghty, looks like she did it.  I
22     don't know who did it.
23 Q.  And the contract that Ms. -- the employment
24     agreement that Ms. Acevedo had, referring you back
25     to Exhibit 12, was with Teupen USA, correct?

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                    192

1  A.  It says.  Correct.
2  Q.  Well, you made it sound as if she didn't work for
3      Teupen when she received the performance
4      evaluation.
5          MR. KLASS:  Object to the form.
6  A.  No, that's incorrect.  I just -- I don't know.  It
7      should be by a single person because Teupen cannot.
8      It was done by Ms. Geraghty.  That's what I said.
9      It looks like.  I don't --
10 Q.  (By Ms. Gessner) Mr. Borutta --
11 A.  I did not look in that paperwork.
12 Q.  I'm not sure Ms. Thompson got your answer because
13     you need to lean in and speak.
14 A.  No, I have a problem with that microphone and it's
15     -- I don't know why.  It worked before, but it's
16     not.
17 Q.  My question to you was do you have any reason to
18     dispute that the performance evaluations of
19     Ms. Acevedo in 2017 and 2018 were provided to her
20     from Teupen?
21         MR. KLASS:  Object to the form.
22 A.  I don't know.
23 Q.  (By Ms. Gessner) My gosh.  Do you see Teupen, the
24     words Teupen in the top right-hand corner?
25 A.  I see Teupen in the top right corner, yes.

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                    193

1  Q.  And Ms. Geraghty worked for Teupen?
2  A.  Yes.
3  Q.  And she was Ms. Acevedo's manager, correct?
4  A.  I think she was.
5  Q.  And she gave Ms. Acevedo a performance evaluation
6      dated 12/21/18 on behalf of Teupen, correct?
7          MR. KLASS:  Object to the form.
8  A.  I don't know.  I don't know that signature, so I
9      don't know.  That should answer your question.  I
10     don't know it.
11 Q.  (By Ms. Gessner) Do you see the words employee
12     signature and supervisor signature?
13 A.  I see the words.
14 Q.  Have you ever seen a performance evaluation form
15     while you have owned and operated Teupen?
16 A.  No.
17 Q.  So you've never seen a form that is like the one
18     that has been marked as Exhibit 15?
19 A.  No.
20 Q.  Any idea where this document came from then?
21 A.  No, sorry, because I don't know the documents.
22 Q.  Well, you produced it in this litigation.  Where
23     did it come from?
24 A.  I think it was in the personnel file, but I have no
25     idea.

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                194

1  Q.  So you didn't take the time to go back and look at
2      the performance of Ms. Acevedo before you had put
3      Andy Liebl over her?
4          MR. KLASS:  Object to the form.
5  A.  Wrong expression, because I did not put Andy Liebl
6      over her.  They were colleagues on the same level,
7      so I cannot answer that question the right way.
8  Q.  (By Ms. Gessner) So you normally would have one
9      colleague terminate another colleague, just like
10     have Andy terminate Ms. Acevedo?
11         MR. KLASS:  Object to the form.
12 A.  I gave him the authority because I was not there.
13     Yes.
14 Q.  (By Ms. Gessner) The very person that Ms. Acevedo
15     had complained to you about, correct?
16         MR. KLASS:  Object to the form.
17 A.  She did not complain about Mr. Liebl.  We talked
18     about Mr. Liebl, and he was the person who gave her
19     the termination notice.  Correct.
20 Q.  (By Ms. Gessner) She expressly brought up
21     Mr. Liebl's name to you during the conversation
22     that you dispute happened, correct?
23         MR. KLASS:  Object to the form.
24 A.  She mentioned -- she mentioned Mr. Liebl.  Yeah.
25     Correct.

www.thompsonmi
1
1
s.com

MARTIN BORUTTA                195

1  Q.  (By Ms. Gessner) So again, you've never looked at
2      her performance evaluation at all?
3          MR. KLASS:  Object to the form.
4  A.  No, I did not.
5  Q.  (By Ms. Gessner) Did you stop the practice of
6      conducting performance evaluations when you became
7      the CEO of Teupen USA?
8          MR. KLASS:  Object to the form.
9  A.  I did not do any performance review in the last
10     three years.
11 Q.  (By Ms. Gessner) Do you know if any other managers
12     at Teupen conduct performance evaluations over the
13     last three years?
14         MR. KLASS:  Object to the form.
15 A.  It's two years since -- no, I don't know and I
16     don't think so.
17 Q.  (By Ms. Gessner) Who holds the position that Marjie
18     had now?  Do you know who Marjie is, Marjie
19     Acevedo?
20 A.  Nobody holds Ms. Acevedo's position now.
21 Q.  Who is performing her job duties?
22 A.  The daily business is outsourced to CKH.
23 Q.  And when did that take place?  When did the
24     outsourcing take place?
25 A.  When Ms. Molyn left the company.  Not directly

www.thompsonmi
1
1
s.com

MARTIN BORUTTA                196

1      after that but beginning of the year, I think in
2      February.
3          MS. GESSNER:  I need two minutes.
4      I've got somebody at my door.  Give me
5      just a second.  I need to see who this
6      is.
7  (RECESS)
8  Q.  (By Ms. Gessner) Do you recall receiving the
9      discovery requests in this case from Ms. Acevedo?
10 A.  No, I don't recall.
11 Q.  Did you personally work to gather information to
12     provide it to the lawyers in response to the
13     discovery requests in this case?
14 A.  I don't remember.
15 Q.  Who else at Teupen has participated in the defense
16     of this case?
17         MR. KLASS:  Object to the form.
18 A.  Fisher Phillips.
19 Q.  (By Ms. Gessner) I'm talking about anybody else who
20     works for Teupen.  Have you delegated or discussed
21     this case with anyone at Teupen?
22 A.  I don't remember.
23 Q.  Is that maybe you did discuss it with someone at
24     Teupen, you just don't know who?
25 A.  No.  I said I don't remember.  That's what I said.

www.thompsonmi
1
1
s.com

MARTIN BORUTTA                197

1  Q.  Did you discuss the fact that you're being deposed
2      today with anyone at Teupen?
3  A.  I told some people that I have an appointment for a
4      deposition, but not what the deposition is about.
5  Q.  You broke up there.  Maybe it was just me.
6  A.  I just talked about that I have a deposition today,
7      but not what the deposition is about.
8  Q.  Who did you tell you had a deposition today?
9  A.  The gentlemen I fly to Las Vegas with.
10 Q.  And who is that?
11 A.  Mr. Rogers, Mr. Blackburn.
12 Q.  Anyone else?
13 A.  No.
14 Q.  Have you asked anyone else at Teupen to assist you
15     in gathering information to provide it to Fisher
16     Phillips?
17 A.  I don't remember.
18 Q.  When were you last asked to provide information?  I
19     don't want to know what your lawyer said before
20     Mr. Klass starts objecting, but when did you last
21     begin --
22         MS. GESSNER:  Strike all that.
23 Q.  (By Ms. Gessner) When did you last search for
24     responsive information in this case?
25 A.  I don't remember.  Two weeks ago or three weeks.  I

www.thompsonmi
1
1
s.com

## Sheet 51 Page 198

```
                    MARTIN BORUTTA                198
1       -- I don't know exactly.
2   Q.  Have you hired anyone as a third-party vendor to do
3       any searches through Teupen's email system
4       associated with this case?  Not what your lawyers
5       did.  Have you hired someone?
6   A.  No.
7   Q.  What actions have you personally taken to find
8       responsive information in this case?
9   A.  I was looking through my emails and the
10      possibilities of looking up documents.
11  Q.  Have you looked through Mr. Liebl's emails?
12  A.  I don't remember.  I don't think so.
13  Q.  You don't think so?
14  A.  No, I don't think so.
15  Q.  Have you look through Ms. Molyn's emails?
16  A.  No, I don't think so.
17  Q.  Have you asked anyone to look through Ms. Molyn's
18      or Mr. Liebl's emails?
19  A.  No, I did not.
20  Q.  Does Teupen have personnel files?
21  A.  There are some.
22  Q.  Where are they located?
23  A.  In one of the cabinets in the office.
24  Q.  In whose office?
25  A.  Actually in my office.
                    www.thompsonmi
                         l
                         l
                       s.com
```

## Page 199

```
                    MARTIN BORUTTA                199
1   Q.  Have you looked through and provided all responsive
2       information included in personnel files in this
3       case?
4           MR. KLASS:  Object to the form.
5   A.  I don't remember.
6   Q.  (By Ms. Gessner) You don't know?  You don't
7       remember whether you looked or not?
8   A.  I don't remember.
9   Q.  Is it possible you didn't look at all?
10          MR. KLASS:  Object to the form.
11  A.  I don't remember.
12  Q.  (By Ms. Gessner) Well, Mr. Borutta, I'm trying to
13      understand.  Do you not remember you did it but you
14      don't remember when or you didn't do it at all?
15  A.  I don't remember whether I looked, and if I looked
16      I don't remember when I did it.
17  Q.  If an employee needs to take time off due to a
18      medical condition, what do they need to do at
19      Teupen?
20  A.  They tell their supervisor that they need medical
21      leave.
22  Q.  Just like Ms. Acevedo did when she informed you she
23      needed medical leave?
24          MR. KLASS:  Object to the form.
25  Q.  (By Ms. Gessner) Is that correct?
                    www.thompsonmi
                         l
                         l
                       s.com
```

## Page 200

```
                    MARTIN BORUTTA                200
1   A.  That is correct.  They inform about a medical
2       leave.
3   Q.  I didn't hear the end part of that.  What did you
4       say?
5   A.  They inform about a medical leave and provide a
6       doctor's note or not.  Most of the time they
7       provide one.
8   Q.  Just like Ms. Acevedo did, correct?
9           MR. KLASS:  Object to the form.
10  A.  I don't know what the others do, but that is the
11      way, to provide a doctor's note or give the
12      information for medical leave.
13  Q.  (By Ms. Gessner) Have you ever had -- while you
14      were the CEO of Teupen USA from mid 2019 to
15      present, have you had employees need to take
16      medical leave other than Ms. Acevedo?
17  A.  Mr. Hickman was on medical leave.
18  Q.  Anyone else?
19  A.  I don't know.  I just know about Mr. Hickman.
20  Q.  How were you aware that Mr. Hickman was on medical
21      leave?
22  A.  Mr. Rogers told me that.
23  Q.  Did you provide any information regarding
24      Mr. Hickman's medical leave in this case?
25          MR. KLASS:  Object to the form.
                    www.thompsonmi
                         l
                         l
                       s.com
```

## Page 201

```
                    MARTIN BORUTTA                201
1   A.  Mr. Hickman's leave was in 2021 and I think I was
2       requested from 2020, but I don't remember.
3   Q.  (By Ms. Gessner) At Teupen, if you need to take a
4       sick day, is it any different than medical leave?
5           MR. KLASS:  Object to the form.
6   A.  I don't know.  That's handled by Mr. Rogers.
7   Q.  (By Ms. Gessner) Do you require employees to bring
8       doctor's note for sick days?
9   A.  I don't know.  That's Mr. Rogers' business, daily
10      business.
11  Q.  So does the company have a policy regarding how
12      sick leave is handled or is it just up to his
13      discretion however he wants to handle it?
14          MR. KLASS:  Object to the form.
15  A.  I think it's practice how they ever did it, but I
16      don't know, so it's his discretion.
17  Q.  (By Ms. Gessner) What training, if any, has
18      Mr. Rogers had about how to handle requests for
19      leave?
20          MR. KLASS:  Object to the form.
21  A.  I don't know.
22  Q.  (By Ms. Gessner) And you have testified you haven't
23      had any human resources training on United States
24      laws, correct?
25          MR. KLASS:  Object to the form.
                    www.thompsonmi
                         l
                         l
                       s.com
```

MARTIN BORUTTA                202

1  A.  I said that before, yes.
2  Q.  (By Ms. Gessner) Just so we have a clear record,
3      yes, you had not had any training, correct?
4  A.  Did not have any HR training in the U.S.
5  Q.  Do you know what COBRA is?
6  A.  Not really.
7  Q.  Do you have any understanding as to what COBRA is?
8  A.  Not really.  I told you before we don't have that
9      in Germany.
10 Q.  Did you do anything when you became the CEO in 2019
11     to educate yourself on what COBRA is?
12 A.  No, I did not, because we still had Insperity in
13     2019.
14 Q.  At what point did you make the decision to get rid
15     of Insperity?
16 A.  I asked for a comparison of different providers I
17     think in September when I saw the cost of Insperity
18     for the budget for the next year.
19 Q.  What was the timeframe again?  I'm so sorry.
20 A.  I think it was September.
21 Q.  September of 2019?
22 A.  I think September.
23 Q.  And what, if anything, did you do to educate
24     yourself on what responsibilities you had to your
25     employees once you eliminated Insperity?

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                203

1  A.  I don't remember.
2  Q.  Let me show you another document.  You say you
3      don't remember.  Do you recall doing anything?  Did
4      you ask for any type of training or transition from
5      Insperity or get any instructions on what you
6      needed to do since they were no longer going to be
7      in place?
8  A.  I said I don't remember.
9  Q.  Again, Mr. Borutta, is that a you did do something,
10     you don't remember what it is, or is that a you
11     don't know whether you did anything or not?
12 A.  Maybe I did an online training, but I don't
13     remember, so I cannot tell you.  I don't remember.
14 Q.  What is it that makes you think that maybe you did
15     an online training?
16 A.  Ms. Gessner, it's three years ago and I don't
17     remember, so I don't remember.  That's what I can
18     tell you.
19 Q.  And since you decided to end the relationship with
20     Insperity, have you done anything to obtain any
21     type of training or information on U.S. employment
22     laws?
23 A.  I don't remember.
24 Q.  Have you had any training this year, in 2021, on
25     U.S. labor laws?

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                204

1  A.  I don't remember.
2  Q.  How about in 2020?
3  A.  I don't remember.
4  Q.  Give me just one moment.  I've lost a document.
5      How many employees were employed by Teupen
6      U.S. in 2019?
7          MR. KLASS:  Object to the form.
8  A.  I don't know the exact number.  I think 18.
9  Q.  (By Ms. Gessner) What makes you think it was 18?
10 A.  Because I think I saw the number.  That's why I
11     think it was 18, but I don't know it exactly.  I
12     think I saw it on my budget, but I don't remember
13     exactly.
14 Q.  Let's see if I can show this to you.  I think we
15     are on Exhibit 16.  Okay.  I am showing you what
16     has been marked as Exhibit 16 to your deposition.
17     You see a document on the screen, Mr. Borutta?
18 A.  I see a document on the screen.
19 Q.  And this is Bates -- it's a two-page document.  It
20     is Bates number 2Teupen003 and 2Teupen004.  This is
21     what you produced through your lawyers to reflect
22     the individuals who had been employed and/or
23     terminated in 2019.  Do you have any reason to
24     dispute that?
25 A.  I think that's correct.

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                205

1  Q.  So let's take a look at this one by one.  How many
2      people is it that you say were employed in 2019?
3      You thought 18?
4  A.  Full-time equivalent the whole year, I think 18.
5      Yes.
6  Q.  Do you have an understanding that you, Teupen, have
7      a responsibility to offer COBRA notice for all
8      employers who employ 19 or more employees for six
9      months?  Do you have an understanding of that?
10         MR. KLASS:  Object to the form.
11 A.  No.  I don't know.
12 Q.  (By Ms. Gessner) Let's count the number of
13     employees that are on this list.  Why don't you do
14     that for me?  Let me go up.  Can you see it?
15 A.  I can see it.
16 Q.  Okay.  Count the number of employees.
17 A.  That's a total number of 23.
18 Q.  Of those 23 employees can you determine how many
19     were employed in 2019 at least six months?
20 A.  I think it's 22.
21 Q.  So more than 19 employees worked greater than six
22     months in 2019 at Teupen, correct?
23         MR. KLASS:  Object to the form.
24 A.  I believe so.
25 Q.  (By Ms. Gessner) And when you ended the contract

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                    206

1   with Insperity at the end of December 2019 Teupen
2   had a responsibility to offer COBRA notices to its
3   employees when they were terminated after
4   December 31, 2019, correct?
5        MR. KLASS:  Object to the form.
6  A.  I don't know of that obligation because I told you
7       before I don't know it.
8  Q.  (By Ms. Gessner) Sitting here today you're aware
9       that no one sent Ms. Acevedo a COBRA notice after
10      she was fired on January 3, 2020, correct?
11       MR. KLASS:  Object to the form.
12 A.  I don't know whether Ms. Acevedo received a COBRA
13      notice from Insperity.  She must have received one.
14 Q.  (By Ms. Gessner) But isn't it true when Insperity
15      sent notices it was only for anyone who had
16      terminated before their contract expired, correct?
17       MR. KLASS:  Object to the form.
18 A.  Now again you asked isn't it true.  I cannot answer
19      isn't it true question.
20 Q.  (By Ms. Gessner) Well, Mr. Borutta, you're the one
21      who canceled the contract, correct?
22 A.  I canceled the contract with Insperity.
23 Q.  Do you know whether or not Insperity had an
24      obligation in 2020 to do anything for Teupen?
25       MR. KLASS:  Object to the form.

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                    207

1  A.  They had no obligation to do anything for Teupen.
2  Q.  (By Ms. Gessner) Because they weren't being paid
3       anymore by Teupen, correct?
4  A.  That is correct.
5  Q.  So any obligation regarding COBRA notice in 2020
6       was Teupen's stand-alone, not Insperity, correct?
7        MR. KLASS:  Object to the form.
8  A.  I don't know because I am not a COBRA specialist.
9  Q.  (By Ms. Gessner) I didn't ask whether you were.
10 A.  I don't know.
11 Q.  I didn't ask whether you were.  If there are legal
12      responsibilities under COBRA laws in 2020, only
13      Teupen would be responsible, correct?
14       MR. KLASS:  Object to the form.
15 A.  I don't know because in 2020 Teupen had way less
16      employees starting from January 2020, and so I
17      don't know.
18 Q.  (By Ms. Gessner) Has anyone educated you in this
19      case at all -- are you now aware that it's the six
20      months preceding the termination that you do the
21      math to determine whether there were more than 19
22      employees?
23       MR. KLASS:  Object to the form.  And
24      also object to the extent that counsel is
25      asking for disclosure of attorney-client

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                    208

1   privileged communications, and the
2   witness can answer to the extent it would
3   not reveal those communications.
4  Q.  (By Ms. Gessner) Once again, Mr. Borutta, do you
5       need Mr. Klass's constant reminder about not
6       talking -- not providing any information that he's
7       told you or any other lawyer has told you?  Do you
8       need that constant reminder?
9        MR. KLASS:  I'm going to object too
10      as you are now interfering with my
11      ability to represent my client, so I will
12      make objections that I see fit for my
13      client.  You can ask your next question.
14       MS. GESSNER:  Not at all.
15      Mr. Klass, we're going to start running
16      some time here so I can get this witness
17      back.  We need him for multiple reasons,
18      but your lengthy and slow and annoying
19      objections have been -- we've been very
20      patient all day long.  It is way over the
21      top, so this client has been -- this
22      witness has been informed numerous times
23      today not to disclose anything that he
24      said to you or that you said to him.  I
25      didn't even ask him anything about what

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                    209

1   his lawyers said.  I'm asking about what
2   his knowledge is related to the Teupen,
3   his company's obligations to employees
4   regarding COBRA.  You're just talking to
5   talk now and to waste time and to
6   obstruct this deposition.
7        MR. KLASS:  Your comment just then
8       was much longer than my objection.
9        MS. GESSNER:  Yeah.  Okay.
10 Q.  (By Ms. Gessner) Mr. Borutta, do you have any
11      knowledge what you're supposed to do at all in 2020
12      about COBRA?
13       MR. KLASS:  Object to the form.
14 A.  No, I have not.
15 Q.  (By Ms. Gessner) Have you Googled the word COBRA to
16      determine what your legal obligation is to your
17      employees under COBRA?
18 A.  I don't remember.
19 Q.  Have you done any independent research of your own
20      to understand what your obligation is under COBRA?
21 A.  I don't remember.
22 Q.  Have you provided COBRA notices to any other
23      employees who you terminated after 2020?
24 A.  No, as I -- no, not as I would know.
25 Q.  When did you decide to file counterclaims against

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                          210

```
 1        Ms. Acevedo?
 2   A.   You will find that in your email conversation with
 3        me.
 4   Q.   Well, you didn't file a lawsuit against her in
 5        January of 2020, did you?
 6   A.   No, but I already told you that there will be legal
 7        consequences if I do not get my company property
 8        back and that's what was clear, what I have to do
 9        if I don't get it back on time and as requested.
10   Q.   Nothing prevented you from filing a lawsuit against
11        Ms. Acevedo in 2020 if you believed that she had
12        kept your property unlawfully, correct?
13   A.   Was that a question?
14   Q.   Yeah.
15   A.   I can't -- that wasn't for me a question.  What's
16        the question?
17   Q.   Mr. Borutta, you're saying based upon your letter
18        you sent me that if you didn't get the property
19        back you are going to have to take legal action
20        against Ms. Acevedo.  Isn't that the testimony you
21        just referred to?
22            MR. KLASS:  Object to form.
23   A.   Yeah.  That's correct.
24   Q.   (By Ms. Gessner) And that was in January of 2020,
25        correct?
```

MARTIN BORUTTA                          211

```
 1   A.   That was January 2020.
 2   Q.   And you did not file a complaint against
 3        Ms. Acevedo until after she had filed the EEOC
 4        charge and lawsuit against Teupen, correct?
 5   A.   I don't remember.
 6   Q.   Well, do you know what day you filed the
 7        counterclaim?
 8   A.   I don't remember.
 9   Q.   Did you take any action to file a lawsuit against
10        Ms. Acevedo before she had filed her EEOC charge
11        and lawsuit against Teupen?
12   A.   I told you that we will take legal action and --
13   Q.   Did you?
14   A.   Sorry?
15   Q.   Did you take any legal action against Ms. Acevedo
16        before she filed an EEOC charge and lawsuit against
17        Teupen?
18   A.   Yes, we did.
19   Q.   What legal action did you take against Ms. Acevedo
20        before she filed an EEOC charge and lawsuit against
21        Teupen?
22   A.   I don't know how you call it, but because -- I can
23        only tell you in German, but I sent Mr. Liebl and
24        Ms. Molyn to the police to file a claim that our
25        property was stolen by Ms. Acevedo.
```

MARTIN BORUTTA                          212

```
 1   Q.   Did you sue her now as you have done now?  Did you
 2        sue her civilly before she filed a claim against
 3        Teupen?
 4   A.   No.  I took action.  That's what I told them.
 5   Q.   Excuse me?
 6   A.   We took legal action and we followed up on that.
 7   Q.   Well, I understand what you think is legal action
 8        is -- your testimony is that you went to the
 9        police, correct?
10   A.   Yeah.  First of all, we went to the police.
11   Q.   And then did you file any type of complaint or
12        action against Ms. Acevedo before she filed her
13        claim against Teupen?
14            MR. KLASS:  Object to the form.
15   A.   I don't remember when we filed the counterclaim.
16   Q.   (By Ms. Gessner) Where is Ms. Acevedo's laptops?
17   A.   Teupen laptop that was used by Ms. Acevedo must be
18        the right question.  It's in my office.
19   Q.   And how long has it been in your office?
20   A.   Since we got it back.
21   Q.   So you have not used it or redistributed it in any
22        way to another employee since you received it?
23   A.   No.
24   Q.   Have you turned it on?
25   A.   No.
```

MARTIN BORUTTA                          213

```
 1   Q.   So you still have the hard drive intact in the same
 2        manner and form in which that she had it last; is
 3        that accurate?
 4   A.   That's -- I cannot answer that question because I
 5        don't know whether the hard drive is intact.
 6   Q.   Have you done anything to look at her computer?
 7   A.   I took it and put it in a drawer.
 8   Q.   And it's still in that drawer?
 9   A.   It's still in the drawer.
10   Q.   We have asked for a forensic copy of the computer.
11        Are you agreeable to give it to us?
12            MR. KLASS:  Object to the form.
13   A.   I got to discuss that with my legal counsel.  I
14        don't know.
15   Q.   (By Ms. Gessner) You have preserved the two
16        computers that she had and you have not touched
17        them and opened them and used them in any way since
18        they were returned; is that accurate?
19   A.   That's not what I said.
20   Q.   Well, what have you done with her computers since
21        you received them?
22   A.   First of all, it's not her computers.  Second of
23        all, the one Teupen computer Ms. Acevedo used at
24        her house is in my drawer and the other computer
25        was an accounting computer that is still in the
```

MARTIN BORUTTA                    214

```
 1     accounting office.  That's what we did with them.
 2  Q.  Has anyone turned on Ms. Acevedo's computers that
 3     she used when she was working for Teupen since they
 4     were returned?
 5  A.  Which one?
 6  Q.  Either one.
 7  A.  For sure, because the second one is the accounting
 8     computer.  It's not Ms. Acevedo's computer.
 9  Q.  But again, you had a duty to preserve everything
10     that was on that computer as soon as you received
11     it back in your possession.  Did you take an image
12     of her computer?
13  A.  The computer is -- her user is still her user, but
14     it doesn't mean if another uses that computer that
15     her image is not on the computer.
16  Q.  Mr. Borutta, we're entitled to see when the
17     computer was turned on after it was returned to
18     you.  Have you done anything to delete that
19     information?
20         MR. KLASS:  Object to the form.
21  A.  I answered you before I took the --
22  Q.  (By Ms. Gessner) You haven't.  You have not
23     answered the question.  Mr. Borutta, let me make --
24     let's start over.  Let me start over.  It's very
25     important that you focus on my question and you
```

MARTIN BORUTTA                    215

```
 1     answer what I'm asking you.  When you received the
 2     computer, the computers that Ms. Acevedo was using,
 3     there were two of them, correct?
 4  A.  Again, the one we didn't receive it, so --
 5  Q.  I didn't ask you a second question.  Let me ask it
 6     to you so it's very clear, because you like to give
 7     me answers that are not responsive.
 8  A.  Ms. Acevedo --
 9  Q.  She had two computers in her possession.  Are you
10     claiming that she kept two computers and didn't
11     return two computers?
12         MR. KLASS:  Object to the form.
13  A.  Ms. Acevedo had one computer in her possession that
14     we received, I don't remember, and Ms. Acevedo was
15     using the former accounting computer from
16     Ms. Geraghty in the accounting office and there was
17     an accounting computer after she left the company
18     because it was always an accounting computer.
19  Q.  (By Ms. Gessner) Okay.  So it was an accounting
20     computer that was left on her desk that she used
21     last before she was terminated in January 2020,
22     correct?
23  A.  Yes.
24  Q.  On January 7, 2020, when you received my letter
25     with a litigation hold notice, what did you do, if
```

MARTIN BORUTTA                    216

```
 1     anything, to preserve the data on the computer
 2     Ms. Acevedo had been using in the office?
 3  A.  I informed my employees, as I told you before, and
 4     showed them your litigation hold notice, not to
 5     delete or to take anything off that computer.
 6  Q.  We have asked for a copy of the hard drive of both
 7     of her computers, the one she used in accounting
 8     and the one that she used at home.  Do you have
 9     copies of those hard drives in your possession?
10         MR. KLASS:  Object to the form.
11  A.  The hard drives are in my possession, so --
12  Q.  (By Ms. Gessner) On the computer that was returned
13     to you by your lawyers, once they made an
14     appearance in this lawsuit, what did you do with
15     that computer when you received it?
16         MR. KLASS:  Object to the form.
17  A.  The same question, same answer.  I took it and put
18     it in a drawer in my office.
19  Q.  (By Ms. Gessner) And has it been used by anyone
20     since?
21  A.  Not of my knowledge, but I don't lock my office,
22     so --
23  Q.  So you have a copy -- you have that computer in
24     your possession for which that you could provide a
25     copy of the hard drive so that we may inspect how
```

MARTIN BORUTTA                    217

```
 1     that computer has been used, correct?
 2         MR. KLASS:  Object to the form.
 3  A.  I have the computer in my possession.  You asked
 4     the question, and yes, I have the computer in my
 5     possession.
 6  Q.  (By Ms. Gessner) So again, you didn't need the
 7     computer back in order for someone else to use it
 8     because you've kept it in your drawer the entire
 9     time since it was returned, correct?
10         MR. KLASS:  Object to the form.
11  A.  It's not correct.
12  Q.  (By Ms. Gessner) Well, you just testified that you
13     hadn't touched it and used it since it was
14     returned?
15  A.  Yeah, but you asked me whether I didn't need it.
16     That's not correct.  I didn't touch it, but I got
17     it back so late that I had to bring over another
18     computer for me to use in the U.S. from Germany.
19     So that's why your question was not correct.
20  Q.  Teupen is a $12.4 million company, isn't it?
21         MR. KLASS:  Object to the form.
22  A.  It's between 10 and 20 million in sales, yeah,
23     Teupen USA.  Yes.
24  Q.  (By Ms. Gessner) And what's the net profit of
25     Teupen?
```

MARTIN BORUTTA                                      218

```
1          MR. KLASS:  Object to the form.
2  A.   That depends which year you are you referring to.
3  Q.   (By Ms. Gessner) In 2020 what was the net profit?
4  A.   $150,000, $180,000, something like that.
5  Q.   In 2021 what's the net profit year to date?
6          MR. KLASS:  Object to the form.
7  A.   I don't know exactly.
8  Q.   (By Ms. Gessner) How do you manage the books in --
9       or do you get any type of accounting reports each
10      quarter for Teupen?
11 A.   Yeah, I get them.
12 Q.   On your bAllence sheet, what was your profit for
13      through quarter three, through the end of
14      September?
15 A.   I don't remember.
16 Q.   Is it your testimony there was not another single
17      computer that you could use other than the one that
18      Ms. Acevedo had from the time -- from March of 2020
19      until May of 2020 when you received it back?
20 A.   My testimony is that I didn't use the computer
21      because, first of all, we got it back late and,
22      second of all, I already brought it from Germany
23      and I didn't want to use it afterwards to preserve
24      it.  That's why it's in the drawer.
25 Q.   So even if you'd received it you were going to use
```

www.thompsonmi
1
1
s.com

MARTIN BORUTTA                                      219

```
1       it?
2          MR. KLASS:  Object to the form.
3  A.   I would have used it maybe for me for accounting,
4       but I got another one, so --
5  Q.   (By Ms. Gessner) How would you have preserved the
6       hard drive as you were required to do according to
7       the litigation hold notice and still use the
8       computer?
9          MR. KLASS:  Object to the form.
10 A.   The hard drive is still the same hard drive.  We
11      just add another user, so there is no damage, no
12      release, nothing on the hard drive.
13 Q.   (By Ms. Gessner) You understand that when you turn
14      on a computer it leaves a date and time stamp so
15      that someone can actually see exactly when the
16      computer was used itself, even if it's connected to
17      a system?
18         MR. KLASS:  Object to the form.
19 A.   Yeah, yeah, I understand that.
20 Q.   (By Ms. Gessner) It's your testimony you've
21      preserved all that data so that we can see exactly
22      when both of these computers have been turned on
23      and off --
24         MR. KLASS:  Object to the form.
25 Q.   (By Ms. Gessner) -- after Ms. Acevedo was
```

www.thompsonmi
1
1
s.com

MARTIN BORUTTA                                      220

```
1       terminated?
2          MR. KLASS:  Object to the form.
3  A.   (No response.)
4  Q.   (By Ms. Gessner) Do you understand my question?
5  A.   I don't know if I can confirm that.  I don't know.
6       I am not an IT specialist.
7  Q.   But again, what action did you take to make sure
8       the person who does know how to preserve the data
9       could do that?
10         MR. KLASS:  Object to the form.
11 A.   I informed the persons about your litigation hold
12      memo and they used it or they agreed to do it, so
13      yeah, I got to be sure that it is what it is what
14      you requested.
15 Q.   (By Ms. Gessner) At some point you became aware
16      that my office had reached out to your registered
17      agent, Parker Poe, asking them whether or not they
18      would accept the return of Ms. Acevedo's phone and
19      computer, correct?
20         MR. KLASS:  Object to the form.
21 A.   No, that --
22 Q.   (By Ms. Gessner) Parker Poe was Teupen's registered
23      agent with the Secretary of State, correct?
24 A.   That question is correct.
25 Q.   And they were the registered agent through the end
```

www.thompsonmi
1
1
s.com

MARTIN BORUTTA                                      221

```
1       of 2020, correct?
2  A.   That is correct.
3  Q.   And you became aware that I had reached out, my
4       office had reached out to Parker Poe attempting to
5       return the computer and the phone and we were told
6       they were not allowed to accept it.  You're aware
7       of that, aren't you?
8          MR. KLASS:  Object to the form.
9  A.   No, I'm not aware of that.
10 Q.   (By Ms. Gessner) Have you not read the pleadings in
11      this case, Mr. Borutta?
12         MR. KLASS:  Object to the form.
13 A.   I'm not aware of that.
14 Q.   (By Ms. Gessner) Is that because you have not read
15      the pleadings in this case?
16         MR. KLASS:  Object to the form.
17 A.   I don't know.
18 Q.   (By Ms. Gessner) Mr. Borutta, since your lawyer
19      really is becoming incredibly annoying, he's
20      objecting because -- Mr. Borutta, are you aware
21      what a pleading is?
22 A.   No.  I didn't read the pleadings.
23 Q.   So you do know what a pleading is?
24 A.   No, I don't know what is a pleading is.  That's
25      what I said.
```

www.thompsonmi
1
1
s.com

MARTIN BORUTTA                    222

1  Q.  Have you read the documents that have been filed
2      with the court in this matter?
3          MR. KLASS:  Object to the form.
4  A.  Maybe a long time ago, yes, and maybe I understood
5      them, but --
6  Q.  (By Ms. Gessner) And so here under oath, under
7      penalty of perjury, no one has made you aware that
8      my office contacted Parker Poe in order to
9      determine whether or not they would accept the
10     computer and the phone on your behalf?
11         MR. KLASS:  Object to the form.
12 A.  It's not to my -- it's not to my knowledge that you
13     contacted Parker Poe because I informed Parker Poe
14     at January 6 or 7 that they are not leading counsel
15     for us and they knew about it, so that's all I know
16     and that's why I cannot confirm.  But I don't know
17     whether your office contacted them or not, and you
18     asked me.  No, I don't know.
19 Q.  (By Ms. Gessner) I'll show you an email to show
20     that we contacted Parker Poe.  Again, what loss
21     have you suffered other than not being able to use
22     the computer now that you've put in a desk drawer
23     from January of 2020 to May of 2020 regarding the
24     computer?
25         MR. KLASS:  Object to the form.

MARTIN BORUTTA                    223

1  A.  I don't know.  We have to determine the loss.
2  Q.  (By Ms. Gessner) Well, no, sitting here today is it
3      that you have zero loss?
4          MR. KLASS:  Object to the form.
5  A.  I said before we had to bring over another
6      computer, so -- and bought another computer.  I
7      don't know what the loss is for that, so --
8  Q.  (By Ms. Gessner) Again, when you bought another
9      computer, you now have two computers that anyone
10     can use that you delegate, correct?
11         MR. KLASS:  Object to the form.
12 A.  Now I have one old computer and one additional one,
13     yes, so there will be a loss, but that has to be
14     determined.
15 Q.  (By Ms. Gessner) Have you done anything independent
16     to determine how much Teupen has lost, allegedly
17     lost as a result of not having its computer
18     returned to it between January and May of 2020?
19 A.  Not yet.
20 Q.  Did Parker Poe contact you to determine -- there
21     was no privilege relationship.  Did they contact
22     you to see if you were going hire them once my
23     office reached out to them asking them whether or
24     not they would accept the computer and phone?
25         MR. KLASS:  Object to the form.

MARTIN BORUTTA                    224

1  A.  You put two questions in one.  I don't know whether
2      your office reached out to them returning the
3      computer and the phone, so I --
4  Q.  (By Ms. Gessner) Did Parker Poe reach out to you
5      asking whether or not you were going to hire them
6      to represent you in this case?
7  A.  Parker Poe informed beginning of January 2020 that
8      they received the litigation hold letter from you
9      and they asked me because -- and I told them no,
10     they are not representing Teupen the same day.
11     That's all I know.
12 Q.  So it's your testimony no one from Parker Poe told
13     you that we had offered to give them the computer
14     and phone to get it to you?
15 A.  Yeah, that's my testimony, because I was never
16     contacted from Parker Poe that we get our phone and
17     the computer back.
18 Q.  And, Mr. Borutta, you never sent any prepaid boxes
19     or any type of courier or anyone to either my
20     office or Ms. Acevedo's home to collect your
21     computer or phone, correct?
22 A.  No, we did not, because we did not know where the
23     computer and the phone are, so where would --
24 Q.  So you made no attempts to learn where the computer
25     or phone were or to get it returned on your cost,

MARTIN BORUTTA                    225

1      did you?
2          MR. KLASS:  Object to the form.
3  A.  I requested you to return our stuff, to get it back
4      to Teupen.  Ms. Gessner, you remember.  You just
5      need to read your emails, and that's all we did.
6  Q.  (By Ms. Gessner) Do you have any email in your
7      possession that you listed out every single thing
8      that you claimed Ms. Acevedo had that you sent to
9      me?
10 A.  Yeah.  It says company property, so what is not
11     clear, company property?
12 Q.  Again, do you have an email where you say I must
13     have my computer and phone because it's going to
14     cause me damage if I don't get it returned?
15         MR. KLASS:  Object to the form.
16 Q.  (By Ms. Gessner) Isn't it true, Mr. Borutta --
17         MS. GESSNER:  Strike that.
18 Q.  (By Ms. Gessner) Isn't it true, Mr. Borutta, I
19     expressly asked you for a list of items and you
20     refused to give it?
21         MR. KLASS:  Object to the form.
22 A.  Please -- can you please rephrase?  You said isn't
23     it true again.
24 Q.  (By Ms. Gessner) Mr. Borutta, isn't it true that I
25     expressly asked you in an email to list all of the

MARTIN BORUTTA                    226

1    things that you were claiming Ms. Acevedo had and
2    you refused to provide a list?
3             MR. KLASS:  Object to the form.
4    A.  I did not provide you a list.  I -- I asked for
5    company property.  That's all I did.
6    Q.  (By Ms. Gessner) And I specifically asked you to
7    tell us exactly what the company property was so
8    that we could make sure that every single thing
9    that you were claiming Ms. Acevedo had was returned
10   to you, and you refused to provide a response
11   detailing exactly what it is that you claimed was
12   missing, isn't that true?
13            MR. KLASS:  Object to the form.
14   A.  I did not send you a list about company property.
15   That is correct.
16   Q.  (By Ms. Gessner) I'm going to show you what we're
17   marking as Exhibit 17.  You've seen this email
18   exchange before, Mr. Borutta?
19   A.  I think so.
20   Q.  In it you say on January 14, "Ms. Gessner, your
21   client got the detailed list of company property
22   with her termination paperwork.  I made an amicable
23   offer and I am are talking about facts that can be
24   easily witnessed.  Our accounting is wrong since
25   Ms. Acevedo took over the task can easily be

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                    227

1    witnessed.  I stay with my opinion, frivolous
2    litigation."  Yet I am expressly asking you to give
3    us a detailed -- "provide me a detailed list of
4    what documents and property you deem are missing
5    and I will check with my client.  In light of your
6    unwillingness to resolve this matter amicably we
7    are left with no choice but to proceed with
8    litigation."
9         At no point in time did you provide me, my
10   office, her lawyer, with a detailed list of any
11   company property that you claimed was missing, did
12   you?
13            MR. KLASS:  Object to the form.
14   A.  I did not provide your list.  I asked for company
15   property.  That's all I did.
16   Q.  (By Ms. Gessner) And you didn't do anything else at
17   all to try to obtain the computer or the phone like
18   sending a FedEx envelope to my office or to
19   Ms. Acevedo or a courier or have any further
20   communication in an attempt to make sure that that
21   computer was returned, is that correct?
22   A.  I do not know which big the box should be because I
23   did not know how many computers Ms. Acevedo had.
24   She had a key to the office, so she could have two
25   computers as well, and seven boxes, so --

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                    228

1    Q.  (By Ms. Gessner) Well, Mr. Borutta, you knew she
2    was represented by counsel.  At no time did you ask
3    me even how many computers does she have; we'll be
4    happy to come pick them up.  At no point did you
5    provide any detailed information, did you?
6             MR. KLASS:  Object to the form.
7    A.  I told company property.  That should be clear.
8    That's all it owned or is owned by the company,
9    so --
10   Q.  (By Ms. Gessner) Mr. Borutta --
11   A.  Yeah.
12   Q.  -- my email was also incredibly clear.  "Please
13   provide me a detailed list of what document and
14   property you deem are missing."  I specifically and
15   expressly asked you for a detailed list and you
16   refused to provide it; isn't that accurate?
17            MR. KLASS:  Object to the form.
18   Q.  (By Ms. Gessner) Let me refresh your recollection
19   with your email.  You did not provide me with a
20   detailed list as I expressly requested from you,
21   did you?
22            MR. KLASS:  Object to the form.
23   Q.  (By Ms. Gessner) You can answer it.
24   A.  I did not provide you with a detailed list.  I
25   asked for company property.

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                    229

1    Q.  And, Mr. Borutta, again you aren't claiming that
2    somehow Ms. Acevedo did anything to or with your
3    computer, are you?
4             MR. KLASS:  Object to the form.
5    A.  I don't know.
6    Q.  (By Ms. Gessner) You haven't looked, have you?
7    A.  You asked that before.
8    Q.  Is that a no, you didn't even look to see if there
9    was any harm or damage to the computer before you
10   filed a frivolous lawsuit against her?
11            MR. KLASS:  Object to the form.
12   A.  That's a question I cannot answer because I did not
13   file a frivolous lawsuit.  I just filed a lawsuit
14   because I didn't get my company property,
15   Ms. Gessner.
16   Q.  (By Ms. Gessner) But when you got the company
17   property back you did nothing to inspect it in any
18   way, did you?
19            MR. KLASS:  Object to the form.
20   A.  From the outside, and I only got the computer back.
21   I did not get the phone back, so we're still
22   talking about the phone.  But the computer looks to
23   be intact.
24   Q.  (By Ms. Gessner) Mr. Borutta, this is what you've
25   done all day.  I didn't ask you anything about the

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                230

1   phone.  We're talking about the computer.  You're
2   putting --
3  A.  No.  You said --
4  Q.  We haven't even gotten there yet.  Stick with the
5   computer.  You didn't turn on the computer to
6   determine whether or not Ms. Acevedo had even
7   touched the computer, did you?
8      MR. KLASS:  Object to the form.
9  A.  No, because we -- the computer --
10 Q.  (By Ms. Gessner) That's a no?  I think that was no,
11   is that right, Mr. Borutta?  That's a no?
12     MR. KLASS:  Object to form.
13 A.  It completely cannot be turned on because then we
14   would damage your image or your backup of the hard
15   drive.  Very interesting.
16 Q.  (By Ms. Gessner) Well, you haven't given me a
17   backup yet.  We've asked for it and it hasn't been
18   received.
19     MR. KLASS:  Object to the form.  Can
20   we take a break?
21     MS. GESSNER:  Not just yet.  I've
22   got two more questions along just line.
23     MR. KLASS:  Okay.
24 Q.  (By Ms. Gessner) When did you first -- I don't want
25   to know about what your lawyer said or what you

MARTIN BORUTTA                231

1   said to your lawyer, but when did you first contact
2   your lawyer about filing a counterclaim against
3   Ms. Acevedo?
4  A.  I don't remember.
5  Q.  Was it before Ms. Acevedo had filed the lawsuit
6   against Teupen?
7      MR. KLASS:  Object to the form.
8  A.  I don't remember, Ms. Gessner.
9  Q.  (By Ms. Gessner) Did you contact any other lawyers
10   other than Fisher Phillips about filing a lawsuit
11   against Ms. Acevedo?
12 A.  I don't remember.  That's --
13 Q.  Do you use more than one telephone to make phone
14   calls, Mr. Borutta?
15 A.  Yes.
16 Q.  Do you have multiple cell phones?
17 A.  Yes.
18 Q.  What are their numbers?
19 A.  Which numbers?  The U.S. number?
20 Q.  Yes.  We'll start there.
21 A.  864-979-7723.
22 Q.  Do you have any other U.S. telephone numbers?
23 A.  No, I don't think so.
24 Q.  Mr. Borutta, did you at any time contact Parker Poe
25   about filing a counterclaim against Ms. Acevedo?

MARTIN BORUTTA                232

1  A.  I did not contact Parker Poe.  That's what I said
2   before.  No.
3  Q.  Did you contact anyone prior to hiring Fisher
4   Phillips about filing a lawsuit against
5   Ms. Acevedo?
6  A.  I don't remember.
7  Q.  Is there anything that would refresh your
8   recollection whether you called a lawyer about
9   filing a lawsuit against Ms. Acevedo?
10 A.  If you have anything that would refresh my memory,
11   maybe, but I don't remember.
12 Q.  I'm asking you whether anything exists that would
13   refresh your memory.  You're the one who keeps
14   saying I don't know.
15 A.  Yeah, but I don't know.  It's two years ago.
16     MS. GESSNER:  We can take that break
17   for just a minute.  How about 10 minutes,
18   David?
19     MR. KLASS:  That'll work.  Thank
20   you.
21 (RECESS)
22 Q.  (By Ms. Gessner) Mr. Borutta, Teupen has sued --
23   well, let me ask a question.  Teupen is your
24   company, right?
25     MR. KLASS:  Object to the form.

MARTIN BORUTTA                233

1  A.  I'm the single largest shareholder.
2  Q.  (By Ms. Gessner) Who are your other shareholders?
3  A.  A private equity company in Germany.
4  Q.  You are involved in the day-to-day operations of
5   the business, correct?
6  A.  Not really.  I am the CEO of the group, so I
7   oversee the operations for them.  I'm not involved
8   in daily business.
9  Q.  Was it your decision to pursue the litigation
10   against Ms. Acevedo?
11 A.  What does pursue mean, please?
12 Q.  Was it your decision to file the counterclaim
13   against Ms. Acevedo?
14 A.  As I told you in the emails, it was my
15   understanding of a legal action.  It's correct
16   that's what we did.
17 Q.  But it was your decision alone, not anyone else at
18   Teupen; only you are the one who decided to file
19   the lawsuit against Ms. Acevedo, correct?
20 A.  Yeah, that is my decision alone.
21 Q.  And so to the extent that there are false claims
22   that are made, it is you who are making those
23   claims, correct?
24     MR. KLASS:  Object to the form.
25 A.  There are no false claims, so I cannot really

MARTIN BORUTTA                    234
1     correct give you an answer on that question.
2  Q.  (By Ms. Gessner) And to the extent there are false
3     claims or the court deems that there are false
4     claims, you were the one who decided to file the
5     lawsuit, correct?
6        MR. KLASS:  Object to the form.
7  A.  I filed the lawsuit.  That is correct.
8  Q.  (By Ms. Gessner) You have alleged in the
9     counterclaim that Ms. Acevedo breached her
10    employment contract.  Are you aware of that?
11 A.  I cannot recall.
12 Q.  Let me show you the document.  I'm showing you the
13    amended counterclaim that you filed against
14    Ms. Acevedo.  I'm going to show you paragraph
15    number 44.  You have alleged that plaintiff emailed
16    defendant's confidential information to her
17    personal email account during her employment
18    including but not limited to from December 15,
19    2019, through December 30, 2019.  Do you see that?
20 A.  Yes, I see that.
21 Q.  Are you aware of any emails that Ms. Acevedo
22    forwarded to herself that were dealing with
23    anything other than the way she was being treated
24    at Teupen?
25 A.  I don't remember.

MARTIN BORUTTA                    235
1  Q.  Did you do anything to look at all of Ms. Acevedo's
2     emails that she sent to herself to determine
3     whether any of the emails that were sent were for
4     any other purpose other than detailing how she was
5     being treated?
6        MR. KLASS:  Object to the form.
7  A.  I don't remember.
8  Q.  (By Ms. Gessner) Before filing this counterclaim on
9     November 20, 2020, against Ms. Acevedo, are you
10    aware of a single email that she sent that
11    pertained any confidential information to anyone
12    other than herself?
13 A.  I don't remember.  That's one year ago.
14 Q.  Well, have you done anything to look?  Mr. Borutta,
15    you've had access to Teupen's own email system the
16    entire time, correct?
17 A.  I have access to the Teupen email system.
18 Q.  And you have access to all of the emails that
19    Ms. Acevedo sent from her Teupen email address,
20    correct?
21 A.  I should have access to that.
22 Q.  And have you ever found or seen an email that she
23    sent to anyone other than herself that contained
24    confidential information outside of Teupen?
25 A.  As I said before, I don't remember.

MARTIN BORUTTA                    236
1  Q.  Do you recall looking at any emails that reflected
2     information she sent to someone outside of Teupen
3     before you filed this lawsuit against her?
4  A.  I think I did, but I don't remember.  It's more
5     than one year ago.
6  Q.  What do you think you remember seeing?
7  A.  That I looked at the emails, but I don't remember
8     what I saw.
9  Q.  Have you produced to us every email that you claim
10    supports your breach-of-contract claim as alleged
11    in paragraph 44?
12 A.  I don't know.  I think so.
13 Q.  Other than Ms. Acevedo's claims against Teupen for
14    discrimination and for retaliation, you are not
15    aware of any other email that Ms. Acevedo has sent
16    to someone outside of Teupen with any confidential
17    information, correct?
18       MR. KLASS:  Object to the form.
19 A.  I don't know.
20 Q.  (By Ms. Gessner) Well, have you done anything to
21    look?
22 A.  As I said before, I cannot recall right now.
23    That's one and a half years ago.
24 Q.  (By Ms. Gessner) Mr. Borutta, you have sued
25    Ms. Acevedo claiming that she has stolen

MARTIN BORUTTA                    237
1     confidential information.  Can you tell me a single
2     piece of confidential information she has stolen?
3        MR. KLASS:  Object to the form.
4  A.  I cannot recall right now.
5  Q.  (By Ms. Gessner) Can you recall anything that you
6     would deem as confidential information that
7     Ms. Acevedo took with her from Teupen that wasn't
8     for her use in this lawsuit?
9        MR. KLASS:  Object to the form.
10 A.  I don't remember, actually.
11 Q.  (By Ms. Gessner) Are you aware of Ms. Acevedo
12    selling or giving any information to any of
13    Teupen's competitors?
14 A.  I don't know.
15 Q.  Well, do you think you'd be aware of that by now?
16 A.  I don't know.
17 Q.  You're not aware of Ms. Teupen (sic) using any of
18    Teupen's information to start a company of her own,
19    correct?
20 A.  I don't know.
21 Q.  What harm or damage do you allege Ms. Acevedo
22    caused the company by forwarding some of her emails
23    to her personal account to reflect how she was
24    being treated in this case?
25       MR. KLASS:  Object to the form.

MARTIN BORUTTA                          238

1  A.   It's my understanding if it's -- or it was
2       confidential information it's a breach of contract.
3       That is the harm, so --
4  Q.   (By Ms. Gessner) Well, at the time that you
5       terminated Ms. Acevedo you had in your possession
6       every single email she had sent to herself,
7       correct?
8  A.   I don't know.  I think so.
9  Q.   Well, let's just break it down.  When you say I
10      don't know it doesn't make common sense when I'm
11      asking this question, Mr. Borutta, so let me help
12      you.  You are the only person who had access to
13      everybody else's email at Teupen if you wanted it,
14      correct?
15          MR. KLASS:  Object to the form.
16 A.   If I wanted I could have access to everybody's
17      email at Teupen.  That is correct.
18 Q.   (By Ms. Gessner) On January 3 when you decided to
19      terminate Ms. Acevedo you had the ability to turn
20      off her email, correct?
21          MR. KLASS:  Object to the form.
22 A.   Yeah, I had the ability to turn off her email.
23 Q.   (By Ms. Gessner) And therefore you had the ability
24      to see every email that she had sent on Teupen's
25      system through her termination date, correct?

www.thompsonmi
l
l
s.com

---

Page 239

MARTIN BORUTTA                          239

1  A.   Yeah, that's correct.
2  Q.   So any email that she sent that you would claim is
3       a breach of contract, you knew about it before you
4       fired her, correct?
5          MR. KLASS:  Object to the form.
6  A.   I didn't not know about it because I didn't read
7       her emails, so how would I know about it?
8  Q.   (By Ms. Gessner) You could have known about it if
9       you had you chosen to read her emails, correct?
10 A.   I could have known about it would be the right
11      answer.  Yes.
12 Q.   Yet you still didn't terminate her with cause; you
13      didn't accuse her of breach of contract until after
14      she had sued Teupen, correct?
15          MR. KLASS:  Object to the form.
16 A.   I don't remember in which time.  Yeah.  Sorry.
17 Q.   (By Ms. Gessner) Well, had Teupen been sued in this
18      case before November 20, 2020?
19 A.   Sorry.  Please ask it again.
20 Q.   Had Teupen been sued in this lawsuit before
21      November 20, 2020?
22 A.   I don't recall when the lawsuit started.
23 Q.   Okay.  Let me refresh your recollection.  I'm
24      showing you the first amended complaint in this
25      case, which is dated March 9, 2021.  Do you see

www.thompsonmi
l
l
s.com

---

Page 240

MARTIN BORUTTA                          240

1       that?
2  A.   I see that.
3  Q.   That was the first amended complaint.  You see
4       that?
5  A.   Yeah.  I see March --
6  Q.   Let me show you the actual original complaint since
7       you haven't seen these pleadings before.
8  A.   I didn't say I haven't seen them.  I said I don't
9       remember.  I can't recall as I've seen them or not.
10 Q.   But again, you did not accuse Ms. Acevedo of
11      breaching her contract until after she had filed a
12      lawsuit against Teupen, correct?
13          MR. KLASS:  Object to the form.
14 A.   I don't -- don't know.
15 Q.   (By Ms. Gessner) Has any other employee filed a
16      lawsuit against Teupen?
17 A.   We had that question.
18 Q.   I'm asking you again.  Please answer it.
19          MR. KLASS:  Object to the form.
20 A.   I told -- I told you not of my knowledge.  I think
21      it was Mr. Kesser and maybe Mr. Taft, but I'm not
22      sure.
23 Q.   (By Ms. Gessner) Did you file a counterclaim
24      against Mr. Kesser?
25 A.   No.

www.thompsonmi
l
l
s.com

---

Page 241

MARTIN BORUTTA                          241

1       You didn't, did you?
2          MR. KLASS:  Object to the form.
3  Q.   (By Ms. Gessner) Did you file a counterclaim
4       against Mr. Taft?
5  A.   He didn't file a claim, I think, so -- so we didn't
6       file a counterclaim.
7  Q.   Can you see the complaint on your screen now and
8       see that the date that it was filed is
9       September 21, 2020?  Do you see complaint?
10 A.   I see a date and I see a document, so what do you
11      want me to do with that document?
12 Q.   I want you to testify what you see on the screen,
13      Mr. Borutta.  Do you see a document that has got
14      civil action number 3:20-cv-518 at the top on your
15      screen?
16 A.   I see the top of that document.  That is correct.
17 Q.   Do you see the word complaint to the right?
18 A.   Yes.
19 Q.   Do you see Marjorie Acevedo, plaintiff, versus
20      Teupen North America, defendant, on the left?
21 A.   Yes, I see it.
22 Q.   Do you see the file stamp at the bottom, the blue
23      lettering that has the case number, the document
24      number, and a date?
25 A.   Yes.

www.thompsonmi
l
l
s.com

Sheet 62   Page 242
MARTIN BORUTTA                                    242
1  Q.  And September 21, 2020, is earlier than November of
2      2020, correct?
3  A.  Yeah.
4  Q.  So you didn't file the counterclaims against
5      Ms. Acevedo until after she had filed the complaint
6      against Teupen, correct?
7  A.  It looks like.
8  Q.  And you didn't accuse her of breach of contract of
9      any sort until after you had deemed that she was
10     terminated without cause; you didn't give her 30
11     days' notice and paid her the severance out of the
12     contract, correct?
13         MR. KLASS:  Object to the form.
14 A.  I -- you got to ask -- there were two questions in
15     one.  Please ask one question.  Otherwise I don't
16     understand you.
17 Q.  (By Ms. Gessner) Do you pay employees their
18     severance that you claim have breached their
19     confidentiality provisions of the agreement?
20         MR. KLASS:  Object to the form.
21 A.  You know, funny enough that I was gentle to pay
22     Ms. Acevedo severance without getting the paperwork
23     back.  I decided to be more friendly, and you tell
24     me now the difference.  So I paid it and I made it,
25     so that's my fault to be separated from my

www.thompsonmi
l
l
s.com

Page 243
MARTIN BORUTTA                                    243
1      employee.  So it was my decision not to terminate
2      her for cause, so I didn't do it and paid
3      severance.
4  Q.  No, you just terminated her and sued her, correct?
5          MR. KLASS:  Object to the form.
6  A.  First of all I terminated her and paid her the
7      severance payment.
8  Q.  (By Ms. Gessner) And then you sued her, correct?
9  A.  Afterwards, because I could not get my property.
10 Q.  You had your property in your possession as early
11     as May of 2020, correct?
12         MR. KLASS:  Object to the form.
13 A.  I don't know when we get the property back.
14 Q.  (By Ms. Gessner) Well, let's mark that
15     communication as well.  Do you have any idea when
16     you received the computer from your lawyer at
17     Fisher Phillips?
18 A.  No.
19 Q.  Was it last month?
20 A.  I have no idea.  Sorry.
21 Q.  You have no idea when you received the computer
22     from your lawyer?
23 A.  You know, I think -- I think you don't know my
24     background what I'm doing, so sometimes -- I'm
25     running a 200-people company and that is part of my

www.thompsonmi
l
l
s.com

Page 244
MARTIN BORUTTA                                    244
1      business in the U.S. and I am traveling between
2      Europe and U.S. two to three times a month.  So I
3      remember when I received a laptop or when I get a
4      letter or when I wrote a letter?
5  Q.  Well, are you aware when your lawyers received the
6      laptop on your behalf, Mr. Borutta?
7  A.  No.  No.
8  Q.  You have no idea?
9  A.  I have no idea.
10 Q.  So it was so important to you that you had to file
11     a lawsuit against Ms. Acevedo but you don't even
12     know when you got it back?
13         MR. KLASS:  Object to the form.
14 A.  I don't know when I got it back because after I had
15     everything done, things go where they have to go,
16     so it doesn't matter.  I didn't get it back when I
17     asked for it.
18 Q.  (By Ms. Gessner) Well, you never asked for it, did
19     you?  You didn't provide a detailed list of any of
20     the items that you claim that Ms. Acevedo had in
21     her possession, correct?
22         MR. KLASS:  Form.
23 A.  That is your company property.  I asked for company
24     property.  That's correct.
25 Q.  (By Ms. Gessner) Despite being repeatedly asked,

www.thompsonmi
l
l
s.com

Page 245
MARTIN BORUTTA                                    245
1      you never provided a list of what company property
2      you were referring to, did you?
3          MR. KLASS:  Form.
4  A.  I don't know.  I didn't provide a list.  I provided
5      the information I want to have company property
6      back.
7  Q.  (By Ms. Gessner) I'll find that email at a break
8      and mark it so that you can make sure that you know
9      exactly when your lawyers received it.  Okay.
10         Let's talk about, did you discuss filing a
11     lawsuit against Ms. Acevedo with anyone other than
12     your lawyers?
13 A.  I don't remember.
14 Q.  Did you file a lawsuit against Mr. Kesser when he
15     had his computer in his possession when he left the
16     company?
17 A.  Mr. Kesser returned his computer pretty fast when I
18     recall correctly, but I don't know because it's
19     more than three years ago.
20 Q.  Is there any employee between you taking over North
21     America as the CEO to present that you had sued for
22     not returning their computer fast enough?
23 A.  Nobody company property, so I don't have to --
24 Q.  That's not my question.  Mr. Borutta, you're not
25     being responsive.  Is that a no, there's not

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                246

1   another single employee that you've ever filed a
2   lawsuit against for not returning their computer
3   soon enough other than Ms. Acevedo?
4        MR. KLASS:  Object to the form.
5   A.  I did not have to file a lawsuit because we didn't
6   have that case, so --
7   Q.  (By Ms. Gessner) So is that a no?
8   A.  No, we didn't file a lawsuit because we didn't have
9   to.
10  Q.  So it's your testimony that every single employee
11  when terminated has immediately on the same day
12  returned their computer?
13       MR. KLASS:  Object to the form.
14  A.  To my knowledge, yes.
15  Q.  (By Ms. Gessner) And if there are witnesses who say
16  otherwise, you don't have reason to think they're
17  lying, do you?
18       MR. KLASS:  Object to form.
19  A.  I don't know.
20  Q.  (By Ms. Gessner) Did Mr. Liebl return his computer
21  on the same day you fired him?
22  A.  Yes.  He didn't have a computer.  He had terminal
23  access, so --
24  Q.  He had what?
25  A.  He had just terminal access, so like a whatever.

MARTIN BORUTTA                247

1   He did not really have a computer.
2   Q.  How about, well, Mr. Kesser?  On the day you fired
3   him, he didn't turn his computer in on that same
4   day, did he?
5   A.  I don't remember.  It's two and a half years ago.
6   Q.  So isn't it true you don't know whether everybody
7   turned it in on the same day or not, correct?
8        MR. KLASS:  Object to form.
9   Q.  (By Ms. Gessner) It's been so long ago you can't
10  remember --
11       MR. KLASS:  Object to the form.
12  Q.  (By Ms. Gessner) -- is that right?
13  A.  I can't remember two and a half years.
14  Q.  And you can't tell me any way that Teupen had been
15  damaged because it did not have Ms. Acevedo's
16  computer in its possession on the day she was
17  terminated?
18       MR. KLASS:  Object to the form.
19  A.  I said before we did not make a calculation for the
20  damage yet.
21  Q.  (By Ms. Gessner) Who is we, we didn't make a damage
22  calculation?
23  A.  Maybe me and maybe my CFO or whomever I give the
24  job or I do it myself, whoever.  So the company is
25  we.

MARTIN BORUTTA                248

1   Q.  So you haven't calculated any damages before you
2   filed the lawsuit?
3        MR. KLASS:  Object to the form.
4   A.  I did not calculate any damages yet.  That's what I
5   said.
6   Q.  (By Ms. Gessner) And this is the same computer that
7   hasn't been used or touched since it was returned,
8   correct?
9        MR. KLASS:  Object to the form.
10  A.  This is the computer that was in the possession of
11  Ms. Acevedo, correct.
12  Q.  (By Ms. Gessner) And that you have not used it
13  since it was returned, correct?
14       MR. KLASS:  Object to the form.
15  A.  I did not use it.
16  Q.  (By Ms. Gessner) And you haven't assigned it to
17  someone else to use, have you?
18       MR. KLASS:  Object to the form.
19  A.  No.  It's in a drawer.
20  Q.  (By Ms. Gessner) At some point you became aware
21  that Ms. Acevedo you traded in her personal cell
22  phone to upgrade to the phone that she currently
23  has, correct?
24       MR. KLASS:  Object to the form.
25  A.  No, that is not correct.

MARTIN BORUTTA                249

1   Q.  (By Ms. Gessner) Well, tell me everything you can
2   recall about Ms. Acevedo's cell phone that is the
3   subject of your counterclaim.
4        MR. KLASS:  Object to the form.
5   Q.  (By Ms. Gessner) You understand my question, right,
6   Mr. Borutta?
7   A.  Yeah, I understand your question, but your question
8   is not a question.  It's an assumption.
9   Ms. Acevedo says that she turned her phone in.  I
10  don't know, and we couldn't find any documentation
11  that she turned her private phone in to get a
12  company phone and I did not grant her take the
13  company phone with her either line, so that's what
14  I can confirm.
15  Q.  So is it your testimony that there was no credit
16  given to Teupen for Ms. Acevedo turning in her
17  personal cell phone?
18  A.  I cannot confirm.  That was before my operational
19  time, so I don't know.
20  Q.  Okay.  I'm going to mark an exhibit.  I'm marking
21  this as Exhibit 18 to your deposition.  Have you
22  seen this document before, Mr. Borutta?
23  A.  I don't remember.
24  Q.  It's Bates number 2100020 through 2100086.  Do you
25  see the number down at the bottom?

MARTIN BORUTTA                    250

1  A.   I see that number at the bottom.
2  Q.   Let's go to page 3.  Do you see on this page that
3       there is a device credit, it's a device credit for
4       Ms. Acevedo's telephone for when she turned it in
5       to Verizon?
6  A.   I don't see a device credit.  Where is a device
7       credit?  Can I make it bigger?
8  Q.   Yeah.  Here, I can make it bigger.  So it says
9       summary for Glen D-e-l-i-g-d-i-s-c-h, but you were
10      aware that Ms. Acevedo's phone number was 201-912-
11      5506, correct?
12 A.   No.
13 Q.   You dispute that that's her phone number?
14 A.   Look at the date, please.  I am not aware of
15      nothing on that, so look at the --
16 Q.   But, Mr. Borutta, did you have Ms. Acevedo's cell
17      phone plugged into your own cell phone?
18 A.   I did what, please?
19 Q.   Did you have her saved as a contact in your cell
20      phone?
21 A.   I don't know.
22 Q.   Do you still have your cell phone there present?
23 A.   I have my -- I do not have my cell phone here.
24 Q.   You don't have it on you?
25 A.   No.

MARTIN BORUTTA                    251

1  Q.   Okay.  So what reason would you dispute that 201-
2       912-5506 is Ms. Acevedo's telephone number?
3  A.   Because the statement says it's Glenn Deligdisch,
4       so why should I -- and it's 2018.  I cannot say
5       anything.  It's '18.  Remember, I was operational
6       working for Teupen from '19 on.  I cannot say
7       anything.
8  Q.   Do you see at the bottom there is a trade-in device
9       promo credit of $16.81 down at the bottom of
10      Teupen --
11 A.   Yeah.
12 Q.   -- 21Teurpen00021?  Do you see that?
13 A.   I see that there is the trade-in device promo
14      credit, but I see not behind it from Ms. Acevedo's
15      private phone.  I see only trade-in device promo
16      credit.
17 Q.   I think I understand your testimony is that because
18      you weren't the person in charge in 2018 you cannot
19      deny or confirm whether or not this is
20      Ms. Acevedo's telephone number or whether or not
21      she traded in her phone for Teupen's plan, can you?
22 A.   No, I cannot, because --
23 Q.   Have you done anything since you filed the
24      counterclaim against her to determine whether or
25      not Ms. Acevedo was owed money back from Teupen for

MARTIN BORUTTA                    252

1       trading in her phone?
2  A.   That's what Ms. Acevedo says and we cannot confirm
3       it because that bill does not say that she traded
4       in her phone.
5  Q.   And you can't confirm or deny it, can you?
6           MR. KLASS:  Object to the form.
7  A.   (No response.)
8  (By Ms. Gessner) You can't confirm or deny it, can
9       you, Mr. Borutta?
10 A.   I don't know.  There was a trade-in of company
11      phones, but --
12 Q.   So you just assumed that Ms. Acevedo had done
13      something wrong with her cell phone whenever you
14      filed the lawsuit against her, but you never
15      verified for sure whether there was an actual
16      claim, did you?
17          MR. KLASS:  Object to the form.
18 Q.  (By Ms. Gessner) Can you, Mr. Borutta?
19 A.   We tried to verify but there is no documentation
20      and there is no documentation that Ms. Acevedo
21      turned her phone in.
22 Q.   Well, let's look at page 58.  These are Teupen's
23      documents that were turned it -- that were produced
24      to us, aren't they?  They have your company's name
25      and Bates number in the bottom right corner,

MARTIN BORUTTA                    253

1       correct?
2  A.   Yeah.
3  Q.   Do you have any reason to dispute that the
4       telephone number reflected -- let's see, wait --
5       that that telephone number reflected -- let me go
6       back to 58.  The summary for Marjie Acevedo, 704-
7       617-9493, do you see that right there?
8  A.   I see that right there, yes.
9  Q.   And at the time that Marjie was fired there were
10      still payments owed on the phone, correct?
11 A.   I don't know.
12 Q.   Do you see that there is -- it says paid $600.01.
13      Do you see that?  And there was a payment 19 of 24
14      at $33.33.  Do you see that?
15 A.   I see that.
16 Q.   And 19 minus 24 is what?
17 A.   19 minus 24 -- 19 minus 24 would be minus 5, so I
18      don't know what you're asking.
19 Q.   And 5 times 33.33 is what?
20 A.   That would be around 170.
21 Q.   And you have nothing to dispute that Ms. Acevedo
22      paid the remaining bAllence owed for the phone
23      herself, do you?
24          MR. KLASS:  Object to the form.
25 A.   I don't know.  I don't know whether she paid it.

Sheet 65   Page 254

MARTIN BORUTTA                                    254
1  Q.  (By Ms. Gessner) Tell me every other employee who
2      you have sued for failure to turn in their cell
3      phone.
4  A.  No other employee kept a company phone or kept it,
5      just Ms. Geraghty, and she turned -- the same day
6      she turned in her private phone.
7  Q.  But Ms. Acevedo had already turned in her private
8      phone for a credit for the company as shown on the
9      exhibit that you see before you as Exhibit 18?
10         MR. KLASS:  Object to the form.
11 A.  I don't -- I don't see that it was her private
12     phone, so --
13 Q.  (By Ms. Gessner) Is it that you don't see it's her
14     private phone because of the 201 phone number
15     that's listed at the top?  Is that what your
16     problem is with the exhibit?
17         MR. KLASS:  Object to the form.
18 A.  No.  It's just -- it's just that it can be every
19     phone.  If Teupen turns in 10 phones for that line
20     you get a credit for the other line.  So where is
21     the receipt that Ms. Acevedo turned in her phone?
22     That's the statement from Verizon.  That is not any
23     receipt that Ms. Acevedo turned in her private
24     phone.  And the credit was for the company, not for
25     her private.  That's the normal -- what we normally
                    www.thompsonmi
                         1
                         1
                       s.com

Page 255

MARTIN BORUTTA                                    255
1      do.  We take our phones, turn them in.  We get new
2      phones for that.  So where is the receipt that
3      Ms. Acevedo turned her phone?  If you bring me that
4      receipt it looks better, but I don't have a
5      receipt.  And that's my problem.
6  Q.  (By Ms. Gessner) So if you see the receipt that the
7      phone was turned in, you agree that you filed a
8      frivolous claim against Ms. Acevedo for her cell
9      phone?
10         MR. KLASS:  Object to the form.
11 A.  No, I don't agree because we filed -- we filed a
12     lawsuit because we do not have the receipt that
13     Ms. Acevedo turned the phone in and took company
14     property, so --
15 Q.  (By Ms. Gessner) You never asked Ms. Acevedo for
16     the receipt before you filed the lawsuit, did you?
17 A.  Ms. Acevedo took the company phone without asking
18     and she didn't provide --
19 Q.  You never asked Ms. Acevedo for a copy of the
20     receipt before you filed the lawsuit, did you?
21 A.  Ms. Acevedo took company property.  I don't need to
22     ask for it.
23 Q.  Is that a no, Mr. Borutta?  Is that a no, you never
24     asked her for the receipt?
25         MR. KLASS:  Object to the form.
                    www.thompsonmi
                         1
                         1
                       s.com

Page 256

MARTIN BORUTTA                                    256
1  A.  I don't know whether we asked her for the receipt.
2  Q.  (By Ms. Gessner) I'm asking did you ask her for the
3      receipt.
4  A.  I personally did not ask her for the receipt
5      because I didn't talk to her personally when she
6      took the phone.
7  Q.  Because you made no attempt to reach out to her
8      despite her request, correct?
9          MR. KLASS:  Object to the form.
10 A.  Number 19, no, I did not call her.
11 Q.  (By Ms. Gessner) And also when I asked you to
12     provide a detailed list of the things that you
13     wanted from her, in no way did you write back and
14     suggest that you -- in any way did you state that
15     you needed a receipt for her cell phone that had
16     been turned in, did you?
17         MR. KLASS:  Object to the form.
18 A.  I requested company property, as you know.
19 Q.  (By Ms. Gessner) Again, you chose not to give me
20     the list that I'd asked you for so that we could
21     make sure you had everything you wanted and needed;
22     is that accurate?
23         MR. KLASS:  Object to the form.
24 A.  I didn't -- I did not give you a detailed list.  I
25     requested --
                    www.thompsonmi
                         1
                         1
                       s.com

Page 257

MARTIN BORUTTA                                    257
1  Q.  (By Ms. Gessner) I'm going to show you another
2      document that is -- I think you referred to it a
3      minute ago and I want to make sure we're talking
4      about the same thing.  I'm going to mark this as
5      Exhibit 19.  Do you see a document on the screen,
6      Mr. Borutta?
7  A.  I see a document on the screen.
8  Q.  Is this a document that you're referring --
9          MS. GESSNER:  Strike that.
10 Q.  (By Ms. Gessner) Is Sheri Geraghty the employee you
11     were talking about a minute ago that had also kept
12     her cell phone when she departed from Teupen?
13         MR. KLASS:  Object to the form.
14 A.  I don't know whether I can say also.  I know from
15     Sheri Geraghty that she brought and that was proof
16     by Mr. Kesser.  What I heard -- and I don't know
17     it.  I just heard it and -- yeah, that's what I
18     know.
19 Q.  (By Ms. Gessner) Again, you didn't sue Ms. Geraghty
20     when she left Teupen and took her phone with her,
21     did you?
22 A.  She turned in the same day her personal phone.  She
23     didn't just kept her company phone, so it was a
24     one-to-one exchange.  Why should I sue her?
25 Q.  And Ms. Geraghty wasn't out on a medical approved
                    www.thompsonmi
                         1
                         1
                       s.com

## Sheet 66   Page 258

MARTIN BORUTTA                                    258

1  leave at the time that she chose to resign, was
2  she?
3  A.  I don't know.
4  Q.  Other than Ms. Acevedo, have you terminated anyone
5  else while they were on a medical leave?
6         MR. KLASS:  Object to the form.
7  A.  I don't know.
8  Q.  (By Ms. Gessner) Well, can you recall anyone else
9  who was on medical leave that you chose to
10  terminate while they were out on a leave?
11  A.  I don't know.
12  Q.  Is that a no?
13  A.  I don't know is the answer.
14  Q.  Let's take it -- have you terminated anyone in the
15  last three months while they were out on medical
16  leave?
17  A.  I don't know whether I terminated anybody the last
18  three months.  I don't remember.
19  Q.  Did you terminate anyone in 2021 while they were
20  out on medical leave?
21  A.  I don't remember, sorry.
22  Q.  Would the list of names help you to recall whether
23  or not you terminated someone while they were on
24  medical leave?
25  A.  No.  I don't -- I don't remember.

www.thompsonmi
1
1
s.com

## Page 259

MARTIN BORUTTA                                    259

1  Q.  So are you aware of anyone else who had brought you
2  a doctor's note indicating they needed to be out
3  several days and you fired them while they were
4  out?
5  A.  I don't know.  I'm not aware.  I don't know.
6  Q.  Are there any documents that would help refresh
7  your recollection as to whether or not you fired
8  anyone else other than Ms. Acevedo while she was
9  out on a medical leave?
10  A.  I don't know.
11  Q.  Did Mr. Kesser return his cell phone on the day he
12  was fired?
13  A.  I don't remember.
14  Q.  So do we have to ask Mr. Kesser whether or not he
15  returned his cell phone on the day he was fired?
16         MR. KLASS:  Object to the form.
17  A.  I don't know if you have to ask Mr. Kesser.  Have
18  you got documents?  I don't know it.
19  Q.  (By Ms. Gessner) Ms. Acevedo is the only person
20  you've ever sued for not returning their cell
21  phone, is that correct?
22  A.  The other people returned their cell phone, so why
23  should I sue them?
24  Q.  Well, again, Mr. Borutta, you can't remember
25  whether people returned their cell phone or not.

www.thompsonmi
1
1
s.com

## Page 260

MARTIN BORUTTA                                    260

1  You just said that.  I just asked you, did
2  Mr. Kesser return his cell phone on the day that he
3  was fired and you said I don't know.  So do you
4  remember who all returned their phone or do you
5  not?
6         MR. KLASS:  Object to the form.
7  A.  You're asking two questions in one.
8  Q.  (By Ms. Gessner) No, I'm not, Mr. Borutta.
9  A.  You ask.
10  Q.  I'm going to ask you, tell me any employee that you
11  are aware who turned in their cell phone after they
12  were fired.
13         MR. KLASS:  Object to the form.
14  A.  Everybody did.  Nobody kept cell phone, just
15  Ms. Acevedo kept their cell phone.
16  Q.  (By Ms. Gessner) Ms. Geraghty kept her cell phone,
17  didn't she?
18  A.  Ms. Geraghty delivered her cell phone the same day
19  and took her company phone in exchange.  That's not
20  comparable.
21  Q.  And you are aware that Mr. Kesser kept his cell
22  phone, too, aren't you?
23  A.  That is not correct.  Mr. Kesser gave it back, but
24  I don't know of the day of his termination or when
25  he turned it back.  He did not keep his company

www.thompsonmi
1
1
s.com

## Page 261

MARTIN BORUTTA                                    261

1  phone.
2  Q.  If individuals say that they also kept their phone
3  and weren't sued, you don't have any reason to
4  dispute someone else who says that, do you?
5         MR. KLASS:  Object to the form.
6  A.  Say that again, please.
7  Q.  (By Ms. Gessner) Yeah.  If someone else testifies
8  that they were able to keep their phone after they
9  were fired from Teupen, you have no reason to
10  dispute that, do you?
11         MR. KLASS:  Object to the form.
12  A.  First of all, I don't know what happened before
13  2019, so it depends what you're referring to or
14  which time you're referring to.  That's -- I cannot
15  just give you an answer because it's way too broad.
16  Q.  (By Ms. Gessner) So the company cell phones that
17  are -- the company cell phones that are paid for by
18  Teupen, they are eligible for personal use, aren't
19  they?
20         MR. KLASS:  Object to the form.
21  A.  They are not normally eligible for private use.
22  That was during the time of Mr. Kesser maybe, but
23  not during my time.
24  Q.  (By Ms. Gessner) So is it your testimony that not a
25  single cell phone issued or paid for by Teupen can

www.thompsonmi
1
1
s.com

## Sheet 67    Page 262

MARTIN BORUTTA                    262

1  be used for a single personal call?
2  A.  The people get the company phone and they get their
3      private phone -- phone additional, so the company
4      phone is for work and the private phone is their
5      private phone.
6  Q.  (By Ms. Gessner) You expect your employees to have
7      two different cell phones, is that correct?
8          MR. KLASS:  Object to the form.
9  A.  That's too broad.  I cannot answer the question
10     because there are employees that have a company
11     phone and employees that don't have one, so --
12 Q.  (By Ms. Gessner) Employees who have company phones,
13     do you expect them to also have a personal phone if
14     they intend to make personal calls using a cell
15     phone?
16 A.  That is not my problem.  I don't expect them
17     anything.  They just cannot use the company phone
18     for private use, so what they do privately is not
19     my problem and I don't expect anything.
20 Q.  I'm going to show you another document.
21     Mr. Borutta, I'm showing you your responses to
22     plaintiff's second set of interrogatories.  Do you
23     recognize this document?
24 A.  I think I've seen that.
25 Q.  It was served to us on October 8, 2020.  Do you see

www.thompsonmi
l
l
s.com

## Page 263

MARTIN BORUTTA                    263

1      that date?
2  A.  Yes, I see that date.
3  Q.  Did you sign a verification page for this second
4      set of interrogatories?
5  A.  I think I did.
6  Q.  I'm going to refer you to the question about cell
7      phones.  Just a second.  Here it says, "Identify
8      and describe each and every time any employee of
9      Teupen used their personal cell phone to secure an
10     upgraded device under the company's cellular plan
11     from January 1, 2017, to January 3, and include the
12     name of the employee, the employee's race, whether
13     the employee was later separated from employment,
14     and whether the employee returned the company cell
15     phone upon separation."  Do you see that?
16 A.  I see that.
17 Q.  And the response was, "Subject to and with no
18     intention of waiving the objection as understood by
19     defendant, it is defendant's understanding that
20     plaintiff may have turned in her personal cell
21     phone to Verizon when she received her company-paid
22     and -owned iPhone."  Why didn't you list Sheri
23     Geraghty?  Because you were well aware that
24     Ms. Geraghty had kept her personal phone.  Why
25     isn't she listed in response to question number 18?

www.thompsonmi
l
l
s.com

## Page 264

MARTIN BORUTTA                    264

1          MR. KLASS:  At this point I'm going
2      to object and instruct the witness not to
3      answer based on attorney-client privilege
4      and attorney work product.
5          MS. GESSNER:  Absolutely not.
6  Q.  (By Ms. Gessner) You verified these
7      interrogatories, didn't you, Mr. Borutta?
8          MR. KLASS:  So, Mr. Borutta --
9      excuse me.
10         MS. GESSNER:  Wait, wait, wait.
11 Q.  (By Ms. Gessner) These are your responses to the
12     interrogatories, are they not, Mr. Borutta?
13 A.  Give me one minute to read the answer and ask me
14     again.
15         MR. KLASS:  Mr. Borutta can answer
16     what he answered in his interrogatories,
17     but this answer was made subject to
18     objection, and whether other information
19     was withheld or considered subject to
20     objection is attorney work product and
21     attorney-client privileged communications
22     and he cannot answer those questions.
23     But he is free to answer any questions
24     about what his answers actually were.
25         MS. GESSNER:  Well, I disagree with

www.thompsonmi
l
l
s.com

## Page 265

MARTIN BORUTTA                    265

1      your objection, Mr. Klass.  It's wholly
2      inappropriate.  It isn't improper.  I
3      haven't asked this witness anything you
4      told him.  I haven't asked him anything
5      that he told you.  I'm asking about the
6      answer that is written on the document
7      that is in front of him and the
8      information he's already testified about
9      today that was excluded.  So again, your
10     objection, your nonstop objections are
11     wholly inappropriate.
12 Q.  (By Ms. Gessner) So, Mr. Borutta, Ms. Geraghty is
13     not listed in response to question number 18 on
14     Exhibit 20, is she?
15 A.  She is not listed.
16 Q.  Are there any other employees who used a personal
17     phone for Teupen's benefit or used a personal phone
18     to upgrade other than Ms. Acevedo and Ms. Geraghty?
19 A.  I don't know.
20 Q.  Ms. Geraghty was able to keep the phone and pay for
21     the line on her own, wasn't she?
22         MR. KLASS:  Object to the form.
23 A.  I don't know.
24 Q.  (By Ms. Gessner) And are you aware that
25     Ms. Geraghty had told Ms. Acevedo that that was an

www.thompsonmi
l
l
s.com

```
                    MARTIN BORUTTA        266
1    option when employees leave, is that they can pay
2    for and transfer the line over when they leave so
3    that they keep their cell phone number, their
4    personal number and have a phone available to them?
5         MR. KLASS:  Object to the form.
6  A.  I don't know what Ms. Geraghty said to Ms. Acevedo.
7  Q.  (By Ms. Gessner) That's right.  I think you said a
8    minute ago maybe under David Kesser that was
9    allowed, but apparently under you it wasn't
10   allowed, is that right?
11 A.  That's what I said.
12 Q.  Do you have any communication that you can show me
13   that sent to all employees informing them of this
14   change as it related to cell phones?
15 A.  I think there was -- they were informed when we
16   changed over to AT&T.
17 Q.  How were they informed?
18 A.  In person when they get a new phone because we cut
19   the phone lines down.  That's why not every
20   employee has a phone.
21 Q.  But it wasn't in writing anywhere, this new policy
22   that you were implementing that everyone had to
23   have a separate personal phone if that intended to
24   use it for personal calls, is that correct?
25        MR. KLASS:  Object to the form.
```

```
                    MARTIN BORUTTA        267
1  A.  They have to use the company phone for company use
2    and the rest is -- I don't know what people do
3    privately and that's not my business.  So if you
4    get a company phone it was for the company and
5    anything else, I don't know.
6  Q.  (By Ms. Gessner) But Ms. Geraghty was able to take
7    her company phone, pay it off and use it for her
8    personal use when she left, correct?
9         MR. KLASS:  Object to the form.
10 A.  Ms. Geraghty exchanged her phone the day she left.
11   What she did before I don't know because that was
12   agreed Mr. Kesser.
13 Q.  (By Ms. Gessner) Ms. Acevedo was never paid for the
14   credit that Teupen had received as a result of her
15   turning in her old phone, was she?
16        MR. KLASS:  Object to the form.
17 A.  I don't know whether she was paid or whether she
18   turned her personal phone in.  I don't know.
19 Q.  (By Ms. Gessner) And you never looked, did you,
20   before filing the lawsuit against her?
21        MR. KLASS:  Object to the form.
22 A.  We didn't find her turning her phone in, so we
23   didn't find any reason to.
24 Q.  (By Ms. Gessner) Did you speak with Ms. Geraghty
25   about whether or not she had told Ms. Acevedo that
```

```
                    MARTIN BORUTTA        268
1    she could transfer the phone before you filed this
2    lawsuit?
3         MR. KLASS:  Object to the form.
4  A.  I didn't speak with Ms. Geraghty.
5  Q.  (By Ms. Gessner) Did you speak with David Kesser
6    about what he perhaps maybe had told Ms. Acevedo
7    about --
8  A.  I don't -- I don't speak with Mr. Kesser.
9  Q.  Is that a no?
10 A.  It's a no.  I don't speak with him.  That means I
11   don't speak with him.
12 Q.  Have you spoken with Andy Liebl about this lawsuit?
13 A.  Sure.
14 Q.  When was the last time you spoke with Mr. Liebl
15   about the lawsuit?
16 A.  When he left the company in June '20, what's coming
17   and what's going.  Not long.  Yeah, that was the
18   last time I talked to him.
19 Q.  You haven't spoke to Mr. Liebl since?
20 A.  No.  That was the last I talked to him, June '20.
21 Q.  Have you spoken with Ms. Geraghty at all about the
22   lawsuit?
23 A.  As long as she was with the company, end of '20 I'm
24   sure, yes.
25 Q.  Have you spoken with her since the lawsuit has been
```

```
                    MARTIN BORUTTA        269
1    filed?
2  A.  I have not spoken to Ms. Molyn since she left the
3    company end of '20.
4  Q.  Do you have any sworn statements in your possession
5    that were provided on behalf of Teupen in this
6    case?
7  A.  I don't know.
8  Q.  Have you collected any sworn statements?
9  A.  I don't know.
10 Q.  Is that a maybe it happened, you just can't
11   remember, or some other --
12 A.  I -- I myself did not collect sworn statements.  I
13   don't know whether Ms. Molyn did or Mr. Liebl.  I
14   don't know.  I myself did not collect sworn
15   statements.
16 Q.  Have you seen any sort of statements in this case?
17 A.  I don't remember.
18        MS. GESSNER:  Let's take five
19   minutes.  I might only have a few more
20   questions and we'll be about done.
21        MR. KLASS:  Great.  Thank you.
22 (RECESS)
23 Q.  (By Ms. Gessner) I've got a couple more documents
24   to show you.  You had said that you hadn't seen a
25   receipt or the credit card receipt where
```

MARTIN BORUTTA                    270

1    Ms. Acevedo had paid for and turned in her own
2    personal cell phone, so I'm showing you a five-page
3    document that has been turned over to your lawyers
4    in discovery in this case that are Bates numbered
5    Acevedo00032 through Acevedo00036.  Have you taken
6    the opportunity to read these documents,
7    Mr. Borutta, before today?  (Exhibit 21)
8  A.  No.
9  Q.  And so you have no idea whether or not these
10     reflect -- even though we provided them in
11     discovery and pointed as evidence that my client
12     had purchased a phone, turned in her phone and had
13     a credit, you haven't looked at them prior to day?
14 A.  I did not look at them.
15 Q.  You said that my client had not -- Ms. Acevedo had
16     not turned in or had not provided any kind of
17     receipt, but she had provided receipts.  You just
18     haven't looked at them, have you?
19     MR. KLASS:  Object to the form.
20 A.  That is not a receipt that the phone was turned in
21     at Verizon, so I don't see any receipt.
22 Q.  (By Ms. Gessner) Okay.  But you have --
23 A.  It's an AT&T bill, correct?
24 Q.  It is an AT&T --
25 A.  I see it.  Right.

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                    271

1  Q.  -- and it is dated September of 2018 when she
2      received the first phone from Teupen, and it used
3      to be AT&T before you switched it to Verizon,
4      didn't it?
5  A.  You would have to --
6      MR. KLASS:  Object to the form.
7  A.  I switched it to AT&T in '19.
8  Q.  (By Ms. Gessner) In when?
9  A.  In 2019 we switched it to AT&T, December '19.
10 Q.  And so let's show you Exhibit 22.  This is where
11     Ms. Acevedo had paid for her own phone that she
12     used to turn in for a credit with Teupen.  You seem
13     to be claiming that Ms. Acevedo had a company phone
14     that she had never paid any money for and took it
15     as opposed to having a phone and which that she had
16     turned in and Teupen received the credit.  So are
17     you disputing that she owned the phone that Teupen
18     got the credit for and never reimbursed her?
19     MR. KLASS:  Object to the form.
20 A.  I don't know what Ms. Acevedo paid for, so --
21 Q.  (By Ms. Gessner) And again, you've never asked or
22     even followed up with whether or not Ms. Acevedo
23     had permission to exchange the phone and transfer
24     it to her personal line, have you?
25 A.  Ms. Acevedo never asked whether she has the

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                    272

1      permission.  She was accountant, not the CEO.  She
2      did not ask for permission whether she can transfer
3      it.  That's what happened.
4  Q.  And Ms. Geraghty was able to transfer and you don't
5      have a clue what Ms. Geraghty had told Ms. Acevedo
6      when she was her supervisor and you didn't tell her
7      anything differently, did you?
8      MR. KLASS:  Object to the form.
9  A.  Ms. Geraghty --
10 Q.  (By Ms. Gessner) Since you need it simply, you
11     weren't privy to any conversations that
12     Ms. Geraghty had with Ms. Acevedo about how to
13     handle the cell phone upon termination, correct?
14 A.  That doesn't matter.
15 Q.  Wait.  You were not present for any conversations
16     about what Ms. Geraghty said to Ms. Acevedo about
17     how to handle the cell phone upon termination, were
18     you?
19 A.  No, I were not present.
20 Q.  And you never gave Ms. Acevedo any instructions
21     whatsoever about what to do with her cell phone
22     when she is terminated or other people are
23     terminated, did you?
24     MR. KLASS:  Object to the form.
25 A.  Ms. Acevedo took her cell phone before she was

www.thompsonmi
l
l
s.com

MARTIN BORUTTA                    273

1      terminated.  She transferred the line over the
2      weekend and she didn't ask.
3  Q.  (By Ms. Gessner) So are you claiming that Teupen
4      owned her phone number?
5      MR. KLASS:  Object to the form.
6  A.  It was paid by Teupen, or I think that's what we
7      are claiming in the counterclaim, the phone -- the
8      line and the phone, when I remember correct.
9  Q.  (By Ms. Gessner) And what's the amount of the value
10     of the claim?  Have you done any damages
11     calculations for what you allege she caused harm to
12     Teupen by transferring her phone to a separate line
13     that she paid for?
14     MR. KLASS:  Object to the form.
15 A.  I did not yet calculate the damage.
16 Q.  (By Ms. Gessner) So prior to filing the lawsuit you
17     have no idea how much the damages are?
18     MR. KLASS:  Object to the form.
19 A.  I have to do a calculation.  I didn't do it.
20 Q.  (By Ms. Gessner) Isn't it true there are no damages
21     associated with any of these claims?
22     MR. KLASS:  Object to the form.
23 A.  I don't know.  I have to do a calculation.
24 Q.  (By Ms. Gessner) And so sitting here today almost a
25     year after you filed the lawsuit you don't know how

www.thompsonmi
l
l
s.com

## Sheet 70   Page 274

MARTIN BORUTTA                                    274

```
1    much you're alleging that Ms. Acevedo owes Teupen
2    as a result of your counterclaim, correct?
3         MR. KLASS:  Object to the form.
4  A.  I have to do a calculation on the damages.
5  Q.  (By Ms. Gessner) I'm asking you, have you ever done
6    any calculations prior to today?
7         MR. KLASS:  Object to the form.
8  A.  I don't remember.
9  Q.  (By Ms. Gessner) You don't know whether you did any
10   math about how much you're allegedly owed as result
11   of these claims, Mr. Borutta?
12        MR. KLASS:  Object to the form.
13 A.  I don't remember.
14 Q.  (By Ms. Gessner) Okay.  Mr. Borutta, I'm showing
15   you what's being marked as Exhibit 23 to your
16   deposition.  Did you read all of the interrogatory
17   responses before you signed the verification page
18   that is marked as Exhibit 23 to your deposition?
19        MR. KLASS:  Object to the form.
20 A.  That's what I signed when I signed it.  I read it
21   to my knowledge as I understood them.
22 Q.  (By Ms. Gessner) But the sentence says, "I have
23   read the foregoing interrogatories and the first
24   supplemental answers to the first interrogatories
25   and the answers to the second interrogatories."
```

www.thompsonmi
l
l
s.com

## Page 275

MARTIN BORUTTA                                    275

```
1    The answers are true according to the best of your
2    knowledge, information and belief.  So did you read
3    them before you signed this?
4  A.  Yeah.  That's what I signed, so yes, to the best of
5    my knowledge and understanding and information I
6    had that time.  That's what I signed for.
7  Q.  Okay.  I'm looking for one more thing.  Did you
8    sign the verification page for the second
9    supplemental responses that you just produced
10   pursuant to the court's order?
11        MR. KLASS:  Object to the form.  For
12   the record, what you just showed him was
13   related to the most recent responses.
14        MS. GESSNER:  Well, I'm looking for
15   the first set.
16 Q.  (By Ms. Gessner) Did you sign a verification before
17   this, Mr. --
18        MS. GESSNER:  Nicole, if you're on
19   here, we have to separate -- we have the
20   same set twice.
21        MR. KLASS:  Do you want to take a
22   break while you find it?
23        MS. GESSNER:  No, I do not.  I want
24   to ask him does he recall signing the
25   verification page from the first set of
```

www.thompsonmi
l
l
s.com

## Page 276

MARTIN BORUTTA                                    276

```
1    interrogatories that were produced in
2    this case.
3  A.  Could you show me the document, please?  And I can
4    tell whether I signed it.
5  Q.  (By Ms. Gessner) Yeah.  Hold on.
6         MS. HAYNES:  Yeah.  I guess I have
7    to take a break.
8         MS. HAYNES:  One moment, please.
9    I'm uploading it now.
10        MS. GESSNER:  Okay.  While she's
11   uploading it, I have one in between here
12   that we can take a look at.
13 Q.  (By Ms. Gessner) Mr. Borutta, why did you change
14   the registered agent from Parker Poe to CT
15   Corporation?
16 A.  I don't remember the reason.
17 Q.  Do you see the document in front of you?
18 A.  I see a document in front of me.
19 Q.  And it's being marked as Exhibit 25.  You don't
20   know why you did it?
21 A.  I don't remember why I did it.
22 Q.  Is this your signature on October 27, 2020?
23 A.  That is my signature.
24 Q.  Did you prepare this document?
25 A.  No, I don't think I prepared it.  I don't remember.
```

www.thompsonmi
l
l
s.com

## Page 277

MARTIN BORUTTA                                    277

```
1    That was -- yeah, that was October last year.  No,
2    I don't remember.
3  Q.  Let me see if we have it yet.  Are there any
4    responses to your questions today that you'd like
5    to modify?
6  A.  What do you mean by that?  Can you explain that to
7    me, please?
8  Q.  Yeah.  Are there any changes that you'd like to
9    make to any of the responses that you've given me
10   to my questions today?
11 A.  No.
12 Q.  And have you understood all of my questions all day
13   long?
14 A.  All the questions I answered with yes or no or I
15   don't know I understood and I told you if I didn't
16   understand them, so you repeated them or changed
17   them.  Yes.
18        MS. GESSNER:  Nicole, is it up?
19        MS. HAYNES:  Yes.  It's the document
20   dated June 4, 2021.
21        MS. GESSNER:  Thank you.
22 Q.  (By Ms. Gessner) Mr. Borutta, is this your
23   signature on this document that we're marking as
24   Exhibit 24?
25 A.  Yeah.  That looks like my signature.
```

www.thompsonmi
l
l
s.com

Sheet 71  Page 278
MARTIN BORUTTA 278

1  Q.  And did you review all of the interrogatory
2     responses before you signed this document?
3  A.  When I signed the document, then I reviewed it of
4     my best knowledge and what I understood.
5  Q.  And again, one last time, Ms. Acevedo is the only
6     employee who you have sued after she filed an EEOC
7     charge or lawsuit against Teupen, is that correct?
8     MR. KLASS:  Object.
9  A.  I don't know because I don't know if there was
10    another EEOC charge.  I don't know.
11 Q.  (By Ms. Gessner) You don't know if any employee --
12 A.  No.
13 Q.  -- filed EEOC charges?
14 A.  I don't know.
15 Q.  Have any other employees filed EEOC charges since
16    you became the CEO of Teupen North America?
17 A.  No.
18    MS. GESSNER:  Well, we're going to
19    hold this deposition open.  We're still
20    missing a ton of outstanding documents
21    that have not have produced in this case
22    including the forensic data that we've
23    asked for, and so we'll conclude it for
24    now.
25    MR. KLASS:  Defendant notes their
www.thompsonmills.com

Page 279
MARTIN BORUTTA 279

1  objection to holding open the
2  deposition, but he will read the
3  transcript.
4     (WHEREUPON, the taking of the
5  deposition was concluded at 5:32 p.m.)
www.thompsonmills.com

Page 280
MARTIN BORUTTA 280

S I G N A T U R E   P A G E

IN RE:      MARJORIE ACEVEDO v. TEUPEN NORTH
            AMERICA, INC.
DEPOSITION OF: MARTIN BORUTTA
TAKEN:      October 15, 2021

    I have read the foregoing pages, 1 through 279, and
find that they contain a correct transcription of the
answers made by me to the questions therein recorded,
with the exception of      corrections as listed on a
separate sheet of paper and incorporated into this
record.

_____
MARTIN BORUTTA              DATE

www.thompsonmills.com

Page 281
MARTIN BORUTTA 281

E R R A T A   S H E E T
OF
MARTIN BORUTTA

Please read your transcript carefully.
Do not mark or write on the transcript itself.
List any corrections you may have by page and line
number on this sheet.
Return errata and signature pages within 30 days to:
Thompson & Mills Court Reporters
P.O. Box 12179
Charlotte, NC 28220 OR michelle@thompsonmills.com

PAGE NO.  LINE NO.  CORRECTIONS
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

www.thompsonmills.com

MARTIN BORUTTA                          282

NORTH CAROLINA

MECKLENBURG COUNTY

                    C E R T I F I C A T E

     I, Michelle S. Thompson, do hereby certify that the
deposition of MARTIN BORUTTA was recorded by me and
transcribed under my supervision and direction; and the
foregoing 281 pages constitute a true and accurate
transcript of the proceeding.

     I further certify that the parties were present via
videoconference as stated on the appearance page.

     I further certify that I am neither counsel for,
related to, nor employed by any of the parties to this
action in which the proceeding was heard; and further,
that I am not a relative or employee of any attorney or
counsel employed by the parties thereto, and am not
financially interested in the outcome of the action.

     This the 1st day of NOVEMBER 2021.


                    _____

                    MICHELLE S. THOMPSON, CVR-M
                    Notary Public
                    #19952490166




          www.thompsonmi
                         l
                         l
                          s.com