

# Transcript of Marjorie Acevedo

**Date:** October 14, 2021
**Case:** Acevedo -v- Teupen North America, Inc.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

**Page 1**

```
          UNITED STATES DISTRICT COURT
       WESTERN DISTRICT OF NORTH CAROLINA
               CHARLOTTE DIVISION

-----------------------------------

MARJORIE ACEVEDO,

          Plaintiff,

    vs.      Civil Action No.
             3:20-CV-00518-FDW-DSC

TEUPEN NORTH AMERICA, INC.,

          Defendant.

-----------------------------------

          The remote videotaped deposition of
MARJORIE ACEVEDO, taken pursuant to Notice
of Taking Deposition, taken before
Alexis Jensen, RPR, CRR, and a Notary Public
in and for the County of Dakota, State of
Minnesota, taken on October 14, 2021,
commencing at approximately 8:08 a.m.
Central Time.



          AFFILIATED COURT REPORTERS
               6880 River Road
          Inver Grove Heights, MN 55076
               (612) 338-4348
```

**Page 2**

```
APPEARANCES:

ON BEHALF OF THE PLAINTIFF:

GESSNERLAW, PLLC
GG Galloway House
602 East Morehead Street
Charlotte, North Carolina  28202
844.437.7637
michelle@mgessnerlaw.com

BY:  L. MICHELLE GESSNER, ESQ.
     NICOLE HAYNES, ESQ.


ON BEHALF OF THE DEFENDANT:

FISHER & PHILLIPS LLP
227 West Trade Street
Suite 2020
Charlotte, North Carolina  28202
704.334.4565
dklass@fisherphillips.com

BY:  DAVID I. KLASS, ESQ.


Also Present:  Martin Borutta
               Blake Winchester, AV Tech
               Glen Fortner, Videographer
```

**Page 3**

```
                    INDEX

WITNESS:  MARJORIE ACEVEDO

Examination by Mr. Klass, page 6



          EXHIBITS

(NONE MARKED.)
```

**Page 4**

1       P R O C E E D I N G S
2       AV TECHNICIAN:  Thank you to
3  everyone for attending this proceeding
4  remotely, which we anticipate will run
5  smoothly.  Please remember to speak slowly,
6  and do your best not to talk over one
7  another.  And please be aware that we are
8  recording this proceeding for backup
9  purposes.
10       Any off-the-record discussions
11  should be had away from the computer, and
12  please remember to mute your mic for those
13  conversations.
14       Please have your video enabled to
15  help the reporter identify who is speaking.
16  If you're unable to connect with video and
17  connect with phone, please identify yourself
18  each time when speaking.  I apologize in
19  advance for any technical-related
20  interruptions.  Thank you so much.
21       THE VIDEOGRAPHER:  Here begins Tape
22  Number 1 in today's videotaped deposition of
23  Marjorie Acevedo in the matter of Acevedo v.
24  Teupen North America, Inc., in the United
25  States District Court, Western District of

5

1 North Carolina, Case Number
2 3:20-CV-00518-FDW-DSC.
3      Today's date is October 14th, 2021.
4 The time on the video monitor is
5 8:08 Central.  The videographer today is
6 Glen Fortner, representing Planet Depos.
7 All participants are attending remotely in
8 location.
9      Would Counsel please voice-identify
10 themselves and state whom they represent.
11      MS. GESSNER:  Yes, this is
12 Michelle Gessner.  I represent the
13 Plaintiff, Ms. Acevedo, and -- go ahead.
14      MS. HAYNES:  Hi, this is
15 Nicole Haynes.  I'm also with GessnerLaw,
16 representing Ms. Acevedo.
17      MR. KLASS:  This is David Klass.  I
18 represent the Defendant, Teupen North
19 America, Inc.  I also have in the room with
20 me, Martin Borutta, who is the corporate
21 representative for this deposition.
22      MS. GESSNER:  And before we get
23 started, I have an objection on the record I
24 would like to make.  This is being
25 videotaped.  Counsel properly noticed it.

6

1      However, the videographer is an
2 unnecessary additional expense, particularly
3 because the deposition is being taken by
4 Zoom.  We have asked that the Zoom be
5 recorded.  And, again, for purposes of any
6 costs in this case going forward, Plaintiff
7 did not request in any way that this
8 videotape -- that this deposition be
9 videotaped by a videographer.
10      THE VIDEOGRAPHER:  The court
11 reporter today is Alexis Jensen,
12 representing Planet Depos.  Would the
13 reporter please swear in the witness.
14           MARJORIE ACEVEDO,
15 having been called as a witness, being duly
16 sworn, testified as follows:
17           EXAMINATION
18 BY MR. KLASS:
19 Q.  Good morning, Ms. Acevedo.  My name is
20    David Klass.  As you heard a moment ago, I
21    represent the Defendant, Teupen North
22    America, Inc., in this case.
23      How are you this morning?
24 A.  I'm good, but I can't see you.
25      Are you going to be not visible.

7

1 Q.  I will not be.
2      So, because this is a Zoom
3    deposition, and we're doing this remotely,
4    and we're not in the same room together, I
5    did want to ask you, at the beginning of
6    this deposition, if you have any documents
7    or other papers in front of you?
8 A.  Nope, just tissues, hand sanitizer.
9 Q.  Is anyone else in the room with you?
10 A.  No, sir.
11 Q.  And although this is a somewhat formal [sic]
12    setting, since we're in an office or
13    offices, and there's no judge or jury
14    present, the deposition testimony that
15    you're about to give will be subject to the
16    same oath and the same penalties of perjury
17 that would apply if you were in court giving
18    testimony in front of a jury -- judge and
19    jury.
20      Do you understand that?
21 A.  I understand.
22 Q.  Okay.  Will you agree to let me know if you
23    do not understand a question?
24 A.  Yes, I will clarify.
25 Q.  And do you agree to let me know if you

8

1    cannot hear me at any time during this
2    deposition?
3 A.  Yes, I will.
4 Q.  If you need me to repeat or clarify a
5    question, will you let me know?
6 A.  Yes.
7 Q.  And although this deposition is being
8    video-recorded, it's also being recorded
9    through stenographic means.  And that means
10 that the court reporter can only take down
11 one person's remark at a time.
12      And therefore, it would be
13 necessary for you to allow me to finish my
14 questions before you begin your answers.
15 And I will similarly accord you the
16 privilege of letting you finish your answer
17 before I ask the next question.
18      Do you understand that?
19 A.  Yes.
20 Q.  If at any point during the deposition,
21 something else occurs to you that is
22 relevant to one of the questions I've asked
23 earlier, please feel free to let me know, so
24 that I will have your most complete response
25 on the record.

**9**

1          Do you agree to do that?
2     A.  Yes.
3     Q.  During the deposition, your attorney may
4          make objections to certain questions for the
5          record.  Once the objection has been made,
6     you will answer the question unless your
7          attorney specifically instructs you not to
8          do so.
9          Do you understand that?
10    A.  Yes.
11    Q.  If at any point you need to take a break,
12         will you agree to please let me know?
13    A.  Yes.
14    Q.  Okay.  The only caveat to that would be if I
15         have asked you a question, I would ask that
16         you provide your answer before we take the
17         break.
18         Is that okay?
19    A.  Yes.
20    Q.  Are you currently under the influence of any
21         medications, drugs, or alcohol that would
22         influence your ability to either understand
23         my questions today or prohibit you from
24         providing truthful answers?
25    A.  No.

**10**

1     Q.  So, now I'm going to ask you some background
2          information that I ask all Plaintiffs, so
3     this is not directed at you personally.
4          What is your date of birth?
5     A.  December 3rd, 1973.
6     Q.  Where were you born?
7     A.  In New York.
8     Q.  New York City or New York State?
9     A.  New York State.
10    Q.  Where were your parents born?
11    A.  Where were my parents born?
12    Q.  Yes.
13    A.  In Ecuador.
14    Q.  And what is -- what would you say is your
15         national origin?
16    A.  Hispanic.
17    Q.  Other than Marjorie Acevedo, have you gone
18         by any other names?
19    A.  Other than my last name, Acevedo, now
20         currently?
21    Q.  Do you have a maiden name?
22    A.  Yes, I have a maiden name.
23    Q.  What is your maiden name?
24    A.  Pacheco.
25    Q.  And how do you spell that?

**11**

1     A.  P, as in Peter, a-c-h-e-c-o.
2     Q.  Have you ever had your deposition taken
3          before?
4     A.  Have I ever -- high I ever had taken a
5          deposition before, in general, or with this
6          one in particular?
7     Q.  Have you ever had your deposition taken
8          before?
9          Have you ever sat, like you are
10         now, being asked questions under oath in a
11         case?
12    A.  No.
13    Q.  Ms. Acevedo, are you married?
14    A.  Yes, I am.
15    Q.  What is the name of your spouse?
16    A.  Luis Acevedo.
17    Q.  How do you spell his first name?
18    A.  L-u-i-s.
19    Q.  When were you married?
20    A.  When was I married?
21    Q.  Yes.
22    A.  2012.
23    Q.  It's not a trick question.
24    A.  No, I was going to say, where, when?  Okay.
25         2012.

**12**

1     Q.  Prior to your current marriage, had you been
2          married before?
3     A.  No.
4     Q.  Do you have any adult children?
5          And by that, I mean children who
6          are 18 or over.
7     A.  Yes.
8     Q.  What are -- do you -- how many do you have
9          who are 18 or over?
10    A.  Two.
11    Q.  What are their names?
12    A.  Adriana and Jeremy.
13    Q.  And where do they live?
14    A.  Adriana lives in North Carolina, and Jeremy
15         lives in South Carolina.
16    Q.  Where in North Carolina does Adriana live?
17         I'm just looking for a city or
18         town.
19    A.  Okay.  For a city, yes, it's Charlotte.
20    Q.  Do you have any relatives who live in the
21         western part of North Carolina?
22    A.  I'm not sure, you know, what geographical
23    western area is.
24         Can you elaborate on that?
25    Q.  Charlotte and north -- directly north, and

13

1   all parts west.
2 **A. No, I only have family in Charlotte.**
3   Q. Okay. How many family members do you have
4   in Charlotte?
5 **A. Three.**
6   Q. And are those -- is that number in addition
7   to your husband and your daughter?
8 **A. No.**
9   Q. So who --
10 **A. As far as like -- okay.**
11  Q. I'm sorry, go ahead.
12 **A. Can you repeat the question.**
13 **    As far -- are you asking as far as**
14 **immediate family or just like outside of my**
15 **household?**
16  Q. I guess I can clarify.
17      So, in addition -- other than your
18  daughter, Adriana, and your husband, Luis,
19  do you have any other immediate family in
20  western part of North Carolina or Charlotte,
21  as I defined it earlier?
22 **A. No.**
23  Q. Do you have any other members of your
24  nonimmediate or extended family in the
25  western part of North Carolina?

14

1 **A. I have siblings that live in Charlotte.**
2   Q. What are their name?
3 **A. Edgar and Peggy.**
4   Q. What are their last names?
5 **A. Edgar Ordaz (phonetic) and Peggy Bacon.**
6   Q. Other than Edgar or Peggy, do you have any
7   other relatives who live in the western part
8   of North Carolina?
9 **A. I have a cousin.**
10  Q. And what is his or her name?
11 **A. Wayne Tamala (phonetic).**
12  Q. Anyone else who lives in the western part of
13  North Carolina who you consider to be a
14  relative?
15 **A. No.**
16  Q. Does your husband have relatives in the
17  western part of North Carolina?
18 **A. No.**
19  Q. Ms. Acevedo, did you graduate from high
20  school?
21 **A. Yes.**
22  Q. What high school and what year did you
23  graduate?
24 **A. Charles E. Gorton High School, and if I can**
25 **recall, it was 1991.**

15

1   Q. Where was that high school located?
2 **A. New York.**
3   Q. Did you attend college?
4 **A. Yes.**
5   Q. What college?
6 **A. Iona.**
7   Q. And is that in New York State?
8 **A. Yes.**
9   Q. Did you graduate?
10 **A. Yes.**
11  Q. What year did you graduate?
12 **A. 2018.**
13  Q. What was your degree?
14 **A. Bachelor's.**
15  Q. And what was your major?
16 **A. Business and accounting.**
17  Q. When did you start attending Iona College?
18 **A. Right after I graduated from high school.**
19  Q. Did you -- at any point, did you attend
20  Iona College remotely?
21 **A. No.**
22  Q. You said you graduated in 2018.
23      Did I get that right?
24 **A. Yes.**
25  Q. So you attended in-person classes there?

16

1 **A. Yes.**
2   Q. Did you attend those classes while you
3   worked for Teupen?
4 **A. No.**
5   Q. What --
6 **A. Sorry, did I make a mistake in the year?**
7 **    Could you repeat the year that I**
8 **provided.**
9   Q. You -- you testified you graduated from
10  Iona College in 2018, 2-0-1-8.
11 **A. Oh, I'm sorry. That's incorrect. I forgot**
12 **what we -- what year we were in.**
13 **    It's -- I don't recall. I think it**
14 **was 9-- -- I know it had an 89 -- oh, gosh.**
15 **    Honestly, I can't recall right now.**
16  Q. Did you graduate before you began working at
17  Teupen?
18 **A. Yes.**
19  Q. Did you -- have you attended any other
20  postgraduate education?
21 **A. Are you asking like a graduate school?**
22  Q. I'll rephrase.
23      Have you attended any graduate
24  schools?
25 **A. No.**

17

1  Q. Have you attended any other undergraduate
2     colleges?
3  A. Yes.
4  Q. Okay. One or more?
5  A. Two.
6  Q. What's the name of the -- of the two
7     colleges that you attended?
8  A. Westchester Community College.
9  Q. Did you attend that before Iona College?
10 A. Yes.
11 Q. And then did you transfer to Iona College?
12 A. Yes.
13 Q. And other than Westchester Community College
14    and Iona College, did you attend any other
15    college-level universities or college?
16 A. Yes.
17 Q. What other colleges did you attend?
18 A. CPCC.
19 Q. What does that stand for?
20 A. Central Piedmont Community College.
21 Q. When did you attend that?
22 A. I think the last time I took a class
23    was -- I think it was 2019.
24 Q. Where is Central Piedmont Community College
25    located?

18

1  A. In Charlotte.
2  Q. Did you take those courses online or in
3     person?
4  A. In person.
5  Q. When did you begin to take courses at
6     Central Piedmont Community College?
7  A. I mean, I just took one-off courses, so I
8     believe since I moved here -- since I moved
9     to North Carolina.
10 Q. Did you take courses while you were employed
11    at Teupen?
12 A. I can't hear you.
13 Q. I'm sorry.
14    Did you take courses there when you
15    were employed at Teupen?
16 A. Yes.
17 Q. Were these evening courses?
18 A. I can't hear you.
19    MS. GESSNER: Counsel -- Counsel,
20 you keep fading in and out. So I -- we
21 can't see you, so we don't know if you have
22 a microphone on or what you're doing. But
23 you -- we cannot hear you when you are not
24 speaking into the microphone. So please
25 speak up so that she can hear you.

19

1     MR. KLASS: I'll repeat the
2  question. I'm sitting in front of my
3  computer.
4  BY MR. KLASS:
5  Q. Did you take your --
6     MS. GESSNER: Well, wait a minute.
7  BY MR. KLASS:
8  Q. -- courses at night?
9     MS. GESSNER: Wait a minute, David.
10 Even if you are, we can't see you. She
11 cannot see you to be able to even read your
12 lips to understand exactly what you're
13 saying.
14    So, if you're standing in front of
15 your computer, we cannot hear you. You are
16 muffled. So please correct that, so that
17 she can be sure to hear your question.
18 BY MR. KLASS:
19 Q. Ms. Acevedo, if you have any -- if I ask you
20    any questions that you cannot hear, will you
21    agree to let me know that you cannot hear
22    them?
23    MS. GESSNER: Wait a minute.
24 Objection, Counsel. She has done that. I
25 too am entitled to be able to hear your

20

1  question as much as she can, and I'm
2  informing you, as she has done, we cannot
3  hear your question. So please make sure
4  that you are heard and are not muffled when
5  you speak.
6     MR. KLASS: I will do my best.
7  Thank you.
8  BY MR. KLASS:
9  Q. Ms. Acevedo, did you attend courses at
10    Central Piedmont Community College in the
11    evenings?
12 A. Yes.
13 Q. How many courses would you take at any one
14    time?
15 A. One.
16 Q. What were the courses -- what -- I'll strike
17    that.
18    What topics were the courses on?
19 A. Accounting.
20 Q. Just accounting, or any other topics?
21 A. Accounting.
22 Q. How many hours per week would you attend
23    courses at Central Community -- or Central
24    Piedmont Community College while you worked
25    at Teupen?

21

1   A. I don't recall.
2   Q. How many hours per week would you spend
3      devoted to working on coursework at Central
4      Piedmont Community College while you were
5      working at Teupen?
6   A. I don't recall.
7   Q. Can you provide an estimate?
8   A. Four hours.
9   Q. Other than Westchester Community College,
10  Iona College, and Central Piedmont Community
11     College, have you taken courses at any other
12     college or university?
13  A. I don't recall.
14  Q. Have you taken any other training or courses
15     related to accounting work or your current
16     profession?
17  A. Can you repeat the question.
18  Q. Other than the colleges that you just
19     mentioned, have you taken any other
20     coursework or training regarding accounting
21     or your current profession?
22  A. No.
23  Q. Have you ever been a witness or party to any
24     other lawsuit other than this one?
25  A. I don't know what "parking" [sic] means.

22

1   Q. I'm sorry, "party."
2   A. "Party"?
3   Q. Correct.
4   A. Can you repeat the question, please.
5   Q. Have you ever been a witness or party to any
6      other lawsuit?
7   A. No.
8   Q. Have you ever been arrested, cited, or
9      charged with a crime other than a speeding
10     ticket in the State of North Carolina?
11  A. No.
12  Q. Have you ever been arrested, cited, or
13     charged with a crime other than a speeding
14     ticket outside the State of North Carolina?
15  A. No.
16  Q. Other than against Teupen, have you ever
17     filed an EEOC charge against any other
18     employer?
19  A. Have I ever filed another EEOC besides
20     Teupen?
21  Q. EEOC charge against a -- an employer other
22     than Teupen.
23  A. No.
24  Q. Other than your claims against Teupen in
25     this lawsuit, have you initiated any claims

23

1      or charges with any governmental entities
2      besides the EEOC?
3   A. Can you repeat the question.
4   Q. Other than against Teupen, have you
5      initiated any claims or charges with any
6      governmental entities besides the EEOC?
7   A. No.
8   Q. Other than against Teupen, have you ever
9      filed a claim with a federal or state agency
10     alleging discrimination or retaliation or
11     harassment?
12  A. Can you repeat the question.
13  Q. Other than against Teupen, have you ever
14     filed a claim with a federal or state agency
15     alleging discrimination or retaliation or
16     harassment?
17  A. No.
18  Q. What is your current address?
19  A. 6877 Spring Peeper Lane, Lancaster,
20     South Carolina, 29720.
21  Q. How long have you lived at that address?
22  A. How long have I lived here currently?
23     Four months.
24  Q. What was your address prior to your current
25     address?

24

1   A. 14015 Dunbritton Lane, Charlotte,
2      North Carolina, 28277.
3   Q. And what time period did you live at that
4      address?
5   A. What time period as in how long I lived
6      there?
7   Q. Yeah, if you could provide start and end
8      dates.
9   A. I don't have specific dates that I can
10     recall at the moment.
11  Q. Can you recall what month you moved to that
12     address?
13  A. I can't hear you. I didn't miss -- I missed
14     the first part.
15  Q. Can you recall what month you removed to
16     that address?
17     MS. GESSNER: Object to form.
18     BY MR. KLASS:
19  Q. You can answer.
20     MS. GESSNER: Counsel, you asked
21  her about two different addresses; it's not
22  clear.
23     Which one are you talking about?
24     MR. KLASS: The Dunbritton Lane
25     address.

---

**25**

1  THE WITNESS: May.
2  BY MR. KLASS:
3  Q. May of what year?
4  **A. I don't recall, I said, the exact year. I**
5  **don't have the lease in front of me.**
6  Q. Where did you live prior to that address?
7  **A. Prior to which address?**
8  Q. Dunbritton Lane.
9  **A. I don't -- I don't recall the address at**
10  **this time, but you should have it on -- on**
11  **the statements and the declarations and the**
12  **hiring paperwork. Teupen has it. I don't**
13  **have it handy. I don't recall at this**
14  **moment.**
15  Q. Prior to living at Dunbritton Lane, did you
16  live anywhere immediately prior to living
17  there in North Carolina, or did you move to
18  that address from a different state?
19  **A. No, I moved -- no. There was a prior**
20  **address in North Carolina.**
21  Q. And you don't remember right now what that
22  address was?
23  **A. No.**
24  Q. What address did you live at when you
25  applied to work at Teupen?

**26**

1  **A. It's the same question. I don't recall the**
2  **address.**
3  Q. When did you move to North Carolina?
4  **A. When did I move to North Carolina as far as**
5  **year?**
6  Q. Yes.
7  **A. 2016.**
8  Q. Do you recall what month?
9  **A. August.**
10  Q. And where did you move from?
11  **A. Where -- as far as address?**
12  Q. City and state.
13  **A. City and state?**
14  Q. Yes. What city and state did you move from
15  when you moved to North Carolina?
16  **A. Jersey City, New Jersey.**
17  Q. Since you moved to North Carolina, and now
18  to South Carolina, have the members of your
19  household been the same?
20  **A. Yes.**
21  Q. The address in North Carolina that you lived
22  at prior to living at Dunbritton Lane, was
23  that in Charlotte, or in another city?
24  **A. Another city.**
25  Q. What city?

**27**

1  **A. Pineville.**
2  Q. Are you currently a member of any civic
3  groups or churches?
4  **A. Can you repeat it again.**
5  Q. Are you currently a member of any civic
6  groups or churches?
7  **A. Church.**
8  Q. What church are you a member of?
9  **A. Elevation Church.**
10  Q. At what location of Elevation Church are you
11  a member?
12  **A. Ballantyne.**
13  Q. How long have you been a member of Elevation
14  Church?
15  **A. I don't recall the year.**
16  Q. Other than Elevation Church, are you a
17  member of any other civic group or church?
18  **A. What is a "civic group"?**
19  Q. It can be however you define it, but
20  examples would be Elks or Kiwanis or Rotary,
21  Lions Club.
22  **A. I'm not familiar with any of those.**
23  Q. Are you a member of any community
24  organizations?
25  **A. No.**

**28**

1  Q. Did you review any documents to prepare for
2  this deposition?
3  **A. Yes.**
4  Q. What documents?
5  **A. The same ones that have been shared between**
6  **you and my attorney.**
7  Q. Any other documents than documents that have
8  been shared between Teupen and you and your
9  attorney in this lawsuit?
10  **A. I don't understand your question.**
11  Q. Have you reviewed any documents to prepare
12  for this deposition other than documents
13  that have been exchanged either by you
14  through your attorney to Teupen or to you
15  from Teupen's counsel?
16  **A. No.**
17  Q. Did you speak to anyone other than your
18  attorney about this deposition?
19  **A. No.**
20  Q. Did you ever make any notes, journal
21  entries, diary entries, markings on
22  calenders, or any other writings regarding
23  anything involving your employment with
24  Teupen?
25  **A. Can you repeat the question.**

---

29

1  Q. Did you ever make any notes, journal
2     entries, diary entries, markings on
3     calenders, or any other writings regarding
4     anything involving your employment with
5     Teupen?
6  **A. Where?  Are you asking for where, or did I**
7     **ever make any markings?**
8  Q. Did you ever make any.
9  **A. Anything regarding Teupen was in Teupen**
10    **premises.**
11 Q. Do you know of any other person who has
12    notes or any written documentation of any
13    sort involving facts asserted in your
14    Complaint against Teupen?
15 **A. I'm not aware.**
16 Q. Other than Teupen, have you ever been
17    discharged from employment?
18 **A. Never.**
19 Q. As any employer ever advised you words to
20    the effect that, If you did not resign, your
21    employment would be terminated?
22 **A. Never.**
23 Q. Have you ever been laid off from a company?
24 **A. Yes.**
25 Q. What was that company?

---

30

1  **A. The CDM Group.**
2  Q. And were you told what the basis of the
3     layoff was?
4  **A. Well, I can't say it was a layoff.  They**
5     **were doing away with certain departments,**
6     **and the department that I worked for was**
7     **dismissed, and I was given the opportunity**
8     **to work in other departments.**
9         **So when I worked -- when I moved to**
10    **North Carolina, I continued to work here**
11    **remotely.  And then they had -- they gave me**
12    **a severance package, and I was -- because I**
13    **moved, and they didn't have another place**
14    **for me to go, I was considered as laid off.**
15 Q. When did you work for CDM Group?
16 **A. When did I work on CDM Group?  As far as the**
17    **length?  I am, can you elaborate on that.**
18 Q. When was your start date, month and year,
19    with CDM Group?
20 **A. 2012.**
21 Q. What was your position there when you
22    started?
23 **A. Financial analyst.**
24 Q. And how long did you hold that position at
25    CDM Group?

---

31

1  **A. I don't recall, because I don't have my**
2     **résumé, but I had been promoted.**
3  Q. What were you promoted to?
4  **A. I'm sorry, I cannot hear you again.**
5  Q. What were you promoted to?
6  **A. Business manager.**
7  Q. Were you -- did your position change after
8     being promoted to business manager by the
9     time you left the company?
10 **A. Yes.**
11 Q. What did it change to?
12 **A. Well, since -- again, since they did away**
13    **with the department, I went back to**
14    **financial analyst and worked with the**
15    **previous department from -- prior to being**
16    **promoted.**
17 Q. When -- when did you go back to being a
18    financial analyst?  Do you recall the month
19    and year?
20 **A. I don't recall.**
21    **Can we take a break?**
22 Q. Sure.
23 **A. Thank you.**
24 Q. How much time do you need?  Is five minutes
25    okay?  Ten minutes?

---

32

1  **A. Ten minutes.**
2  Q. Okay.
3      THE VIDEOGRAPHER:  Off record, the
4  time is 8:45 Central.
5      (Break taken.)
6      THE VIDEOGRAPHER:  Going back on
7  the record, the time is 8:57 Central.
8  BY MR. KLASS:
9  Q. Ms. Acevedo, what does CM -- CDM Group do as
10    a business?
11 **A. Are you referring to my past -- my former**
12    **employer?**
13 Q. Yes.
14 **A. It's an advertisement agency.**
15 Q. And you said you began working there in
16    2012.
17      Is that right?
18 **A. Yes.**
19 Q. Who was your supervisor when you worked
20    there?
21 **A. Melissa Rodriguez.**
22 Q. What was her position?
23 **A. A supervisor.**
24 Q. Was she a supervisor of yours the entire
25    time you worked there, or for a specific

---

33

1  position when you worked there?
2  **A. For a specific position.**
3  Q. And which position was that?
4  **A. The first one.**
5  Q. The financial analyst --
6  **A. Yes.**
7  Q. -- position? Okay.
8      Who was your supervisor when you
9  were promoted?
10 **A. Pamela.**
11 Q. And Pamela --
12 **A. I don't recall her last name at this time.**
13 Q. Okay. Was Pamela your supervisor when your
14 employment with CDM Group ended?
15 **A. No.**
16 Q. Who was your supervisor then?
17 **A. Melissa Rodriguez.**
18 Q. So Melissa was your original supervisor;
19 then you were supervised by Pamela; and then
20 you were supervised again by Melissa.
21     Is that right?
22 **A. Yes.**
23 Q. Remind me again what was the position that
24 you were promoted into?
25 **A. It's on the résumé that was handed in to**

34

1     **Teupen, so you should have that.**
2  Q. Do you recall the position, though?
3  **A. Business manager.**
4  Q. What department was the business manager
5  position in?
6  **A. Facilities.**
7  Q. And what department was your financial
8  analyst position in?
9  **A. Accounting.**
10 Q. And you said before that CDM Group
11 eliminated the facilities department.
12     Is that right?
13 **A. Correct.**
14 Q. And then you moved back to the accounting
15 department?
16 **A. That's right.**
17 Q. When you moved back to the accounting
18 department, was there any time period when
19 you still worked in the New York area?
20 **A. Can you repeat that question, please.**
21 Q. When you left being a business manager in
22 the facilities department and began working
23 again as a financial analyst in the
24 accounting department, did you work at any
25 point while you were still in the New York

35

1  or Jersey City area?
2  **A. Yes.**
3  Q. How long did you work as a financial analyst
4  at that point while you were in that
5  geographic area?
6  **A. I don't recall.**
7  Q. At some point when you were working as a
8  financial analyst, you moved down to
9  North Carolina.
10     Is that right?
11 **A. Yes.**
12 Q. And when you did that, you were working
13 remotely?
14 **A. Yes.**
15 Q. Do you recall how long you worked remotely
16 from North Carolina before your employment
17 ended?
18 **A. I don't recall.**
19 Q. And what reason did the company give you for
20 ending your employment as a financial
21 analyst when you were working in
22 North Carolina?
23 **A. They were downsizing. They moved from**
24 **New York location to New Jersey.**
25 Q. Prior to working at the CDM Group, had you

36

1  held any prior employment as an account or
2  bookkeeper or a similar role?
3  **A. Yes.**
4  Q. What company was that at?
5  **A. I don't have my résumé in front of me to go**
6  **over what my employment history is, but**
7  **they've all been accounting in some way or**
8  **form.**
9  Q. Do you recall your prior employer that
10 you performed any --
11 **A. I can't hear you.**
12 Q. I'm sorry.
13     Can you recall the name of any
14 employer that you performed accounting work
15 for prior to working at Teupen other than
16 CDM Group?
17     MS. GESSNER: Object to form,
18 Counsel. She has -- asked and answered,
19 and -- and you have her résumé. I think
20 she's asked you several times to show it.
21     You're asking her to memorize something that
22 she said is written down on a document that
23 you have in your possession.
24     So, again, asking these memory
25 questions, you're going to get, I don't

37

1  recall.  She's asked you to assist her by
2  showing her the document, as opposed to
3  asking her these blind questions.
4       So I'd ask that you give her that
5  courtesy.  It seems as if -- if you're
6  playing games with her for some reason
7  unnecessarily.
8       MR. KLASS:  Thank you for that
9  objection.  I would ask that you not engage
10  in speaking objections, which are
11  inappropriate and improper under Rule 30.
12  You can simply object to the form of the
13  question.
14       And these are my deposition
15  questions, and I can ask whichever questions
16  I would like to, and if you would like to
17  object, that is certainly your right to do
18  so.
19       So --
20       MS. GESSNER:  Okay.  Counsel,
21  objection to your statement on the record.
22  You asked this witness to ask you if she
23  didn't understand, or ask you to clarify.
24  She has now repeatedly asked you to show her
25  your -- her résumé, to which that you have

38

1       repeatedly refused.
2       So, again, it seems as if you're
3  being completely obstructive in allowing her
4       to give you honest answers that -- as
5       opposed to from memory from the document she
6       has informed you that you have in your
7       possession, and she knows that you have in
8       your possession, and you're refusing to show
9  it to her.
10       So, again, if you ask her
11       questions, and not try to harass and
12       obstruct this deposition, I will be silent.
13       MR. KLASS:  Thank you, again, for
14       your speaking objection, which is improper.
15  So I will ask a new question.
16  BY MR. KLASS:
17  Q.  Ms. Acevedo, do you have any memory, as you
18       sit here today, apart from looking at a
19       résumé, of any prior company that you
20       performed accounting work for prior to
21       working at Teupen other than CDM Group?
22  A.  I'm going to request that you show me the
23       résumé, so we can view it altogether.
24  Q.  Ms. Acevedo I'm just asking if you have a
25       memory.  If you don't remember, you don't

39

1  remember.
2  A.  I don't recall.
3  Q.  Thank you.
4       Other than with CDM Group, have you
5  ever been laid off from employment?
6  A.  No.
7  Q.  Now, I'd like to ask you questions about
8  your employment history after you worked at
9  Teupen.
10       Who was your first employer after
11  you worked at Teupen?
12  A.  Signature Healthcare.
13  Q.  When did you begin working for Signature
14  Healthcare?
15  A.  May.
16  Q.  Of what year?
17  A.  2020.
18  Q.  What position were you hired into?
19  A.  Bookkeeper.
20  Q.  Was that a full-time position or a part-time
21  position?
22  A.  Part-time.
23  Q.  How many hours per week?
24  A.  I cannot hear you again.
25  Q.  I'm sorry.

40

1       How many hours per week?
2  A.  Less than 18 hours.
3  Q.  What was your rate of pay?
4  A.  $26 an hour.
5  Q.  How long did you hold that position for?
6  A.  How long did I hold the position for?
7  Q.  Yes.
8  A.  Are you asking if I'm still working there?
9  Q.  Are you still working there?
10  A.  Yes.
11  Q.  Are you still working as a part-time
12  bookkeeper for them?
13  A.  No.
14  Q.  When did you stop working as a part-time
15  bookkeeper for them?
16  A.  November.
17  Q.  Of 2020?
18  A.  Yes.
19  Q.  And when you stopped working as a part-time
20  bookkeeper for Signature Healthcare in
21  November of 2020, what was your new position
22  with that company?
23  A.  Just full-time.
24  Q.  Did your rate of pay change?
25  A.  No.

---

**41**

1  Q. Are you still paid on an hourly basis?
2  **A. Yes.**
3  Q. And what is your current rate of pay there?
4  **A. I believe you just asked me if it was the**
5  **same pay, so I don't understand your next**
6  **question.**
7  Q. Are you still being paid $26 per hour at
8    Signature Healthcare?
9  **A. Yes.**
10 Q. And when you say "full-time," what do you
11   mean by that in terms of hours worked per
12   week?
13 **A. More than 18 hours a week.**
14 Q. Are you given a set number of hours to work
15   each week?
16 **A. No.**
17 Q. If you work over 40 hours a week, are you
18   paid overtime?
19 **A. Yes.**
20 Q. Other than Signature Healthcare, have you
21   worked at any other company since leaving
22   employment with Teupen?
23 **A. Yes.**
24 Q. What other company?
25 **A. Raven's Nest.**

---

**42**

1  Q. Do you still work there?
2  **A. No.**
3  Q. When did you begin working at Raven's Nest?
4  **A. September.**
5  Q. Of 2020?
6  **A. Yes.**
7  Q. What position did you hold with
8    Raven's Nest?
9  **A. Bookkeeper.**
10 Q. Was that a full- or part-time position?
11 **A. It was part-time.**
12 Q. How many hours per week did you work?
13 **A. Less than six.**
14 Q. What was your rate of pay?
15 **A. $20 per hour.**
16 Q. How long did you work at Raven's Nest?
17 **A. It was a short term.**
18 Q. Do you recall what month you ended
19   employment there?
20 **A. Last time I worked there was December 2020.**
21 Q. Why did you stop working at Raven's Nest?
22 **A. I was sort of on a per-diem basis or a**
23   **contractor. I wasn't -- it was just**
24   **whenever they needed me, if they needed me.**
25 Q. So why did they -- why did you stop

---

**43**

1    performing work for them?
2  **A. They didn't need me anymore.**
3  Q. Did they tell you why?
4  **A. They said the company was -- is going**
5  **through a slow term after the holidays, and**
6    **they will call me back when they boost up in**
7    **sales.**
8  Q. And did they ever call you back?
9  **A. No.**
10 Q. Did you ever follow up with them?
11 **A. No.**
12 Q. Other than Signature Healthcare and
13   Raven's Nest, have you worked for any other
14   company since you left employment with
15   Teupen?
16 **A. I -- I don't understand the question.**
17 Q. Other than Raven's Nest -- strike that.
18       Other than working for Raven's Nest
19   and Signature Healthcare, have you worked
20   for any other company since you stopped
21   working for Teupen?
22 **A. I have another part-time job at Complete**
23   **Package Cleaning Services.**
24 Q. What job was that?
25 **A. Bookkeeper.**

---

**44**

1  Q. When did you work for them?
2  **A. As in time length?**
3       **Can you elaborate on that, please.**
4  Q. When did -- what month did you start working
5    for them?
6  **A. I worked for them for a long time, even**
7    **before -- while also was working with**
8    **Teupen.**
9  Q. Do you recall when you started working for
10   them, what year?
11 **A. 2018.**
12 Q. Did you work as their bookkeeper their --
13   that entire time that you worked for them?
14 **A. Yes.**
15 Q. How many hours per week did you work for
16   them?
17 **A. Five hours.**
18 Q. Is that five hours every week?
19 **A. Weekly -- it wasn't five hours a week, no.**
20 Q. So in -- well, strike that.
21       Did you work for them continuously
22   from 2018 -- or I -- I'll strike that too.
23       Do you still work for Complete --
24   for that company?
25 **A. Yes.**

---

45

1  Q. Okay. Since you began working for them in
2     2018 to the present, have you worked for
3     them continuously?
4  **A. It sounds like you just re-asked me the same**
5     **thing. I -- can you repeat that.**
6  Q. I'll ask a different question.
7           What is the average number of hours
8     per week you have worked for them since you
9     started working for them in 2018?
10 **A. Less than five hours.**
11 Q. Can you be more specific?
12 **A. Three hours.**
13 Q. Other than that company, Raven's Nest, and
14    Signature Healthcare, have you worked for
15    any other companies since you left
16    employment with Teupen?
17 **A. No.**
18 Q. While you were employed part-time with
19    Signature Healthcare, did you continue to
20    work -- to look for additional work?
21 **A. Yes.**
22 Q. And how did you do that?
23 **A. How did I do what?**
24 Q. Look for additional work.
25 **A. Indeed, LinkedIn.**

46

1  Q. Did you send applications to employers other
2     than through LinkedIn or Indeed?
3  **A. No.**
4  Q. Were you ever offered a job by a company
5     since you left Teupen other than the three
6     companies that you mentioned a minute ago?
7  **A. Yes.**
8  Q. What company offered you a position?
9  **A. I don't recall the name right now.**
10 Q. Do you recall when they offered you the
11    position?
12 **A. In 2020.**
13 Q. Do you recall the month?
14 **A. October.**
15 Q. And why did you not accept that offer?
16 **A. I did accept the offer.**
17 Q. How come you did not start working for that
18    company?
19 **A. Because they rescinded my offer after**
20    **learning that I wasn't working with Teupen**
21    **any longer.**
22 Q. When you applied to that company -- in
23    writing, or both?
24 **A. Both.**
25 **(Reporter clarification.)**

47

1         MR. KLASS: Of course.
2         Did you tell that company that you
3     were still working for Teupen verbally, in
4     writing, or both?
5         (Reporter clarification.)
6         THE WITNESS: Yes.
7  BY MR. KLASS:
8  Q. Was that application to that company made
9     while you were still employed with Teupen,
10    or after you were employed with Teupen?
11 **A. After.**
12 Q. Was it on your résumé that you provided to
13    them that you were still employed with
14    Teupen at that time?
15 **A. Yes.**
16 Q. Did they tell you how they found out you no
17    longer worked at Teupen?
18 **A. No.**
19 Q. Other than that one job offer, were there
20    any other job offers that you received that
21    you did not accept after you left working
22    for Teupen?
23 **A. No.**
24 Q. Did you tell any other companies after you
25    left Teupen, either verbally or in writing,

48

1     that you still worked for Teupen at the time
2     that you applied?
3  **A. No.**
4  Q. At Signature Healthcare, do you have
5     benefits?
6         And by "benefits," I mean, health
7     insurance, dental insurance, 401(k)
8     participation.
9  **A. Yes.**
10 Q. And have you signed up for any insurance
11    plans through Signature Healthcare?
12 **A. Yes.**
13 Q. Did you participate in those insurance plans
14    when you began working there part-time or
15    sometime after that?
16 **A. No.**
17 Q. When did you sign up for health insurance or
18    other insurance coverage through Signature
19    Healthcare?
20 **A. During open enrollment.**
21 Q. Do you recall when that was?
22 **A. April 2021.**
23 Q. Were you eligible to enroll in health or
24    other benefits plans prior to April 2021
25    with Signature Healthcare?

49

1  A. Yes.
2  Q. And you chose not to enroll?
3  A. No, I was getting medical, but I didn't have
4     a full benefits package until April 2021.
5  Q. When did you -- when were you provided
6     medical or health insurance benefits with
7     Signature Healthcare?
8  A. When I became full-time.
9  Q. Were you eligible to receive health
10    insurance through Signature Healthcare prior
11    to working full-time?
12 A. I believe you asked me that question
13    again -- before.
14        Is it something different?  I
15    don't -- I don't know.  Can you explain this
16    question.
17 Q. Prior to working full-time for Signature
18    Healthcare, were you given the opportunity
19    to enroll with their health insurance plan?
20 A. No.
21 Q. And you said that when you -- that during
22    open enrollment in April of 2021, you were
23    given a full benefits package.
24        What -- what do you mean by that?
25 A. 401(k), I had an opportunity to sign up for

50

1     401(k).
2  Q. Any other type of benefit that you were
3     given then that you were not previously
4     eligible for?
5  A. Additional PTL time.
6  Q. Any type of insurance coverage that you
7     became eligible for in April 2021 that you
8     were not eligible for when you became
9     full-time?
10 A. That sounds like the same question.
11    Can -- I don't understand.
12 Q. When you -- when you became full-time with
13    Signature Healthcare, you enrolled in their
14    health plan coverage; is that right?
15 A. Yes.
16 Q. Did you enroll at the same time in any other
17    health -- health or benefits insurance at
18    the same time?
19 A. I'm sorry, I didn't hear the first part.
20    Can you repeat the question.
21 Q. Okay.  Other than enrolling in health
22    insurance coverage when you became full-time
23    with Signature Healthcare, did you enroll in
24    any other insurance plan at that same time?
25 A. I don't understand your question.

51

1  Q. Did you enroll in dental coverage when
2     you -- with Signature Healthcare when you
3     became full-time with Signature Healthcare?
4  A. Yes.
5  Q. Did you have health insurance coverage -- or
6     I'll strike that.
7        Did you have health insurance
8     between when you ended employment with
9     Teupen and becoming full-time for Signature
10    Healthcare?
11 A. No.
12 Q. Were you insured through any plan held by
13    your husband during that time?
14 A. I said no insurance, sir.
15 Q. When did you begin working at Teupen?
16 A. 2017.
17 Q. Do you recall what month?
18 A. May.
19 Q. Did you sign an Employment Agreement when
20    you began working at Teupen?
21 A. Yes.
22 Q. Would you agree that that Employment
23    Agreement was in effect throughout your time
24    at Teupen?
25 A. I don't understand your question.

52

1  Q. I'll rephrase.
2        After you signed the Employment
3     Agreement with Teupen, was the Employment
4     Agreement ever rescinded or canceled in any
5     way?
6  A. No.
7  Q. So, if I can, I'd like to share my screen
8     with you.  Let me see if I can make this
9     work.
10       Can you see the top of a document
11    in front of you called Employment Agreement?
12 A. Yes.
13 Q. Okay.  And do you see the first paragraph is
14    dated the 24th of May, 2017?
15 A. You're asking me if I can see the paragraph?
16 Q. Yeah.  Do you see where it says that; where
17    it says the 24th day of May, 2017?
18       MS. GESSNER:  Counsel, what are the
19    Bates numbers of this document and how many
20    pages is it.  Please read it into the record
21    to that it is clear --
22       MR. KLASS:  Okay.
23       MS. GESSNER:  -- exactly what
24    you're looking at.
25       MR. KLASS:  It is eight pages.  It

**53**

1  starts at 1Teupen00009, and it ends at --
2  hold on -- 1Teupen00016.
3  BY MR. KLASS:
4  Q. Ms. Acevedo, would -- would you agree that
5  this is your Employment Agreement with
6  Teupen?
7      MS. GESSNER: Objection, Counsel.
8  She can only see the first page, despite the
9  scrolling. If you'd like to give her an
10  opportunity to read all eight pages and give
11  her the scrolling capabilities or let her
12  tell you when to scroll next, again,
13  I -- she has not had an opportunity to read
14  this document.
15      MR. KLASS: I will note that that's
16  the second speaking objection made that is
17  improper.
18      MS. GESSNER: And I'll note that if
19  Counsel would take a proper deposition, I
20  wouldn't need to instruct him on how to show
21  a witness a document.
22      So I'm not going to let this
23  witnessed be hoodwinked into answering
24  questions when you know you are required to
25  show her the full document and give her an

**54**

1  opportunity to review it, just as if we were
2  in person, where she would be handed the
3  hardcopy of the document and have as much
4  time as she needs to review it.
5      So, Counsel, please conduct
6  yourself professionally, and, again, I will
7  not say a word.
8  BY MR. KLASS:
9  Q. Ms. Acevedo, do you see your signature on
10  the screen in front of you?
11 **A. Yes.**
12  Q. Do you recognize that to be your signature?
13 **A. Yes.**
14  Q. Okay. And do you see at the bottom of that
15  document, on the bottom right, it says,
16  1Teupen00016?
17 **A. Yes.**
18  Q. Okay. When you left employment with Teupen
19  in January of 2020, did you ever sign any
20  type of Separation or Severance Agreement?
21 **A. I don't recall.**
22  Q. When you left employment with Teupen, would
23  you agree that your -- that you were
24  informed of your separation on January 3rd,
25  2020?

**55**

1 **A. Can you repeat the question.**
2  Q. When was -- when was your last day of
3  employment with Teupen?
4 **A. I don't know.**
5  Q. Okay. All right. So turning back to when
6  you were hired, who were you hired by?
7 **A. Sheri Geraghty.**
8  Q. What was her position at Teupen at the time?
9 **A. Controller.**
10  Q. And what position did -- or were you hired
11  into?
12 **A. I'm sorry can you repeat that.**
13  Q. What position were you hired for?
14 **A. Accountant.**
15  Q. And who were you to report to as an
16  accountant for Teupen?
17 **A. Sheri Geraghty.**
18  Q. Was she your direct supervisor?
19 **A. Yes.**
20  Q. Did you have any other supervisors when you
21  began employment?
22 **A. David Kesser.**
23  Q. What was his position?
24 **A. President.**
25  Q. Did you have any other supervisors at that

**56**

1  time?
2 **A. No.**
3  Q. Was David Kesser a direct supervisor of
4  yours, or was he a secondary or indirect
5  supervisor?
6 **A. I reported to Sheri Geraghty.**
7  Q. And who did Sheri Geraghty report to?
8 **A. David Kesser.**
9  Q. What were your job duties as accountant when
10  you were hired?
11 **A. I can't recall all the responsibilities. If**
12 **you have the form that you can share, and I**
13 **can review it, we can go over what I've**
14 **done.**
15  Q. I'll rephrase.
16      On a typical day, what were your
17  job duties -- what did your job duties
18  entail?
19 **A. Again, it's a long list. It's a small**
20 **company. I did more than accounting.**
21  Q. Well, what type of accounting functions did
22  you perform for Teupen when you were hired?
23 **A. Accounts payable, accounts receivable.**
24  Q. Anything else accounting related that you
25  can remember?

**57**

1  A. There's a whole list, and I don't have it in
2     front of me to go over every detail of my
3     duties.
4  Q. You said you performed duties other than
5     accounting.
6        Were there -- what duties were
7     those?
8  A. I used to purchase office supplies.
9  Q. Any other non-accounting duties you
10    performed?
11 A. I helped with the parts department.
12 Q. In what way?
13 A. In many different ways. I mean, I could
14    just -- doing the auditing at the end of the
15    year, counting parts.
16 Q. Any other duties you had when you were hired
17    aside from accounting duties other than
18    purchasing office supplies and helping the
19    parts department?
20 A. Like I said, I've -- I've done multiple
21    tasks there. I just can't name them all off
22    the top of my head.
23 Q. Can you name any other ones off the top of
24    my head?
25 A. I just said I couldn't name them off the top

**58**

1     of my head, aside from what I just
2     mentioned, sir.
3  Q. Did you have any job duties related to human
4     resources?
5  A. Not at all.
6  Q. Did you have any job duties related to
7     payroll?
8  A. No.
9  Q. Did you have any job duties related to
10    general office administration?
11 A. You need to elaborate on that.
12 Q. I'll rephrase.
13 A. Can we take a break?
14 Q. Okay. Do you need ten minutes?
15 A. Sure. That will do.
16       THE VIDEOGRAPHER: We're off the
17    record. The time is 9:38 Central.
18       (Break taken.)
19       THE VIDEOGRAPHER: Going back on
20    the record, the time is 9:48 Central.
21    BY MR. KLASS:
22 Q. Ms. Acevedo, I'm going to share my screen
23    with you.
24       MS. GESSNER: And, David, before
25    you start asking her questions, we have just

**59**

1     sent to your office, attention to Ben, your
2     co-counsel, since he isn't here for the
3     deposition, on some outstanding discovery
4     that was ordered by the judge to be produced
5     to us on October 11th that has not been
6     produced.
7        We need responses to this
8     discovery, because, as you know, we are set
9     to depose Mr. Borutta tomorrow, and are now,
10    while you're taking her deposition, severely
11    prejudiced because of Defendant's refusal to
12    comply with the judge's order.
13    Will you please confirm that letter
14    has been received and we will receive
15    responses by 4:00 p.m. today. Otherwise, we
16    need to postpone the deposition and take
17    this issue up with the Court and seek fees
18    and costs and perhaps even issue sanctions
19    for fairly to comply.
20       MR. KLASS: I have received the
21    e-mail. I cannot commit to providing a
22    response by 4:00 p.m. today, especially
23    because Mr. Borutta is attending the
24    deposition currently, and I would need to
25    confer with him to provide any supplement

**60**

1     that we think is needed.
2        I have not had a chance to review
3     your letter, especially in any meaningful
4     detail, because we are in the middle of a
5     deposition. I'll note that we provided our
6     supplements last Friday.
7        You have had several days to review
8     them. And demanding -- or, first, sending a
9     letter during a deposition, and then
10    demanding a response during the same day as
11    the deposition is not realistic. But we
12    will do our best to respond when we are able
13    to.
14       MS. GESSNER: Well, Counsel, we
15    have expeditiously reviewed the documents.
16    And I'll note that you were sending
17    documents -- first of all, you had your
18    assistant send a link to documents that no
19    documents actually were available in the
20    link.
21       And then additional documents prior
22    to Ms. Acevedo's deposition were not
23    received until very late yesterday evening
24    on the eve of her deposition that were, in
25    fact, due on Monday.

61

1     You do have co-counsel, and you
2  have not announced it anyway that
3  Mr. Morrell is in this deposition.
4     Is that correct?
5     MR. KLASS:  He is not in this
6  deposition, but I also do not know what his
7  availability is today to respond.
8     MS. GESSNER:  Okay.  And, Counsel,
9  Mr. Borutta is with you.  We will take a
10 lunch break, correct, around 12:00, 12:30,
11 and you'll have at least 45 minutes to an
12 hour to consult with Mr. Borutta and provide
13 those responses to us?
14    MR. KLASS:  I will be using my
15 lunch break to perform work on the
16 deposition, as we are in the middle of a
17 deposition.  If I have time, I will consult
18 with him about your letter.
19    MS. GESSNER:  Well, Counsel, he is
20 present with you.  You do have time.  And
21 you are aware and have made your client
22 aware that Defendant is in contempt of a
23 Court Order by refusing to provide discovery
24 responses that the Court ordered, correct?
25    MR. KLASS:  No, we disagree with

62

1  that statement.  And if we can now continue
2  with our deposition, we --
3     MS. GESSNER:  Well, Counsel, wait a
4  minute.  We're going to call the
5  magistrate's office at lunch, so -- because
6  we're not going to proceed with Mr. Borutta
7  until we know with confidence that you are
8  going to respond.
9     So we'll reach out to Judge Cayer's
10 office and ask that you make yourself
11 available when the Court is available during
12 this deposition today.
13    Do you have any objection to that?
14    MR. KLASS:  I don't have an
15 objection to you calling the magistrate
16 judge about whatever you want to call him
17 about.
18    MS. GESSNER:  Okay.  And we'll --
19 we'll take a break when we are available to
20 get him and get you on the call at the same
21 time, given we're all in the same room
22 today.
23    You don't have any objection to
24 that, do you?
25    MR. KLASS:  I only have an

63

1  objection to doing -- or to calling the
2  magistrate judge about a discovery matter
3  that -- that does not relate to the current
4  deposition while the deposition is
5  proceeding.
6     So --
7     MS. GESSNER:  Counsel --
8     MR. KLASS:  -- once this deposition
9  ends, I have no objection to calling the
10 magistrate judge about the issue you have
11 raised.  Otherwise, we would object to
12 calling the magistrate judge about any issue
13 that does not relate to the conduct of this
14 deposition that I am taking of your client.
15    MS. GESSNER:  Okay.  Well, we
16 disagree.  And, Counsel, the -- the
17 abundant, abundant lack of professionalism
18 and gamesmanship that you participated in to
19 make sure that you took Ms. Acevedo's
20 deposition first, even though we noticed
21 Mr. Borutta first, is noted and will not be
22 lost if we have to fight this fight before
23 the Court.
24    And so not making yourself
25 available for a deposition that you insisted

64

1  go after Ms. Acevedo is ridiculous.  So,
2  we -- we'll take it up with Judge Cayer.
3     And I just want to make sure on the record
4  that the Court is aware that you are
5  withholding simple information, simple as an
6  organization chart, and obstructing our
7  ability to take a meaningful deposition
8  tomorrow, and, as well, to prepare this
9  witness for this deposition today, because
10 you refuse to produce documents that the
11 Court ordered you to produce.
12    So, you proceed, and we'll --
13 we'll -- we'll do what we need to do on this
14 end.  But if we don't have the documents by
15 4:00 p.m., we are going to postpone
16 Mr. Borutta's deposition and seek fees and
17 costs accordingly.
18    MR. KLASS:  I disagree with your
19 contentions, and you are free to file
20 whatever you want to file.
21    So, with that, can we proceed with
22 the deposition?
23 BY MR. KLASS:
24 Q.  All right.  Ms. Acevedo, I'm going to share
25 with you my screen.

65

1       Do you see a document in front of
2  you with a title of Accounting Administrator
3  at the top?
4  **A. Yes.**
5  Q. And do you see at the bottom of this
6  document, in the lower right-hand corner, it
7  says, 1Teupen00006?
8  **A. Yes.**
9  Q. Sorry for this.
10      Do you recognize this document?
11  **A. I will have to read it, so give me a few**
12      **minutes.**
13  Q. Okay.
14  **A. I can't scroll up. Do you -- can I scroll**
15      **somehow?**
16  Q. I can scroll down for you.
17  **A. Okay. Okay.**
18  Q. Do you recognize this document?
19  **A. It looks like what I probably would have**
20      **seen when I applied for Teupen in the either**
21      **Indeed or LinkedIn. I don't recall.**
22  Q. Does this document accurately reflect what
23      your accounting job duties were as
24      accounting administrator for Teupen?
25  **A. The majority, but not all of it.**

66

1  Q. Is there anything that's listed on this
2      document that you did not perform?
3  **A. Okay. I'll have to review it again.**
4  Q. I'll strike the question.
5       How long were you an accounting
6      administrator for Teupen?
7  **A. I don't have all the paperwork available to**
8      **me now. I know that there have been several**
9      **shifts in titles, but I don't have that in**
10      **front of me. So if you have that and**
11      **wouldn't mind sharing it, then that would be**
12      **great.**
13  Q. Did your job title ever change from
14      accounting administrator?
15  **A. Yes.**
16  Q. What did it change to?
17  **A. Like I said, I don't have the information in**
18      **front of me. So if you don't mind sharing**
19      **that, that would be great.**
20  Q. Do you have an independent memory, without
21      looking at a document, as to what your title
22      changed to?
23  **A. It's been quite some time. So, if you would**
24      **show me the document, that would -- that may**
25      **be helpful to me to refresh my memory.**

67

1  Q. All right. I will share with you another
2      document.
3       Are you looking at a document that
4      says, Job Title, Accounting Manager, at the
5      top?
6  **A. That's what I read.**
7  Q. Okay. And at the bottom of the first page
8      of the document is 1Teupen00001, and it's
9      two pages, and it goes to 1Teupen00002.
10      Do you see that?
11  **A. I don't see anything on the second page.**
12  Q. Do you see the number on the bottom of the
13      page?
14  **A. The number I see, yes.**
15  Q. So if you could take a moment to review this
16      document and let me know when I need to
17      scroll down.
18  **A. You can scroll. Okay. I'm done.**
19  Q. Ms. Acevedo, did you take on the role of
20      accounting manager at some point while you
21      worked at Teupen?
22  **A. Yes, I was given the title, but this is the**
23      **first time that I've seen this job**
24      **description. It has never been presented to**
25      **me.**

68

1  Q. Even though it's the first time you've seen
2      this job description, having reviewed it,
3      are the duties and description of the job
4      accurate to what you actually did as an
5      accounting manager for Teupen?
6  **A. I have to read it again. And if you can**
7      **center it, I'll be able to see all the key**
8      **responsibilities.**
9       **Bring it down a little.**
10  Q. Like that --
11  **A. Yes.**
12  Q. -- or --
13  **A. That right there, mm-hmm.**
14      **So, I'm sorry, can you repeat the**
15      **question.**
16  Q. So, Ms. Acevedo, even though you haven't
17      seen this document before, are the key
18      responsibilities that are described in this
19      document the same responsibilities that you
20      actually performed as an accounting manager
21      for Teupen?
22  **A. Well, I mean, if they were numbered, I could**
23      **tell you which number I have done and what**
24      **was part of my responsibilities. There are**
25      **other bullet points here that I just**

**69**

1    resumed, because there was no controller or
2    VP of finance in Teupen.
3         So while Sheri left, there was
4    nobody there, physically there, to do these
5    things. So I kind of picked up, but they
6    were not under my responsibilities when I
7    was promoted to the accounting manager.
8    Most of the bullets here are for controller
9    and VP of finance.
10 Q. Okay. So most of the bullet points on this
11    document are job duties that you did not do
12    until after Sheri Geraghty left employment
13    with Teupen; is --
14 A. Correct.
15 Q. -- that right?
16 A. Yes.
17 Q. Okay. Do you recall when you became the
18    accounting manager for Teupen?
19 A. I don't have the actual date. I'm sure you
20    have it. And so if you can share that, I
21    can recollect. I don't know the date off
22    the top of my head.
23 Q. Do you recall -- well, if you began working
24    for Teupen in 2017, and you worked until
25    January of 2020, do you recall what year you

**70**

1    became the accounting manager?
2  A. 2019.
3  Q. Okay. Did you become the accounting manager
4    before Sheri Geraghty left?
5  A. Yes, she promoted me.
6  Q. And Sheri Geraghty left Teupen in July of
7    2019, correct?
8  A. I don't have those HR documents. If -- if
9    that's what you have, I don't recall.
10 Q. Do you recall when Sheri Geraghty left
11    Teupen?
12 A. It's the same question.
13 Q. Do you recall what year she left?
14 A. 2019.
15 Q. Do you recall what season it was; winter,
16    spring, summer, fall?
17 A. I would say summer.
18 Q. And around the same time that Sheri Geraghty
19    left, did any other one end their employment
20    with Teupen?
21 A. I'm sorry, can you repeat the question.
22 Q. Around the same time that Sheri Geraghty
23    left Teupen, did any other employees leave
24    Teupen as well?
25 A. Well, can you elaborate on that.

**71**

1         Did they leave because they chose
2    to leave, or were they fired?
3  Q. In any manner.
4  A. I would say during that -- during that time,
5    there was a high turnover.
6  Q. And David Kesser, who you mentioned before,
7    did he leave Teupen around that time?
8  A. More or less around that time, he was fired.
9  Q. How do you know he was fired?
10 A. Because I was given paperwork to handle in
11    the absence of an HR rep or controller or VP
12    of finance. I was asked to take on
13    responsibilities that I had to quickly learn
14    of, because it wasn't in my job description.
15 Q. Who asked you to have a role in that?
16 A. I'm sorry, I didn't hear you.
17 Q. Who asked you to have a role in doing that?
18 A. Martin.
19 Q. Would that be Martin Borutta?
20 A. Correct.
21 Q. And what did you understand at that time to
22    be his position with Teupen?
23 A. I believe he was in transition of becoming
24    the CEO.
25 Q. Prior to Sheri Geraghty leaving in summer of

**72**

1    2019, had you ever talked to Martin Borutta
2    before?
3  A. No, again, I never had -- no.
4  Q. Prior to Sheri Geraghty leaving in summer of
5    2019, had you ever communicated with
6    Martin Borutta before, including by e-mail?
7  A. No.
8  Q. When did you first become aware of who
9    Martin Borutta was as he related to Teupen?
10 A. I don't recall the dates and time.
11 Q. Did you know who he was prior to
12    Sheri Geraghty leaving the company?
13 A. I knew that he was a shareholder.
14 Q. Do you remember when you became aware of
15    that?
16 A. No, I don't recall.
17 Q. When did you first meet Martin Borutta?
18 A. I don't recall.
19 Q. Did you meet him prior to Sheri Geraghty
20    resigning or after?
21 A. I don't recall. He wasn't in the office
22    often.
23 Q. In your memory, was he ever in the office
24    when you were present prior to
25    Sheri Geraghty leaving Teupen in summer of

73

1    2019?
2  **A. I don't recall.**
3  Q. You mentioned David Kesser being fired.
4      Did any other employee other than
5      Mr. Kesser and Ms. Geraghty leave the
6      company for whatever reason around that same
7      time period?
8  **A. There was a lot of employees that were**
9  **either let go or had -- had left.**
10 Q. Do you recall their names?
11 **A. If you have a list -- a list of the census**
12 **that I can see, then I can point out who**
13 **they are.**
14 Q. Do you recall if Tony Trainer left the
15     company around that time?
16 **A. Tony Trainer, yes, he was dismissed.**
17 Q. And do you recall if Ben Taft left the
18     company around that time?
19 **A. He was also dismissed.**
20 Q. Do you recall what Ben Taft's position at
21     the company was when he was dismissed?
22 **A. What his title was? I don't know what**
23 **you're asking.**
24 Q. Title or job function, either one.
25 **A. Sales.**

74

1  Q. What was Tony Trainer's role at the company
2      when he was dismissed?
3  **A. Sales.**
4  Q. Do you know why Mr. Kesser was fired?
5  **A. Honestly, I don't know. I know -- I**
6  **don't -- I don't know.**
7  Q. Do you know why --
8  **A. I don't recall.**
9  Q. Do you know why Mr. Taft was fired?
10 **A. No, I don't. I don't recall.**
11 Q. Do you know why Mr. Trainer was fired?
12 **A. No, I don't.**
13 Q. Do you know who fired Mr. Kesser,
14     Mr. Trainer, and Mr. Taft?
15 **A. Martin did.**
16 Q. Do you know what -- is Mr. Kesser white?
17 **A. He appeared to be. I'm not sure what his**
18 **origin is.**
19 Q. Is Mr. Taft white?
20 **A. Again, I'm not aware of his origin.**
21 Q. And is Mr. Trainer white?
22 **A. Martin should know.**
23 Q. I'm asking you.
24 **A. I don't know their origin.**
25 Q. And Mr. Kesser, Mr. Taft, and Mr. Trainer,

75

1      they're -- they are all men, correct?
2  **A. I'm sorry? I didn't understand the**
3  **question.**
4  Q. Mr. Kesser, Mr. Taft, and Mr. Trainer are
5      all men, correct?
6  **A. Yes.**
7  Q. Do you know why any of those three were
8      fired?
9  **A. I believe I answered that question already.**
10 **I'm not sure.**
11 Q. What responsibilities or tasks did
12     Mr. Borutta give to you, if any, related to
13     Mr. Kesser being fired?
14 **A. I don't recall.**
15 Q. What task, if any, did Mr. Borutta give to
16     you regarding Mr. Trainer being fired?
17 **A. Sending out the mail -- the -- the**
18 **termination via letter postal mail.**
19 Q. Any other task that you were asked to do by
20     Mr. Borutta regarding Mr. Trainer?
21 **A. I'm sure there was a lot that I cannot**
22 **recall at this time.**
23 Q. Same questions regarding Mr. Taft, were
24     there any tasks that Mr. Borutta gave to you
25     to do regarding Mr. Taft's separation from

76

1      employment?
2  **A. Mail out the letter, contact Insperity to**
3  **find out when was the actual date of**
4  **termination, when -- when was his -- when**
5  **did his benefits end. I mean, it was just**
6  **an ongoing -- it was actually lengthy for**
7  **Ben Taft, is what I recall.**
8  Q. When -- were those tasks given when Mr. Taft
9      was fired, or --
10 **A. I can't hear you, sir. I missed your first**
11 **part.**
12 Q. Sorry. Were those tasks given to you when
13     Mr. Taft was fired or at a later date?
14 **A. In the transition.**
15 Q. So would that be around the time that
16     Mr. Taft was fired?
17 **A. I mailed the letter. I remember that.**
18 Q. Do you recall how you mailed it?
19     Was it regular mail or certified
20     mail?
21 **A. Certified mail.**
22 Q. Did Mr. Borutta ask you to send it via
23     certified mail?
24 **A. Yes.**
25 Q. Did Mr. Borutta ask you to do anything with

77

1    respect to Mr. Taft as regarding Insperity?
2              MS. GESSNER: Object to form.
3        BY MR. KLASS:
4    Q. You can answer.
5    A. I don't understand the question.
6    Q. Did Mr. Borutta ask you to do anything with
7       respect to Insperity as it related to
8       Mr. Taft's termination?
9    A. Yes.
10             MS. GESSNER: Object to form.
11       BY MR. KLASS:
12   Q. What did he ask you to do?
13   A. I don't recall. He just didn't have access
14      to Insperity, because he was never -- he
15      didn't have access to a lot of stuff.
16             Since he resumed a CEO position
17      during that time, he was limited in what he
18      could do. So at that point, I had to try to
19      get him access to Insperity. So, for the
20      most part, I -- I did what he asked.
21   Q. Did he ask you to provide him access to
22      Teupen's Insperity account?
23   A. Yes.
24   Q. Did he ask you to contact Insperity
25      regarding Ben Taft's termination of

78

1    employment?
2    A. Yes.
3    Q. What did he say specifically?
4    A. I don't recall. He was not at the -- at the
5       office as often, so I had the assigned
6       attorney, Parker Poe, reaching out to me for
7       answers, and I did what I could at that
8       time.
9    Q. Do you recall when Parker Poe became
10      involved with Ben Taft and his separation of
11      employment?
12   A. I don't recall.
13   Q. Was it the same month Mr. Taft was separated
14      from employment, or was it sometime after
15      that?
16   A. I don't recall.
17   Q. When Mr. Trainer and Mr. Kesser were
18      separated from employment, were -- did
19      Mr. Borutta give you any instructions
20      related to Insperity for those separations?
21   A. Yes.
22   Q. And what did he say to you about those
23      separations and what to do regarding
24      Insperity?
25   A. I had to let them know that they were being

79

1    let go.
2    Q. How did you communicate to Insperity
3       regarding those three employees' separations
4       of employment; Mr. Trainer, Mr. Kesser, and
5       Mr. Taft?
6    A. Via e-mail.
7    Q. What did -- prior to that, had you ever
8       worked with Insperity before?
9    A. No.
10   Q. Do you know who at Teupen was the
11      point-of-contact for Insperity?
12   A. No.
13   Q. How did you know that Insperity existed as
14      it related to Teupen?
15   A. Because it's who gave us our paychecks,
16      who's -- they're the ones who've done our
17      payroll. They're our HR contact
18      representative.
19   Q. How did you know who to contact at Insperity
20      regarding those three individuals'
21      separation from employment?
22   A. I just answered that question. I think you
23      said, Did I know who to call? I didn't know
24      who to call. I called the 800-number, I
25      believe, or sent an e-mail. We had one

80

1    person who we would contact in regards to
2    payroll. So, I think that was like my
3    direct connect at that time.
4    Q. Do you know that person's name at Insperity?
5    A. I don't recall.
6    Q. If you didn't have any role -- strike that.
7             How did you -- how did you know
8       what that person's name was prior to then?
9    A. Sheri shared that with me.
10   Q. Did Sheri give you that person's e-mail
11      address?
12   A. I believe so.
13   Q. Did Sheri tell you what to do or how to
14      communicate or if to communicate with
15      Insperity when an employee was separated
16      from employment with Teupen?
17   A. No.
18   Q. Did you have any understanding at that time
19      as to what Mr. Borutta knew -- knew about
20      Insperity's involvement with Teupen at the
21      time?
22   A. I don't know. I don't understand your
23      question. I don't know.
24   Q. Did you have any sense at the time those
25      three individuals were separated from

81

1  employment as to the extent of Mr. Borutta's
2  knowledge related to Insperity's role and
3  assistance for Teupen?
4  **A. I -- I don't understand your question.**
5  Q. Do you know what Mr. Borutta knew about
6    Teupen's relationship with Insperity at the
7    time these three people were fired from
8    Teupen?
9  **A. No.**
10 Q. Okay. Prior to contacting Insperity
11   regarding any of these three people's
12   separations from employment with Teupen, had
13   you ever communicated with Insperity in the
14   past regarding any other employee's
15   separation of employment with Teupen?
16 **A. No.**
17 Q. Do you know what the process was that Teupen
18   had in place for contacting Insperity when
19   an employee left --
20 **A. No.**
21 Q. -- Teupen's employment?
22       Did Mr. Borutta ever tell you when
23   to contact Insperity regarding any of those
24   three employees, Mr. Taft, Mr. Kesser, or
25   Mr. Trainer's, separation from employment?

82

1  **A. I don't recall.**
2  Q. Did you have an in-person meeting or
3    meetings with Mr. Borutta during that
4    transition period in summer of 2019?
5  **A. What time period are you referring to;**
6    **before Sheri or after Sheri?**
7  Q. Well, let's start with before Sheri.
8    Before Sheri resigned, did you have
9    any in-person meetings with Mr. Borutta?
10 **A. No.**
11 Q. Immediately after Ms. Geraghty resigned, and
12   around the time that Mr. Taft, Mr. Trainer,
13   and Mr. Kesser were fired, did you have any
14   meetings with Mr. Borutta?
15 **A. Yes.**
16 Q. Do you recall when the first meeting was?
17 **A. No.**
18 Q. Do you recall how many meetings you had in
19   person with Mr. Borutta at that time?
20 **A. No.**
21 Q. Did you have more than one meeting with
22   Mr. Borutta around that time?
23 **A. Yes.**
24 Q. Did Mr. Borutta ever tell you why he fired
25   Mr. Taft, Mr. Trainer, or Mr. Kesser?

83

1  **A. I don't recall.**
2  Q. Did you ever have a conversation around that
3    time with Mr. Borutta regarding what your
4    job duties would be going forward?
5  **A. No.**
6  Q. Did you ever have a discussion with
7    Mr. Borutta regarding a pay increase for
8    yourself after Ms. Geraghty resigned?
9  **A. Yes.**
10 Q. What do you recall was said in that
11   discussion?
12 **A. It's hard to say. We never really had a**
13   **meeting longer than ten minutes. It was**
14   **just whenever I could catch him during his**
15   **spare time. He was always in and out.**
16 Q. Do -- do you specifically recall having a
17   meeting with Mr. Borutta -- meeting or
18   discussion in person -- regarding a raise
19   for you around the time that the other
20   employees left?
21 **A. Yes.**
22 Q. And who brought up the discussion -- the
23   topic of a raise; was it you or him?
24 **A. I don't recall.**
25 Q. Do you recall asking Mr. Borutta for a

84

1  raise?
2  **A. It's the same question.**
3  Q. You don't recall if you asked
4    Mr. Borutta for --
5  **A. I mean, we just --**
6  Q. -- a raise?
7  **A. We had a discussion, I mean, maybe five, ten**
8    **minutes out in the open, perhaps that**
9    **everyone heard. It wasn't a, Let's sit down**
10   **and talk about what your duties will be.**
11       **It was like a two-minute**
12   **possibility of increasing my pay, because it**
13   **was evident that I took on more roles than**
14   **what my responsibilities initially was.**
15 Q. And you had that discussion about your pay
16   after a discussion that you had with Mr.
17   Borutta about what your duties would be
18   going forward?
19 **A. That -- you totally confused me with that.**
20   **Can you please repeat it.**
21 Q. I'm just trying to find out what your
22   communications were with Mr. Borutta around
23   this time and sort of the timing and
24   sequence of those.
25       So, did you -- did you have a

85

1    discussion with Mr. Borutta about additional
2    or different job duties when Sheri Geraghty
3    left and Mr. Kesser was fired, along with
4    Mr. Trainer and Mr. Taft?
5  **A. I recall having a -- a discussion about**
6    **taking on additional responsibility because**
7    **of what Sheri showed me, but that was it.**
8  Q. What do you mean "because of what Sheri
9    showed you"?
10 **A. I only had two weeks to train with Sheri.**
11   **In two weeks, it was too much to learn. She**
12   **was the VP of finance. She had multiple**
13   **roles there, which included HR, payroll,**
14   **finance, reportings directly to Germany.**
15        **Like, she did a -- above and**
16   **beyond. And two weeks of training with**
17   **Sheri, it was just impossible for me to**
18   **learn so much.**
19 Q. That training, did that happen after
20   Ms. Geraghty left the company or before?
21 **A. It was before she left, when she put in**
22   **her -- her resignation.**
23 Q. Did she put in her resignation with, like, a
24   two-week notice or a four-week notice or
25   something like that?

86

1  **A. I don't recall.**
2  Q. Who told you that you were going to have
3    increased responsibilities when Sheri left?
4  **A. She told me. She said, because they were in**
5    **the midst of hiring someone else to take**
6    **Sheri's position. And she -- she kept**
7    **asking -- I remember her telling me that --**
8    **that Martin was in the process of hiring**
9    **someone else. He was looking for even a**
10   **friend or someone to take her role.**
11 Q. That discussion you had with Sheri, was it
12   before you had any discussions with Martin?
13 **A. Yes.**
14 Q. And was that discussion -- well, strike
15 that.
16        Why were you being trained to
17   complete Ms. Geraghty's job tasks if Martin
18   was looking for a replacement for her?
19 **A. I recall her sharing with me that they still**
20   **didn't have somebody. And because she**
21   **cared, as a financial person, how -- what**
22   **was going to happen after she left, she**
23   **wanted to make sure that I knew some of her**
24   **responsibilities so I can help in the**
25   **interim.**

87

1  Q. So when you took on those additional duties,
2    your belief was that was going to be on an
3    interim basis until Martin hired a
4    replacement for Sheri Geraghty?
5  **A. Yes.**
6  Q. And at some point, did that -- did your
7    understanding change as to whether there
8    would be a replacement hire?
9  **A. Martin never talked to me about who was**
10   **coming in or not. There was a lot of**
11   **transition going on. There were people**
12 **being let go. He was bringing on new**
13 **people.**
14        **So, I didn't know what my position**
15   **was. And as an accountant, I just kept**
16   **doing to the best of my ability, handled the**
17   **tasks that came when it arised.**
18 Q. Did you -- did the discussion of a pay
19 increase for you with Martin Borutta come up
20   while you thought that you were covering
21   Sheri's duties on an interim basis or on a
22   permanent basis?
23 **A. I don't understand your question.**
24 Q. So you said before that, initially, your
25   understanding was that you would be covering

88

1    Ms. Sheri -- Ms. -- Ms. Geraghty's duties on
2    a temporary basis while Martin found a
3    replacement for her.
4        Is that right?
5  **A. Yes.**
6  Q. Okay. And then at some point, you had a
7    discussion with Martin Borutta about a
8    salary increase for you.
9        Is that right?
10 **A. Yes.**
11 Q. So when you had that discussion with
12   Mr. Borutta about the salary increase, did
13   you still think that you would only be
14   taking on those job duties of Ms. Geraghty's
15   on an interim basis until Mr. Borutta found
16   a replacement for her?
17 **A. At the time, we believed that I was learning**
18   **enough to be able to handle the role, so he**
19   **granted my increase in pay. And I said, I**
20   **may need to continue to use Sheri Geraghty**
21   **from time to time to help me along the way.**
22        **But Sheri wanted some money to**
23   **continue to train me or to work as a per**
24   **diem person, and Martin did not want to pay**
25   **her.**

**89**

1  Q. So when you had the discussion about your
2    salary increase with Martin, you said he
3    granted the pay increase.
4         Does that mean that you requested
5    it?
6  **A. We had mentioned it. I don't recall when it**
7  **was mentioned, but I -- I took an**
8  **opportunity that I had, five minutes or less**
9  **of his time, to ask him for an increase in**
10 **pay, because I was doing more than what my**
11 **pay covered during the time.**
12 Q. Do you recall --
13 **A. I was fulfilling many roles.**
14 Q. Do you recall what salary amount you
15   requested?
16 **A. I believe it was about 80 or maybe 75.**
17 Q. Do you think you requested --
18 **A. I cannot hear you, Mr. Klass.**
19 Q. I'm sorry. Do you think you requested
20   $84,000?
21 **A. I don't recall how much it was.**
22 Q. Do you recall what you were making at the
23   time prior to the salary increase?
24 **A. I think I believe it was in the 60,000**
25 **range.**

**90**

1  Q. And after talking to Mr. Borutta, did you
2    get a salary increase?
3  **A. I did.**
4  Q. And was that to $72,000 per year?
5  **A. I'm sorry?**
6  Q. Was that to $72,000 per year?
7  **A. Yes.**
8  Q. What were the additional job functions that
9    you took on when you started performing
10   Sheri Geraghty's role?
11 **A. Well, if you bring that document over again,**
12 **where it said, Accounting Manager, there**
13 **were additional responsibilities that a**
14 **controller did, and -- and I can tell you**
15 **from -- from there what were the additional**
16 **responsibilities.**
17 Q. Okay. So I'm sharing that document, and it
18   is, Job Title, Accounting Manager, at the
19   top. It's two pages, and it starts at
20   1Teupen0001 [sic] and goes until 2.
21        So looking at the Key
22   Responsibilities section, what were the job
23   duties that you took on after Sheri Geraghty
24   left?
25 **A. Okay. For the record, I've never seen this**

**91**

1  **account manager key responsibilities while I**
2  **was working at Teupen. So I just want to**
3  **make sure that we all understand that.**
4         **So what you're presenting to me**
5  **right before me is an Accounting Manager Key**
6  **Responsibilities, but this is a combined**
7  **task that would include -- would include a**
8  **controller and a VP finance role.**
9         **So the additional responsibilities**
10 **that I had when Sheri left was mainly**
11 **compiling all the financial information and**
12 **sending it to Germany. I've never had to do**
13 **any reporting. I've never worked with the**
14 **budget while I was in Teupen prior to Sheri.**
15        **So I had to pick up and do**
16 **reconciliation. I've never done inventory**
17 **reconciliation. I've never done trade show**
18 **reconciliation, warranty accrual**
19 **reconciliation. Depreciation, I've never**
20 **done that either. So those are all the**
21 **additional tasks that I picked up when Sheri**
22 **left.**
23        **Let's see what else. Monthly sales**
24 **tax prep was also VP finance, so I resumed**
25 **that when Sheri left. Fixed asset register,**

**92**

1    **again, I picked that up, and I had to learn**
2    **that along the way. Performing inventory**
3  **adjustments, I never had to do that, so --**
4  **because we had a parts manager to do that,**
5    **who handled all of the adjustments. So that**
6    **was new for me.**
7  Q. Anything else on this document that --
8  **A. Well, let me keep reading.**
9  Q. Okay.
10 **A. So I've never done the inventory**
11 **reconciliation, nor did I do prepay trade**
12 **show reconciliation or the warranty. I**
13 **think I mentioned this before. Didn't do**
14 **the depreciation.**
15        **I didn't do the warranty documents.**
16 **That was something new that I had to learn.**
17 **All the IT issues, I had to resume that as**
18 **well. Solving all the phone issues.**
19        **I think that about -- that resumes**
20 **[sic].**
21 Q. Okay. Thank you. And you said before that
22 Ms. Geraghty trained you for about two weeks
23   to -- how to perform her job tasks.
24        Is that right?
25 **A. She showed me whatever she could within a**

93

1 two-weeks time frame. It was a lot to take
2 on.
3 Q. And you believe that was before she left
4 employment?
5 A. I -- I didn't hear you, the first part. You
6 keep going off the mic.
7 Q. You believe that was before she left
8 employment with Teupen?
9 A. Can you repeat the full question, please.
10 Q. The training -- the two weeks of training
11 that she provided to you, was that while she
12 was still employed with Teupen or after?
13 A. While she was still employed with Teupen.
14 Q. That training that occurred, were
15 Mr. Kesser, Mr. Trainer, and Mr. Taft still
16 employed with Teupen at that point, or had
17 they been fired already?
18 A. No, it was before they were fired.
19 Q. Did Sheri Geraghty ever train you or provide
20 assistance to you in how to perform her
21 former job duties after she left employment
22 with Teupen?
23 A. I mean, she tried to make herself available
24 by phone, but she already had another job,
25 so it's -- it was very limited.

94

1 Q. Did she ever come to Teupen's offices after
2 she left employment to assist you or train
3 you or answer questions?
4 A. Maybe one time. Can we take a break?
5 Q. Okay. Ten minutes?
6 A. Thank you. Yes.
7 Q. Okay.
8 THE VIDEOGRAPHER: We're going off
9 the record. The time is 10:44 Central.
10 (Break taken.)
11 THE VIDEOGRAPHER: Going back on
12 the record, the time is 10:56 Central.
13 BY MR. KLASS:
14 Q. Ms. Acevedo, did you ever have a
15 conversation with Martin Borutta that your
16 additional job tasks that you took over from
17 Sheri Geraghty would be done so on a
18 permanent basis?
19 MS. GESSNER: Well, Counsel, just a
20 second, before you get in and -- and maybe
21 we'll have to get the court reporter to read
22 that question back, unless you want to
23 repeat it.
24 I just want to make sure that
25 we -- it's 12:00 now, 11:56 -- that we do

95

1 take a lunch break, and we'd request that
2 that lunch break be at 12:45 and for 45
3 minutes.
4 Any objection to that?
5 MR. KLASS: No objection.
6 MS. GESSNER: Okay. Thank you.
7 BY MR. KLASS:
8 Q. So I'll repeat the question.
9 Ms. Acevedo, did you ever have a
10 conversation with Mr. Borutta that the
11 additional job duties that you were taking
12 on from Sheri Geraghty would be done on a
13 permanent basis as opposed to an interim
14 basis?
15 A. I don't recall.
16 Q. When Mr. Kesser, Mr. Taft, and Mr. Trainer
17 were fired, and Ms. Geraghty resigned, who
18 were the most senior people at Teupen who
19 were left at that time?
20 A. Most senior in what sense? Is it like
21 seniority, how long they've been there, or
22 executive? Can you elaborate.
23 Q. Executive, in terms of hierarchy in the
24 company.
25 A. So repeat the question again.

96

1 Q. When the four people I just mentioned,
2 Mr. Trainer, Taft, Kesser, and Ms. Geraghty
3 left, who were the most senior in terms of
4 hierarchy people left at Teupen?
5 MS. GESSNER: Object to form. As
6 Counsel's well aware, Plaintiff has asked
7 for an org chart repeatedly. The Court has
8 ordered the production of an org chart to
9 show hierarchy, and the Defendant has
10 refused to produce it.
11 BY MR. KLASS:
12 Q. Ms. Acevedo, you can answer the question.
13 A. No one.
14 Q. After Ms. Geraghty left and the other three
15 people were fired, who did you report to?
16 A. Martin.
17 Q. Do you know if Martin had any other direct
18 reports at that time?
19 A. I don't understand the question.
20 Who did Martin report to?
21 Q. Who reported directly to Martin other than
22 you?
23 A. I guess everyone there. He was the only
24 seniority -- the only person that was
25 calling the shots.

---

**97**

1  Q. Do you know who Patrick Blackburn is?
2  **A. Yes.**
3  Q. What -- what was his job at the time?
4  **A. He worked in sales.**
5  Q. Do you know what his job title was?
6  **A. Manager, sales manager.**
7  Q. Give me a moment. I'm going to share a
8     document.
9        Do you recognize this document,
10    Ms. Acevedo?
11 **A. It looks like a chain.**
12 Q. Do you see in the upper right-hand corner,
13    it says, Acevedo, followed by four zeroes
14    and then 25?
15 **A. Mm-hmm, yes.**
16 Q. And I'll represent to you that your attorney
17    produced this to us in discovery.
18        Do you -- do you have this document
19    in your personal possession?
20 **A. No.**
21 Q. Did you ever provide this document to your
22    attorney?
23 **A. Could be.**
24 Q. Do you remember if you did?
25 **A. If -- if it has "Acevedo," then she -- yes,**

---

**98**

1     **I provided it to her.**
2  Q. Do you know how you came in possession of
3     this document?
4  **A. I think it was hand-delivered or laying on**
5     **my desk one time when I went to work.**
6  Q. If you review this document, is the
7     structure of this document accurate?
8        And by "structure," I mean,
9     reporting structure.
10 **A. Yes, everybody reported to Martin.**
11 Q. And do you see a box on this document with
12    Operations Management, and then underneath,
13    Andreas S. Liebl, or Liebl?
14 **A. Um-hmm, yes.**
15 Q. And do you see below him, on -- to the lower
16    right, under Parts, it has Geraldine Molyn?
17        Do you see that?
18 **A. Yes.**
19 Q. So is it fair to say that this
20    organizational structure applied to Teupen
21    after those two individuals began working
22    for the company?
23 **A. I'm sorry, after what individuals?**
24        MS. GESSNER: Object to form.
25 BY MR. KLASS:

---

**99**

1  Q. Andreas Liebl --
2        MS. GESSNER: Wait -- wait a
3     minute, let me get my objection in. Object
4     to form. This witness is not a Teupen
5     30(b)(6) witness.
6  BY MR. KLASS:
7  Q. So, Ms. -- Ms. Acevedo, you asked which
8     individuals, and I was going to say
9     Andreas Liebl and Geraldine Molyn.
10       Would this document apply after
11    those two people began employment with
12    Teupen?
13       MS. GESSNER: Same objection.
14       THE WITNESS: I'm sorry, I'm
15    confused. I don't even know what's the
16    question.
17 BY MR. KLASS:
18 Q. Okay. Who is Andreas S. Liebl, as -- he
19    relates to Teupen?
20 **A. An employee.**
21 Q. Do you recall when he was hired?
22 **A. I don't have a date, no.**
23 Q. In terms of the time frame we were talking
24    about a few minutes ago regarding when --
25    was it before or after Sheri Geraghty and

---

**100**

1     those other three individuals left the
2     company?
3  **A. Again, I don't have a recollection of the**
4     **dates, but I know for sure it was after**
5     **Sheri.**
6  Q. Do you recall how long after Sheri left
7     Mr. Liebl started working at Teupen?
8  **A. I don't recall specific dates.**
9  Q. Was it in the summer of 2019?
10 **A. Well, when is the end of the summer?**
11 Q. However you would define it.
12 **A. Any specificity, I don't -- can't assume**
13    **what you're asking me.**
14 Q. Was it before Labor Day 2019?
15 **A. I don't recall.**
16 Q. Do you know what his job position was when
17    he was hired at Teupen?
18 **A. I don't remember the title.**
19 Q. Aside from title, do you remember what his
20    job duties were?
21 **A. I mean, he was managing parts and**
22    **maintenance.**
23 Q. Was he the operations manager?
24 **A. If that's what you want to refer to it.**
25 Q. Well, I'm asking you.

101

1  A. I don't know. I don't have -- I don't
2     recall the title.
3  Q. Who did you report to at Teupen from the
4     time you took over Sheri Geraghty's
5     responsibilities until the time you were
6     discharged from Teupen?
7  A. Martin.
8  Q. Did you report to Andy Liebl?
9  A. No, I reported to Martin, just like the
10    chain-of-command you just showed me.
11 Q. Did you have to interact with Andy Liebl in
12    your role after you took on Sheri Geraghty's
13    responsibilities?
14 A. Yes, I had interactions with -- with
15    Andreas.
16 Q. Did he go by Andreas or Andy, or what --
17    what name did he go by?
18 A. I have no idea. His name is Andreas.
19 Q. What did you call him?
20 A. Andrea [sic], Andy.
21 Q. And what -- what sort of job functions of
22    yours required communicating with -- with
23    Andy Liebl?
24 A. Well, he held a company corporate card, so I
25    had to code all the charges from everyone

102

1     who held a company card -- a corporate card,
2     credit card. So that was my responsibility
3     to ensure that everything was coded in a
4     timely basis, so that we can pay the card.
5  Q. So in your role, you had responsibility over
6     accounting for the company's credit cards.
7        Am I understanding that right?
8  A. Yes.
9  Q. And when you talk about "coding" or "coding
10    transactions," what do you mean by that?
11 A. It's an accounting terminology.
12       Are you familiar with accounting
13    terminology?
14 Q. I am not. So if you could explain to me
15    what you mean by "coding the transactions,"
16    that would be helpful.
17 A. Coding, so -- I mean, there's different
18    codes. If you're -- if you're fixing
19    anything that has to do with a car, it will
20    go against maintenance for car. If you
21    purchase something for the office, pen,
22    pencil, paper, it will be coded as office
23    supplies, and so on and so forth.
24 Q. And when you do the coding, what sort of
25    documents is the coding required for?

103

1  A. For ordering purposes. We want to make sure
2     that the company's money is being used for
3     company expenses.
4  Q. Were there any other reasons why you had to
5     interact with Andy Liebl other than the fact
6     that he had a company credit card, and you
7     needed to have his transactions coded
8     accurately?
9  A. No, I was the accountant, the accounting
10    person, so I needed to -- that was
11    my -- that was our communication on the
12    regular.
13 Q. Did you have any other regular
14    communications about other job functions you
15    had or that he had that required you two to
16    interact with each other?
17 A. I mean, he had to, I mean, approve everyone
18    else's credit cards. So everyone underneath
19    him had to report to him. So he ultimately
20    had to ensure that everyone did their
21    accounting work, so that when it comes to my
22    hands, it will be easier for me to handle.
23       But since -- you know, anything
24    related to parts or maintenance or, you
25    know, anything, would have to be brought up

104

1     to him, because he was the manager of
2     everyone else in those departments.
3  Q. So your -- your main interactions with him
4     were related to ensuring that the credit
5     card purchases were coded accurately.
6        Is that right, or am I getting it
7     wrong?
8  A. I just explained myself. So I don't know if
9     this is a trick question, but I -- you'll
10    have to make me understand what you're
11    asking again. I don't know.
12 Q. Are there any other reasons you needed to
13    talk to Mr. Liebl on a day-to-day basis
14    related to you performing your job
15    functions?
16 A. If I wasn't given other work from other
17    departments, then I would have to talk to
18    him about it. For example, if there was any
19    invoices or issues with invoices for the
20    parts, since he was the manager of the parts
21    department, then I would have to have that
22    discussion with him.
23 Q. Did you work out of an office for Teupen?
24 A. Yes.
25 Q. How big is that office area?

105

1    And I don't mean your specific
2  office, but, I mean, Teupen's office space.
3  **A. You got cut off in the beginning. Can you**
4    **repeat the question, please.**
5  Q. How big is Teupen's office space where you
6    worked?
7  **A. I'm not sure what the measurements are, but**
8    **Martin should know.**
9  Q. How many -- did you have cubicles or
10   separate offices?
11 **A. There were separate offices.**
12 Q. Do you recall approximately how many
13   separate offices there were?
14 **A. I mean, if we -- if we can picture how many**
15   **departments there were, then we will be able**
16   **to tell. There was a parts manager**
17   **department; there's sales department;**
18   **accounting department; president's office,**
19   **or CEO; CFO office; maintenance. I'm not**
20   **sure if I mentioned that already.**
21    **And then there was a parts**
22   **department in the back -- I'm sorry -- yeah,**
23   **parts/maintenance, so there was an office**
24   **back there as well in the warehouse.**
25    **So...**

106

1  Q. What was the layout of the office? Were all
2    these offices off of, like, a central
3    hallway, or was there a common area in the
4    middle? How old you describe the layout?
5  **A. The offices were, like, around the sides of**
6    **the building. They all -- most of them had**
7    **windows, so they were, like, on the outside.**
8    **And then we had a kitchen and a conference**
9    **room in the middle called common area.**
10 Q. Where was your office in relation to
11   Mr. Liebl's office?
12 **A. Across -- I don't know how many feet. On**
13   **the other side of the building, I should**
14   **say.**
15 Q. Was Mr. Liebl hired before Gerri Molyn?
16 **A. I think you asked me this before, and I did**
17   **say he came after Sheri.**
18    **Oh, I'm sorry. Can you repeat the**
19   **question again.**
20 Q. Sorry. I know Gerri and Sheri sound
21   similar, but it --
22 **A. Yeah.**
23 Q. -- was Mr. Liebl hired before Gerri Molyn?
24 **A. Geraldine.**
25 Q. Geraldine.

107

1  **A. Yes. Yes, he was hired before her.**
2  Q. Okay. And what did you -- how did you call
3    Geraldine Molyn when you worked there?
4  **A. By her name.**
5  Q. You called her Geraldine or --
6  **A. Yes.**
7  Q. -- Gerri?
8  **A. Both.**
9  Q. I'm -- I'm sorry. Both.
10    What was her position?
11 **A. Based on the chain-of-command that you just**
12   **showed me, I think it said parts.**
13 Q. Well, based on your memory and your
14   interactions with her, what -- what did you
15   understand her job duties or job role to be?
16 **A. My understanding was a parts manager,**
17   **because she replaced someone else who was**
18   **fired before she came in.**
19 Q. Do you know who she replaced?
20 **A. Misty Goins (phonetic).**
21 Q. Do you know why she was -- was she fired,
22   Misty Goins?
23 **A. Yes, she was.**
24 Q. Do you know why?
25 **A. My -- no.**

108

1  Q. Do you know who fired her?
2  **A. Andy.**
3  Q. How do you know that?
4  **A. Because he's in charge of the parts**
5    **department.**
6  Q. Did anyone tell you that Andy fired -- fired
7    Misty, or is that your assumption because he
8    was her supervisor?
9  **A. No, he had me draft the termination --**
10   **termination letter for her, because he**
11   **wanted to bring his friend Geraldine to work**
12   **in the company.**
13 Q. What is Misty Goins' national origin or
14   race? Do you know that?
15 **A. No, I don't know that.**
16 Q. Did you understand her to be Hispanic or not
17   Hispanic?
18 **A. I've never spoke to her in Spanish, so I**
19   **don't know.**
20 Q. Did you ever speak -- do you speak Spanish?
21 **A. I do.**
22 Q. Did you ever speak in Spanish in front of
23   Andy Liebl or Geraldine Molyn?
24 **A. I didn't have anyone else to talk to in**
25   **Spanish. So my demeanor and my integrity is**

109

1  to speak in a language that everyone
2  understood.
3 Q. Who did Gerri Molyn report to when she was
4  hired?
5 A. To Andy.
6 Q. And did she have any job functions other
7  than working for the parts department?
8 A. I don't understand your question.
9 Q. Did she have any job duties when she was
10  hired other than doing work related to
11  parts?
12 A. No.
13 Q. Did you have to work directly with her for
14  any reason?
15 A. Yes, anything to do with parts department,
16  we billed -- those -- sales were based on
17  also the parts that we sell to customers.
18  So she handled the parts department, so we
19  often had to talk about the parts
20  department.
21 Q. What sort of information would you need from
22  her to do your job?
23 A. Well, any sales orders needed to be
24  processed by her and then given to me for
25  accounts receivable purposes.

110

1 Q. Any other reason why you'd have to
2  communicate with her to do your job?
3 A. I mean, I often asked her if she could help
4  me with getting Andy's credit card receipts,
5  you know, together, so that I could complete
6  my portion of the accounting responsibility.
7 Q. Any other reason that you can recall that
8  you would need to speak with Ms. Molyn in
9  order to perform your job?
10 A. I mean, we -- not to perform my job, but we
11  had to work together. I mean, it's a small
12  company. Everyone had to work together. So
13  she came and ran the parts department.
14      And so, she would have to run
15  reports, and I recall working with her to
16  try to work out in running reports, to get
17  the inventory accurate. We even did an
18  inventory count together.
19 Q. You mentioned before that Mr. Liebl hired
20  Ms. Molyn and that they were friends.
21      How did you know they were friends?
22 A. Because Andy told me.
23 Q. Did he say how he knew her?
24 A. Yes, they worked in another employer
25  previous -- previous to that.

111

1 Q. Did you learn ever that Mr. Liebl had known
2  Mr. Borutta prior to his hiring at Teupen?
3 A. Yes.
4 Q. How did you learn that?
5 A. Andy told me.
6 Q. And what did he tell you?
7 A. That he worked with Martin in the past.
8 Q. Do you know if Martin also worked with
9  Gerri Molyn in the past?
10 A. I believe that was mentioned before; that
11  they all worked together in the past.
12 Q. In your Complaint in this case, you alleged
13  that Mr. Liebl singled you out and treated
14  you differently and harsher than co-workers
15  who were not Hispanic and who were male.
16      What do you mean by that?
17 A. He was very arrogant towards me.
18 Q. In what way?
19 A. In the way he spoke. I mean, he
20  disrespected me in speaking German often
21  throughout the whole office. If I ever
22  brought any issues about any parts
23  department issue, you know, he just
24  disregarded.
25 Q. What -- when you say "he spoke German,"

112

1  could you elaborate on that --
2 A. I'm sorry, I cannot hear you.
3 Q. I --
4 A. You're not speaking on the mic.
5 Q. I'm sorry. When you say "he spoke German,"
6  can you elaborate on that.
7      Did he speak German to you?
8 A. He spoke German throughout the whole office
9  for most of the day. I don't know who --
10 Q. Who was he speaking --
11 A. -- he would speak to. I don't know. I'm
12  not someone who would constantly ask who are
13  they talking to either on the phone or -- or
14  around, but...
15 Q. Was there anyone other than Mr. Borutta and
16  Mr. Liebl who spoke German in the office, to
17  your knowledge?
18 A. I have no idea. For the most part of my
19  day, I maintained within my own office,
20  because I was very busy handling accounting
21  and above.
22 Q. So when you heard Mr. Liebl speak German,
23  was that when you were in your office, and
24  he was outside of it somewhere, and you
25  overheard him, or was it different?

113

1   A.  He would be on his mobile phone throughout
2       the day, most of the day.  So, he would come
3       and go, walk into my office.  If he has --
4       if we were for some reason having a
5       discussion, he would pick up the call, he
6       would right in start the conversation in
7       German.  So -- then he will walk around.  I
8       mean, he was very loud.
9   Q.  How does he speaking German to people on the
10      phone relate to his treatment of you?
11  A.  There were times I felt he was talking about
12      me.
13  Q.  Do you know what he was talking to you
14      about?
15  A.  I don't understand --
16  Q.  I'll strike that.  That was a bad --
17  A.  -- the German language.
18  Q.  That was a bad question.  I'm sorry.
19          Do you know what about you he was
20      talking about in German?
21  A.  I mean, we started off with a good
22      relationship when he first got hired.  But I
23      felt like, at certain points, he started
24      retaliating against me, because I believe
25      that he just didn't like my approach, or he

114

1   didn't like me asking him for credit card
2       receipts or asking him questions about what
3       he felt he didn't want me to answer [sic].
4           So I don't know what -- what made
5       him change, but he just -- maybe he just
6       couldn't accept working with someone -- a
7       female like myself and someone, you know,
8       that wasn't like him.  I don't know.
9   Q.  Well, let me -- let me back up.
10          When -- when you say he was
11      speaking German, and you thought he might
12      have been talking about you, first, you
13      don't speak German, right?
14  A.  No.
15  Q.  And you don't understand German, right?
16  A.  No.
17  Q.  So what made you think he was talking about
18      you when he was speaking German?
19  A.  Well, I mean, there's also body expressions.
20      There's facial expressions.  There's, you
21      know -- and laughing.  And there's just
22  notions that you just could tell.  You know,
23      it's -- it's from within deep your gut,
24      feeling that it's just something is off.
25  Q.  And that was based on your gut feeling?

115

1   A.  I mean, like I said, for the most part, we
2       didn't have any issues until after
3       retaliation.  And I feel as, after he
4       started asking me to do certain -- or I
5       would ask him certain things, some
6       justification on his expenses and expense
7       report, or after he started asking me to cut
8       him checks, you know, and -- and mixing
9       personal and business, he didn't really like
10      that.  So he just tried to -- started to
11      treat me differently.
12  Q.  Well, at this point, I'm just asking you
13      about him talking about you when he was
14      speaking German.
15          And I'm just asking how you know or
16      why you think he was talking about you when
17      he was speaking German, if you don't speak
18      German and don't understand German?
19  A.  There were many occasions when he would
20      pause his German communication with whoever
21      on the phone and then speak to me, ask me a
22      question, and then go back to speaking in
23  German.
24          So there was reason to believe, for
25  me, that there -- he was holding a

116

1   conversation that had to do with me in some
2       way, some form.
3   Q.  But you don't -- you don't really know that
4       for a fact, right?
5   A.  I don't know German.
6   Q.  You mentioned before that he disregarded --
7       I -- I don't want to miss-- misstate what
8       you said before -- but that he disregarded
9       you or requests from you.
10          Can you elaborate on -- on what you
11      meant or what you said?
12  A.  Disregarded me in the sense of, like,
13      ignoring me or not providing what I've
14      requested at times, which making my job
15      uneasy and unable to finish for the
16      monthly -- for the monthly close.
17  Q.  So when you say ignoring things, are you
18      talking about the coding for his credit card
19      transactions?
20  A.  Yes, I'm talking about coding.  I'm talking
21      about ignoring my e-mails; asking him to
22      complete his work, so that I can complete my
23      work; and e-mails about customer concerns or
24      parts return.
25          There was many times that

117

1  I -- we've had e-mails going -- that I've
2  asked him for, like, even tools that -- that
3  were purchased, and then we don't -- we
4  didn't have -- we didn't have it on the
5  premises.
6      I mean, there was just a lot of
7  things that I had to ask him, and it was
8  always ignored, disregarded, not answered,
9  and it made my -- my job difficult.
10 Q.  These requests that you made to him to --
11 for him to provide you with things or
12 information, were these requests done by
13 e-mail or verbally or both?
14 A.  Mainly e-mail, because it's -- it's a form
15 of paper trail that, as an accountant, we
16 need to comply with, so we always have
17 something to back up.
18 Q.  Do you recall any verbal conversations that
19 you had, either in person or on the phone,
20 with Mr. Liebl, where you asked him for
21 something related to your job, and he either
22 ignored you or provided some other response
23 that you were not satisfied with?
24 A.  I mean, it's always work-related. Again, if
25 I was missing information that I would need

118

1  from the parts department; if I felt that,
2  at the time that he hired Geraldine, and she
3  wasn't complying with some -- providing the
4  details that I needed, then I would come to
5  him.
6      And a lot of times she also
7  disregarded and ignored my e-mails, so I
8  would have -- I would ask her, and she --
9  you know, it's just always been disregard
10 [sic]. I brought it up to Andy's attention.
11 Most of the times, he would have said, Oh,
12 I'm going to talk to her. I don't know if
13 he did or not.
14     But there were times that I needed
15 to talk to him, and he had brought her to
16 the room or his office, so we can talk about
17 things, but I don't feel like there was a
18 good outcome from the meetings that we've
19 had.
20     So it's always been a struggle to
21 communicate and work in a small office as a
22 team, because they were not team players.
23 Q.  Other than, you know, speaking in -- in
24 general terms, about verbal conversations,
25 do you have any memories of specific

119

1  conversations that you had with Mr. Liebl
2  where he did not provide you with
3  information that you needed?
4  A.  I feel like that's the same question you're
5  asking me, and I -- I don't -- I don't know.
6  Q.  So you -- you provided a lot of testimony
7  just now about instances where you would
8  talk to him.
9      But my -- my question now is, can
10 you recall any specific conversations about
11 specific items that you had with him, like
12 on a specific day, for example?
13 A.  I don't have recollection on specific days.
14 Q.  Do you have a recollection on specific
15 conversations with him?
16 A.  I think I've mentioned a couple already.
17 Q.  Do you recall any additional conversations
18 with him?
19 A.  I mean, besides making it difficult to work
20 with Gerri, Geraldine?
21 Q.  What -- what are those specific
22 conversations you recall?
23 A.  When I felt like she was being
24 discriminatory towards me, she would muffle
25 when I would ask her for things. At certain

120

1  times, I've heard her say, like, I don't
2  know why you have this position, or -- you
3  know, she made me feel like she could do my
4  job better, and she made me feel as though
5  she was after my job, and it just became
6  difficult to work with her.
7      I brought it up to Andy's
8  attention, and he said he will talk to her
9  again, and things would not resolve. So, it
10 was difficult to work with them.
11 Q.  So let me ask you about that comment you
12 just mentioned.
13     In your Complaint, you allege that
14 Ms. Molyn said something along the lines of,
15 I don't know how people like you get into
16 positions like this.
17     Do you recall a statement that she
18 made to you to that effect?
19 A.  Yeah, something to that effect.
20 Q.  Do you recall when that statement was made?
21 A.  Like I said, I -- I often had tried to
22 approach her in many different forms. I've
23 sent her e-mails. I've come to talk to her.
24 And she would just always walk away and
25 muffle things or say things as if, you know,

121

1    she just didn't want to deal with me.  She
2    just was hard to work with.
3 Q.  So my question is, do you know -- do you
4    recall when she made that statement to you?
5 A.  It was multiple times.  I mean, I don't --
6    we -- it -- it -- it was -- it was clearly
7    evident that she just could not work with
8    me.
9 Q.  Do you recall when any of those times were?
10 A.  No, I don't recall dates and times.
11 Q.  Do you recall the context of that comment
12    that you say she made about, I don't know
13    how people like you get into positions like
14    this?
15         Was there prior discussion that you
16    had had with her before she made that
17    comment?
18 A.  I mean, it was often -- like I said, we at
19    some point couldn't see eye to eye.  You
20    know, she would run reports.  I would ask
21    her how did she come up with those numbers,
22    if she could take a look at it again.
23         And it was kind of like
24    frustration.  She was frustrated from me
25    asking her for explanations and details on

122

1    how she'd come up with numbers that I had to
2    tie in with other reports, and it was just
3    difficult working with her.
4 Q.  So was -- was she frustrated?
5 A.  I cannot hear you, sir.
6 Q.  I'm sorry.  Was she frustrated?
7 A.  Yes.  She showed, yes, frustration.  And
8    she -- at one point, we had a meeting
9    with -- with Andy, and she did say that.
10    She said she's frustrated that I have to
11    keep asking her questions.  Like, she just
12    didn't like me to ask her questions.
13 Q.  Did she say why?
14 A.  Again, I cannot hear you, sir.
15 Q.  Did she say why?
16 A.  She just doesn't like me asking questions.
17    She said she constantly had to repeat
18    herself.  And I'm like, If I'm not clear on
19    something, I am -- I'm a -- I like to ask
20    questions.
21         Because, again, I'm a numbers
22    person.  I'm an accountant, and it's black
23    and white.  It's -- you have to have -- tie
24    everything together.  And if it doesn't tie,
25    I'm going to have to ask questions.

123

1 Q.  So, was Ms. Molyn primarily frustrated
2    because you would ask her questions about
3    issues related to you performing your
4    accounting duties?
5 A.  No, she was a team player.  We -- we worked
6    a lot together.  But at the time, like I
7    said, I wasn't doing all the reporting or
8    had to ask her so many questions, because
9    Sheri used to do it.
10         Sheri was the controller.
11    Sheri Geraghty was the VP of finance.  She
12    would have multiple discussions with
13    Misty Goins about reporting and stuff.  So I
14    really wasn't involved with that until after
15    Sheri left.
16 Q.  Did you ever work with Ms. Molyn in a group
17    setting?
18 A.  I don't -- I don't understand the question.
19 Q.  Did you ever have conversations with her
20    about work when other people were present
21    other than Andy?
22 A.  She had her own office.  So it was either,
23    you know, we talked in her office or we
24    talked in my office.
25 Q.  Were most of your conversations with her one

124

1    on one or sometimes with Andy being present?
2 A.  I would say 50/50.
3 Q.  50 percent one on one?
4 A.  50 percent with -- one on one with
5    Geraldine, and then also it -- 50 percent
6    including Andy.  So, I mean, we always had
7    to come to Andy, because at the end of the
8    day, he was the manager, and he needed to
9    understand what was going on.
10         Whether she brought it up to his
11    attention or I brought it up to Andy's
12    attention, we all had to have a discussion.
13 Q.  Did you -- did your office have a door?
14 A.  Yes.
15 Q.  Did you work with your door open or closed?
16 A.  I often had my door open.  But when there
17    was a high turnover, and there were new
18    people coming in, all of a sudden, there
19    were smokers in the building, and it was
20    affecting my health, and I had to constantly
21    close my door.
22 Q.  Who were the smokers in the building?
23 A.  Andy.
24 Q.  Anyone else?
25 A.  I mean, I know that a lot of the maintenance

125

1    people were smokers. You can smell it when
2    you walk in the warehouse in the back. So,
3    I guess -- I'm assuming, I don't know --
4    they smoked back there, but there were a lot
5    of smokers. A policy never -- we never had
6    a smoking issue until Andy started working
7    there.
8  Q. How long after Andy started working at
9    Teupen did he start smoking at work?
10 A. Oh, I don't know the time frame or timeline.
11   He was -- he's a smoker, so...
12 Q. So it happened pretty -- pretty soon
13   afterwards?
14 A. Yes.
15 Q. And after that, you mostly worked with your
16   door closed, because you didn't like the
17   smoke?
18 A. I mean, secondhand exposure.
19 Q. So you worked mostly with your door closed
20   after that?
21 A. Yes.
22 Q. Is it fair to say that you did not witness
23   Ms. Molyn's conversations with other Teupen
24   employees?
25      MS. GESSNER: Object to form.

126

1    BY MR. KLASS:
2  Q. I'll rephrase.
3      Would you agree that Ms. Molyn had
4    conversations with other Teupen employees
5    that you were either not aware of or did not
6    overhear?
7  A. Yes. I mean, I wasn't in -- like I said,
8    I -- most of my time's consumed sitting
9    behind a computer doing accounting work. So
10   I wasn't socializing throughout the office
11   and listening to every conversation. So
12   I -- I'm certain that there was a lot of
13   other discussions where I was not present.
14 Q. Would the same thing be true for Andy Liebl;
15   that, because you worked with the door
16   closed most of the time, you weren't aware
17   of what he was doing day in, day out, except
18   when you needed to communicate with him?
19 A. Yes, I wasn't following him to see what he
20   was up to. I mean, I -- if I needed to
21   speak to him, I would go look for him.
22 Q. So then is it fair to say that you don't
23   know how he interacted with other
24   co-workers, because you weren't there most
25   of the time?

127

1  A. Oh, he had a lot of issues with other
2    co-workers. I mean, he even fired the
3    parts -- not the parts manager -- the
4    maintenance manager.
5  Q. What was his name?
6  A. Ralph Baer.
7  Q. Is he -- is he white?
8  A. Again, I don't know his origin.
9  Q. Do you know if he was Hispanic?
10 A. I've never spoken to him in Spanish, so I
11   don't know.
12 Q. And you -- you think Andy fired him?
13 A. Oh, he did.
14 Q. Why did he fire him?
15 A. I don't know. I know that they had -- oh,
16   often had issues and arguments. I don't
17   know what was the actual cause. I don't
18   recall at this point.
19 Q. So your recollection is that Andy did not
20   get along with multiple co-workers, not just
21   you?
22 A. Correct.
23      MS. GESSNER: Object to form. Let
24   me get my objection in. Object to form.
25   BY MR. KLASS:

128

1  Q. Did Gerri Molyn have difficult relationships
2    with other co-workers, to your knowledge?
3  A. Yes.
4  Q. And who did she have difficulty working
5    with?
6  A. I don't recall specific people, but they all
7    seemed to express how difficult it was to
8    work with her.
9  Q. Were they men or women?
10 A. There was only three women there.
11 Q. So is it fair to say that a lot of the
12   people she had difficulty working with were
13   men?
14 A. I can't assume.
15 Q. How do you know she had difficulty working
16   with other people?
17 A. Well, for one, I know that one person
18   expressed a difficulty working with her.
19 Q. Who was that?
20 A. Patrick Blackburn.
21 Q. What did he say?
22 A. That she wanted to do things her way. I
23   mean, I don't remember the conversations.
24   But, I mean, if -- she just didn't like
25   people to tell her what to do and how to do

129

1 it. I mean, she picked and chose what she
2 wanted to do and what she wanted to respond
3 to.
4 Q. Did -- to your knowledge, did
5 Patrick Blackburn have difficulty working
6 with Andy Liebl?
7 A. Yes.
8        MR. KLASS: Michelle, it's 12:44
9 now on my clock. This might be a good time
10 to take our lunch break.
11       MS. GESSNER: Okay.
12       THE VIDEOGRAPHER: We're going off
13 the record. The time is 11:44 Central.
14       (Break taken.)
15       THE VIDEOGRAPHER: We're back on
16 the record. The time is 12:31 Central.
17 BY MR. KLASS:
18 Q. Ms. Acevedo, did you ever tell anyone you
19 worked with what your national origin was?
20 A. I mean, I didn't have to. I mean, it's
21 obvious that I am of Spanish color skin and
22 heritage, and my appearance is not white.
23 So, I am a Latin American.
24 Q. Did you ever tell Andy Liebl or Gerri Molyn
25 that your family was originally from

130

1 Ecuador?
2 A. No, we never spoke about personal life.
3 Q. Did you ever talk to Mr. Liebl or Ms. Molyn
4 about you being born and growing up and
5 living in New York?
6 A. Yes.
7 Q. Did you ever speak Spanish in front of
8 Mr. Liebl or Ms. Molyn?
9 A. I didn't have anyone to spoke -- to speak to
10 in Spanish. I mean, maybe they -- they may
11 have heard me speaking to my husband maybe
12 on a phone call.
13 Q. But you don't know that one way or the
14 other, right?
15 A. I don't know that, no, for sure.
16 Q. Okay. We were talking about smoking in the
17 building prior to the lunch break.
18       Did you ever complain about
19 employees smoking in the building to anyone
20 at Teupen?
21 A. Yes. I mean, I did tell Andy himself. You
22 know, I told him that it smelled in the
23 building, and there was a lot of smoking
24 going on. I've told -- I mentioned it to
25 Patrick as well, because he was also a

131

1 smoker.
2 Q. Did Patrick ever smoke in the building?
3 A. I've never seen him personally, but I know
4 that he was a smoker. There was often
5 cigarette breaks going on there.
6 Q. What was Patrick's response when you
7 complained?
8 A. I mean, he would just walk away and go
9 outside. I mean, but it's evident who the
10 smokers are, because the smoke is on -- you
11 know, it's on their clothes.
12 Q. Did you ever complain to -- or what was --
13 strike that.
14       What was Andy Liebl's response when
15 you complained to him about him smoking in
16 the building?
17 A. I mean, he -- again, he would just walk away
18 and, you know -- I mean, I would just often
19 say that the smell was awful.
20 Q. How does Mr. Liebl smoking in the building
21 relate to your claim that he might have
22 discriminated or retaliated against you
23 based on your national origin or your sex or
24 your claim disability?
25 A. Well, I mean, most importantly, I mean, I've

132

1 used -- as you know and fully aware, I have
2 gone to -- I've had multiple medical visits
3 regards to having cough or chest congestion.
4 I mean, he played a part in that. I mean,
5 he disregarded it. If I said it smelled in
6 the building, it's not like they stopped.
7 It went on.
8       We didn't have an HR department to
9 tell them it's not -- it's not against
10 violation laws. I mean, everyone, I mean,
11 did there whatever they wanted to do. I
12 know there was another employee that had
13 issues as well with the smell. And that
14 employee also actually made a call to
15 Insperity, to our, you know, HR company
16 to -- to even put in a complaint about it.
17 Q. Who was that employee?
18 A. Cassandra Travieso.
19 Q. Did you ever complain to Martin Borutta or
20 bring up the issue of smoking to Mr. -- to
21 Mr. Borutta?
22 A. I didn't have to, because he was aware of
23 it. Cassandra Travieso had -- somebody had
24 posted, Do Not Smoke, on one of the doors in
25 the building. And from what I'm aware, he

133

1 asked, Who put that up? I didn't see
2 anybody put it up. My -- I don't know if it
3 was Cassandra, but she did tell me that she
4 had put in a complaint with Insperity. And
5 so she also had issues with the smoking in
6 the building. And she was also Hispanic,
7 who also wasn't treated fairly, and she
8 ended up leaving the job.
9 Q. Did -- do you know who put up that sign, Do
10 Not Smoke?
11 A. I personally don't know, but obviously -- I
12 mean, it was clear who were the smokers and
13 who were the nonsmokers. So I -- it could
14 have been her.
15 Q. How long was the -- how long was the sign up
16 for?
17 A. I'm sorry? I didn't hear that.
18 Q. How long was the sign up for?
19 A. I'm not sure. I don't know how long it was
20 for, and I didn't notice it. I was told
21 that there was a sign on there, and I -- and
22 I was told that Martin didn't like it and
23 asked around, Who put it up? And he took it
24 down, because Martin is also a smoker.
25 Q. Who told you that Martin didn't like it?

134

1 A. I -- I don't recall.
2 Q. Did you see Martin take the sign down?
3 A. Again, I don't know how it went up and how
4 it went down. I just know that it was a
5 complaint put about the smoking issue before
6 I even made any -- before I voiced my
7 opinion about it.
8 Q. Did -- did you ever talk to Martin about
9 your personal issues with smoking in the
10 building?
11 A. He was not there as often to, you know -- I
12 mean, to be there and to talk about these
13 things. Often, I tried to, you know, have a
14 meeting with him, but his -- his presence in
15 the office was very limited and minimal.
16 Q. So do you remember talking to him about it
17 or not?
18 A. I could have mentioned it. He -- he may
19 have asked me if who -- if I knew who put it
20 up, and I -- you know, I didn't have
21 information to provide.
22 Q. Well, you said you "could have mentioned
23 it."
24 Do you specifically remember doing
25 that, or are you guessing?

135

1 A. I don't -- we've had small talk
2 conversations. I know that the situation
3 was brought up, and -- but I don't know when
4 exactly or when that I mentioned it to him.
5 Q. Are you sure you mentioned it to him?
6 A. I don't recall.
7 MS. GESSNER: Objection, asked and
8 answered multiple times. You're just trying
9 to get her to say no. So, please stop doing
10 that.
11 BY MR. KLASS:
12 Q. Do you know who else at Teupen Andy Liebl
13 would e-mail to perform his job duties?
14 A. I -- I'm not -- can you repeat the question,
15 please.
16 Q. Sure. Do you know who else Andy Liebl would
17 e-mail with at Teupen to perform his job
18 duties other than you?
19 A. No, I don't know.
20 Q. Do you know if he ever did not timely
21 respond to other employees' e-mails?
22 A. He wasn't someone who would constantly do --
23 send e-mails. So, I mean, to my knowledge,
24 he avoided responding [sic] e-mails, and I
25 think it was just targeted towards me. He

136

1 just didn't want to comply or listen to what
2 I have to say.
3 I don't know. He was just totally
4 against me being Latina, I guess. I mean,
5 it was evident that he treated me
6 differently than what he'd done with others,
7 and I just felt uncomfortable, and I just --
8 I don't know why he did what he did.
9 Q. Well, I'm asking you about your knowledge
10 about his responses to other people's
11 e-mails to him.
12 Do you have any knowledge about
13 whether he responded to other people's
14 e-mails or how quickly he responded to them?
15 A. I didn't have access to his e-mails, so I
16 wouldn't be able to answer that.
17 Q. You said in your Complaint that Mr. Liebl
18 failed to include you on important
19 communications and relevant information.
20 What do you mean by that?
21 A. I don't -- I don't know what you're
22 referring to.
23 Q. So, in your Complaint in this case, you say
24 that, Mr. Liebl repeatedly failed to include
25 Plaintiff, meaning you, on important

137

1    communications and relevant information.
2        MR. KLASS:  And, Ms. Gessner, I'm
3    referring to paragraph 23 of the Amended
4    Complaint.
5    BY MR. KLASS:
6    Q.  So my question to you, Ms. Acevedo --
7        MS. GESSNER:  Counsel, I'm not --
8    wait a minute.  Wait a minute.  Wait a
9    minute.
10       Counsel, I'm not your witness.  So
11   since you directed that at me, I would
12   request that you show this witness the
13   document you're referring to, since you're
14   asking her questions about a specific
15   document, so that she can see the whole
16   thing.
17       MR. KLASS:  All right.  Let
18   me -- let me pull it up.
19   BY MR. KLASS:
20   Q.  Ms. Acevedo, I'm showing you the first page
21   of your First Amended Complaint in this
22   case, and I'm going to scroll down to
23   paragraph 23 for you.
24       MS. GESSNER:  Counsel, while you're
25   doing that, I don't think -- have you marked

138

1    any of the prior documents that you've had
2    up as exhibits?  I don't think I recall you
3    actually marking them, nor do I see an
4    exhibit number on any of them.
5        Are you planning to attach those
6    documents to her deposition?
7        MR. KLASS:  No.
8        MS. GESSNER:  I didn't hear you.
9        MR. KLASS:  No.
10       MS. GESSNER:  So, again, you're not
11   going to mark these as exhibits to her
12   deposition; is that correct?
13       MR. KLASS:  I haven't decided
14   whether to at this point or not.
15       MS. GESSNER:  Okay.
16   BY MR. KLASS:
17   Q.  So, Ms. Acevedo, if you can see paragraph 23
18   in front of you, the second sentence reads,
19   in part, He did not review and approve
20   expenses, and he repeatedly failed to
21   include Plaintiff, meaning you, on important
22   communications and relevant information.
23       So my question to you is, what do
24   you mean by Mr. Liebl repeatedly failing to
25   include you on important communications and

139

1    relevant information?
2    **A.  Well, Mr. Klass, this is just my response**
3    **and answer to paragraph 23.  I would like to**
4    **see the question that made me respond.**
5    Q.  Ms. Acevedo, this is your Complaint in this
6    case, where you are alleging facts and legal
7    allegations and claims against Teupen.  So,
8    this isn't responding to -- to anything.
9    These -- these are your allegations in this
10   case.
11       So, my question is -- is, I guess,
12   first, do you agree with -- that statement
13   that Mr. Liebl repeatedly failed to include
14   you on important communications and relevant
15   information, do you agree with that?
16   **A.  Yes.**
17   Q.  Okay.  And what do you base that agreement
18   on?
19   **A.  That he would have expenses that I wouldn't**
20   **be aware of, and then I have to come back**
21   **and ask him, What was this for?  And he**
22   **would -- it was hard to get an answer from**
23   **him, and this is why it -- I couldn't --**
24   **sorry -- I couldn't produce my work, because**
25   **of his lack of communication.**

140

1    **Or when he decided to start looking**
2    **into changing -- for example, looking for a**
3    **new phone company, like, he didn't inform**
4    **me, when I was the one who would handle**
5    **those situations when it comes to vendors**
6    **and stuff.**
7        **So, he would just, you know, do**
8    **whatever it was, but not include me.  So I**
9    **always have to go around asking him -- and**
10   **this is just in general.  I can't recall a**
11   **specific, but I would go and ask him**
12   **questions about whatever his action was or**
13   **whatever his expense was.**
14       **And it was just always, you know,**
15   **beating around the bush or ignoring me, or**
16   just -- you know, he would treat me in a way
17   **that he didn't have to answer me.  Like, he**
18   **made -- he belittled me; he will just ignore**
19   **me, like I -- like who am I to question him.**
20   Q.  Okay.  You mentioned not communicating with
21   you regarding the credit card coding issues
22   and also about replacing or updating the
23   phones.
24       Are there any other instances that
25   you can remember where he didn't include you

141

1    on what you considered to be important
2    communications?
3    A. Yes, because -- well, I can recall at this
4       point that we were searching for a new
5       health benefit package. And I was doing the
6       research and doing work, and then he also
7       had Geraldine working on it.
8          And -- and then she would have
9       information that I wouldn't have. So we
10   weren't working on the same page. We were
11      both doing the same work, wasting time, and,
12      like, he would fail to tell me those things.
13   Or when we were looking for a new payroll
14      company, it was the same thing. So it's
15   like, Oh, here I need you to work -- work on
16   this, and then he had her doing it. And it
17      was kind of like we were both working on the
18      same thing, but yet not as a team.
19          It was -- it was just -- I don't
20      know. It was just hard and difficult. Like
21      he just -- I don't know. He treated me
22      differently and unfairly, and -- you know,
23      and this is why I -- I put in a claim. This
24      is why, because he -- you know, he was
25      discriminative towards me.

142

1          You know, he didn't care for my
2       health. You know, when I called out and
3       went to the doctor's, I got terminated.
4       Like, he gave me a warning letter that
5       wasn't even warranted, because it was not
6       true facts. Like, he was -- simply put, he
7       was putting -- he was just against me.
8          He was retaliating because I had
9       tried to talk to Martin about these
10   difficult situations in the office. And
11      Martin would go back and talk to Andy, and
12   they just made it difficult for me. And, I
13      mean, I truly believe that they were just
14      pushing me to leave. And because I wanted
15      to continue to work there, and I love to do
16      what I do, I tried to put up with as much as
17      I could, until I was dismissed --
18      erroneously dismissed.
19   Q. You say in the next sentence of paragraph 23
20      that, Liebl did not treat any non-Hispanic
21      employees this way.
22          How do you know that?
23   A. I was the one that was not, you know,
24      getting his response. You know, I was the
25      one that's constantly after him; can you

143

1    tell me this, can you tell me that. You
2    know, is -- I mean, he -- he -- he ran a
3    parts department. I mean, he didn't have
4    issues with Geraldine. He didn't have
5    issues with the service department.
6          Like, I really feel he pointed me
7    out and just wanted me out of there. I
8    really felt that, you know, me -- that I
9    wasn't -- who am I to question him? And I
10   might have been a needle in his hip -- you
11   know, a thorn in his hip that he just wanted
12   to -- to get rid of.
13   Q. Why do you think he singled you out?
14   A. By not responding to me, Mr. Klass. You
15   know, if you're working somewhere, and
16   you -- you -- you have to, you know, depend
17   on others, you know, come together
18   collaboratively to -- to fulfill a role to,
19   you know, do your work in the company.
20          If you don't have the backup, if
21   you don't have a team that are working with
22   you, it becomes difficult for you. So, that
23   made me feel that I was singled out, that I
24   was isolated, that I was on my own.
25   Q. But you don't know how he treated other

144

1    employees, right?
2    A. I mean, he did what he did. I mean, he said
3    what he -- he -- he was the boss of everyone
4    else. He wasn't my direct boss, so he made
5    it hard for me.
6    Q. Did you ever complain to Mr. Borutta about
7       concerns you had about Andy Liebl?
8    A. Yes. I e-mailed him to tell him that I
9    wanted to talk to him the next time that he
10   was in town. He said, Yes, we would.
11   One -- at one time he came, he didn't have
12   the time for me, because he has other
13   meetings or other appointments to attend to.
14          So, like I said, I -- I've never
15   had a whole time planned in the calendar to
16   sit with him and talk about these things,
17   because he -- I felt like he was -- just,
18   like, brushed it off. And at one point, he
19   even told me, Just handle it with -- with
20   Andy, as if to sort of say he doesn't want
21   to deal with it.
22          So, I feel like I was singled out.
23   I felt like he pushed Andy to do the dirty
24   work for him. Obviously, it was clear.
25   They didn't want me there. They used me. I

145

1 was overworked. I did what I could.
2 I've -- I -- I'd never called out. And all
3 of a sudden, I took vacation a week
4 before -- the week of Christmas. I come
5 back, and I -- and I'm being demoted. I'm
6 sent home. I'm -- then I'm fired by e-mail,
7 because I went to the doctor's. They didn't
8 believe that my doctor's note was
9 legitimate.
10      Like, it was clear that I was
11 legitimately separated, and I was
12 mistreated, and that's a discrimination to
13 me. Like, I -- I couldn't even put into
14 words how I feel about being Hispanic;
15 trying to do my job; prove to people that I
16 could do the work; do the work; work
17 overtime; do what I did. I did everything I
18 could to be there and be supportive for
19 everyone, but they made my life a living
20 hell there.
21 Q. Ms. Acevedo, I'm just asking if you talked
22 to Mr. Borutta about these concerns. So I'd
23 like to back up with some of what you just
24 said.
25      You said that you e-mailed

146

1 Mr. Borutta about the issue.
2      Do you remember when you sent that
3 e-mail?
4 A. I don't recall the date and time. Martin
5 should have it. He has all the e-mails,
6 access to everything there. I'm sure that
7 you have it as well. I don't have dates and
8 times, and I don't have the document in
9 front of me.
10 Q. Do you remember what month it was in?
11 A. No, I don't recall.
12 Q. Do you recall if it was before or after the
13 warning notice was given to you?
14 A. Obviously either.
15 Q. Okay. So, did you send -- did you send
16 Mr. Borutta one e-mail or more than one
17 e-mail about the issue?
18 A. I don't recall.
19 Q. Do you recall if, in the e-mail, you
20 mentioned to him, Mr. Borutta, what your
21 concerns were, or was your e-mail simply,
22 Next time you're in town, I want to talk to
23 you about some things?
24 A. I don't recall the specifics.
25 Q. Okay. And aside from that e-mail or two, or

147

1 however many you think you sent, did you
2 ever talk to Mr. Borutta on the phone about
3 any concerns you had about Andy Liebl?
4 A. No.
5 Q. Same question regarding Ms. Molyn.
6      Did you ever talk to Mr. Borutta
7 about any concerns you had with Ms. Molyn by
8 phone?
9 A. Not by phone.
10 Q. Did you ever e-mail Mr. Borutta about any
11 concerns you had about Ms. Molyn?
12 A. I don't recall.
13 Q. Did you have any in-person discussions with
14 Mr. Borutta about any concerns you had with
15 Mr. Liebl or Ms. Molyn?
16 A. Yes.
17 Q. How many times did you have in-person
18 discussions with him about --
19 A. I don't know how many times.
20 Q. Was it more than one time?
21 A. Yes.
22 Q. Do you recall when those discussions were?
23 A. I don't recall. All I can say is it was
24 before the -- the warning that I received.
25 That, I can say.

148

1 Q. You recall having a discussion with
2 Mr. Borutta before the warning notice that
3 was given to you.
4      Is that right?
5 A. I mean, I'd had discussions, again, small
6 talk here and there, whenever he would just
7 pop up in the office. I don't know how many
8 times.
9 Q. Do you recall --
10 A. I did -- I do recall asking him at one
11 point, saying, I would like us to talk about
12 this letter I received.
13 Q. Which letter are you talking about?
14 A. Well, on both occasions, both.
15 Q. I -- I'm sorry. Which letters?
16 A. Which letters are you referring to?
17 Q. Well, you just mentioned that you talked --
18 wanted to talk to him about a letter or two.
19      Which --
20 A. The warning.
21 Q. What letter are you --
22 A. One was the warning I had mentioned to him
23 verbally. The second one, I reached out to
24 him, e-mail, and there was no response.
25 Q. What was the second one about?

149

1  A. The term- -- the demotion.
2  Q. When you talked to Mr. Borutta in person
3     about your complaints or concerns with
4     Mr. Liebl or Ms. Molyn, what do you recall
5     telling him?
6  A. I don't recall the specifics. It was just
7     small talk, and, again, I was brushed off,
8     because he was too busy.
9  Q. Did you tell him you were being
10    discriminated against?
11 A. I mentioned to him that I needed to talk to
12    him about the things that were going on in
13    the office.
14 Q. Did you say what those things were?
15 A. No, I didn't have a chance and opportunity
16    to speak to him. With the limited time that
17    Martin gave me, there's no way that I can
18    give him discrimination, bias, all this in
19    one or two sentences.
20       I raised the concern to him, and he
21    failed to follow through. Okay? There was
22    no HR department. We didn't have Insperity.
23    Like we -- he, as the sole owner or
24    shareholder or CEO, whatever he want to call
25    himself, he -- it was his responsibility to

150

1     follow up with me. If someone's telling
2     somebody in the hierarchy, I'm going through
3     X, Y, Z, then he should have done something
4     about it.
5        And he disregarded me, brushed me
6     off, told me to handle things with Andy.
7     Andy was totally against me, wanted me out
8     the office, and he wanted to have Jeremy
9     take my position. So they made my
10    hell -- my job a living hell there.
11 Q. Do you know if Mr. Borutta ever looked into
12    your concerns with Mr. Liebl or Ms. Molyn?
13 A. I have no -- I don't have any -- I was --
14    I've never been a witness of that.
15 Q. Okay. Would you know, in your role at
16    Teupen, whether Mr. Liebl had ever been
17    reprimanded or disciplined by Mr. Borutta
18    for any reason?
19 A. I wouldn't know. I've never been present in
20    front of both of them.
21 Q. And you testified that Martin Borutta told
22    you at some point to work it out with
23    Mr. Liebl.
24       Is that right?
25 A. Yes.

151

1  Q. Do -- do you recall when that conversation
2     was?
3  A. I don't recall date and time.
4  Q. Do you know if it was before or after the
5     warning notice?
6  A. I don't recall.
7  Q. So let me ask you about the warning notice,
8     and let me pull it up for you.
9        MR. KLASS: And for the record,
10    this is Acevedo000070, Bates stamp.
11    BY MR. KLASS:
12 Q. Ms. Acevedo, do you recognize this document
13    in front of you to be the warning notice we
14    were just referring to?
15 A. Yes.
16 Q. And did you receive a copy of this warning
17    notice when you worked at Teupen?
18 A. That was left on my desk on one morning that
19    I came to work.
20 Q. And the date on this document is
21    December 18, 2019.
22       Do you recall if you received it on
23    that date, or if you received it afterwards?
24 A. I didn't match the date with the -- what the
25    actual day it was. Like I said, I come to

152

1     my office, and most of the time, I receive
2     something on my desk, or I'm sent it by
3     e-mail or by -- I don't know. I mean, it's
4     just never been presented to me or sat down
5     for discussion.
6  Q. Do you know if this warning notice -- well,
7     strike that.
8        Who do you understand gave you this
9     warning notice?
10 A. Andy. That's what his name says.
11 Q. Do you know whether Martin Borutta knew
12    about this warning notice being given to
13    you?
14 A. Honestly, I don't believe he was aware of
15    it.
16 Q. When you received this warning notice, what
17    did you do?
18 A. I was in disbelief. I mean, it was saying
19    that I failed to do something. So, I
20    quickly looked up to see if it was accurate.
21    I looked up to confirm whether or not the
22    credit card had been paid, when it was last
23    paid.
24       And then I sent an e-mail to
25    certain people -- a couple -- a handful of

153

1   people in the office to let them know, Be
2   aware, I just received a warning for an
3   accusation that was inaccurate, and I wanted
4   to have witnesses that this was uncalled
5   for, and I wanted people to know
6   that -- that I had received such notice, and
7   to look out, they might receive some -- one
8   as well. I didn't know.
9 Q. Did you talk to Andy Liebl about this
10   warning notice?
11 A. I did. I went to his office, and I brought
12   him the proof. I printed out the bank
13   statement. I printed out the credit card
14   statement. And I brought him the letter,
15   and I said, How can this be if the credit
16   card is on auto-pay?
17 Q. What did he say?
18 A. He was like -- he told me that he had
19 received a call or he had made a call, and
20   they said that it wasn't paid, and it should
21   have been paid. And, I mean, this came out
22 of left field.
23       Like, I'm asking him to -- to
24   provide me his expense receipts, code them,
25 submit them, so, you know, we can process

154

1   them, enter it into the accounting system.
2   And here he is giving me a warning for --
3   for not paying a credit card. It -- it --
4   it was nonsense.
5       This clearly states he wanted to
6   have some type of trail; that he wanted to
7   just eliminate me; he didn't want me there;
8   again, you know, I -- he was totally against
9   me; and he just wanted me out. He wanted a
10   reason to have against me, and this was
11   inaccurate. So this backfired on him.
12 Q. So you say you printed out the bank
13   statement.
14       Did the bank statement show that it
15   had been paid?
16 A. Yes.
17 Q. And did you show that to Mr. Liebl?
18 A. Yes.
19 Q. What was his response when you said that
20   this had been paid?
21 A. He said, Oh, well, I don't know, they told
22   me different.
23 Q. Did he -- did he retract the warning notice?
24       Did he say anything about what
25   would happen to it?

155

1 A. No, he just says -- I said, Well, I'm not
2   signing this. This is not accurate. And --
3 and he was just like -- you know, he didn't
4   say nothing. He was like, Leave it here.
5   And I just -- you know, I -- there was
6   nothing to do. I mean, there was -- it's --
7   it's not legitimate.
8 Q. Do you know if he did anything with the
9   warning notice afterwards?
10 A. No, I don't know what he does.
11 Q. Do you know if he -- if he ever reported
12   that to Mr. Borutta?
13 A. I have no idea. I doubt it, because it's
14 irrelevant. I mean, this was just, like,
15 not thought through. This was just
16 something for him to prove or try and have
17 something against me. He wanted to build a
18   case against me, because he wanted me to
19   quit, or he wanted to fire me.
20 Q. And how do you know that?
21 A. Because, Mr. Klass, I did what I did -- I
22   did everything I could to help out in that
23   office, despite the high turnover, despite
24 thinking about maybe I would be the next one
25 to get fired, because I don't know what --

156

1 what were they doing, what -- what was the
2 plan.
3       I did what I could. I proved
4   myself enough that Mr. Borutta gave me an
5   increase, because he showed that I did a lot
6   of work. But Andy and Geraldine had a
7   different plan for me. I mean, they wanted
8   me out. And unfortunately, I told Martin,
9   and Martin disregarded.
10 Q. Do you know what Mr. Liebl's intentions
11   were, do you?
12       I mean, you're just speculating,
13   right?
14 A. I'm not speculating. It's what I felt.
15   My -- my feelings are real. I felt like I
16   was isolated, separated. He didn't want me
17   there. I'm Latin. He didn't want me to
18 tell him what to do.
19       He wanted to have the power. He
20 wanted to have Geraldine in his [sic]
21   position, because Geraldine did everything
22   he said without questioning him. Remember,
23   they worked together before, so they're a
24   team.
25 Q. You mentioned that you sent an e-mail to

157

1　other people at Teupen after you got this
2　warning notice, right?
3 **A. Yes.**
4　Q. Okay. So I'm going to show you another
5　document now. And this, for the record, is
6　Acevedo000060 on the first page, and the
7　second page of the two-page document is
8　Acevedo000061.
9　　　Do you recognize this email chain,
10　Ms. Acevedo?
11 **A. Yes, I wrote it. I sent it.**
12　Q. And let's -- let's look at a couple -- there
13　are two e-mails on this document, right?
14 **A. You have to point out what you're referring**
15 **to.**
16　Q. Okay. Do you see, at the top of the
17　document, under Forward Memo to File --
18 **A. Mm-hmm.**
19　Q. -- from your work e-mail account at Teupen
20　to your personal e-mail account at G-mail;
21　is that right?
22 **A. Yes.**
23　Q. And that's dated Thursday, December 19,
24　2019, at 10:22 a.m.
25　　　Is that right?

158

1 **A. Yes.**
2　Q. And you are forwarding to your personal
3　e-mail account the e-mail that's right below
4　it, right?
5 **A. Yes.**
6　Q. Okay. And the e-mail that's right below it
7　is from you, dated December 19, 2019, at
8　9:54 a.m.
9　　　Is that right?
10 **A. Yes.**
11　Q. And Allen Bennett, James Crawford,
12　James -- or Jason Rogers, Patrick Blackburn,
13　and Tim Hickman (phonetic), those were your
14　co-workers at Teupen at the time?
15 **A. Yes.**
16　Q. And do you see on the second page of the
17　document, there's a -- it looks like a PDF
18　attachment that says, Memo to File,
19　12/19/19?
20 **A. Mm-hmm.**
21　Q. Do you see that?
22 **A. Yep.**
23　Q. Do you know what that document is?
24　　　Is that the warning notice?
25 **A. Absolutely.**

159

1　Q. Okay. So why did you send this e-mail at
2　9:54 a.m. on December 19 to these five
3　people?
4 **A. Like I just mentioned before, I wanted some**
5 **employees to be a witness of what -- what I**
6 **had received or founded on my desk that**
7 **morning.**
8　Q. Why didn't you e-mail this to
9　Martin Borutta?
10 **A. Because he wasn't there, and I don't know if**
11 **he -- you know, if he had anything to do**
12 **with it, but I wanted to let everyone else**
13 **know.**
14　Q. Do you think it would have been important to
15　let your direct supervisor know of this
16　warning notice?
17 **A. Yes, I should have.**
18　Q. But you didn't?
19 **A. But who comes on a daily -- on a -- who**
20 **comes to work one morning and find a warning**
21 **notice left on their desk?**
22 **　Usually, from my experience -- or**
23 **having worked in other companies, HR**
24 **departments will schedule an interview and**
25 **have a discussion with the manager or --**

160

1　there's -- there's always a mediator or
2　someone, you know, that -- that will sit
3　down and talk to you about why you're
4　getting a notice.
5　　　You don't find this -- I mean,
6　Mr. Klass, you don't go to work one day or
7　been to a job one day and go to your job
8　desk and find a warning letter. I mean,
9　I -- I was in shock.
10　Q. Did you ever talk to --
11 **A. Besides having anxiety, I was -- that even**
12 **drove me to anxiety. I -- I just couldn't**
13 **believe what I found. I'm like --**
14　Q. Did you ever talk to --
15 **A. My quick reaction was just to send it and**
16 **share it with people in the office, because**
17 **I didn't know what to expect. I didn't know**
18 **if anybody else had received it. I don't**
19 **know what was going on.**
20　Q. Did you ever talk to Mr. Borutta about the
21　warning notice?
22 **A. Yes. I mentioned it, that I wanted -- you**
23 **know, that I told him that I had discovered**
24 **something, and he said he would talk to**
25 **Andy.**

161

1  Q. When did you have that discussion?
2  A. I have no idea. I don't know at what time
3     frame, what -- that week, that same day. I
4     don't even remember if he was there. I
5     don't think he was there. He may have been
6     coming. I mean, I don't know.
7  Q. Was it an in-person discussion?
8  A. It could have been, yes.
9  Q. Well, do you remember having an in-person
10    discussion, or are you guessing?
11 A. I'm not certain. I don't recall. For the
12    record, I don't recall.
13 Q. Do you remember what you said to him about
14    the warning notice?
15 A. I don't recall.
16 Q. Do you remember what he said to you about
17    the warning notice?
18 A. That he would talk to Andy about it.
19 Q. Do you know if did he?
20 A. I have no idea. Again, I never had a
21    followup with any of these accusations. I
22 didn't have a followup when I was being
23 demoted. I didn't have a -- I don't know.
24    No, I don't. I rarely had any -- more than
25    10, 15 minutes with Martin.

162

1  Q. I'm going to share with you another
2     document, and it is Bates-labelled at the
3     bottom right Acevedo000010.
4        Ms. Acevedo, is this document in
5     front of you the credit card information
6     that you printed out and showed to Mr. Liebl
7     after you received the warning notice?
8  A. Yes.
9  Q. And if you need me to scroll down, I can.
10       Okay. It is?
11 A. You can scroll down, but I recognize my
12    handwriting, and I know that that was the
13    amount that he was referring to.
14 Q. So you see in the middle of the document, it
15    says, Paid 12/16/19, in red ink?
16 A. Um-hmm.
17 Q. Is that your handwriting?
18 A. Yes.
19 Q. Do you still have this document?
20 A. No, that was at the office. The e-mail was
21    sent from the office.
22 Q. What'd you do with it?
23 A. Shred it.
24 Q. Do you know how your attorney produced it to
25    us in this lawsuit, if you shredded it?

163

1  A. I sent it to her. Remember, I sent the
2     e-mail to myself. So I shared the -- the
3     e-mail with my attorney.
4  Q. The e-mail we looked at a moment ago?
5  A. Yes.
6  Q. And I think your testimony before was that
7     that PDF attachment was the warning notice?
8  A. That, along with it. That -- that was
9     along. That was part of it. I told you
10    that I printed the bank statement and the
11    letter, and I shared it with everyone else
12    in the office.
13 Q. And do you still have that e-mail?
14 A. I don't know. I don't -- I haven't -- I
15    don't know. I haven't looked for it or
16    anything like that.
17 Q. Okay. Let me point you to -- towards the
18    top of this document.
19       Do you see on the top left, I think
20    it says, My accounts, but "my" has been cut
21 off partially.
22       Do you see that?
23 A. Um-hmm.
24       (Reporter clarification.)
25       THE WITNESS: Yes.

164

1  BY MR. KLASS:
2  Q. And do you see to the right of that, it
3     says, Closing, ledger, opening, available,
4     and then a couple of other columns?
5  A. Um-hmm. Yes.
6  Q. What -- what do those refer to?
7  A. I mean, this is a bank statement. Anyone
8     who has a bank would know when -- when --
9     when the money is [sic] been closed or
10    available. I mean, it's just like it's a
11    regular checking account.
12 Q. Would you agree that what is in Teupen's
13    business bank account is confidential
14    information to Teupen?
15 A. Sure.
16 Q. I'd like to show you one more exhibit.
17    This, for the record, is Bates-numbered in
18    the bottom right Acevedo000011.
19       Ms. Acevedo, do you recognize this
20    document?
21 A. Yes. This is, I believe, his credit card
22    information.
23 Q. When you say "his," are you -- are you
24    referring to the --
25 A. The name that is on there; Andreas.

165

1  Q. Does this relate to the warning notice in
2     any way?
3  A. Yes.
4  Q. And how does it relate to it?
5  A. Well, it clearly states there that he has an
6     available credit limit of $9,932.17. He
7     said -- his warning letter indicated that I
8     failed to pay his credit card. So I showed
9     him, how can I fail to pay when he has that
10    amount available to him.
11 Q. Do you know if this document was part of the
12    PDF in the e-mail that you saw a moment ago
13    that you forwarded to yourself?
14 A. Can you scroll it all the way up to the
15    bottom. The other way. Sorry.
16       So, it has Acevedo document. So,
17    yes, it was a part of it.
18 Q. I want to ask you some more questions about
19 the statement that you say Ms. Molyn made to
20 you along the lines of, I don't know how
21 people like you get into positions like
22    this.
23       Was there a discussion that --
24    between the two of you that preceded that
25    statement?

166

1  A. I don't recall the exact statement, but like
2     I said, she didn't like me questioning her,
3     just like Andy. I would question her about
4     the findings on a report or missing some
5     information. She didn't like that, and she
6     often disregarded me and just walk away and
7     would just mumble and murmur things, and I
8     so happened to hear that.
9        And I -- I knew that she was
10    totally against me. I just had a feeling
11    that she just did not want me there, and her
12    and Andy tagged up on me -- against me.
13 Q. Did you ever report that comment to
14    Mr. Borutta?
15 A. I told Andy that there were issues that she
16    had made -- I didn't understand why
17    Geraldine had any issues against me. I told
18    him I tried talking to her. I told him that
19    I sent her e-mails.
20       And one time, Andy asked me, Why
21    are you sending her e-mails? And I said,
22    It's the only way that I can track and
23 follow up. If I send an e-mail, and I don't
24 get a response, then I can go back and say,
25    Oh, I never received a response for this.

167

1     So I piggy-backed the e-mails, and I'll send
2     another e-mail.
3        I mean -- and she didn't like that.
4     She didn't like me questioning her. She
5     didn't want me to send her e-mails. She
6     wouldn't include me on things that I should
7     be included in.
8        For instance, if there were
9     invoices that needed to go out for a machine
10    or something, and she needed to me include
11    me, because I was accounting. I was
12    accounts payable, accounts receivable. I
13 needed to have that documented and put away,
14 and she wouldn't include me.
15       And I would often say, When did you
16 send this? I'd say, You didn't include me.
17 And she was like, I don't need to include
18    you. And, I mean, she always has
19    something -- a strike against me. And I --
20    I just -- I mean, talking about it is just
21    so disturbing, and just bringing back to
22    memory of having anxiety and breakdown. And
23    I was treated unfairly, and this is why
24    we're here today.
25 Q. When you -- when you talked to Mr. Liebl

168

1     about that comment you say Ms. Molyn made,
2     what -- what did his -- what was his
3     response?
4  A. He said he would talk to her. That was what
5     we -- his normal response; I will talk to
6     her, I will talk to her about it.
7  Q. Do you know whether he did or did not?
8  A. No, I don't.
9        I need to take a break.
10 Q. Okay. Would you like a ten-minute break?
11 A. Yes, thank you.
12 Q. Okay.
13       THE VIDEOGRAPHER: Going off the
14    record, the time is 13:19 Central.
15       (Break taken.)
16       THE VIDEOGRAPHER: Going back on
17    the record, the time is 13:30 Central.
18    BY MR. KLASS:
19 Q. Ms. Acevedo, did you ever have a meeting
20    with Mr. Liebl and Ms. Molyn to address
21    Ms. Molyn's behavior towards you?
22 A. Yes.
23 Q. When did that meeting happen?
24 A. I don't have the date -- the date and time.
25    I don't recollect.

169

1  Q.  Do you remember what month it was?
2  A.  No, I don't.
3  Q.  Was it before or after the warning notice
4     that was given to you?
5  A.  Before.
6  Q.  And how did that meeting come about?
7  A.  Well, Andy asked me to tell Geraldine what
8     was my concern.  So I expressed my concern.
9     And -- and she's, you know -- and then he
10    asked her what did -- asked Geraldine what
11    did she think.  And she was like, Oh, well,
12 she's always asking me questions, and I
13 don't know why I have to keep telling her or
14 including her in everything.  You know, it's
15    just double work for me.
16        And then I responded to Andy, and I
17    was, like, Andy, you know, I thought we were
18    a team here.  I thought that we were
19    supposed to work together, support one
20    another.  You know, you -- you -- you hire
21 her to be the parts manager, and I come ask
22 her about parts, I mean, she gives me a
23 runaround.  Like, she doesn't want to answer
24    to me.  And I don't know how else, you know,
25 so I send her e-mails.

170

1        And then he's like, Why do you send
2     her e-mails?  So I was, like, Well, it's the
3     only way that I can follow up on what I
4     need.  And, you know, I was like, I'm -- I'm
5     busy at work, so I need to keep a record of
6     what I've requested and didn't get back, if
7     I don't get a response.
8        And she's just like, It's -- it's
9     unnecessary.  And -- and she just -- I
10 don't -- she said that she didn't need to
11 answer to me.  And -- and then she excused
12 herself.  She said, I have to go.  I have a
13    meeting to attend to.  And Andy looked at
14    her and said, Well, where are you going?
15 And she's like, I have to go out.  I have an
16    appointment.  And she stormed off.  And --
17    and I said, Andy, I thought we were having a
18    meeting here.  And he was like, Oh, well,
19    I'll talk to her later.
20        So I feel like all around, every --
21 every time I wanted to confront a situation,
22    confront an issue, I've always just been
23    disregarded.  Like, it was meaningless, what
24    I felt, what I went through.  It was just --
25    it was not prioritized.

171

1  Q.  Do you agree that the meeting was set up by
2  Andy so that you could discuss your concerns
3     with Ms. Molyn and they could be attempted
4     to be resolved?
5  A.  No.  I recall when I had approached him
6     about it, and he said, Go on and get
7     Geraldine and bring her here to the office.
8     And I -- I was like, You want me to go get
9     her?  And he's like, Yeah.
10        I mean, he could have called her
11    and say, Geraldine come to the office, but
12 he made me go and get her.  Again, like he
13    just disregarded who -- my position, like
14 who I was.  Like, he didn't treat me alike.
15    He kind of like made me feel belittled all
16    the time.  Like, You go get her.  You're --
17    you're the gopher.  Go get her.  I went to
18    her, and I was like, Geraldine -- putting me
19 in a difficult situation -- I was like, Can
20 you come to Andy's office.  He wants to talk
21 to us.
22        So, it was like I was always trying
23    to be careful in what I said and always not
24    to make anyone feel uncomfortable, not to
25    offend anyone.  But on the contrary, they

172

1     said and did whatever they wanted, and --
2     and it made me feel like I was nothing
3     basically.  So I -- I had to bring it up to
4     Andy for it to happen.
5  Q.  When the meeting ended, and Andy said he
6     would talk to Ms. Molyn about it, do you
7     know one way or the other whether he did?
8  A.  No, I don't know, because I never got
9     feedback.  I never got a followup.
10 Q.  Do you know if Andy ever disciplined her as
11    a result?
12 A.  Not to my knowledge, I don't believe so.
13 Q.  You don't know one way or the other, though?
14 A.  I don't know.
15 Q.  Did Ms. Molyn ever make any statements to
16    you about what you were paid?
17 A.  I wanted to say that she heard when I asked
18    Martin to give me an increase in pay, and
19    she kind of like was in competition, because
20    she wanted to get higher -- more money.
21        I know that she was pretty much
22    around every time I had a con- -- or tried
23    to have a conversation with anyone there,
24    and it was like she was being competitive.
25    I mean, she wanted my role.  That was

173

1  clearly defined. She wanted to take
2  my -- she wanted to resume my role. And on
3  December 29, when I got served a demotion,
4  my -- my emotions and feelings and my
5  thoughts came to life. She was put in
6  place, and for me to go elsewhere.
7  Q. You said -- did you say that you think she
8  might have been there when you tried to talk
9  to Martin about increasing your salary; did
10 I hear that right?
11 A. Yes. Like I said, I've never had a
12 conversation with Martin where it was
13 formal, sitting down privately. It was
14 always out in the open, five-, ten-minute
15 chat or talk.
16 Q. Did you have a discussion with Martin about
17 increasing your salary after your salary was
18 increased to 72,000 a year in the summer of
19 2019?
20 A. I recall asking him for more, and he said, I
21 will give you 72. He -- and then --
22 Q. Do you recall a conversation --
23 A. I didn't -- I'm sorry. I didn't finish.
24 Q. Go ahead.
25 A. Okay. So I asked him for more. He said,

174

1  I'll give you 72. And I -- and then
2  someone's -- the bonus came about someway or
3  somehow. And he was like, you know, Well,
4  we'll -- we'll give you more during the
5  bonus or something like that.
6      But, I mean, I -- I -- I mean, I
7  wanted to believe that there was hopes that
8  I was going to get a little more. But when
9  she came in, she was given more than me. I
10 mean, she took the manager's -- she took a
11 parts manager position to replace
12 Misty Goins. Misty Goins was not making
13 more than $60,000 annually. I don't recall
14 how much she was making, but here comes
15 Geraldine, a friend of Andy, a friend of
16 Martin, and she gets -- she gets hired at
17 $73,000 salary.
18 Q. Did you have a -- a problem or issue with
19 what she was paid?
20 A. She was being competitive. I was like --
21 you know, I was like, I thought that she was
22 being -- you know, filling in, or it was a
23 transition, or she was filling in
24 Misty Goins' shoes and replacing
25 Misty Goins. And I just -- I just had

175

1  started to believe that it was something --
2  there was a motive behind that, honestly.
3  You know, because she made it hard for me
4  after that, and...
5  Q. Did -- did you have a problem with how much
6  Ms. Molyn was making?
7  A. No, I didn't have a problem with it. I was
8  just questioning, like, Why would she
9  make -- get so much more when she's only a
10 parts manager?
11 Q. Was it your job function to determine or
12 evaluate other employees' salaries?
13 A. I didn't evaluate it, but I was submitting
14 it to Insperity. Again, I had resumed roles
15 when there was no controller or VP finance
16 there. So I was the one that submitted
17 the -- you know, the application and the --
18 the requisition, whatever, everything that I
19 needed to get her rolling and -- and
20 onboarding with -- at Teupen.
21 Q. Did you have any job duty or role in setting
22 an employee's pay?
23 A. No.
24 Q. Do you think it was any of your business
25 what Ms. Molyn was paid by the company?

176

1      MS. GESSNER: Object to form.
2      THE WITNESS: They made it my
3  business.
4      MS. GESSNER: Wait a minute.
5  Object to form. Counsel is being very rude
6  to this witness by saying is it any of her
7  business. I suggest that you rephrase that
8  question, Mr. Klass. I'm not going to let
9  you be rude and -- and disrespectful to this
10 witness.
11 BY MR. KLASS:
12 Q. You can answer the question.
13     MS. GESSNER: Counsel --
14     THE WITNESS: Are you rephrasing
15 the question?
16     MS. GESSNER: -- again -- again,
17 same objection.
18     MR. KLASS: Noted.
19 BY MR. KLASS:
20 Q. You can answer the question.
21 A. Are you rephrasing the question?
22 Q. Do you have an answer to my prior question?
23 A. I don't know what the question is. Can you
24 please repeat it.
25 Q. Was it any of your business as -- or in your

177

1    role for Teupen to question what other
2    people -- what other employees were making?
3  **A. I think that's an offensive question, and I**
4    **wish not to answer.**
5  Q. Well, you have to answer. It's a
6    deposition.
7      So what is your answer?
8  **A. Can you repeat it in a nice way that I can**
9    **understand.**
10 Q. Was it part of your job function to go
11    question any other employee's pay when you
12    were at Teupen?
13 **A. Yes, to make sure that I enter the correct**
14    **information and submit the right information**
15    **to Insperity. It became my business. It**
16    **became -- it involved me.**
17 Q. Did you have any role in setting any other
18    employee's pay?
19 **A. You asked me that before, and I said no.**
20 Q. Was it your -- part of your job duties to
21    ask Mr. Borutta why certain employees were
22    paid the salaries they were paid?
23 **A. No, I didn't ask him.**
24 Q. Did you ever complain to Mr. Borutta about
25    Ms. -- well, strike that.

178

1    Do you recall the Christmas party
2    in 2019?
3  **A. To what extent?**
4  Q. Do you recall being there?
5  **A. Yes.**
6  Q. Do you recall that it occurred on a Friday?
7  **A. Most of the parties have been on a Friday,**
8    **so I believe, yes.**
9  Q. Would you disagree if I told you the
10    Christmas party was on December 20th, 2019?
11 **A. I'm not sure. Can you show me the document,**
12    **so that I can confirm.**
13 Q. I'm just asking based on your memory.
14 **A. I don't recall.**
15 Q. Do you recall talking to Mr. Borutta that
16    day?
17 **A. On that day, he was in his office, and he**
18    **wasn't really talking to anyone.**
19 Q. Did you talk to him that day?
20 **A. Excuse me? I can't hear you.**
21 Q. Sorry. Did you talk to him that day?
22 **A. I don't recall.**
23 Q. You had just received the warning notice the
24    day before, December 19.
25    Do you recall talking to

179

1    Mr. Borutta about the warning notice when he
2    was at the office on December 20th, during
3    the Christmas party?
4  **A. I'm not sure. Like I said, he was to**
5    **himself. I may have brought it up to him.**
6    **But like I said, he was being antisocial.**
7    **So, I -- he wasn't engaging with everyone**
8    **else at the party is what I'm saying. He**
9    **wasn't in the conference room, where we were**
10    **holding a little luncheon. So I don't**
11    **recall.**
12 Q. Were people from AT&T there that day?
13 **A. I'm not certain on the day that they were**
14    **there.**
15 Q. But they were there some day in December,
16    right?
17 **A. They were there some day, yes.**
18 Q. What --
19 **A. What day it was, I have no idea, because I**
20    **wasn't informed.**
21 Q. What were they doing?
22 **A. I don't know. I wasn't there. I wasn't a**
23    **part of it. I wasn't told that there was**
24    **going to be a new company coming in. I**
25    **wasn't informed what changes and who was**

180

1    **going to get a phone or what -- I wasn't**
2    **informed what was the deal, what was**
3    **happening. So, I don't know. I wasn't**
4    **present where they were. I wasn't -- I**
5    **didn't see them.**
6  Q. Do you -- do you know if other employees got
7    new phones with AT&T when they came out?
8  **A. Um-hmm, yes.**
9  Q. And who got new phones to your memory?
10 **A. I have no idea who it was. I -- my -- I**
11    **don't know if it was just salespeople. I**
12    **know that there -- there were some guys from**
13    **the back, which is the warehouse, the**
14    **maintenance, the mechanics or**
15    **whatnot, they asked if they were getting**
16    **one.**
17      **And I said, I have no idea. I**
18    **don't know what's going on. I don't know**
19    **what they're here for. I don't know who's**
20    **getting what. So, I don't know. I -- I**
21    **said, All I know is that I was not included.**
22 Q. How did you know they were there?
23 **A. Because it's a small office. You could tell**
24    **there were people there, and there was**
25    **obviously something going on. They weren't**

181

1    in the lunchroom, but they were somewhere
2    else.
3  Q.  Did you talk to them?
4  A.  No.
5  Q.  Did you talk to anyone else about why they
6    were there?
7  A.  I don't recall.
8  Q.  Okay.  Do you recall talking to Andy Liebl
9    or Gerri Molyn specifically about them being
10   there?
11 A.  No.
12 Q.  Were you given a new phone?
13 A.  No.
14 Q.  Was your phone line changed?
15 A.  No.  I'm sorry, let me take that back.
16       What time frame are you referring
17   to?
18 Q.  When -- when AT&T came out to the office.
19 A.  No, I was not approached or mentioned
20   anything about changing my phone or phone
21   line, or I don't -- I didn't know what was
22   going on and, like I said, who was getting a
23   phone, who wasn't getting a phone, what was
24   the deal, when was the beginning, when was
25   Verizon ending.  I have no information on

182

1    what happened on that day.
2        I just wanted to put -- say it for
3    the record, that's probably one of the --
4    the things that I had mentioned when you
5    asked me to -- to read a paragraph, and
6    asked how did Andy not include me on certain
7    times that he -- that I should have been
8    made aware of.  I can say this is one of
9    those times.
10 Q.  And what -- what was your job function that
11   you needed to be made aware of regarding
12   AT&T coming out?
13 A.  Well, I am -- I was accounts payable.  As an
14   accountant, I have to pay the bills.  I have
15   to change all the transactions.  For some
16   reason, I inherited the changing phones,
17   switching.  If someone needed a -- a case, I
18   had to -- to look to see what we had in our
19   back-stock.  I mean, we had dozens of phones
20   in Teupen.
21 Q.  Would you have been responsible for paying
22   the -- whatever new service was set up with
23   AT&T for Teupen's employees?
24 A.  I mean, that would fall under my role as an
25   accountant for accounts payable to pay the

183

1    bill.
2  Q.  You paid the bill for the Verizon accounts
3    with Teupen --
4  A.  I paid for all the bills.
5  Q.  Okay.  And that includled the Verizon bills?
6  A.  Correct.
7  Q.  If the Christmas party was on a Friday, and
8    it was December 20th, you mentioned before
9    that you took -- you took time off for the
10   week around the holidays.
11       Did you take the next week off; do
12   you recall?
13 A.  I would have to look at a calendar to see
14   when exactly I took off -- time off.  I
15   don't remember what -- what days I took off
16   in 2019.
17 Q.  Do you recall going into the office any day
18   in December after the Christmas party and
19   before the day that you were demoted?
20 A.  Again, I would have to look at the calendar.
21   I don't know what days -- the days fall on,
22   but I don't know.  I don't know if -- if I
23   was on vacation, I was on vacation.  There
24   was no reason for me to be at the office.
25 Q.  But you don't have a -- you don't have a

184

1    specific memory of being in the office that
2    week?
3  A.  Show me the calendar, and I'll let you know.
4  Q.  What -- what calendar are you referring to?
5  A.  2019.  I don't -- I -- I can't recollect
6    what -- what days my vacation fell on in
7    2019.
8  Q.  Do you have a record that would show you
9    what days you took as vacation?
10 A.  What kind of record?
11 Q.  I'm asking -- I'm asking you, do you have a
12   record that would show what vacation days
13   you took in 2019?
14 A.  I -- I don't have -- no, I don't -- I
15   don't -- I don't have anything to -- that
16   would show when I was off.  I would just
17   know by the calendar what days I was out.
18 Q.  But your recollection is that --
19       MS. GESSNER:  Counsel -- wait a
20   minute.  Wait, wait.  Counsel, let me get an
21   objection.  Let the record reflect that
22   Counsel is refusing to show her a simple
23   calendar from 2019, so that she can see what
24   dates fall on what days.  That's all she's
25   asked you to do, and you're now still

185

1  refusing to show her that so that she can
2  give you testimony.
3        MR. KLASS:  That is another
4  speaking objection, which is improper.  That
5  also mischaracterizes, I think, the
6  testimony and my questions, but I will see
7  if I can find a calendar.
8        MS. GESSNER:  Well, okay, first of
9  all, again, I think she clearly said, Will
10  you please show me a calendar.  She said it
11  several times, Counsel.  And instead of
12  showing her the calendar, you just continue
13  to ask her questions that she's already told
14 you she needed a calendar to use.
15        It seems that you're being
16  intentionally rude and obstructive on basic
17  things that she's asking you for, and I'd
18  ask you to not do that.
19        MR. KLASS:  I disagree with your
20  characterization.
21  BY MR. KLASS:
22 Q.  So, I don't have a calendar to show you.  I
23  can tell you that December 20th, 2019 was a
24  Friday.  I can also tell you that
25  December 25, or Christmas, was a Wednesday;

186

1  and that December 30th, the day that you
2  were demoted, was a Monday.
3        So the week after the Christmas
4  party would have been December 23rd, which
5  was a Monday, through December 27th, which
6  was a Friday.
7        So, with that understanding, does
8  that refresh your memory as to whether -- or
9  what days you took off around Christmas in
10  2019?
11 A.  I'm more of a visual person.  I would have
12  to see a calendar.  I don't -- you know
13  what?  All I recall is that anyone who
14  requested time off, they would write -- put
15  it in writing and get it signed off.
16        And I'm most certain that I did
17  that and had Martin sign off on it.  So,
18  right now, I can't answer the question,
19  because I don't know exactly if I took a
20  whole week off or three days off or two days
21  off.  I don't recall.
22 Q.  Let me see if this will work.  I'm going to
23  share the screen with you.  All right.  So
24  this is a calendar that I pulled off of
25  Google for December 2019.

187

1        So, take a moment to review this
2  calendar.  And if this refreshes your memory
3  as to what days you took off the week of
4  Christmas, please let me know.
5 A.  Okay.  I don't recall if the office was
6  closed -- I know it was closed on the 25th.
7  I don't know if it was closed on the day
8  before.
9        So, could you ask Martin what day
10  was it closed, because I -- I don't recall
11  right now if it was one day or two.
12        Again, I was an accountant, so I
13  had a lot of responsibilities.  So I may
14  have taken time off from the actual office,
15  but I worked for home, because, again, there
16  was no one there to fulfill my
17  responsibilities while I was out.
18 Q.  All right.  Well, let's -- let's take this
19  day by day.
20        Do you remember working on
21  December 23rd, 2019, which was a Monday?
22 A.  I'm going to tell you this again, I don't
23  recall what day.  And I keep repeating
24  myself, so can we move on to the next
25  question.

188

1 Q.  So you don't recall -- just to clarify, even
2  looking at the calendar, which you have
3  requested be provided, you do not recall
4  what days between December 23rd and
5  December 27 you did not work other than
6  December 25th --
7 A.  I might have been --
8 Q.  -- is that right?
9 A.  -- out on the 26th and the 27th.  I don't
10  recall if I was out the 23rd or the 24th, or
11  if --
12 Q.  Okay.
13 A.  -- I was actually, in fact, out of the
14  office the whole week.
15 Q.  Okay.  All right.  Thank you.
16        Is there any document that would
17  refresh your memory as to when -- what days
18  you took off?
19 A.  If you're -- if you want to have a
20  discussion or question about a document that
21  you have, can you please share it to refresh
22  my memory.
23 Q.  I don't -- I don't have it.
24        I'm asking if there's a document
25  that you're aware of that exists --

189

1  A. I don't recall.
2  Q. -- you might be able to see.
3      Do you recall sending -- well, I'll
4  strike that.
5      Did you have a laptop while you
6  worked at Teupen?
7  A. Everyone had a laptop.
8  Q. And could you use that laptop to work from
9  home?
10 A. Yes, because everything is on the
11  ShareDrive.
12 Q. So if you were working from home, you would
13  be able to log in to your work e-mail
14  account and send and receive e-mails?
15 A. Yes.
16 Q. Do you recall sending e-mails to your
17  personal e-mail address from your work
18  e-mail address the last week of December of
19  2019?
20 A. Yes.
21 Q. Why did you send those e-mails?
22 A. Because I had reason to believe that there
23  was a motive to get me fired or to have me
24  taken out of the office. So I wanted to
25  write memo to files that will support a

190

1  case, shall it happen the way it did. And
2  so here -- this is why we are where we are
3  today, with supporting documents.
4  Q. So the e-mails that you sent to yourself
5  then reflected your beliefs at the time as
6  to the reasons for the actions that were
7  being taken against you?
8  A. I don't understand your question. I don't
9  know if you are explaining it or asking it
10  correctly, but it's just like choppy bits
11  and pieces put together.
12 Q. The e-mails that you sent to your personal
13  e-mail address, did you provide summaries or
14  statements when you provided -- when you
15  sent those e-mails?
16 A. What kind of statements? I don't know what
17  you're referring to.
18 Q. I'll rephrase. You forwarded a series of
19  work e-mails from your work e-mail address
20  to your personal e-mail address, correct?
21 A. Um-hmm.
22 Q. I'm sorry, that's --
23 A. Yes.
24 Q. -- a yes?
25      And when you forwarded those

191

1  e-mails, did you type statements or words
2  that summarized or provided your comments to
3  what e-mails you were forwarding?
4  A. Yes, I wrote memo to files, as -- as far as
5  my recollection of the events that had been
6  occurring that was used against me as far as
7  discrimination, as far as, like, being --
8  you know, being sabotaged -- sabotaged at
9  work.
10 Q. Did those statements that you e-mailed to
11  yourself reflect -- accurately reflected
12  your beliefs at the time you sent those
13  e-mails.
14      Is that fair?
15 A. Can you -- can you repeat that, please.
16 Q. Sure. The statements that you e-mailed to
17  yourself the last week of December 2019
18  accurately reflected your beliefs at the
19  time you sent those e-mails.
20      Is that fair?
21 A. Yes.
22 Q. Do you recall -- would you agree that you
23  were demoted on December 30th, 2019?
24 A. Do I agree? I don't understand what the
25  question is.

192

1  Q. Yeah. Were you demoted on December 30th,
2  2019?
3  A. If that was the date on the document that
4  you have in your possession, then you -- if
5  you could please share it, I can confirm.
6  Q. Okay.
7      MS. GESSNER: Counsel, again, for
8  the record, she keeps asking for documents
9  to you that we've asked for repeatedly in
10 discovery, and they're now, again, subject
11  to a discovery dispute, that show the exact
12  time off that was taken that the Defendant
13  has failed to produce. The very line of
14 questions that you've been asking about for
15  the last 30 minutes, Defendant has chosen to
16  withhold those documents improperly.
17      MR. KLASS: That's incorrect. We
18 don't have the documents that you are
19  alleging we have. And we have provided the
20  documents that we do have.
21  BY MR. KLASS:
22 Q. So turning to this document in front of you,
23  Ms. Acevedo, at the top, it's got the
24  corporate logo. It's dated December 30th,
25  2019. And for the record, the bottom right

193

1    Bates number is 1Teupen00027.
2        Ms. Acevedo, do you recognize this
3    letter that's in front of you?
4  A. Yes.
5  Q. And what do you recognize this letter to be?
6  A. I don't understand your question.
7  Q. What is this letter?
8  A. It says there clearly, Letter Regarding Your
9    Change of Duties.
10 Q. Okay. When did you receive this letter?
11 A. On the day that I came back to the office,
12   December 30, 2019.
13 Q. And do you recall how you were given this
14   letter?
15 A. Yes.
16 Q. And how were you given the letter?
17 A. Gerri -- Geraldine came to my office and
18   said, Andy would like to speak to you in the
19   conference room. When I went to the
20   conference room, he was sitting down with
21   the letter. And to my surprise, Geraldine
22   was there as well. So they were both there
23   while Andy served me with the letter.
24 Q. Do you see on this document that it is
25   signed by Martin Borutta?

194

1  A. That's what it says.
2  Q. Okay. Do -- do you -- what did you
3    understand this letter to mean as it
4    reflects -- as it applied to your job?
5  A. I didn't know what it mean. Therefore, I
6    tried calling Martin and sending him an
7    e-mail, and I didn't get a response.
8  Q. Okay. I want to go back a minute and ask
9    you about those e-mails you sent the last
10   week of December.
11       Did you tell anyone at Teupen that
12   you were sending those to your personal
13   e-mail?
14 A. No.
15 Q. Did anyone authorize you to send those to
16   your personal e-mail?
17 A. I wasn't sending thing -- anything other
18   than my emotions and feelings on the e-mail,
19   which you have possession of. I was writing
20   a note to myself, memo to file.
21 Q. Had anyone authorized you to send those from
22   your work computer -- work e-mail to your
23   personal e-mail?
24 A. I was working from home. Did anyone tell me
25   not to work from home? Nobody really knew

195

1    what to do there but survive. I had to
2    learn to survive in the office, given the
3    circumstance that my boss -- my direct boss
4    wasn't there. I had to handle and deal with
5    both Geraldine and Andy belittling me and
6    discriminating against me. I had to work
7    under a lot of circumstances.
8        So in -- in the end, there was no
9    one there to really be there to give me the
10   right directions. So I had to work from
11   home.
12 Q. Did anyone tell you you could forward those
13   e-mails to your personal e-mail account?
14 A. No. I -- like I said, I was forwarding my
15   emotions written on paper, written in an
16   e-mail to myself, a memo to file.
17 Q. When you had this meeting with -- with
18   Andy Liebl and Gerri Molyn on December 30th,
19   you -- did you audio-record that meeting?
20 A. Yes, I did.
21 Q. How did you do that?
22 A. I had my phone with me.
23 Q. Did you tell either of them, Mr. Liebl or
24   Ms. Molyn, that you were recording the
25   meeting?

196

1  A. No. For all I know, Andy was recording the
2    meeting, because he was infamous for that.
3  Q. Do you know if he recorded the meeting?
4  A. I have no idea if he did or did not.
5  Q. Why did you record the meeting?
6  A. Because I have two people that were against
7    me sitting down in a meeting with me. So,
8    there was no other witness. Because they
9    were a team; they were friends. Martin,
10   Andy, and Geraldine were friends. So they
11   teamed up on me. And my only defense is to
12   show proof or have some type of proof of
13   what I was experiencing.
14 Q. Had you recorded any other conversations
15   with Andy Liebl or Gerri Molyn or
16   Martin Borutta previously?
17 A. No.
18 Q. When you were called into the conference
19   room by Ms. Molyn, what did you think was
20   going to happen?
21 A. That I was going to either be let go or
22   something negatively was going to happen.
23 Q. So I'm going to try to play an
24   audio-recording that we received from your
25   counsel. Hopefully, I do this correctly.

197

1    But I'd like for you to listen to it, and
2    then I'll ask you some questions afterwards.
3        Okay?
4 **A. Sure.**
5        (Audio playing.)
6    BY MR. KLASS:
7 Q. And this, for the record, was produced as
8    Acevedo000194.
9        (Audio playing.)
10    BY MR. KLASS:
11 Q. And I'm pausing it right now.
12        Can you hear that?
13 **A. No, I cannot.**
14 Q. Can you -- can you hear any of the audio, or
15    is it too low to be heard?
16 **A. I hear something, but I don't -- maybe it's**
17    **too low.**
18        (Audio playing.)
19        THE WITNESS: I really cannot hear
20    it.
21    BY MR. KLASS:
22 Q. Ms. Acevedo, can you not hear it?
23 **A. No.**
24 Q. Could you hear your voice at all?
25 **A. I hear my voice, but I don't hear what is**

198

1    **going on with -- I can't hear it clearly.**
2 Q. Okay. I will -- I'll try that later to see
3    if I can fix that. Your attorney sent us
4    two audio-recordings.
5        Did you make a second
6    audio-recording as well?
7 **A. I don't recall at the moment. I would have**
8    **to hear it.**
9 Q. When you had the meeting with Mr. Liebl and
10    Ms. Molyn, was there any direction for you
11    to provide Ms. Molyn with passwords that you
12    used to perform your duties?
13 **A. Yes, that's what Andy said. He said, Give**
14    **her your passwords. Again, Martin is not**
15    **there. Andy was not my direct boss -- boss.**
16    **And I have Andy and Geraldine, in a**
17    **conference room with me, asking me for stuff**
18    **that I was just dumbfounded, confused.**
19        **So I asked to speak to Martin. And**
20    **he -- Andy's response was, Go ahead, go call**
21    **him, if you want to. I'm just doing what he**
22    **told me to do. I tried reaching Martin, and**
23    **he would not respond to me. So I**
24    **wouldn't -- wasn't going to give, you know,**
25    **information to Geraldine without getting a**

199

1    **true confirmation from Martin.**
2 Q. Let me show you the letter that was provided
3    to you again.
4        Do you see -- and you would agree
5    that this letter came from Mr. Borutta,
6    correct?
7 **A. That's what it says.**
8 Q. Do you recognize that to be his signature?
9 **A. No, I don't recollect.**
10 Q. Did you have to see his signature on a
11    regular basis as the accountant for Teupen
12    and him being the CEO?
13 **A. I mean, perhaps on checks, when he signed**
14    **the checks for accounts payables, but I**
15    **don't recall.**
16 Q. Did you have any --
17 **A. As you see -- and you can't really read the**
18    **signature. So, I mean -- I mean, it's a**
19    **circle and some bubbles.**
20 Q. Did you think that this letter was signed by
21    anyone other than Mr. Borutta?
22 **A. I didn't know what to believe. Again, I'm**
23    **sitting with Geraldine and Andy, two people**
24    **who were against me, who were plotting to**
25    **get me out of there.**

200

1 Q. Do you see the second paragraph of the
2    letter, where it says, Please hand over all
3    information and passwords that are required
4    for Ms. Molyn to take over the accounting
5    position; do you see that?
6 **A. Yes.**
7 Q. Okay. And --
8 **A. Can you -- can you please tell me, is the**
9    **"pls" an abbreviation for please?**
10 Q. I'm not the author. So --
11 **A. Does that exist?**
12 Q. -- however you would -- however you would
13    interpret it.
14 **A. Okay. So hand over -- well, Martin is**
15    **there. You can ask him.**
16 Q. Well, this is your deposition.
17 **A. Okay.**
18 Q. So the letter asks you to hand over
19    information and passwords to Ms. Molyn.
20        And you -- you just said you didn't
21    want to do that until you actually talked to
22    Mr. Borutta; is that right?
23 **A. Yes, that is correct.**
24 Q. And did you tell that to Mr. Liebl and
25    Ms. Molyn at the time that you received this

201

1    letter?
2  A. Yes.
3  Q. And what was the response from them?
4  A. I mean, it's in the audio. I have to hear
5     the audio again. You've heard it, I'm sure,
6     multiple times, so you can hear it. I have
7     to hear it. I don't know word for word what
8     went on, but I said, I -- I can remember
9     asking to speak to Martin.
10 Q. Did you review or listen to the audio to
11    prepare for this deposition today?
12 A. No, I did not hear it in the last few days.
13    I didn't even realize that I had it until I
14    remembered, and I sent it to my attorney.
15 Q. When was the last time you heard the audio?
16 A. Probably at the time that I sent it to her.
17 Q. Can you recall if you recorded the whole
18    interaction between you and Ms. Molyn and
19    Mr. Liebl, or if there were additional
20    interactions that you had either before the
21    audio-recording or after?
22 A. I don't understand your question.
23       You're asking me if I have more
24    videos.
25 Q. I'm asking if the audio-recordings that you

202

1    made capture the entire conversation you had
2    with Ms. Molyn and Mr. Liebl at the time?
3  A. For the record, I sent the audio with the
4     exact timing and length of the meeting.
5  Q. When you say you tried to contact
6     Mr. Borutta, how did you attempt to contact
7     him?
8  A. I sent him an e-mail.
9  Q. Did you call him?
10 A. Yes.
11 Q. Did he respond -- pick up the phone?
12 A. No.
13 Q. Did you leave him a voicemail?
14 A. I don't recall if I left a voicemail or not.
15    I'm sure I -- I don't recall.
16 Q. Do you recall if you called him more than
17    once?
18 A. I don't recall.
19 Q. Okay.
20 A. I have reason to believe that he called Andy
21    while I was trying to call -- reach out to
22    him, and Andy pursued to speak to him in
23    German while he was in my office waiting for
24    me to hand in my passwords. And then he
25    said, Just go, just leave. So he may have

203

1    been instructed by Martin to tell me to
2    leave the office.
3  Q. Okay. So let me back up. So, you have this
4     meeting in the conference room with
5     Mr. Liebl and Ms. Molyn.
6        At some point, that meeting ends,
7     correct?
8  A. Mm-hmm, yes.
9  Q. Where do you go after the meeting happens?
10 A. To my office.
11 Q. And what do you do in your office?
12 A. I sat down, and I sent this e-mail right
13    before us to Martin.
14 Q. Then what did you do?
15 A. Then I had Andy and Geraldine both
16    antagonizing me and sabotaging me, telling
17    me I need to give them the -- the
18    information, I need to give them the
19    information.
20       Like, I -- I couldn't even think.
21    I didn't know what to do at that point. I
22    was waiting. I told them, I'm trying to
23    reach Martin, and we're going to wait.
24    And -- and they were just there.
25 Q. So at that point, they asked you for

204

1    their -- for the passwords.
2        Is -- is that right?
3  A. They asked me for the passwords from the
4     very beginning in the conference room.
5  Q. And you refused to give them the passwords?
6  A. I said, I would like to speak to Martin to
7     confirm this, because I don't understand
8     what is the changes here, why is this
9     happening, and -- and then Andy said, You
10    can go ahead and call him. And I tried to
11    call him, and I tried to e-mail him, and he
12    wouldn't respond.
13 Q. Did you give Mr. Liebl or Ms. Molyn the
14    passwords before you left for the day?
15 A. No, they didn't allow me to even stay there.
16    I -- like I said, Andy received a phone
17    call. He was talking in German. And then
18    he said, Get your stuff and leave for the
19    day. Take the rest of the day off.
20 Q. How do you know that he was talking to
21    Mr. Borutta?
22 A. Who else would call him in the middle of our
23    meeting or my demotion letter, and I'm
24    sending an e-mail to Martin, and shortly
25    after, Andy gets a call, while he's standing

205

1  in my office. And -- and then tells
2  me -- he walks out back and forth, speaking
3  to him, comes back, hangs up the phone, and
4  says, Just get your stuff and leave.
5  Q.  Could you hear the voice on the other end of
6  the phone --
7  A.  I cannot hear you.
8  Q.  I'm sorry. Could you hear the voice on the
9  other end of the phone that --
10 A.  I can hear German talk, language, but I did
11 not hear him. I don't know who --
12 Q.  Did you recognize -- did you recognize the
13 voice --
14        (Reporter clarification.)
15 BY MR. KLASS:
16 Q.  Did you recognize the voice on the other end
17 of the line with Andy Liebl?
18 A.  He didn't have him on speaker. I
19 don't -- there was no way for me to hear
20 what Andy -- what was going into Andy's ear.
21 Q.  Did Andy Liebl ever tell you that he issued
22 you that letter that I showed you a moment
23 ago, the change of --
24 A.  I don't know what letter you're referring
25 to.

206

1  Q.  The change of responsibilities letter, dated
2  December 30th.
3  A.  Can you repeat the question.
4  Q.  Did Mr. Liebl ever tell you that he issued
5  the change of duties letter?
6  A.  You're asking me if Andy was the one that
7  told me that he wrote the letter?
8  Q.  Correct.
9  A.  No. I mean, it has Martin's name on it. He
10 said, Martin wanted me to give you this.
11 Martin was here -- if I could recall, he
12 said, Martin was here over the weekend. He
13 was going through stuff, and he wanted me to
14 give you this letter.
15        And I asked why he wasn't there.
16 He said, He had to go somewhere. He's in a
17 meeting, or is -- I don't even recall.
18 Q.  Do you know where Mr. Borutta was at the
19 time?
20 A.  No, because he wouldn't answer my call or my
21 e-mail.
22 Q.  So let me share with you another document.
23 I think I had it on the screen there a
24 moment ago. And for the record, this has a
25 Bates stamp on the first page as

207

1  Acevedo000039, and then the second page is
2  Acevedo000040.
3        Ms. Acevedo, do you recognize this
4  document?
5  A.  Yes, I think we discussed this one already.
6  Q.  Okay. So the top e-mail -- there are two
7  e-mails on this page, correct?
8  A.  Yes.
9  Q.  So the top e-mail is from your work e-mail
10 account to your personal e-mail account, and
11 that's dated December 30th, 2019, at
12 9:27 a.m.
13        Is that right?
14 A.  Yes.
15 Q.  And then the e-mail below is from you to
16 Mr. Borutta, and it copies Ulf Birkenkamp,
17 and that's dated December 30th, 2019, at
18 9:32 a.m.
19        Do you see that?
20 A.  Um-hmm.
21 Q.  And the e-mail on this page that's to
22 Martin Borutta, is that the e-mail you were
23 referring to in your testimony that you sent
24 to him when you went to your desk after the
25 meeting with Mr. Liebl and Ms. Molyn on

208

1  December 30th?
2  A.  Yes.
3  Q.  Who is Ulf Birkenkamp?
4  A.  He's the controller or the financial person
5  in Germany. He's who I was report to when I
6  was resending him reports. Well, I didn't
7  report to him, but I would resend him the
8  reports. He's the controller in Germany.
9  Q.  Why did you forward this e-mail to your
10 personal e-mail account?
11 A.  Because, again, it was proof to show that I
12 tried to reach out to my boss about a
13 demotion that I didn't expect and was served
14 by Andy, who was not my boss.
15        So, it was like another memo to
16 file that I tried to reach him, and I didn't
17 get a response. And today, we have proof of
18 that.
19 Q.  Did you ever talk to Mr. Borutta about your
20 meeting with Mr. Liebl or Ms. Molyn or the
21 decision to change your responsibilities?
22 A.  Can you ask that question again.
23 Q.  Sure. Did you ever talk to Mr. Borutta
24 about your meeting with Mr. Liebl or
25 Ms. Molyn on December 30th, or about your

209

1  change of responsibilities?
2  A. No, I just said this, for the record, I
3     tried to reach Martin, and he wouldn't
4     answer me, so I couldn't talk to him about
5     it. He didn't give me the opportunity to
6     speak to him.
7  Q. When -- on December 30th, when you were in
8     the office, did anyone ask for you to leave
9     your equipment or company property there?
10 A. Who is anybody? Do you have someone in
11    particular?
12 Q. Andy Liebl or Ms. Molyn.
13 A. When Andy got off the phone, he said, Just
14    leave.
15 Q. And what happened then?
16 A. And I said, Why am I leaving? I was like,
17    Andy, I have a lot of work to do. I just
18    came back from vacation, or from being away.
19    There's a lot of work that needs to be done.
20    Like, I really cannot just go home. Like,
21    there's things I need to get done.
22 Q. And what was his response?
23 A. He said, Just leave. He says, Just take the
24    rest of the day off.
25 Q. And then what did you do?

210

1  A. And then I said, Well, let me wait for
2     Martin to get back to me, because, again,
3     like, he's not my boss. He's telling me to
4     leave. I'm waiting for Martin to call me
5     back. Like -- like, I was clueless. I
6     didn't know what to do at that point.
7        I, again, was being sabotaged by
8     Andy and Geraldine, and forcing me or, like,
9     kind of, like, you know, telling me, I need
10    to give them password, take my stuff, go
11    move somewhere else. And then, I was asked
12    to leave. So I was in the midst of a
13    nervous breakdown.
14 Q. So did you end up leaving the office?
15 A. I did.
16 Q. Did you tell anyone that you were in the
17    midst of a nervous breakdown?
18 A. Yes, I told my husband, and he -- we went to
19    the doctor's office right after.
20 Q. Did you tell anyone at Teupen?
21 A. I mean, I didn't -- there was nobody around
22    at that point visually for me to say, I'm
23    having a nervous breakdown. I was just
24    dumbfounded and shocked, and I just didn't
25    know what to do.

211

1  Q. So you went to the doctor that day.
2     And what doctor did you see?
3  A. I don't have her name at this point.
4  Q. Do you still see her?
5  A. I haven't been to the doctor's office. You
6     have my medical records, and you know when
7     was the last time I was at the doctor's.
8  Q. Do you recall the last time you were at the
9     doctor's, as you sit here today?
10    Do you recall the last time you
11    were at the doctor's, when you -- as you sit
12    here --
13 A. I didn't hear --
14 Q. -- today?
15 A. -- you from the beginning. Could you please
16    repeat the question.
17 Q. Do you recall the last time you were at the
18    doctor's, as you sit here today?
19 A. What specific doctor are you referring to?
20 Q. The doctor that you saw on December 30th,
21    2020 -- '19.
22 A. No, I did not see the same doctor.
23 Q. What were you treated for when you went to
24    the doctor on December 30th, 2019?
25 A. For anxiety, for a nervous breakdown.

212

1  Q. And as a result of that doctor's visit, did
2     the doctor provide you with a note about
3     returning to work?
4  A. Yes, same note that I had sent to Martin.
5  Q. And did you -- did you e-mail it to him?
6  A. I cannot recall if I -- if it was by text or
7     by e-mail or both.
8  Q. I'll share this document with you. For the
9     record, this is Bates-numbered
10    Acevedo000047.
11       Ms. Acevedo, is this your e-mail to
12    Mr. Borutta and others forwarding them the
13    doctor's note from that day --
14 A. Yes.
15 Q. -- December 30th? Okay.
16       Did you ever tell Mr. Borutta why
17    you could not return to work for a couple of
18    days?
19 A. He never called me back. I waited for his
20    response from when I was sent home.
21 Q. Did you ever tell Mr. Borutta what the
22    medical condition was that prevented you
23    from returning to work for a couple of days?
24 A. Again, he did not return my call or e-mail.
25    So, he didn't care.

213

1  Q. I'm not -- I'm not asking whether he
2    returned your call or e-mail.
3       I'm asking whether you ever told
4    him what your medical condition was that
5    prevented you from returning home?
6  **A. On December 30th?**
7  Q. Yes.
8  **A. No, I did not speak to him.**
9  Q. Did you ever speak to Andy Liebl or
10   Patrick -- excuse me, Patrick Blackburn or
11   Gerri Molyn or anyone else at Teupen about
12   why you could not return to work --
13 **A. No.**
14 Q. -- after December 30th?
15      Did you ever tell anyone at Teupen
16   that you suffered from anxiety or depression
17   or any other claim disability that you have?
18 **A. I told Martin that I was upset about Andy's**
19   **actions. I told Andy that it was a stress**
20   **factor to me to deal with Geraldine, who**
21   **wasn't cooperative, who wasn't a team**
22   **player.**
23      **So I've expressed that. I've**
24   **expressed that to Patrick Blackburn as well.**
25   **I've expressed that, you know, it's been**

214

1  **very hard to work at Teupen and fulfill my**
2    **roles and responsibilities, dealing with a**
3    **group of people that was totally against me.**
4    **Yes, I've expressed it.**
5  Q. Did you ever express it in terms of having a
6    medical condition that you had anxiety that
7    was diagnosed, or did you simply say, You
8    know, I -- I'm stressed, I am anxious about
9    things at work?
10 **A. I feel like you're asking me two questions.**
11   **Can you repeat the question.**
12 Q. Did you ever tell anyone at Teupen that you
13   had been diagnosed with any type of anxiety,
14   depression, or any other disability that
15   you're claiming in this lawsuit?
16      MS. GESSNER: Object to form. Are
17   you referring to other than the doctor's
18   note that she clearly provided?
19      MR. KLASS: Yes.
20      MS. GESSNER: Okay. So that wasn't
21   clear in your question. So, it's obvious
22   that she provided a doctor's note that she
23   was experiencing a medical condition.
24      So why don't you rephrase your
25   question, because you're asking for

215

1    something that includes -- that excludes
2    that letter, and you know that it exists.
3       BY MR. KLASS:
4  Q. Other than the doctor's note that you
5    provided on December 30th, 2019, which note
6    speaks for itself, did you ever tell anyone
7    at Teupen that you had a medical condition
8    that was diagnosed related to anxiety or
9    depression or any other disability you are
10   claiming in this lawsuit?
11 **A. I didn't have to speak -- an opportunity to**
12   **speak to anyone from when I was sent home.**
13 Q. Prior to being sent home, did you ever
14   have -- did you ever inform anyone of that?
15 **A. Not that I was diagnosed. I expressed how**
16   **I'd been feeling, but not a diagnose [sic]**
17   **from a clinical person.**
18 Q. When did you first receive treatment for
19   anxiety or depression?
20 **A. During my work at Teupen?**
21 Q. Did you ever tell anyone at Teupen that you
22   were seeing a medical doctor or any type of
23   medical provider for --
24 **A. No.**
25 Q. -- stress or anxiety or depression?

216

1  **A. No.**
2       MS. GESSNER: Counsel, before you
3    ask another question, I'd like to take a
4    five-minute break. I think we've been on
5    the record about an hour.
6       MR. KLASS: Okay.
7       MS. GESSNER: If somebody could
8    tell me what time we started this session.
9       THE VIDEOGRAPHER: One second.
10   We're going off the record. The time is
11   14:35 Central.
12      (Break taken.)
13      THE VIDEOGRAPHER: Going back on
14   the record, the time is 14:46 Central.
15      BY MR. KLASS:
16 Q. Ms. Acevedo, did you receive a letter from
17   Teupen -- Teupen announcing your separation
18   from employment?
19 **A. Could you allow me to see the document, so I**
20   **can confirm.**
21 Q. Yes. For the record, this is Bates number
22   1Teupen00024. It's a two-page document, and
23   the second page is 1Teupen00025.
24      Ms. Acevedo, do you recognize this
25   document?

217

1  A. Yes.
2  Q. And what do you recognize this document to
3     be?
4  A. Just as it is written, termination of
5     employment.
6  Q. When did you receive this document?
7  A. Well, the document says January 3rd, 2020.
8  Q. To the best of your memory, is that when you
9     received it?
10 A. Yes.
11 Q. Did you receive it by e-mail?
12 A. Yes.
13 Q. So you're looking at the first page of the
14    document. I'll turn your attention to the
15    second page.
16        Did you receive the second page of
17    this document as well?
18 A. Yes.
19 Q. And this second page asks you to return all
20    company materials, documents, and equipment
21    in your possession, correct?
22 A. That's what it says.
23 Q. And it specifically includes invoices,
24    correspondence, computer, cell phones, and
25    accessories, correct?

218

1  A. That's what it says there.
2  Q. After you received that document, did you
3     have any further communications with anyone
4     at Teupen?
5  A. No.
6  Q. Did you ever try to contact Mr. Borutta to
7     ask him why you were being terminated from
8     employment?
9  A. No.
10 Q. Why not?
11 A. He never cared to answer me on the 30th.
12    So, what was I -- I wasn't expecting to call
13    me, obviously. I'm always served in this
14    format, without him being present.
15 Q. When you -- when your employment ended, did
16    Teupen pay you for 30 days after your
17    employment ended?
18 A. Yes.
19 Q. Do you know why you were paid for 30 days
20    after your employment ended?
21 A. For -- I mean, I don't know. What does
22    the -- the agreement says? I mean, I would
23    like to look at the agreement. I believe he
24    was trying to be compliant with the
25    contract.

219

1  Q. So you think that you were being paid 30
2     days because of what was provided for in the
3     Employment Agreement that you had; is that
4     right?
5  A. Yes.
6  Q. Turning away from your separation from
7     employment for a few minutes --
8  A. I cannot hear you, sir.
9  Q. I'm sorry. Turning back to while you were
10    employed with Teupen.
11        Were you employed when Ralph Baer
12    was separated from employment?
13 A. Yes.
14 Q. And did you have any responsibility related
15    to processing that termination?
16 A. I had to submit the information to
17    Insperity.
18 Q. Did you have to do anything with his e-mail
19    account?
20 A. I don't recall.
21 Q. Who was Teupen's IT provider; do you recall?
22 A. I don't recall their name.
23 Q. Does Network Essentials sound familiar?
24 A. That's correct.
25 Q. Did you have to contact Network Essentials

220

1     about Mr. Baer's e-mail account?
2  A. I -- I don't understand the question.
3  Q. When Mr. Baer was -- when his employment was
4     terminated, did you contact Network
5     Essentials regarding what to do, if
6     anything, with Mr. Baer's work e-mail
7     account?
8  A. I mean, when someone is terminated, we
9     terminate the -- the account.
10 Q. What does "terminate the account" mean to
11    you?
12 A. Remove it, so that we don't pay for it from
13    the payables.
14 Q. Do you know if that meant deactivating the
15    account or deleting it, including the
16    e-mails, or do you --
17 A. I don't know what that meant. I just wanted
18    to get that off the payables.
19 Q. How did you communicate that to Network
20    Essentials?
21 A. I don't recall.
22 Q. Do you remember what you told Network
23    Essentials?
24 A. I don't recall. If it was an e-mail -- I
25    usually try to do things via e-mail, so we

221

1  can have some paper trail. I don't have
2  that in my possession, so I cannot recall.
3  Q. What services did Insperity provide for
4  Teupen?
5  A. Basically anything that had to do with HR,
6  payroll.
7  Q. Do you know if their --
8  A. Benefits.
9  Q. -- if your -- I'm sorry, go ahead.
10 A. I'm sorry. So benefits.
11 Q. When you say "benefits," does that include
12    health and dental plans and the like?
13 A. Yes.
14 Q. Do you know if the insurance -- did Teupen
15    have a health insurance plan that it
16    provided to employees in 2019?
17 A. Yes.
18 Q. And were you a -- a participant in that
19    health insurance plan?
20 A. Yes.
21 Q. And that health insurance plan was provided
22    through Insperity, correct?
23 A. Yes.
24 Q. And do you know if Insperity was the plan
25    administrator for that health plan?

222

1  A. I'm not sure. Again, Sheri Geraghty used to
2     handle all of this. It just fell in my lap
3     when she wasn't there. I don't -- I don't
4     know the logistics how -- who was the direct
5     contact. I just know that they were all a
6     company that helped Teupen with a lot of
7     their paperwork.
8  Q. Between when you took over Ms. Geraghty's
9     duties in the summer of 2019 and when you
10    stopped working for Teupen, were there other
11    employees that ended their employment with
12    Teupen during that time period?
13 A. I'm sorry, can you repeat the question.
14 Q. Between when you took over Ms. Geraghty's
15    job duties in the summer of 2019 and when
16    you were let go in January of 2020, were
17    there other employees that ended their
18    employment with Teupen during that time
19    period?
20 A. I mean, yes, we have this discussion,
21    everyone that was fired or left.
22 Q. So we -- we mentioned Ralph Baer was one of
23    them, correct?
24 A. Yes.
25 Q. And Misty Goins was another?

223

1  A. Correct.
2  Q. And Ben Taft, correct?
3  A. Yes.
4  Q. And David Kesser and Tony Trainer, correct?
5  A. Yes.
6  Q. And Sheri Geraghty resigned, correct?
7  A. Yes.
8  Q. Can you think of anyone else --
9  A. Yes.
10 Q. -- who left the company during that time
11    period?
12 A. Yes.
13 Q. And for those other people, did you -- were
14    you involved in any step in processing their
15    separation from the company?
16 A. For what other people?
17 Q. Anyone else who left during that time
18    period?
19 A. I mean, whatever paperwork they needed --
20    that I needed to submit to Insperity, I was
21    the one to submit them.
22 Q. Did you ever send out a COBRA notice to any
23    of those people I just mentioned;
24    Ralph Baer, Misty Goins, Ben Taft,
25    Tony Trainer, David Kesser, Sheri Geraghty?

224

1  A. No.
2  Q. Do you know who did?
3  A. I believe Insperity. Again, that was not
4     part of my duties, so I don't know who
5     handled that.
6  Q. Did there come a point when there was a
7     decision at Teupen to look for alternatives
8     to using Insperity in 2019?
9  A. Can you repeat that question, please.
10 Q. Was there a point in 2019 when Teupen began
11    to look for alternatives to using Insperity?
12 A. Yes.
13 Q. Were you involved in that process?
14 A. At the beginning I was.
15 Q. When -- do you remember when that was?
16 A. No, I don't recall dates and time.
17 Q. Do you recall if it was in the fall of 2019?
18 A. Yes.
19 Q. What was your role in -- in that?
20 A. I was told to find another company to --
21    to -- I mean, Martin wanted to do away with
22    paying Insperity, because he realized we're
23    paying a lot of money for their services.
24      What he failed to realize is -- was
25    he was de-- terminating not only the

225

1   services cost, but he was terminating HR,
2   payroll, health benefits, all of the above.
3   So I started to look or tried to inquire
4   about finding other healthcare benefits and
5   payroll, and that's when I just started to
6   do some research.
7   Q. Did Martin ask you to find alternatives?
8   A. Yes.
9   Q. And did you find alternatives?
10  A. I started to work on it, when I learned that
11     Gerri was also working on it, and that's
12     because Andy had told her to. So, this is
13     another occasion where we were both working
14     on the same things, and she had expectations
15     that I was working on certain things, and I
16  had expectations that she was working on
17  certain things.
18        So we were both doing the same
19     work. And in the end, it just sat around,
20     because she felt I was doing it, and I felt
21     she was doing it, and things weren't getting
22     done. But then, again, Martin had the
23     ultimate decision to make a decision on who
24     he wanted to choose or select as the new
25     healthcare provider and new payroll. But

226

1   it -- it was hard to present that to him
2   when he wasn't in the office as often.
3   Q. Couldn't you have e-mailed it to him?
4   A. I'm sure that there have been e-mails that
5     were sent, and Andy was in the midst of it.
6     So he wanted to get all the information.
7        So I believe that Andy and Martin
8     spoke about a lot of things. It's just
9     keeping me out of the loop or not filling me
10    in on -- on who was working on what and what
11    he needed, it was -- it was -- it was hard.
12  Q. Did there come a point when you stopped
13     working on finding alternatives or
14  processing a changeover, and Gerri started
15     to do that?
16  A. Yes, because she was sending me e-mails, and
17     she then was complaining to Andy that I
18  wasn't giving her information. So I said,
19     I -- I'm like, Who is -- is she working on
20     this, or I'm working on this?
21        Like, it just was redundant, and I
22     didn't have time to work on -- on that, when
23     I had other duties to fulfill and ensure
24  that I would do the month-end close, so I
25     could submit it to Germany.

227

1        And it's just -- it was just too
2     many cookies in the jar, too many hands on,
3   and it wasn't going anywhere. So I told
4     Andy, I will let Gerri take care of it. I'm
5     sure she'll be fine with it. And that fell
6     through the cracks, because then, when it
7     was time, they sat on it, and they never
8     presented it to Martin. And so they
9     probably missed opportunities of the whole
10    transition and the lapse in coverage.
11  Q. Do you know if Gerri ever completed changing
12     over the -- the work that Insperity was
13     doing for Teupen to a new provider or
14     providers?
15  A. I have no idea what she was doing. She
16     wouldn't share anything with me. I -- you
17     know, there was a lot going on in the month
18     of December. I was served with a warning
19     letter, demotion letter. I took a few days
20     off. I came back. I was sent home.
21        I mean, I don't know what was going
22     on in the whole month of December, because,
23     obviously, they were plotting against me to
24     try to get rid of me. So, it all fell onto
25     her hands.

228

1   Q. Did Martin ever tell you that he was
2     transitioning the work from you to Gerri to
3     complete the changeover process for
4     Insperity?
5   A. Martin wasn't around or wasn't direct on
6     what he wanted everyone to do. That's why I
7     reached out to him, when I received the
8     demotion letter, for him to clarify for me
9     what -- to confirm the change or roles,
10    because most of the time, I don't even know
11    what was going on. It was just Andy calling
12    shots.
13  Q. Was -- did Teupen actually terminate its
14     relationship with Insperity at the end of
15     2019?
16  A. Yes.
17  Q. Okay. And are you aware that Insperity --
18     or that your health insurance through
19     Insperity terminated on December 31st, 2019?
20  A. Everyone's insurance was supposed to
21     terminate, because I recall sending out a
22     letter to Insperity letting them know that
23     we were not going to continue services in
24     the month of December.
25        I don't recall what specific dates

229

1    it was, because it -- it was depending on
2    the last payroll for December. So, I don't
3    know at what time there was a cutoff. I
4    cannot recall when was this transition and
5    when the new healthcare benefits were going
6    to take over. Like I said, there was a lot
7    of things going on in December, and I had
8    no -- I wasn't informed or filled in on what
9    the changes were going to be.
10   Q. Did you receive a COBRA notice from
11      Insperity after Insperity's health plan
12      ended at the end of December 2019?
13   A. No, I did not.
14   Q. Did you sign up for a new health plan for
15      2020 with Teupen?
16   A. I did. I did receive an e-mail from
17      Geraldine. As a matter of fact, I don't --
18      I believe it was the week when I was sent
19      home. I was -- I went to work
20      December 30th. I was served the demotion
21      letter. I was asked to go home.
22         I didn't come back to the office.
23   I do recall receiving an e-mail from
24   Geraldine asking me -- in her e-mail, I'm
25   sorry, I -- if I could recall, it said --

230

1    she was sending out an e-mail to everyone in
2    the office, saying, My apologies for sending
3    this late. I really need everyone to tell
4    me who is going to -- what kind of plan
5    they're choosing. And they needed to know
6    right away, because it was going to be
7    effective January 1st.
8         I do recall an e-mail. I don't
9    know if it was on -- on the 31st that I
10   received the e-mail, but it needed to be
11   done right away. I replied back. I gave
12   her my information and my son's information,
13   and I said, Please put us on. And I don't
14   know what happened after that.
15   Q. Okay. Let me show you a document.
16         So, this copy now, unfortunately,
17   the date didn't transferred, but this is
18   Bates-numbered, for the record,
19   1Teupen00364.
20         And looking at the first e-mail,
21   the lowest one on this, do you see
22   December 30th -- 31st, 2019, at 11:42 a.m.,
23   from Geraldine Molyn?
24   A. Yes, that's what I mentioned, and I believe
25      it was the 31st. So that confirms.

231

1    Q. Okay. Is this the e-mail that you were just
2       referring to?
3    A. Yes.
4    Q. Okay. And you were given the option from
5       Ms. Molyn to choose three different
6       healthcare plans with United Healthcare.
7          Is that right?
8    A. That's what it says there.
9    Q. Okay. And then you responded to Ms. Molyn
10      the same day with your selection of the
11      plan, correct?
12   A. Yes.
13   Q. Okay. Did you ever receive any health
14      insurance paperwork for the new plan?
15   A. I believe so.
16   Q. Do you know when that coverage ended?
17   A. It was a short term, because I remember
18      going to the doctor's, and they said my
19      insurance was invalid, and I just couldn't
20      go to the doctor's anymore. I don't recall
21      the length of time, but I know it was a
22      short time.
23   Q. And you don't recall receiving a COBRA
24      notice from Insperity regarding your 2019
25      coverage ending?

232

1    A. No, I don't recall. I mean, we had a new
2       insurance, so I should have received a
3       letter from the current insurance that
4       Geraldine was handling, and I didn't either.
5       So...
6    Q. I'm going to share a document with you.
7       This is Bates-numbered 20Teupen00012, for
8       the record.
9          Ms. Acevedo, is the date under your
10      name on this letter correct as of the date
11      on this letter?
12   A. What? I don't -- I don't understand your
13      question.
14   Q. Okay. Do you see that this letter is dated
15      January 7, 2020?
16   A. Yes, I see that.
17   Q. And do you see your name under this -- under
18      the date?
19   A. Um-hmm, yes.
20   Q. And is the address under your name accurate
21      as of January 7, 2020?
22   A. Yes.
23   Q. Do you recall receiving this letter from
24      Insperity?
25   A. No, I don't recall receiving this.

233

1  Q.  If you had been provided that letter or
2     notice of any type of COBRA rights you might
3     have had, would you have signed up for COBRA
4     coverage?
5  A.  Of course, I -- I would have.  I needed it.
6     I needed to continue my disability issues.
7     I was still being seen by a doctor regarding
8     my anxious -- my anxiety and depression, and
9  I couldn't even go, because I didn't have
10 insurance, nor did I have a job to pay out
11 of pocket.
12 Q.  Are you aware that, under COBRA, you would
13    have been responsible for 100 percent of the
14    premium for the health insurance?
15 A.  No, I didn't receive the information, so I
16    wouldn't have known.
17 Q.  Would you have been able to afford paying
18    the full premium, if you had known?
19 A.  If I would have known, I'm sure I would have
20    worked something out with my husband to try
21    to get insurance.
22 Q.  Did your husband have separate health
23    insurance?
24 A.  No, he did not.
25 Q.  When you were at Teupen, prior -- or

234

1     after -- I'll strike that.
2        After you assumed Ms. Geraghty's
3     job responsibilities in the summer of 2019,
4     were you responsible for preparing financial
5     reports to send to Teupen's German company?
6  A.  I wasn't responsible to do that.  Sheri
7     tried to show me within a few weeks' span,
8     so that I can continue to provide the
9     information that Germany required.
10 Q.  So after Ms. Geraghty left, were you
11    responsible for that, or was someone else?
12 A.  No one was there.  They were supposed to
13    have -- they were supposed to get a
14    replacement for Sheri Geraghty, and that
15    never occurred.
16 Q.  Did you send financial statements to Germany
17    after Sheri Geraghty left employment with
18    Teupen?
19 A.  Yes.
20 Q.  And what type of financial statements did
21    you send?
22 A.  The same information that Gerri
23    would -- that Sheri Geraghty would send to
24    Ulf.
25 Q.  Why type of information was that?

235

1  A.  I don't have it in front of me.  If you have
2     a document, I can confirm.
3  Q.  Was it Profit & Loss Statements?
4  A.  Yes.
5  Q.  Did you have any type of duty to ensure that
6     what you sent was accurate?
7  A.  I sent what should have been accurate, but
8     if there was always a question, Ulf will
9     come back and ask me, and we would get it
10    fixed -- well, we worked to where we could
11    get it correctly, so we were all on the same
12    page.
13 Q.  I'd like to ask you now about your phone.
14       At some point, did your phone
15    services, were they -- I'll strike that
16    question.  That's bad.
17 A.  I don't understand.
18 Q.  At some point, did you become a participant
19    in Teupen's cell phone plan?
20 A.  What do you mean "participant"?
21 Q.  At some point, did you set up your phone
22    number under Teupen's business account with
23    a cell phone provider?
24 A.  Are you asking me if Teupen was paying for
25    the phone bill?

236

1  Q.  I'm asking if, at some point, was Teupen
2     paying for the service on your phone?
3  A.  Yes.  When I was promoted to accounting
4     manager, Sheri Geraghty offered me to have a
5     phone.  And so I said, Instead of buying me
6     a phone and getting a phone, we can just use
7     my phone, the way that she used her phone.
8     So that is what we agreed upon, and that's
9     how my phone went under Teupen's service.
10 Q.  So who was your provider before it went
11    under Teupen's plan?
12 A.  AT&T.
13 Q.  And what type of phone did you have at the
14    time?
15 A.  An iPhone 7.
16 Q.  Do you recall when you changed your plan
17    over to Teupen's?
18 A.  I don't know exactly the time or dates, but
19    you should have that, because that was
20    provided to you and my attorney.
21 Q.  That would have been in 2018; is that right?
22 A.  I would have to see the document to confirm.
23 Q.  What did Sheri Geraghty specifically tell
24    you you could -- that Teupen would pay for?
25 A.  For the monthly service, the line?

237

1  Q. Did she tell you that Teupen would buy you a
2  new phone?
3  **A. Teupen bought every employee a phone there.**
4  **Everyone had a new phone.**
5  Q. I'm just asking what Sheri Geraghty told
6  you.
7       So, did she tell you that you could
8  get a new phone paid for by Teupen?
9  **A. I don't recall the conversation.**
10 Q. Was there a discussion about being provided
11 a phone by Teupen for your use?
12 **A. Sheri Geraghty offered that to me, so she**
13 **confirmed that with David Kesser.**
14 Q. So she said to you that if you wanted,
15 Teupen could give you a phone, and that the
16 phone could be serviced under Teupen's plan?
17 **A. I don't know the specific conversation that**
18 **went on word for word. So, I don't recall.**
19 Q. Is there anything that would refresh your
20 memory as to what was said during that
21 conversation?
22 **A. All she said was, like, You -- you're**
23 **getting a promotion, and you could have**
24 **the -- the service paid for. And I said,**
25 **Well, I don't need a new phone. I can use**

238

1  **my phone. And that's what I did.**
2  **So when I went to trans- --- go to**
3  **Verizon and have the phone line put under**
4  **the -- Teupen, they offered me an upgrade,**
5  **because I had an iPhone 7, and the new**
6  **phones were out.**
7  Q. When you say "they offered you an upgrade,"
8  are you referring to, like, the salespeople
9  at Verizon?
10 **A. Yes.**
11 Q. Did you do this at a specific Verizon store?
12 **A. Yes.**
13 Q. Which store?
14 **A. It's -- it was in -- it's in Pineville.**
15 Q. Was it a Verizon-branded store, or was it
16 like in a Best Buy or something?
17 **A. No, it was a Verizon store, and I believe**
18 **it's off South Boulevard.**
19 Q. Do you know if you could have used your own
20 phone from AT&T on Verizon if you had wanted
21 to?
22 **A. I don't understand the question.**
23 Q. If -- did you have the opportunity to
24 decline getting an upgrade phone and use
25 your phone from AT&T on the Verizon network?

239

1  **A. I don't -- I don't -- I don't -- I don't**
2  **recall. I believe the iPhone 7 was the old**
3  **phone, and they had brought in a new phone,**
4  **and that was the plan, and that was a way to**
5  **getting perhaps a discount. I don't know.**
6  **I don't recall the conversation.**
7  Q. Do you recall if any Verizon employee told
8  you that your AT&T phone wouldn't work on
9  the Verizon network, because it uses
10 different technology?
11 **A. I don't -- I don't remember that.**
12 Q. So you were offered an upgraded iPhone.
13      What did -- what did Verizon tell
14 you had to be done or could be done with
15 your old phone?
16 **A. I had to do a trade-in.**
17 Q. So to get the upgrade, you had to turn in
18 your current phone?
19 **A. Yes.**
20 Q. Was your current phone paid off?
21 **A. No, I was paying it, and I had to pay a**
22 **balance.**
23 Q. And once you -- and you paid that balance,
24 and then turned it into Verizon?
25 **A. Yes.**

240

1  Q. And did Verizon say what would happen once
2  you turned in your iPhone 7?
3  **A. They said that the -- that the phone -- that**
4  **Verizon will provide a credit for the phone,**
5  **because I paid for the phone, the balance of**
6  **the phone.**
7       **So Verizon didn't inherit my**
8  **balance. I paid for my balance. And**
9  **because I traded the phone, and I paid off**
10 **the phone, they provided a credit. So**
11 **Verizon provided a credit for my line for a**
12 **duration. I don't recall how long, but**
13 **that's indicated in the Teupen bill -- in**
14 **the Verizon bills.**
15 Q. And when did you become -- you became
16 responsible at some point for paying the
17 Verizon bills for Teupen?
18 **A. I paid all the payables. I was accounts**
19 **payable.**
20 Q. Did you do that even before you took over
21 Sheri Geraghty's roles?
22 **A. Yes. I was accounts payable.**
23 Q. So you would have seen the invoices every
24 month and paid them?
25 **A. Yes.**

241

1  Q. Did you ever look at those invoices while
2     you were employed to see if there had been a
3     credit applied for your phone that you had
4     turned in?
5  A. Of course, mm-hmm, yes.
6  Q. When you got your new iPhone 8, was it with
7     your preexisting phone number, or did you
8     get a new phone number?
9  A. No, we changed the line, because I had a 201
10    area code phone number that I had when --
11    since I was in New Jersey. So we changed
12    that number over to 704.
13 Q. And that change occurred after you had
14    already joined the Teupen Verizon account,
15    correct?
16 A. In transition, I believe.
17 Q. So the 704-number that you used, you hadn't
18    had before it was associated with the Teupen
19    Verizon account, correct?
20 A. I'm sorry, could you repeat that.
21 Q. You did not have the 704-number that you
22    transferred to before it was under the
23    Teupen Verizon account; is that right?
24 A. Correct.
25 Q. And just so I'm clear, what is the

242

1     704-number that you were given?
2  A. I believe the same number that I have,
3     704-617-9493.
4  Q. And what was the 201-number phone number you
5     had originally?
6  A. 201-912-5506.
7  Q. And after you turned in your iPhone 7 to
8     Verizon, paid off whatever balance was left
9     on that phone, did you make any personal
10    payments to your iPhone 8 or the line
11    associated with that phone number while you
12    were employed by Teupen?
13 A. No. Well, let's go back to -- what time
14    frame are you referring to?
15 Q. While you were employed -- while you were
16    employed by Teupen, did you ever pay for any
17    costs associated with the iPhone 8 or the
18    phone line attached to that phone?
19 A. I paid for it after. I took it upon
20    my -- my responsibility.
21 Q. After you removed the phone line from the
22    Teupen account, correct?
23 A. Yes.
24 Q. And you did that at the end of December of
25    2019, correct?

243

1  A. Yes.
2  Q. Why did you remove your phone line
3     from -- or the phone number from Teupen's
4     account in December of 2019?
5  A. Because as previously discussed, there was
6     an AT-- -- AT&T vendor on the premises of
7     Teupen building, and they were going to be
8     transitioning over to AT&T. No one told me
9     what was going to happen, what were the
10    changes, when it was going to be in effect.
11    No one offered me a phone line.
12       So I didn't know at what point
13    Verizon was going to be terminated. So I
14    did not want to be without a phone. So I
15    took my phone back out, and I paid it
16    myself.
17 Q. Did you tell anyone before you did that that
18    you were going to do that?
19 A. I had no one to speak to. On the day that I
20    actually transitioned it, I was sent home,
21    and I never returned.
22 Q. Did you ever e-mail Martin or Andy or anyone
23    else that you were changing your -- the
24    phone line over to your personal account?
25 A. Again, I didn't have an opportunity to speak

244

1     to anyone. So, no.
2        Can we take a break?
3  Q. Sure. Ten minutes?
4  A. Thank you. Yes.
5        THE VIDEOGRAPHER: We are going off
6     the record. The time is 15:28 Central.
7        (Break taken.)
8        THE VIDEOGRAPHER: Going back on
9     the record, the time is 15:40 Central.
10    BY MR. KLASS:
11 Q. Ms. Acevedo, I'm going to show you a
12    document. At the top of this document, it
13    says, Verizon Manage Account Support. The
14    bottom of the document is Bates-numbered
15    15Teupen00086.
16       Ms. Acevedo, do you recognize what
17    this document is?
18 A. Basically transferring my line off of the
19    Verizon; change of billing responsibility.
20    I mean, I can only interpret what it means,
21    or assume.
22 Q. Did you type in your name under Name of New
23    Customer, and your e-mail address under
24    E-Mail of New Customer?
25 A. I don't recall if I did or they did.

245

1  Q. When you say "they," who might you be
2     referring to?
3  A. Verizon.
4  Q. No one at Teupen, though?
5  A. No.
6  Q. Do you see at the bottom, where it says,
7     Order Confirmation, and then there is a box
8     with a check in it that says, Requester, and
9     then it has your work e-mail address; is
10    that right?
11 A. That's what I see.
12 Q. Do you remember checking that box?
13 A. I mean, I -- it's there, so, I guess.
14 Q. When -- did you complete this document?
15 A. I don't recall where this document is coming
16    from.
17 Q. Is the wireless number under the column,
18    Wireless Number, the -- the number that was
19    associated with your phone line?
20 A. Yes.
21 Q. When you transferred the phone line from
22    Teupen's account to your personal e-mail,
23    had Teupen agreed to release liability for
24    the mobile phone number to you?
25 A. I mean, they should have known. It is their

246

1     business. They were the ones that were
2     making all the transition over to a new
3     vendor, a new carrier. So...
4  Q. That's not exactly what I asked.
5        I asked if Teupen agreed to release
6     liability for the mobile phone number to you
7     when you --
8  A. I don't know.
9  Q. Did Teupen disagree to remain responsible
10    for all charges incurred until the line was
11    transferred to your personal account?
12 A. I don't know.
13 Q. Did you have the -- did you represent to
14    Verizon that you had the legal capacity to
15    bind Teupen holding the account from which
16    the line was being transferred -- I'll
17    strike that.
18       Do you see under, Order
19    Confirmation; it says, quote, By selecting
20 my e-mail and checking the box to request
21    order confirmation e-mails below, I
22    represent that I have the legal capacity to
23    bind the organization holding the account
24    from which the line will be transferred,
25    unquote.

247

1        Do you see that?
2  A. Yes, I see that.
3  Q. And did you represent that you had the legal
4     capacity to bind the organization holding
5     the account, meaning Teupen?
6  A. I was the account person handling the
7     Verizon. So I will add lines, and I
8  would -- had the capacity of removing lines,
9     because I was given that authority by
10    Sheri Geraghty before she left.
11 Q. Did Sheri Geraghty specifically authorize
12    you to remove your phone line from Teupen's
13    account in December of 2019?
14 A. Sheri Geraghty was not there, as you --
15    as -- for the record, as you know, she was
16    not there on December of 2019.
17 Q. So she did not authorize you to remove your
18    phone line, right?
19 A. She wasn't present.
20 Q. Did anyone --
21 A. She authorized me to be there, to be in
22    the -- as part of the contact person
23    to -- to make changes, but she was not there
24    on December 30 -- on December of 2019.
25 Q. Did anyone at Teupen authorize you to make

248

1     that change?
2        MS. GESSNER: Object to form, asked
3     and answered. She just testified she had
4     the authority.
5     BY MR. KLASS:
6  Q. Did anyone else at Teupen, other than you,
7     authorize you to change the phone line?
8  A. Nobody had authorization to handle the
9     Verizon carrier or account. I was the sole
10    accountholder, because I was accounts
11    payable, because there was no other
12    controller or VP finance there.
13 Q. Did Martin have authority, Martin Borutta?
14 A. I don't -- no, his name was not -- is
15    not -- was not on the account, so I don't
16    believe he did.
17 Q. So in terms of managing the account, were
18    you answerable to Mr. Borutta?
19 A. I'm sorry, I don't understand the question.
20    Can you repeat that, please, or rephrase.
21 Q. In managing Teupen's Verizon account, were
22    you answerable to Mr. Borutta?
23 A. Mr. Borutta was my boss. He's the one who I
24    reported to.
25 Q. Did Mr. Borutta ever authorize you to remove

249

1    your cell phone line from the Teupen
2    account?
3    **A. Mr. Borutta never spoke to me or told me**
4    **what not to do.**
5    Q. Did he -- did Mr. Borutta ever tell you that
6        the iPhone 8 was your personal phone and not
7        Teupen's phone?
8    **A. He wasn't aware of it. Like I said, he**
9    **wasn't in the midst of all the transactions**
10   **when things occurred. He came**
11   **latter -- later, after -- after he**
12   **terminated everyone.**
13   Q. After you no longer worked at Teupen, did
14       you become aware that Mr. Borutta may have
15       asked for the cell phone to be returned to
16       Teupen?
17   **A. If you would bring up the document that he**
18   **sent to me, the termination letter, does it**
19   **say there? I don't recall.**
20   Q. I'm not referring to a letter specifically.
21       I'm asking, did he ever -- or did
22       you ever become aware that Teupen was
23       seeking the iPhone 8 that you had to be
24       returned to Teupen?
25   **A. No.**

250

1    Q. I wanted to ask you about your work laptop.
2        Actually, before I do that, what is
3        your -- is your personal e-mail address M,
4        as in Marjorie -- I'm sorry, I'm going to
5        mispronounce your last name, but
6        Pacheco71@gmail.com, and it's P-a-c-h-e-c-o?
7    **A. Yes.**
8    Q. Does anyone else have access to that e-mail
9        account?
10   **A. No.**
11   Q. When you were employed at Teupen, did anyone
12       else have access to your work e-mail
13       account?
14   **A. No.**
15   Q. And your work e-mail account was
16       macevedo@teupen-usa.com?
17   **A. Yes. I mean, let me rephrase that.**
18   **I mean, the IT department had**
19   **access. Martin had access as well with the**
20   **permission -- after he -- you know, he's**
21   **granted permission from the IT department.**
22   **So, Martin had access. I don't know if Andy**
23   **had access, but the IT department had**
24   **access.**
25   Q. Are you aware of anyone at Teupen who might

251

1    have had access to your work e-mail account
2    sending an e-mail from that account to your
3    personal e-mail account at G-mail?
4    **A. I -- I don't know.**
5    Q. You're not aware of any e-mails that were
6    sent?
7    **A. At this point, I don't know what went on**
8    **behind the scenes.**
9    Q. Well, I'm asking about e-mails from your
10   work e-mail account to your personal G-mail
11   account that were not sent by you.
12       Are you aware of any such e-mails?
13   **A. Not to my recollection.**
14   Q. Okay. All right. So I'd like to ask you
15   about your work laptop.
16       When you left the Teupen offices on
17   December 30th, 2019, where was your laptop
18   on that day?
19   **A. My work laptop was on my desk.**
20   Q. At the office?
21   **A. At the office.**
22   Q. And when you left that day, did you take it
23   home with you?
24   **A. No. So my work laptop always remained at**
25   **the office. So I used a spare laptop so**

252

1    **when -- for when I was working from home**
2    **that I often left at home.**
3    Q. And that spare laptop was also Teupen's?
4    **A. Yes.**
5    Q. So as of December 30th, 2019, the spare
6    laptop was at your house the entire day; is
7    that right?
8    **A. Correct.**
9    Q. And after your employment was terminated in
10   January of 2020, what attempts did you make
11   to return the laptop to Teupen?
12   **A. What -- I -- I surrendered my laptop to my**
13   **attorney.**
14   Q. What day did you do that?
15   **A. It was in January. I don't recall the**
16   **specific day. It might have been around the**
17   **20th, I believe. I don't -- you have the**
18   **document. You have the e-mails.**
19   Q. Why didn't you return it personally to
20   Teupen?
21   **A. They dismissed me. I was under disability;**
22   **anxiety and depression. When I -- when I**
23   **decided to go -- to call an attorney, she**
24   **said she will handle my case, so it went to**
25   **her hands. And I felt -- I rest assured**

253

1  that she was going to handle it, so it was
2  out of my hands.
3  Q. Were you able to -- between the time that
4  your employment was terminated with Teupen,
5  and the date that you gave your laptop to
6  your attorney, were you able to drive?
7  A. No.
8  Q. You were not able to --
9  A. I didn't want to drive. I was accompanied
10  by my husband, and we dropped it off.
11 Q. Why didn't you drop off the laptop at
12  Teupen's offices?
13 A. I just said -- I just repeated -- I just
14  gave you an answer. My attorney was under
15  control. She was to handle everything once
16  we decided we were going to file a claim.
17  So, I dropped it off to her. When I
18  received the letter of dismissal and
19  requesting the equipment to come back, I
20  wasn't given any box to return.
21      When I was working for CDM Group in
22 New York, and they wanted the -- their
23 laptop back, they're sending me all the
24  equipment; the return address -- the return
25  postage or UPS, I don't recall, the box.

254

1      I didn't have to provide that. I
2  mean, I didn't was sent any box or any UPS
3  pickup for the property. So I handed it
4  over to my attorney, and I felt that she was
5  going to handle it the appropriate way.
6  Q. Without telling me what the advice was, did
7  you give the laptop to your attorney based
8  on advice of counsel?
9      MS. GESSNER: Object to form. I'm
10  going to instruct her not to answer this.
11  She can't answer the question without
12  telling you what she was told by my office,
13 and you know that. It's a completely
14  inappropriate question. Move on.
15      This -- the whole story is part of
16  the pleading in front of the Court, you have
17  it, including Ms. Acevedo's declaration.
18      MR. KLASS: Well, I'm entitled to
19  ask questions about what evidence has been
20  provided to the Court. And I don't want at
21  this point to know the legal advice, but if
22  it was provided to your office based on
23  legal advice, I think I'm entitled to know
24  if that's the case.
25      So not the reasoning behind it, I'm

255

1  not -- I'm not interested in that. I just
2  want to know if it was -- whether there was
3  a privilege there that caused that action to
4  occur.
5      MS. GESSNER: Same objection, and
6  I'm instructing her not to answer this
7  question.
8  BY MR. KLASS:
9  Q. Did you ever consider mailing or FedExing
10  the laptop back to Teupen yourself?
11 A. No.
12 Q. Why not?
13 A. I wanted it out of sight and out of mind.
14  So I dropped it off to my attorney.
15 Q. What date did you engage your attorney to
16  represent you regarding your claims against
17  Teupen?
18 A. I don't recall.
19 Q. Was it before you were separated from
20  employment or after?
21 A. I don't recall.
22 Q. Is there anything that would cause you to
23  recall that?
24 A. No. I mean, I don't -- I don't recall how
25  I -- again, I was destroyed. I was just

256

1  seeking for help and advice.
2  Q. Do you recall if you engaged counsel before
3  or after December 30th, the day that you
4  were demoted?
5  A. I don't recall.
6  Q. Do you know when your laptop was returned to
7  Teupen?
8  A. I'm not -- cannot recall the exact date. I
9  know that she was working at providing it or
10  submitting it to the counsel that Teupen
11  had, which was Parker Poe. I know there was
12  a back-and-forth. And she discovered that
13  Parker Poe was not defending Teupen. And I
14  don't know what -- you know, what was the
15  back-and-forth. I -- she tried to reach out
16  to Martin. Again, he's hard to contact and
17  respond.
18      So, to me, it was out of sight, out
19  of mind, and I felt rest assured and at
20  peace that my attorney had it.
21 Q. Did you ever access the laptop after you
22  were demoted on December 30th, 2019?
23 A. No. Martin disabled my laptop.
24 Q. And when you say "disabled," what do you
25  mean by that?

257

1  A. He contacted IT, and -- because he wanted to
2  gain access to information on my e-mail. So
3  I wasn't able to get in. So, I was locked
4  out of it. I believe I made a call to the
5  IT department. They said, This is Martin's
6  request. If you want to have -- if you want
7  anything answered or have a discussion, you
8  can speak to him about it. And that was it.
9  So I never gained access to the laptop.
10 Q. Do you know when that was?
11 A. I don't recall the date and time.
12 Q. Was it before or after December 30th, 2019?
13 A. I don't recall the date and time. I'm sure
14 it's in the declaration, where I was more
15 clear when I made the declaration. I don't
16 know and have it -- those documents in front
17 of me. So I won't be able to answer that.
18 Q. What documents are you referring to?
19 A. The declaration that explained all the
20 details about the equipment.
21 Q. When -- do you know if you called
22 Network Essentials before or after your
23 termination date with Teupen occurred?
24 A. It was clearly before the termination date,
25 because I was terminated via e-mail when I

258

1  was under disability.
2  Q. Do you recall why you were attempting to use
3  your computer at that time?
4  A. Because I needed to work. So it could have
5  been even before -- now that you're
6  refreshing my memory, it could have even
7  been before December 30th, where I was maybe
8  at the time on the week that I was off, and
9  I was trying to get some work done, and I
10 realized I didn't have access to the
11 computer.
12 Q. You said you had two laptops. You had a
13 spare laptop and a work laptop.
14     And when -- when you worked from
15 home, was that always on the spare laptop,
16 or was it also sometimes on the work laptop?
17 A. During my time with Teupen, I always had a
18 laptop. Everyone always -- had a laptop.
19 That was their main computer. I mean, there
20 may have been times when I would take that
21 exact same computer and take it with me and
22 work from home.
23     But when I had access -- after all
24 the turnover, I had access to another laptop
25 that I made it to use. So instead of take

259

1  it -- unplugging and plugging in my laptop
2  from work, I used the other laptop to use
3  from work.
4  Q. So did you ever use your -- your -- the
5  laptop that you used when you were in the
6  offices, did you ever bring that home to use
7  it from home?
8  A. I just said that, that there would have been
9  times that I used the main laptop and -- and
10 then used the spare. I mean, everything is
11 on the ShareDrive. So e-mail, everything,
12 is from the same. All I needed was a
13 log-in, so same log-in, same information, I
14 was able to access from both laptops.
15 Q. When you say that your -- your -- what was
16 your wording, your account was deactivated?
17 I don't want to misstate what you told me.
18 A. I -- I don't know what you're referring to.
19 You will have to repeat the question or the
20 answer --
21 Q. You said you were -- you said you were
22 locked out or your account was deactivated,
23 and you didn't use the laptop?
24 A. Well, if I couldn't get in, I didn't have
25 access, or they changed my password

260

1  temporarily or indefinitely, I couldn't get
2  in. So, you can't have access to the laptop
3  if you can't log in.
4  Q. So when you boot up the computer and turn it
5  on, and there's an initial sign-on page, is
6  that what you're referring to?
7  A. Yes.
8  Q. And you're saying that you typed in your
9  password, and it wouldn't let you on?
10 A. Yes.
11 Q. And that's when you called
12 Network Essentials to find out what was
13 going on?
14 A. Correct.
15 Q. Prior to December of 2019, had you ever been
16 treated or evaluated by a psychiatrist or
17 psychologist or other mental health provider
18 in the last ten years?
19 A. By "other healthcare provider," can you
20 elaborate on that.
21 Q. Prior to December 2019, in the -- in the ten
22 years prior to that, have you ever been
23 treated or evaluated by a psychiatrist,
24 psychologist, or mental health provider?
25 A. Prior to December 2019?

261

1  Q. Yes.
2  A. No, not while I was at Teupen.
3  Q. Are you still being treated for anxiety or
4     depression?
5  A. No, I'm -- like I said, I didn't have
6     insurance, so I wasn't able to follow up
7     with the doctors when I needed it the most.
8     So I just coped with it and hoped for the
9     better, and -- and sought out other means.
10 Q. So if the -- if your doctor's notes or
11    records wouldn't reflect the length of time
12    that you had anxiety or depression, how long
13    would you say you suffered from either of
14    those conditions following the end of your
15    employment with Teupen?
16 A. I mean, I can't -- I can't pinpoint that.
17    I'm still suffering it. As you see, I can
18    even have a breakdown just talking about and
19    reminiscing and talking about what -- what I
20    was put through.
21       That's -- that's marred for life.
22    You know, like, that's in my brain, it's in
23 my heart, it's my emotions. So if I'm going
24    to continue to talk about what Teupen has
25    done and how they sabotaged me and how they

262

1     treated me, then it will surface up.
2  Q. Have you sought treatment for anxiety or
3     depression or any other mental health
4     concern since you obtained health insurance
5     through Signature Healthcare?
6  A. No, I did not.
7  Q. Have you always told the truth to your
8     doctors?
9  A. Yes.
10 Q. Did you have any events in your life outside
11    of Teupen, during the course of your
12    employment with Teupen, that caused you
13    emotional distress?
14 A. No.
15 Q. Have you had any events causing you
16    emotional distress in your life since your
17    employment with Teupen ended?
18 A. No.
19 Q. You don't believe that Teupen intended to
20    cause you emotional distress, correct?
21 A. I believe that they treated me unfairly. I
22    believe that they didn't like me being a
23    Latin female and -- and having the position
24    I held. And I believe, in the midst of the
25    whole transition, they probably wanted to

263

1     get rid of me.
2        I have that belief, because of the
3     way they treated me. They disregarded my --
4  my meetings and talking about how I'd been
5     treated. I had no one to go to. There was
6     no HR department. So, they were
7     finding -- they were finding ways for me to
8     leave, and because I had strong skin and
9     wanted to continue on and continue to do my
10    work, they had -- they had to do it like
11    this.
12       I mean, I -- I'm -- I -- I have
13    great work ethics. I'm a work alcoholic. I
14    gave Teupen many hours of my time. I --
15    I -- I even worked from home. That's why I
16    took the laptop home, so I could work from
17    home. I was committed. I was dedicated. I
18 did what I did, because I loved my job. I
19 loved my position.
20       But I wasn't treated fairly, and --
21    and -- and that was unfair, you know, and
22    that's why we are where we are today.
23 Q. After you took over Sheri Geraghty's job
24    duties in the summer of 2019, approximately
25    how many hours would you work for Teupen

264

1     each week up until the time that you were
2     terminated from employment?
3  A. I'm sorry, can you repeat the question.
4  Q. Sure. How many hours did you work for
5     Teupen each week on average between the time
6     that you assumed Sheri Geraghty's job duties
7     in the summer of 2019 and when you stopped
8     working for Teupen in January of 2020?
9  A. Well, I mean, I would put in 12 hours
10    long -- a day. You know, I would go in at
11    9:00, 9:00 a.m., and I wouldn't leave
12    there until about 9:00 p.m. daily. You
13    know, if you -- if you -- 12 hours a day, 5
14    days a week, that's 60 hours. That's almost
15    a whole 80 hours in one week.
16 Q. And did you put in those hours consistently
17    during that time period from summer of 2019
18    up until the time that you stopped working
19    for Teupen?
20 A. Yes, it was consistently, because like I
21    said, I didn't have a backup. I didn't have
22    no one to do the work for me. I went above
23    and beyond. I was accounting manager, and
24    there was no controller and no VP of
25    finance. So I did, to the best of my

265

1   **ability, what I could do to provide the**
2   **financials.**
3   Q.  Did you ever work weekends?
4   **A.  Yes, there were times that I would come into**
5   **the office on the weekends.**
6   Q.  How frequently?
7   **A.  I can't recall.  I mean, I try not to.  I do**
8   **have a family.  My husband used to get upset**
9   **with me, because I was putting in too many**
10  **hours of work.  It wasn't worth it.  I've**
11  **lost sleep.  I -- I was sleep deprived, you**
12  **know, but I was just trying to do my job.  I**
13  **was trying to do what I needed to do.**
14  Q.  Did you ever talk to Martin Borutta about
15  how many hours you were working?
16  **A.  I'm sure it was mentioned, which is the**
17  **reason why I can justify asking for an**
18  **increase in pay.**
19  Q.  Did you ever ask him to -- for help, like
20  hiring another person to work with you or
21  assume some of your job duties?
22  **A.  I -- I believe I asked him, in the beginning**
23  **when Sheri left, that they were -- he said**
24  **he was looking for someone.  I mean, I**
25  **believed him.  I believed that there was**

266

1   **going to be someone else that, you know,**
2   **would -- would take these responsibilities,**
3   **you know, from me.**
4   Q.  Other than right after you assumed the
5   duties of Sheri Geraghty, did you ever
6   follow up with Martin and ask him later on
7   if someone else could help you with those
8   job tasks?
9   **A.  I could -- like I said, I rarely saw the**
10  **man.  And when he was in town, because he**
11  **lives in Germany, like, he was only here to**
12  **do certain things, and if I had two minutes**
13  **of his time, that was too much.**
14  Q.  Other than what you have testified earlier
15  today, do you recall any other statements by
16  Andy Liebl that you viewed to be harassing
17  or discriminatory or retaliatory based upon
18  your national origin, your sex, or your
19  claim disability?
20  **A.  That was way too long.  Can you repeat that**
21  **question.**
22  Q.  Sure.  Other than what you've testified
23  about earlier, are there any other
24  statements that you recall Andy Liebl making
25  regarding discrimination, harassment, or

267

1   retaliation based upon your national origin,
2   your sex, or your claim disability?
3   **A.  I'm sorry, I -- I don't -- I don't recall.**
4   **I don't -- I don't understand the question.**
5   Q.  Are there any statements that you have
6   told -- that you have not told me about yet
7   today that you perceived to be
8   discriminatory in any way based on your
9   national origin, sex, or claim disability
10  from Andy Liebl?
11  **A.  Whatever the statement he said, I already**
12  **put it in writing, so I can't recall at the**
13  **moment.**
14  Q.  Same question for Gerri Molyn, are there any
15  statements of hers that you haven't
16  testified about today that you believe were
17  discriminatory or retaliatory or harassing
18  in any way related to your national origin,
19  your sex, or your claim disability?
20      MS. GESSNER:  Object to form on
21  multiple reasons.  Compound question, lots
22  of asked and answered, doesn't include other
23  documents presented in this case.
24      So, Counsel, again it seems that
25  you're trying to intentionally affect this

268

1   witness or ask improper questions.  If you
2   want to break it down piece by piece, please
3   do so, but a compound question, just like
4   you've asked now repeatedly, is completely
5   improper.
6       MR. KLASS:  That was not a compound
7   question.  And what was improper was your
8   speaking objection, which I think is now at
9   least the fourth or fifth time you've made
10  an improper speaking objection, and you are
11  influencing the witness' testify by doing
12  so.
13      MS. GESSNER:  Absolutely not.  Wait
14  a minute.  Absolutely not, David.
15  Absolutely not, David.  I have barely said
16  anything today, and only when you have
17  attempted to obstruct this deposition,
18  harassed this witness, and not followed the
19  basic Rules of Civil Procedure.
20      So if you want to ask her a
21  question and break it down, do it.  But she
22  just told you repeatedly she didn't
23  understand the question; it was too long.
24  She said that unprompted by me.
25      So, again, you're speaking

269

1    statements about what has or hasn't happened
2    today are absolutely unnecessary, and we'll
3    have the recording, including the Zoom
4    recording, at the end of this to be able to
5    show the Court, if necessary, exactly what
6    happened today.
7           MR. KLASS: Thank you. I will
8    reask my question now.
9    BY MR. KLASS:
10   Q. Ms. Acevedo, do you recall any statement by
11   Ms. Molyn that you believe was
12   discriminatory in any way related to your
13   national origin that has not been previously
14   stated by you today?
15 A. No.
16   Q. Do you recall -- or I'll strike that.
17          Were there any statements by
18   Ms. Molyn that you believed to be
19   discriminatory in any way related to your
20   sex, which you have not already testified to
21   today?
22 A. No.
23   Q. Are there any statements of Ms. Molyn, other
24   than the statements you've already testified
25   today, that you believe to be discriminatory

270

1    in any way related to your claim disability
2    in this case?
3  A. I mean, did she cause me anxiety and
4     anxious, and -- yes.
5    Q. I'll -- I'll rephrase.
6           I'm asking if there are any
7    statements that Ms. Molyn made that you
8    perceived to be discriminatory against you
9    based upon your claim disability in this
10   case, and that you haven't already told me
11   about today?
12 A. I believe I mentioned it all, but you'll
13    find all the facts in the declaration as you
14    have before you.
15   Q. All right. I'm going to ask the same
16   questions for Mr. Liebl, because counsel has
17   made objections that they were compound.
18          So, regarding Mr. Liebl, are there
19   any statements or conduct that you believe
20   he made that you believe are discriminatory
21   against you based on your national origin
22   that you have not already testified today?
23 A. The only thing I can recall is that he
24    cursed a lot. So he was -- he had a gutter
25    mouth. I mean, it could have been offensive

271

1     towards me. He spoke a lot of German, and
2     he could have been insulting me in his
3     language, but he was way out of line.
4    Q. Were any of his -- was any of his profanity
5     directed at you because of your national
6     origin?
7  A. Sure.
8    Q. How so?
9  A. He often said, Stupid, you know. He often
10    said -- you know, mumbled as well. Like, I
11   can't capture every word, but I understood
12    that it was against me after us having a
13    discussion or something.
14   Q. And how does that relate to it being
15    discriminatory based on your national
16    origin?
17 A. I already answered that question. There's
18    nothing more for me to say.
19   Q. Okay. Other than what you just told me and
20    what you testified today, are there any
21    other statements or conduct by Mr. Liebl
22    that you believe to be discriminatory in any
23    way against you based on your national
24    origin?
25 A. I already answered that. There's nothing

272

1     further for me to say.
2    Q. Okay. Are there any statements or conduct
3     by Mr. Liebl that you have not already
4     testified about today that you believe to be
5     discriminatory in any way against you based
6     on your sex?
7           MS. GESSNER: Object to form.
8    Again, Counsel, you keep saying "testified
9     to a day -- today," and it seems, once
10    again, trying to play games and trying to
11    trick her. There's a tremendous amount of
12    documents that have been produced in this
13   case, as well as discovery responses and
14   affidavits.
15          And so now you're trying to get her
16    to testify to things that you are already
17 aware of that are already in the record.
18 So, I'd like you to preface your
19    sentence -- your question with -- you know,
20    if you want to ask her about anything and
21    everything, include anything and everything.
22          Otherwise, she needs to testify
23    about what -- all the pleadings that have
24 been filed in this case, her prior
25 affidavits, her discovery responses,

273

1  of which -- that you never marked not even a
2  single exhibit and went through with her,
3  and now you're trying to ask whether there's
4  anything else other than what she's stated
5  today.
6       Again, it's just gamesmanship. So
7  please stop. Preface your question so that
8  it is a complete question, and move on.
9       MR. KLASS: Thank you for another
10 speaking objection that is improper. I will
11 ask --
12      MS. GESSNER: It is not a
13 speaking --
14      MR. KLASS: -- another question
15 now.
16      It is not a speaking -- wait a
17 minute. Stop. Don't talk over me. It is
18 not a speaking objection. You have once
19 again attempted to try to harass and
20 obstruct this deposition, be very rude to
21 this witness, put words in her mouth, as
22 you've attempted to do all day,
23 understanding that there's a far more, you
24 know, robust record than just this
25 deposition today.

274

1  So your question is just in this
2  deposition, as opposed to in this case. And
3  so, Counsel, again, you keep thanking me for
4  helping you. I'm helping you so that you
5  have a full record, maybe one you don't
6  want, and I'd ask that you conduct yourself
7  professionally and appropriately and not try
8  to mislead this witness.
9       MR. KLASS: Thank you. You are not
10 helping me, but I will move on and ask
11 another question.
12      MS. GESSNER: Well, Counsel, every
13 time I've objected or said anything, you've
14 changed the way that you have approached the
15 question, and you have followed in line with
16 what is proper, and so in effect, I have
17 helped you. So please do move on.
18 BY MR. KLASS:
19 Q. Ms. Acevedo, apart from the statements that
20 you have testified about today, do you
21 recall any other statements, as you sit here
22 today, that Mr. Liebl made that you believe
23 to be discriminatory against you based on
24 your sex?
25 A. I already answered the question.

275

1  Q. I didn't hear the answer.
2       What was the answer?
3  A. It's the same question. I have nothing
4     further to say.
5  Q. Okay. And I've got one last question on
6     this topic.
7       Other than what you testified about
8     earlier today, are there any other
9     statements by Mr. Liebl that you recall that
10    you believe to be discriminatory in any way
11    related to your claim disability in this
12    case?
13      MS. GESSNER: Object to --
14      THE WITNESS: It's the same
15 question.
16      MS. GESSNER: Wait a minute.
17 Object to form. Counsel, again, are you
18 limiting her testimony only to what you
19 asked her today or what you are very well
20 aware is -- has been made available to you
21 and to Defendant throughout this case as it
22 relates to Mrs. Acevedo's statements and
23 claims.
24      MR. KLASS: So I am asking her what
25 the conduct or statements are that she is

276

1  alleging to be discriminatory in this case.
2       MS. GESSNER: But you keep --
3       MR. KLASS: And we both have -- let
4  me finish.
5       MS. GESSNER: Counsel --
6       MR. KLASS: Let me finish, please.
7       MS. GESSNER: Wait a minute,
8  Counsel, you keep --
9       MR. KLASS: Don't talk -- no, no,
10 do not talk over me.
11      MS. GESSNER: Yep, yep, yep.
12 Counsel, Counsel, Counsel.
13      MR. KLASS: I've allowed you to
14 talk. Do not interrupt me.
15      MS. GESSNER: Counsel, you keep
16 prefacing "in this deposition," not "in this
17 case." That is your problem with the
18 question.
19      "Have you told me everything today
20 in this deposition," as opposed to "In this
21 case, have you provided." It's a very
22 different question, and I'm not going to let
23 you play games with her.
24      MR. KLASS: Well, you can make your
25 form objection, but under the rules, she

277

1 still has to answer it.
2     MS. GESSNER: Well, I'm also going
3 to make my objection and make sure she
4 understands exactly what she's being asked,
5 because you want her to answer differently.
6     MR. KLASS: No, that's a speaking
7 objection. That's improper under the rules.
8 And if you interfere with this witness'
9 testimony, we can go before a magistrate
10 judge.
11     MS. GESSNER: Okay. Mr. Klass, I'm
12 happy to go before Judge Cayer with you.
13 She's told you repeatedly several times
14 today she hasn't understood your question,
15 and you continue to say "in this
16 deposition," and in a way that you're going
17 to attempt to use this to say, If she didn't
18 bring it up in the deposition, it doesn't
19 exist. That's not how litigation or
20 discovery works, and you should know that by
21 now.
22     MR. KLASS: Counsel, I have
23 literally one more question on this topic,
24 so if --
25     THE WITNESS: I would like to take

278

1 a break right now, please.
2     MR. KLASS: You'd like to take a
3 break? Sure.
4     THE VIDEOGRAPHER: We're going off
5 the record. The time is 16:25 Central.
6     (Break taken.)
7     THE VIDEOGRAPHER: Going back on
8 the record, the time is 16:35 Central.
9 BY MR. KLASS:
10 Q. Ms. Acevedo, since you left working for
11    Teupen, have you communicated with any
12    current or former employees of the company?
13 A. I'm sorry, can you repeat the question.
14 Q. Since you left working for Teupen in January
15    of 2020, have you communicated with any
16    current or former employees of Teupen?
17 A. I did talk to James Crawford.
18 Q. Do you recall when that was?
19 A. I don't recall the specific date and time.
20 Q. What was the topic of conversation?
21 A. That he was a witness; he heard how I was
22    being treated on December 30th, 2019; and
23    that right after I left, they went --
24    they -- Andy and Geraldine went into my
25    computer and were searching for stuff,

279

1    so -- but he heard everything, and he -- he
2    was on my side.
3 Q. Who initiated that communication?
4 A. He did.
5 Q. Was it a phone call?
6 A. Yes.
7 Q. Was it a single communication you had with
8    him?
9 A. Yes.
10 Q. Were his comments only directed at
11    December 30th, during the -- regarding the
12    meeting with Andy and Gerri and what
13    happened immediately after, or did it relate
14    to anything else?
15 A. Just what he heard on that day.
16 Q. Other than talking with him, did you talk to
17    any other current or former employee of
18    Teupen after you left employment there?
19 A. I think someone else tried to reach me. I
20    don't recall speaking to him.
21 Q. Anyone else you can think of?
22 A. There was one other person that reached out
23    to me. I can't recall his name.
24 Q. Did you talk to this person?
25 A. I don't recall if we actually had a

280

1    conversation, or he left me a message,
2    or -- but said that -- I think he called me
3    and said that -- that James -- he had spoken
4    to James, and that he heard the
5    conversation, and that I was -- that James
6    was going to call me or something like that.
7    I don't remember the exact conversation,
8    but...
9 Q. Do you recall having conversation -- any
10    other conversations with any current or
11    former employees of Teupen after you left
12    employment?
13 A. No.
14 Q. I've asked you a lot of questions today.
15     Are there any answers to those
16    questions, now that you've had some time to
17    reflect on them, that you would like to
18    change or add to or modify?
19 A. I think at one point you mentioned if I had
20    spoken to anybody about what was going on
21    and my condition. I just wanted to be clear
22    that the only person I ever spoke to about
23    the situation I was going through at work,
24    aside from Teupen, was my husband, Luis.
25     There's a lot more of retaliation

281

1    that I experienced with Andy. **I can't**
2    **recall all in detail today, but I know**
3    **there's more.**
4  Q. What -- do you know of anything that would
5    refresh your memory?
6  **A. No, it's just been an overwhelming day for**
7    **me. I'm sorry, I didn't expect for this to**
8    **be the way it is and bring back emotions.**
9    **So I -- I -- I can't recall anything further**
10   **at this point.**
11        MR. KLASS: I don't have any
12   further questions at this time. Your
13   attorney might have questions for you.
14        MS. GESSNER: No questions.
15        MR. KLASS: At this time then, I
16   would like to suspend this deposition until
17   it can be reconvened later. Defendant at
18   this time is reserving the right to seek
19   Court intervention regarding Plaintiff's
20   Counsel's instruction to the witness not to
21   answer questions regarding return of the
22   company laptop at Teupen. And we would like
23   to suspend the deposition, so that we can
24   get the Court's guidance before concluding
25   it.

282

1        MS. GESSNER: We absolutely object
2    to suspending this deposition. Ms. Acevedo
3    will not be presented again. Counsel's one
4    and only question that Ms. Acevedo was
5    instructed not to answer absolutely clearly
6    asked her for what my office, her legal
7    counsel, told her, which is clear
8    attorney/client privilege.
9        We will not present this witness
10   again. She has been here for almost seven
11   full hours today. Defendant has had plenty
12   of time to ask whatever questions they
13   choose to ask that are proper, not seeking
14   conversations with counsel, which is the
15   only question objected to. And we
16   absolutely will oppose and seek fees, costs,
17   and sanctions for any attempt to re-depose
18   Ms. Acevedo.
19        MR. KLASS: Thank you. For -- for
20   clarification of the record, is it correct
21   that you would object to any conversations
22   that Ms. Acevedo had with you regarding
23   return of the laptop and any steps you did
24   or did not take to return the laptop to
25   Teupen; is that understanding correct

283

1    that --
2        MS. GESSNER: Counsel, Counsel,
3    Counsel, I'm not your witness. My objection
4    was clear. You asked her, did she refuse to
5    return the laptop on the advice of counsel,
6    which expressly seeks from her what she was
7    told from counsel. It's 100 percent
8    improper.
9        I'm not your witness. I'm not
10   answering your questions. That's the only
11   single question we instructed her not to
12   answer today, and we are not presenting this
13   witness again.
14        MR. KLASS: Well, we reserve the
15   right to seek Court intervention, and this
16   deposition will be suspended at this time.
17   At this time --
18        MS. GESSNER: Well, again, Counsel,
19   we --
20        MR. KLASS: -- Defendant has no
21   further questions.
22        MS. GESSNER: We will read and sign
23   the transcript. We will order an electronic
24   copy only, and we will not present this
25   witness again. And I would like to

284

1    understand what is the time frame to get a
2    final written transcript.
3        THE VIDEOGRAPHER: Would you like
4    to go of the record, Counsel?
5        MS. GESSNER: No, I would not like
6    to go off the record. Given the conduct of
7    opposing counsel throughout this case, it is
8    very important that everything be on the
9    counsel.
10        THE REPORTER: Okay. I'm going to
11   try and write what I'm saying to you then
12   and speak at the same time. It's a ten-day
13   turnaround, ten business days.
14        MR. KLASS: All right.
15        MS. GESSNER: Okay. Thank you,
16   Ms. Jensen.
17        THE REPORTER: Yep.
18        THE VIDEOGRAPHER: All right. If
19   there's nothing else --
20        THE REPORTER: Can I get your
21   order, Mr. Klass.
22        THE VIDEOGRAPHER: Just one second.
23   This marks the end of the deposition of
24   Marjorie Acevedo. We're going off the
25   record at 16:44 Central.

285

1      THE REPORTER:  I just wanted that
2  on the record.  Sorry.
3      Go ahead, Mr. Klass, what do you
4  need -- what would you like?
5      MR. KLASS:  I will need to consult
6  with my client before we make our order, but
7  we probably will make one, and we'll let you
8  know soon.
9      THE REPORTER:  Okay.
10     MR. KLASS:  Thank you.
11     (Deposition concluded at 4:44 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

286

1  STATE OF MINNESOTA )
2
   COUNTY OF DAKOTA   )
3
4      Be it known that I took the remote
   videotaped deposition of MARJORIE ACEVEDO on
5  October 14, 2021;
6      That I was then and there a notary
   public in and for the County of Dakota,
7  State of Minnesota, and that by virtue
   thereof I was duly authorized to administer
8  an oath;
9      That the witness before testifying
   was by me first duly sworn to testify the
10 whole truth and nothing but the truth
   relative to said cause;
11
       That the testimony of said witness
12 was recorded in stenotype by myself and
   transcribed into typewriting under my
13 direction, and that the deposition is a true
   record of the testimony given by the witness
14 to the best of my ability;
15     That I am not related to any of the
   parties hereto nor interested in the outcome
16 of the action;
17
       Witness my hand and seal this 27th day
18 of October, 2021.
19
20  _____
       ALEXIS JENSEN, RPR, CRR
21     COURT REPORTER
22
23
24
25

## A

**a-c-h-e-c-o**
11:1
**abbreviation**
200:9
**ability**
9:22, 64:7,
87:16, 265:1,
286:23
**able**
19:11, 19:25,
60:12, 68:7,
88:18, 105:15,
136:16, 189:2,
189:13, 233:17,
253:3, 253:6,
253:8, 257:3,
257:17, 259:14,
261:6, 269:4
**above**
85:15, 112:21,
225:2, 264:22
**absence**
71:11
**absolutely**
158:25, 268:13,
268:14, 268:15,
269:2, 282:1,
282:5, 282:16
**abundant**
63:17
**accept**
46:15, 46:16,
47:21, 114:6
**access**
77:13, 77:15,
77:19, 77:21,
136:15, 146:6,
250:8, 250:12,
250:19, 250:22,
250:23, 250:24,
251:1, 256:21,
257:2, 257:9,
258:10, 258:23,
258:24, 259:14,
259:25, 260:2
**accessories**
217:25

**accompanied**
253:9
**accord**
8:15
**accordingly**
64:17
**account**
36:1, 77:22,
91:1, 157:19,
157:20, 158:3,
164:11, 164:13,
189:14, 195:13,
207:10, 208:10,
219:19, 220:1,
220:7, 220:9,
220:10, 220:15,
235:22, 241:14,
241:19, 241:23,
242:22, 243:4,
243:24, 244:13,
245:22, 246:11,
246:15, 246:23,
247:5, 247:6,
247:13, 248:9,
248:15, 248:17,
248:21, 249:2,
250:9, 250:13,
250:15, 251:1,
251:2, 251:3,
251:10, 251:11,
259:16, 259:22
**accountant**
55:14, 55:16,
56:9, 87:15,
103:9, 117:15,
122:22, 182:14,
182:25, 187:12,
199:11
**accountholder**
248:10
**accounting**
15:16, 20:19,
20:20, 20:21,
21:15, 21:20,
34:9, 34:14,
34:17, 34:24,
36:7, 36:14,
38:20, 56:20,

56:21, 56:24,
57:5, 57:17,
65:2, 65:23,
65:24, 66:5,
66:14, 67:4,
67:20, 68:5,
68:20, 69:7,
69:18, 70:1,
70:3, 90:12,
90:18, 91:5,
102:6, 102:11,
102:12, 103:9,
103:21, 105:18,
110:6, 112:20,
123:4, 126:9,
154:1, 167:11,
200:4, 236:3,
264:23
**accounts**
56:23, 109:25,
163:20, 167:12,
182:13, 182:25,
183:2, 199:14,
240:18, 240:22,
248:10
**accrual**
91:18
**accurate**
68:4, 98:7,
110:17, 152:20,
155:2, 232:20,
235:6, 235:7
**accurately**
65:22, 103:8,
104:5, 191:11,
191:18
**accusation**
153:3
**accusations**
161:21
**acevedo**
1:5, 1:17, 3:3,
4:23, 5:13,
5:16, 6:14,
6:19, 10:17,
10:19, 11:13,
11:16, 14:19,
19:19, 20:9,

32:9, 38:17,
38:24, 53:4,
54:9, 58:22,
64:1, 64:24,
67:19, 68:16,
94:14, 95:9,
96:12, 97:10,
97:13, 97:25,
99:7, 129:18,
137:6, 137:20,
138:17, 139:5,
145:21, 151:10,
151:12, 157:6,
157:8, 157:10,
162:3, 162:4,
164:18, 164:19,
165:16, 168:19,
192:23, 193:2,
197:8, 197:22,
207:1, 207:2,
207:3, 212:10,
212:11, 216:16,
216:24, 232:9,
244:11, 244:16,
269:10, 274:19,
278:10, 282:2,
282:4, 282:18,
282:22, 284:24,
286:6
**acevedo's**
60:22, 63:19,
254:17, 275:22
**across**
106:12
**action**
1:7, 140:12,
255:3, 286:26
**actions**
190:6, 213:19
**actual**
69:19, 76:3,
127:17, 151:25,
187:14
**actually**
60:19, 68:4,
68:20, 76:6,
132:14, 138:3,
188:13, 200:21,

228:13, 243:20,
250:2, 279:25
**add**
247:7, 280:18
**addition**
13:6, 13:17
**additional**
6:2, 45:20,
45:24, 50:5,
60:21, 85:1,
85:6, 87:1,
90:8, 90:13,
90:15, 91:9,
91:21, 94:16,
95:11, 119:17,
201:19
**address**
23:18, 23:21,
23:24, 23:25,
24:4, 24:12,
24:16, 24:25,
25:6, 25:7,
25:9, 25:18,
25:20, 25:22,
25:24, 26:2,
26:11, 26:21,
80:11, 168:20,
189:17, 189:18,
190:13, 190:19,
190:20, 232:20,
244:23, 245:9,
250:3, 253:24
**addresses**
24:21
**adjustments**
92:3, 92:5
**administer**
286:11
**administration**
58:10
**administrator**
65:2, 65:24,
66:6, 66:14,
221:25
**adriana**
12:12, 12:14,
12:16, 13:18
**adult**
12:4

**advance**
4:19
**advertisement**
32:14
**advice**
254:6, 254:8,
254:21, 254:23,
256:1, 283:5
**advised**
29:19
**affect**
267:25
**affecting**
124:20
**affidavits**
272:14, 272:25
**affiliated**
1:26
**afford**
233:17
**after**
15:18, 31:7,
39:8, 39:10,
43:5, 46:19,
47:10, 47:11,
47:21, 47:24,
48:15, 52:2,
64:1, 69:12,
72:20, 78:14,
82:6, 82:11,
83:8, 84:16,
85:19, 86:22,
90:1, 90:23,
93:12, 93:21,
94:1, 96:14,
98:21, 98:23,
99:10, 99:25,
100:4, 100:6,
101:12, 106:17,
115:2, 115:3,
115:7, 120:5,
123:14, 125:8,
125:15, 125:20,
142:25, 146:12,
151:4, 157:1,
162:7, 169:3,
173:17, 175:4,
183:18, 186:3,

201:21, 203:9,
204:25, 207:24,
210:19, 213:14,
218:2, 218:16,
218:20, 229:11,
230:14, 234:1,
234:2, 234:10,
234:17, 241:13,
242:7, 242:19,
242:21, 249:11,
249:13, 250:20,
252:9, 255:20,
256:3, 256:21,
257:12, 257:22,
258:23, 263:23,
266:4, 271:12,
278:23, 279:13,
279:18, 280:11
**afterwards**
125:13, 151:23,
155:9, 197:2
**again**
6:5, 27:4,
31:4, 31:12,
33:20, 33:23,
34:23, 36:24,
38:2, 38:10,
38:13, 39:24,
49:13, 53:12,
54:6, 56:19,
66:3, 68:6,
72:3, 74:20,
90:11, 92:1,
95:25, 100:3,
104:11, 106:19,
117:24, 120:9,
121:22, 122:14,
122:21, 127:8,
131:17, 134:3,
138:10, 148:5,
149:7, 154:8,
161:20, 171:12,
175:14, 176:16,
183:20, 185:9,
187:12, 187:15,
187:22, 192:7,
192:10, 198:14,
199:3, 199:22,

201:5, 208:11,
208:22, 210:2,
210:7, 212:24,
222:1, 224:3,
225:22, 243:25,
255:25, 256:16,
267:24, 268:25,
272:8, 272:10,
273:6, 273:19,
274:3, 275:17,
282:3, 282:10,
283:13, 283:18,
283:25
**against**
22:16, 22:17,
22:21, 22:24,
23:4, 23:8,
23:13, 29:14,
102:20, 113:24,
131:22, 132:9,
136:4, 139:7,
142:7, 149:10,
150:7, 154:8,
154:10, 155:17,
155:18, 166:10,
166:12, 166:17,
167:19, 190:7,
191:6, 195:6,
196:6, 199:24,
214:3, 227:23,
255:16, 270:8,
270:21, 271:12,
271:23, 272:5,
274:23
**agency**
23:9, 23:14,
32:14
**ago**
6:20, 46:6,
99:24, 163:4,
165:12, 205:23,
206:24
**agree**
7:22, 7:25,
9:1, 9:12,
19:21, 51:22,
53:4, 54:23,
126:3, 139:12,

139:15, 164:12,
171:1, 191:22,
191:24, 199:4
**agreed**
236:8, 245:23,
246:5
**agreement**
51:19, 51:23,
52:3, 52:4,
52:11, 53:5,
54:20, 139:17,
218:22, 218:23,
219:3
**ahead**
5:13, 13:11,
173:24, 198:20,
204:10, 221:9,
285:3
**alcohol**
9:21
**alcoholic**
263:13
**alexis**
1:19, 6:11,
286:32
**alike**
171:14
**all**
5:7, 10:2,
13:1, 36:7,
53:10, 55:5,
56:11, 57:21,
58:5, 60:17,
62:21, 64:24,
65:25, 66:7,
67:1, 68:7,
75:1, 75:5,
91:3, 91:11,
91:20, 92:5,
92:17, 92:18,
101:25, 106:1,
106:6, 111:11,
123:7, 124:12,
124:18, 128:6,
137:17, 145:2,
146:5, 147:23,
149:18, 165:14,
170:20, 171:15,

180:21, 182:15,
183:4, 184:24,
185:9, 186:13,
186:23, 187:18,
188:15, 196:1,
197:24, 200:2,
217:19, 222:2,
222:5, 225:2,
226:6, 227:24,
235:11, 237:22,
240:18, 246:2,
246:10, 249:9,
251:14, 253:23,
257:19, 258:23,
259:12, 270:12,
270:13, 270:15,
272:23, 273:22,
281:2, 284:14,
284:18
**allegations**
139:7, 139:9
**allege**
120:13
**alleged**
111:12
**alleging**
23:10, 23:15,
139:6, 192:19,
276:1
**allen**
158:11
**allow**
8:13, 204:15,
216:19
**allowed**
276:13
**allowing**
38:3
**almost**
264:14, 282:10
**along**
85:3, 88:21,
92:2, 120:14,
127:20, 163:8,
163:9, 165:20
**already**
75:9, 93:17,
93:24, 105:20,

119:16, 185:13,
207:5, 241:14,
267:11, 269:20,
269:24, 270:10,
270:22, 271:17,
271:25, 272:3,
272:16, 272:17,
274:25
**also**
2:25, 5:15,
5:19, 8:8, 44:7,
61:6, 73:19,
91:24, 109:17,
111:8, 114:19,
118:6, 124:5,
130:25, 132:14,
133:5, 133:6,
133:7, 133:24,
140:22, 141:6,
185:5, 185:24,
225:11, 252:3,
258:16, 277:2
**alternatives**
224:7, 224:11,
225:7, 225:9,
226:13
**although**
7:11, 8:7
**altogether**
38:23
**always**
83:15, 117:8,
117:16, 117:24,
118:9, 118:20,
120:24, 124:6,
140:9, 140:14,
160:1, 167:18,
169:12, 170:22,
171:22, 171:23,
173:14, 218:13,
235:8, 251:24,
258:15, 258:17,
258:18, 262:7
**amended**
137:3, 137:21
**america**
1:10, 4:24,
5:19, 6:22

**american**
129:23
**amount**
89:14, 162:13,
165:10, 272:11
**analyst**
30:23, 31:14,
31:18, 33:5,
34:8, 34:23,
35:3, 35:8,
35:21
**andrea**
101:20
**andreas**
98:13, 99:1,
99:9, 99:18,
101:15, 101:16,
101:18, 164:25
**andy**
101:8, 101:11,
101:16, 101:20,
101:23, 103:5,
108:2, 108:6,
108:23, 109:5,
110:22, 111:5,
122:9, 123:21,
124:1, 124:6,
124:7, 124:23,
125:6, 125:8,
126:14, 127:12,
127:19, 129:6,
129:24, 130:21,
131:14, 135:12,
135:16, 142:11,
144:7, 144:20,
144:23, 147:3,
150:6, 150:7,
152:10, 153:9,
156:6, 160:25,
161:18, 166:3,
166:12, 166:15,
166:20, 169:7,
169:16, 169:17,
170:13, 170:17,
171:2, 172:4,
172:5, 172:10,
174:15, 181:8,
182:6, 193:18,

193:23, 195:5,
195:18, 196:1,
196:10, 196:15,
198:13, 198:15,
198:16, 199:23,
202:20, 202:22,
203:15, 204:9,
204:16, 204:25,
205:17, 205:20,
205:21, 206:6,
208:14, 209:12,
209:13, 209:17,
210:8, 213:9,
213:19, 225:12,
226:5, 226:7,
226:17, 227:4,
228:11, 243:22,
250:22, 266:16,
266:24, 267:10,
278:24, 279:12,
281:1
**andy's**
110:4, 118:10,
120:7, 124:11,
171:20, 198:20,
205:20, 213:18
**announced**
61:2
**announcing**
216:17
**annually**
174:13
**another**
4:7, 22:19,
26:23, 26:24,
30:13, 43:22,
67:1, 93:24,
110:24, 132:12,
157:4, 162:1,
167:2, 169:20,
185:3, 206:22,
208:15, 216:3,
222:25, 224:20,
225:13, 258:24,
265:20, 273:9,
273:14, 274:11
**answer**
8:16, 9:6,

9:16, 24:19,
77:4, 94:3,
96:12, 114:3,
136:16, 139:3,
139:22, 140:17,
169:23, 170:11,
176:12, 176:20,
176:22, 177:4,
177:5, 177:7,
186:18, 206:20,
209:4, 218:11,
253:14, 254:10,
254:11, 255:6,
257:17, 259:20,
275:1, 275:2,
277:1, 277:5,
281:21, 282:5,
283:12
**answerable**
248:18, 248:22
**answered**
36:18, 75:9,
79:22, 117:8,
135:8, 248:3,
257:7, 267:22,
271:17, 271:25,
274:25
**answering**
53:23, 283:10
**answers**
8:14, 9:24,
38:4, 78:7,
280:15
**antagonizing**
203:16
**anticipate**
4:4
**antisocial**
179:6
**anxiety**
160:11, 160:12,
167:22, 211:25,
213:16, 214:6,
214:13, 215:8,
215:19, 215:25,
233:8, 252:22,
261:3, 261:12,
262:2, 270:3

**anxious**
214:8, 233:8,
270:4
**anybody**
133:2, 160:18,
209:10, 280:20
**anymore**
43:2, 231:20
**anyone**
7:9, 14:12,
28:17, 108:6,
108:24, 112:15,
124:24, 129:18,
130:9, 130:19,
164:7, 171:24,
171:25, 172:23,
178:18, 181:5,
186:13, 194:11,
194:15, 194:21,
194:24, 195:12,
199:21, 209:8,
210:16, 210:20,
213:11, 213:15,
214:12, 215:6,
215:12, 215:14,
215:21, 218:3,
223:8, 223:17,
243:17, 243:22,
244:1, 247:20,
247:25, 248:6,
250:8, 250:11,
250:25, 279:21
**anything**
28:23, 29:4,
29:9, 56:24,
66:1, 67:11,
76:25, 77:6,
92:7, 102:19,
103:23, 103:25,
109:15, 139:8,
154:24, 155:8,
159:11, 163:16,
181:20, 184:15,
194:17, 219:18,
220:6, 221:5,
227:16, 237:19,
255:22, 257:7,
268:16, 272:20,

272:21, 273:4,
274:13, 279:14,
281:4, 281:9
**anyway**
61:2
**anywhere**
25:16, 227:3
**apart**
38:18, 274:19
**apologies**
230:2
**apologize**
4:18
**appearance**
129:22
**appearances**
2:1
**appeared**
74:17
**application**
47:8, 175:17
**applications**
46:1
**applied**
25:25, 46:22,
48:2, 65:20,
98:20, 194:4,
241:3
**apply**
7:17, 99:10
**appointment**
170:16
**appointments**
144:13
**approach**
113:25, 120:22
**approached**
171:5, 181:19,
274:14
**appropriate**
254:5
**appropriately**
274:7
**approve**
103:17, 138:19
**approximately**
1:22, 105:12,
263:24

**april**
48:22, 48:24, 49:4, 49:22, 50:7
**area**
12:23, 34:19, 35:1, 35:5, 104:25, 106:3, 106:9, 241:10
**arguments**
127:16
**arised**
87:17
**around**
61:10, 70:18, 70:22, 71:7, 71:8, 73:6, 73:15, 73:18, 76:15, 82:12, 82:22, 83:2, 83:19, 84:22, 106:5, 112:14, 113:7, 133:23, 140:9, 140:15, 170:20, 172:22, 183:10, 186:9, 210:21, 225:19, 228:5, 252:16
**arrested**
22:8, 22:12
**arrogant**
111:17
**aside**
57:17, 58:1, 100:19, 146:25, 280:24
**asked**
6:4, 8:22, 9:15, 11:10, 24:20, 36:18, 36:20, 37:1, 37:22, 37:24, 41:4, 49:12, 71:12, 71:15, 71:17, 75:19, 77:20, 84:3, 96:6, 99:7, 106:16, 110:3,

117:2, 117:20, 133:1, 133:23, 134:19, 135:7, 166:20, 169:7, 169:10, 172:17, 173:25, 177:19, 180:15, 182:5, 182:6, 184:25, 192:9, 198:19, 203:25, 204:3, 206:15, 210:11, 229:21, 246:4, 246:5, 248:2, 249:15, 265:22, 267:22, 268:4, 275:19, 277:4, 280:14, 282:6, 283:4
**asking**
13:13, 16:21, 29:6, 36:21, 36:24, 37:3, 38:24, 40:8, 52:15, 58:25, 73:23, 74:23, 83:25, 86:7, 100:13, 100:25, 104:11, 114:1, 114:2, 115:4, 115:7, 115:12, 115:15, 116:21, 119:5, 121:25, 122:11, 122:16, 136:9, 137:14, 140:9, 145:21, 148:10, 153:23, 169:12, 173:20, 178:13, 184:11, 185:17, 188:24, 190:9, 192:8, 192:14, 198:17, 201:9, 201:23, 201:25, 206:6, 213:1, 213:3, 214:10, 214:25, 229:24, 235:24, 236:1, 237:5, 249:21, 251:9,

265:17, 270:6, 275:24
**asks**
200:18, 217:19
**asserted**
29:13
**asset**
91:25
**assigned**
78:5
**assist**
37:1, 94:2
**assistance**
81:3, 93:20
**assistant**
60:18
**associated**
241:18, 242:11, 242:17, 245:19
**assume**
100:12, 128:14, 244:21, 265:21
**assumed**
234:2, 264:6, 266:4
**assuming**
125:3
**assumption**
108:7
**assured**
252:25, 256:19
**at&t**
179:12, 180:7, 181:18, 182:12, 182:23, 236:12, 238:20, 238:25, 239:8, 243:6, 243:8
**attach**
138:5
**attached**
242:18
**attachment**
158:18, 163:7
**attempt**
202:6, 277:17, 282:17
**attempted**
171:3, 268:17,

273:19, 273:22
**attempting**
258:2
**attempts**
252:10
**attend**
15:3, 15:19, 16:2, 17:9, 17:14, 17:17, 17:21, 20:9, 20:22, 144:13, 170:13
**attended**
15:25, 16:19, 16:23, 17:1, 17:7
**attending**
4:3, 5:7, 15:17, 59:23
**attention**
59:1, 118:10, 120:8, 124:11, 124:12, 217:14
**attorney**
9:3, 9:7, 28:6, 28:9, 28:14, 28:18, 78:6, 97:16, 97:22, 162:24, 163:3, 198:3, 201:14, 236:20, 252:13, 252:23, 253:6, 253:14, 254:4, 254:7, 255:14, 255:15, 256:20, 281:13, 282:8
**audio**
197:5, 197:9, 197:14, 197:18, 201:4, 201:5, 201:10, 201:15, 202:3
**audio-record**
195:19
**audio-recording**
196:24, 198:6, 201:21
**audio-recordings**
198:4, 201:25

auditing
57:14
august
26:9
author
200:10
authority
247:9, 248:4,
248:13
authorization
248:8
authorize
194:15, 247:11,
247:17, 247:25,
248:7, 248:25
authorized
194:21, 247:21,
286:11
auto-pay
153:16
av
2:26, 4:2
availability
61:7
available
60:19, 62:11,
62:19, 63:25,
66:7, 93:23,
164:3, 164:10,
165:6, 165:10,
275:20
average
45:7, 264:5
avoided
135:24
aware
4:7, 29:15,
61:21, 61:22,
64:4, 72:8,
72:14, 74:20,
96:6, 126:5,
126:16, 132:1,
132:22, 132:25,
139:20, 152:14,
153:2, 182:8,
182:11, 188:25,
228:17, 233:12,
249:8, 249:14,

249:22, 250:25,
251:5, 251:12,
272:17, 275:20
away
4:11, 30:5,
31:12, 120:24,
131:8, 131:17,
166:6, 167:13,
209:18, 219:6,
224:21, 230:6,
230:11
awful
131:19

**B**

b) (6
99:5
bachelor's
15:14
back
31:13, 31:17,
32:6, 34:14,
34:17, 43:6,
43:8, 55:5,
58:19, 94:11,
94:22, 105:22,
105:24, 114:9,
115:22, 117:17,
125:2, 125:4,
129:15, 139:20,
142:11, 145:5,
145:23, 166:24,
167:21, 168:16,
170:6, 180:13,
181:15, 193:11,
194:8, 203:3,
205:2, 205:3,
209:18, 210:2,
210:5, 212:19,
216:13, 219:9,
227:20, 229:22,
230:11, 235:9,
242:13, 243:15,
244:8, 253:19,
253:23, 255:10,
278:7, 281:8
back-and-forth
256:12, 256:15

back-stock
182:19
backfired
154:11
background
10:1
backup
4:8, 143:20,
264:21
bacon
14:5
bad
113:16, 113:18,
235:16
baer
127:6, 219:11,
220:3, 222:22,
223:24
baer's
220:1, 220:6
balance
239:22, 239:23,
240:5, 240:8,
242:8
ballantyne
27:12
bank
153:12, 154:12,
154:14, 163:10,
164:7, 164:8,
164:13
barely
268:15
base
139:17
based
107:11, 107:13,
109:16, 114:25,
131:23, 178:13,
254:7, 254:22,
266:17, 267:1,
267:8, 270:9,
270:21, 271:15,
271:23, 272:5,
274:23
basic
185:16, 268:19
basically
172:3, 221:5,

244:18
basis
30:2, 41:1,
42:22, 87:3,
87:21, 87:22,
88:2, 88:15,
94:18, 95:13,
95:14, 102:4,
104:13, 199:11
bates
52:19, 151:10,
193:1, 206:25,
216:21
bates-labelled
162:2
bates-numbered
164:17, 212:9,
230:18, 232:7,
244:14
beating
140:15
became
49:8, 50:7,
50:8, 50:12,
50:22, 51:3,
69:17, 70:1,
72:14, 78:9,
120:5, 177:15,
177:16, 240:15
become
70:3, 72:8,
235:18, 240:15,
249:14, 249:22
becomes
143:22
becoming
51:9, 71:23
been
6:15, 9:5,
12:1, 21:23,
22:5, 22:8,
22:12, 26:19,
27:13, 28:5,
28:8, 28:13,
29:16, 29:23,
31:2, 36:7,
39:5, 59:5,
59:14, 66:8,

66:23, 67:24,
93:17, 95:21,
114:12, 118:9,
118:20, 133:14,
143:10, 150:14,
150:16, 150:19,
152:4, 152:22,
153:21, 154:15,
154:20, 159:14,
160:7, 161:5,
161:8, 163:20,
164:9, 170:22,
173:8, 178:7,
182:7, 182:21,
186:4, 188:7,
191:5, 192:14,
203:1, 211:5,
213:25, 214:13,
215:16, 216:4,
226:4, 233:1,
233:13, 233:17,
235:7, 236:21,
241:2, 252:16,
254:19, 258:5,
258:7, 258:20,
259:8, 260:15,
260:22, 263:4,
269:13, 270:25,
271:2, 272:12,
272:24, 275:20,
281:6, 282:10

**before**
1:18, 5:22,
8:14, 8:17,
9:16, 11:3,
11:5, 11:8,
12:2, 16:16,
17:9, 34:10,
35:16, 44:7,
49:13, 58:24,
63:22, 68:17,
70:4, 71:6,
72:2, 72:6,
79:8, 82:6,
82:7, 82:8,
85:20, 85:21,
86:12, 87:24,
91:5, 92:13,

92:21, 93:3,
93:7, 93:18,
94:20, 99:25,
100:14, 106:15,
106:16, 106:23,
107:1, 107:18,
110:19, 111:10,
116:6, 116:8,
121:16, 134:5,
134:6, 145:4,
146:12, 146:14,
147:24, 148:2,
151:4, 156:23,
159:4, 163:6,
169:3, 169:5,
177:19, 178:24,
183:8, 183:19,
187:8, 201:20,
203:13, 204:14,
216:2, 236:10,
240:20, 241:18,
241:22, 243:17,
247:10, 250:2,
255:19, 256:2,
257:12, 257:22,
257:24, 258:5,
258:7, 270:14,
277:9, 277:12,
281:24, 285:6,
286:13

**began**
16:16, 32:15,
34:22, 45:1,
48:14, 51:20,
55:21, 69:23,
98:21, 99:11,
224:10

**begin**
8:14, 18:5,
39:13, 42:3,
51:15

**beginning**
7:5, 105:3,
181:24, 204:4,
211:15, 224:14,
265:22

**begins**
4:21

**behalf**
2:3, 2:14

**behavior**
168:21

**behind**
126:9, 175:2,
251:8, 254:25

**being**
5:24, 6:3,
6:15, 8:7, 8:8,
11:10, 31:8,
31:15, 31:17,
34:21, 38:3,
41:7, 73:3,
75:13, 75:16,
78:25, 86:16,
87:12, 103:2,
119:23, 124:1,
130:4, 136:4,
145:5, 145:14,
149:9, 152:12,
161:22, 172:24,
174:20, 174:22,
176:5, 178:4,
179:6, 181:9,
184:1, 185:15,
190:7, 191:7,
191:8, 199:12,
209:18, 210:7,
215:13, 218:7,
218:14, 219:1,
233:7, 237:10,
246:16, 261:3,
262:22, 271:14,
277:4, 278:22

**belief**
87:2, 263:2

**beliefs**
190:5, 191:12,
191:18

**believe**
18:8, 41:4,
49:12, 71:23,
75:9, 79:25,
80:12, 89:16,
89:24, 93:3,
93:7, 111:10,
113:24, 115:24,

142:13, 145:8,
152:14, 160:13,
164:21, 172:12,
174:7, 175:1,
178:8, 189:22,
199:22, 202:20,
218:23, 224:3,
226:7, 229:18,
230:24, 231:15,
238:17, 239:2,
241:16, 242:2,
248:16, 252:17,
257:4, 262:19,
262:21, 262:22,
262:24, 265:22,
267:16, 269:11,
269:25, 270:12,
270:19, 270:20,
271:22, 272:4,
274:22, 275:10

**believed**
88:17, 265:25,
269:18

**belittled**
140:18, 171:15

**belittling**
195:5

**below**
98:15, 158:3,
158:6, 207:15,
246:21

**ben**
59:1, 73:17,
73:20, 76:7,
77:25, 78:10,
223:2, 223:24

**benefit**
50:2, 141:5

**benefits**
48:5, 48:6,
48:24, 49:4,
49:6, 49:23,
50:17, 76:5,
221:8, 221:10,
221:11, 225:2,
225:4, 229:5

**bennett**
158:11

besides
22:19, 23:2,
23:6, 119:19,
160:11
best
4:6, 20:6,
60:12, 87:16,
217:8, 238:16,
264:25, 286:23
better
120:4, 261:9
between
28:5, 28:8,
51:8, 165:24,
188:4, 201:18,
222:8, 222:14,
253:3, 264:5
beyond
85:16, 264:23
bias
149:18
big
104:25, 105:5
bill
183:1, 183:2,
235:25, 240:13
billed
109:16
billing
244:19
bills
182:14, 183:4,
183:5, 240:14,
240:17
bind
246:15, 246:23,
247:4
birkenkamp
207:16, 208:3
birth
10:4
bits
190:10
black
122:22
blackburn
97:1, 128:20,
129:5, 158:12,

213:10, 213:24
blake
2:26
blind
37:3
body
114:19
bonus
174:2, 174:5
bookkeeper
36:2, 39:19,
40:12, 40:15,
40:20, 42:9,
43:25, 44:12
boost
43:6
boot
260:4
born
10:6, 10:10,
10:11, 130:4
borutta
2:25, 5:20,
59:9, 59:23,
61:9, 61:12,
62:6, 63:21,
71:19, 72:1,
72:6, 72:9,
72:17, 75:12,
75:15, 75:20,
75:24, 76:22,
76:25, 77:6,
78:19, 80:19,
81:5, 81:22,
82:3, 82:9,
82:14, 82:19,
82:22, 82:24,
83:3, 83:7,
83:17, 83:25,
84:4, 84:17,
84:22, 85:1,
87:19, 88:7,
88:12, 88:15,
90:1, 94:15,
95:10, 111:2,
112:15, 132:19,
132:21, 144:6,
145:22, 146:1,

146:16, 146:20,
147:2, 147:6,
147:10, 147:14,
148:2, 149:2,
150:11, 150:17,
150:21, 152:11,
155:12, 156:4,
159:9, 160:20,
166:14, 177:21,
177:24, 178:15,
179:1, 193:25,
196:16, 199:5,
199:21, 200:22,
202:6, 204:21,
206:18, 207:16,
207:22, 208:19,
208:23, 212:12,
212:16, 212:21,
218:6, 248:13,
248:18, 248:22,
248:23, 248:25,
249:3, 249:5,
249:14, 265:14
borutta's
64:16, 81:1
boss
144:3, 144:4,
195:3, 198:15,
208:12, 208:14,
210:3, 248:23
both
46:23, 46:24,
47:4, 107:8,
107:9, 117:13,
141:11, 141:17,
148:14, 150:20,
193:22, 195:5,
203:15, 212:7,
225:13, 225:18,
259:14, 276:3
bottom
54:14, 54:15,
65:5, 67:7,
67:12, 162:3,
164:18, 165:15,
192:25, 244:14,
245:6
bought
237:3

boulevard
238:18
box
98:11, 245:7,
245:12, 246:20,
253:20, 253:25,
254:2
brain
261:22
break
9:11, 9:17,
31:21, 32:5,
58:13, 58:18,
61:10, 61:15,
62:19, 94:4,
94:10, 95:1,
95:2, 129:10,
129:14, 130:17,
168:9, 168:10,
168:15, 216:4,
216:12, 244:2,
244:7, 268:2,
268:21, 278:1,
278:3, 278:6
breakdown
167:22, 210:13,
210:17, 210:23,
211:25, 261:18
breaks
131:5
bring
68:9, 90:11,
108:11, 132:20,
171:7, 172:3,
249:17, 259:6,
277:18, 281:8
bringing
87:12, 167:21
brought
83:22, 103:25,
111:22, 118:10,
118:15, 120:7,
124:10, 124:11,
135:3, 153:11,
153:14, 179:5,
239:3
brushed
144:18, 149:7,

**bubbles**
150:5
199:19
**budget**
91:14
**build**
155:17
**building**
106:6, 106:13,
124:19, 124:22,
130:17, 130:19,
130:23, 131:2,
131:16, 131:20,
132:6, 132:25,
133:6, 134:10,
243:7
**bullet**
68:25, 69:10
**bullets**
69:8
**bush**
140:15
**business**
15:16, 31:6,
31:8, 32:10,
34:3, 34:4,
34:21, 115:9,
164:13, 175:24,
176:3, 176:7,
176:25, 177:15,
235:22, 246:1,
284:13
**busy**
112:20, 149:8,
170:5
**buy**
237:1, 238:16
**buying**
236:5

**C**

**calendar**
144:15, 183:13,
183:20, 184:3,
184:4, 184:17,
184:23, 185:7,
185:10, 185:12,
185:14, 185:22,

186:12, 186:24,
187:2, 188:2
**calenders**
28:22, 29:3
**call**
43:6, 43:8,
62:4, 62:16,
62:20, 79:23,
79:24, 101:19,
107:2, 113:5,
130:12, 132:14,
149:24, 153:19,
198:20, 202:9,
202:21, 204:10,
204:11, 204:17,
204:22, 204:25,
206:20, 210:4,
212:24, 213:2,
218:12, 252:23,
257:4, 279:5,
280:6
**called**
6:15, 52:11,
79:24, 106:9,
107:5, 142:2,
145:2, 171:10,
196:18, 202:16,
202:20, 212:19,
257:21, 260:11,
280:2
**calling**
62:15, 63:1,
63:9, 63:12,
96:25, 194:6,
228:11
**came**
87:17, 98:2,
106:17, 107:18,
110:13, 144:11,
151:19, 153:21,
173:5, 174:2,
174:9, 180:7,
181:18, 193:11,
193:17, 199:5,
209:18, 227:20,
249:10
**can't**
6:24, 16:15,

18:12, 18:18,
18:21, 19:10,
24:13, 30:4,
36:11, 56:11,
57:21, 65:14,
76:10, 100:12,
128:14, 140:10,
178:20, 184:5,
186:18, 198:1,
199:17, 254:11,
260:2, 260:3,
261:16, 265:7,
267:12, 271:11,
279:23, 281:1,
281:9
**canceled**
52:4
**cannot**
8:1, 18:23,
19:11, 19:15,
19:20, 19:21,
20:2, 31:4,
39:24, 59:21,
75:21, 89:18,
112:2, 122:5,
122:14, 197:13,
197:19, 205:7,
209:20, 212:6,
219:8, 221:2,
229:4, 256:8
**capabilities**
53:11
**capacity**
246:14, 246:22,
247:4, 247:8
**capture**
202:1, 271:11
**car**
102:19, 102:20
**card**
101:24, 102:1,
102:2, 102:4,
103:6, 104:5,
110:4, 114:1,
116:18, 140:21,
152:22, 153:13,
153:16, 154:3,
162:5, 164:21,

165:8
**cards**
102:6, 103:18
**care**
142:1, 212:25,
227:4
**cared**
86:21, 218:11
**careful**
171:23
**carolina**
1:2, 2:8, 2:18,
5:1, 12:14,
12:15, 12:16,
12:21, 13:20,
13:25, 14:8,
14:13, 14:17,
18:9, 22:10,
22:14, 23:20,
24:2, 25:17,
25:20, 26:3,
26:4, 26:15,
26:17, 26:18,
26:21, 30:10,
35:9, 35:16,
35:22
**carrier**
246:3, 248:9
**case**
5:1, 6:6, 6:22,
11:11, 111:12,
136:23, 137:22,
139:6, 139:10,
155:18, 182:17,
190:1, 252:24,
254:24, 267:23,
270:2, 270:10,
272:13, 272:24,
274:2, 275:12,
275:21, 276:1,
276:17, 276:21,
284:7
**cassandra**
132:18, 132:23,
133:3
**catch**
83:14
**cause**
127:17, 255:22,

262:20, 270:3,
286:16
**caused**
255:3, 262:12
**causing**
262:15
**caveat**
9:14
**cayer**
64:2, 277:12
**cayer's**
62:9
**cdm**
30:1, 30:15,
30:16, 30:19,
30:25, 32:9,
33:14, 34:10,
35:25, 36:16,
38:21, 39:4,
253:21
**cell**
217:24, 235:19,
235:23, 249:1,
249:15
**census**
73:11
**center**
68:7
**central**
1:23, 5:5,
17:20, 17:24,
18:6, 20:10,
20:23, 21:3,
21:10, 32:4,
32:7, 58:17,
58:20, 94:9,
94:12, 106:2,
129:13, 129:16,
168:14, 168:17,
216:11, 216:14,
244:6, 244:9,
278:5, 278:8,
284:25
**ceo**
71:24, 77:16,
105:19, 149:24,
199:12
**certain**
9:4, 30:5,

113:23, 115:4,
115:5, 119:25,
126:12, 152:25,
161:11, 177:21,
179:13, 182:6,
186:16, 225:15,
225:17, 266:12
**certainly**
37:17
**certified**
76:19, 76:21,
76:23
**cfo**
105:19
**chain**
97:11, 157:9
**chain-of-command**
101:10, 107:11
**chance**
60:2, 149:15
**change**
31:7, 31:11,
40:24, 66:13,
66:16, 87:7,
114:5, 182:15,
193:9, 205:23,
206:1, 206:5,
208:21, 209:1,
228:9, 241:13,
244:19, 248:1,
248:7, 280:18
**changed**
66:22, 181:14,
236:16, 241:9,
241:11, 259:25,
274:14
**changeover**
226:14, 228:3
**changes**
179:25, 204:8,
229:9, 243:10,
247:23
**changing**
140:2, 181:20,
182:16, 227:11,
243:23
**characterization**
185:20

**charge**
22:17, 22:21,
108:4
**charged**
22:9, 22:13
**charges**
23:1, 23:5,
101:25, 246:10
**charles**
14:24
**charlotte**
1:3, 2:8, 2:18,
12:19, 12:25,
13:2, 13:4,
13:20, 14:1,
18:1, 24:1,
26:23
**chart**
64:6, 96:7,
96:8
**chat**
173:15
**check**
245:8
**checking**
164:11, 245:12,
246:20
**checks**
115:8, 199:13,
199:14
**chest**
132:3
**children**
12:4, 12:5
**choose**
225:24, 231:5,
282:13
**choosing**
230:5
**choppy**
190:10
**chose**
49:2, 71:1,
129:1
**chosen**
192:15
**christmas**
145:4, 178:1,

178:10, 179:3,
183:7, 183:18,
185:25, 186:3,
186:9, 187:4
**church**
27:7, 27:8,
27:9, 27:10,
27:14, 27:16,
27:17
**churches**
27:3, 27:6
**cigarette**
131:5
**circle**
199:19
**circumstance**
195:3
**circumstances**
195:7
**cited**
22:8, 22:12
**city**
10:8, 12:17,
12:19, 26:12,
26:13, 26:14,
26:16, 26:23,
26:24, 26:25,
35:1
**civic**
27:2, 27:5,
27:17, 27:18
**civil**
1:7, 268:19
**claim**
23:9, 23:14,
131:21, 131:24,
141:23, 213:17,
253:16, 266:19,
267:2, 267:9,
267:19, 270:1,
270:9, 275:11
**claiming**
214:15, 215:10
**claims**
22:24, 22:25,
23:5, 139:7,
255:16, 275:23
**clarification**
46:25, 47:5,

163:24, 205:14,
282:20
**clarify**
7:24, 8:4,
13:16, 37:23,
188:1, 228:8
**class**
17:22
**classes**
15:25, 16:2
**cleaning**
43:23
**clear**
24:22, 52:21,
122:18, 133:12,
144:24, 145:10,
214:21, 241:25,
257:15, 280:21,
282:7, 283:4
**clearly**
121:6, 154:5,
165:5, 173:1,
185:9, 193:8,
198:1, 214:18,
257:24, 282:5
**client**
61:21, 63:14,
282:8, 285:6
**clinical**
215:17
**clock**
129:9
**close**
116:16, 124:21,
226:24
**closed**
124:15, 125:16,
125:19, 126:16,
164:9, 187:6,
187:7, 187:10
**closing**
164:3
**clothes**
131:11
**club**
27:21
**clueless**
210:5

**cm**
32:9
**co-counsel**
59:2, 61:1
**co-workers**
111:14, 126:24,
127:2, 127:20,
128:2, 158:14
**cobra**
223:22, 229:10,
231:23, 233:2,
233:3, 233:12
**code**
101:25, 153:24,
241:10
**coded**
102:3, 102:22,
103:7, 104:5
**codes**
102:18
**coding**
102:9, 102:15,
102:17, 102:24,
102:25, 116:18,
116:20, 140:21
**collaboratively**
143:18
**college**
15:3, 15:5,
15:17, 15:20,
16:10, 17:8,
17:9, 17:11,
17:13, 17:14,
17:15, 17:20,
17:24, 18:6,
20:10, 20:24,
21:4, 21:9,
21:10, 21:11,
21:12
**college-level**
17:15
**colleges**
17:2, 17:7,
17:17, 21:18
**color**
129:21
**column**
245:17

**columns**
164:4
**com**
2:10, 2:20,
250:6, 250:16
**combined**
91:6
**come**
46:17, 87:19,
94:1, 113:2,
118:4, 120:23,
121:21, 122:1,
124:7, 139:20,
143:17, 145:4,
151:25, 169:6,
169:21, 171:11,
171:20, 224:6,
226:12, 229:22,
235:9, 253:19,
265:4
**comes**
103:21, 140:5,
159:19, 159:20,
174:14, 205:3
**coming**
87:10, 124:18,
161:6, 179:24,
182:12, 245:15
**commencing**
1:22
**comment**
120:11, 121:11,
121:17, 166:13,
168:1
**comments**
191:2, 279:10
**commit**
59:21
**committed**
263:17
**common**
106:3, 106:9
**communicate**
79:2, 80:14,
110:2, 118:21,
126:18, 220:19
**communicated**
72:5, 81:13,

278:11, 278:15
**communicating**
101:22, 140:20
**communication**
103:11, 115:20,
139:25, 279:3,
279:7
**communications**
84:22, 103:14,
136:19, 137:1,
138:22, 138:25,
139:14, 141:2,
218:3
**community**
17:8, 17:13,
17:20, 17:24,
18:6, 20:10,
20:23, 20:24,
21:4, 21:9,
21:10, 27:23
**companies**
45:15, 46:6,
47:24, 159:23
**company**
29:23, 29:25,
31:9, 35:19,
36:4, 38:19,
40:22, 41:21,
41:24, 43:4,
43:14, 43:20,
44:24, 45:13,
46:4, 46:8,
46:18, 46:22,
47:2, 47:8,
56:20, 72:12,
73:6, 73:15,
73:18, 73:21,
74:1, 85:20,
95:24, 98:22,
100:2, 101:24,
102:1, 103:3,
103:6, 108:12,
110:12, 132:15,
140:3, 141:14,
143:19, 175:25,
179:24, 209:9,
217:20, 222:6,
223:10, 223:15,

224:20, 234:5, 278:12, 281:22

**company's**
102:6, 103:2

**competition**
172:19

**competitive**
172:24, 174:20

**compiling**
91:11

**complain**
130:18, 131:12, 132:19, 144:6, 177:24

**complained**
131:7, 131:15

**complaining**
226:17

**complaint**
29:14, 111:12, 120:13, 132:16, 133:4, 134:5, 136:17, 136:23, 137:4, 137:21, 139:5

**complaints**
149:3

**complete**
8:24, 43:22, 44:23, 86:17, 110:5, 116:22, 228:3, 245:14, 273:8

**completed**
227:11

**completely**
38:3, 254:13, 268:4

**compliant**
218:24

**comply**
59:12, 59:19, 117:16, 136:1

**complying**
118:3

**compound**
267:21, 268:3, 268:6, 270:17

**computer**
4:11, 19:3, 19:15, 126:9, 194:22, 217:24, 258:3, 258:11, 258:19, 258:21, 260:4, 278:25

**con**
172:22

**concern**
149:20, 169:8, 262:4

**concerns**
116:23, 144:7, 145:22, 146:21, 147:3, 147:7, 147:11, 147:14, 149:3, 150:12, 171:2

**concluded**
285:11

**concluding**
281:24

**condition**
212:22, 213:4, 214:6, 214:23, 215:7, 280:21

**conditions**
261:14

**conduct**
54:5, 63:13, 270:19, 271:21, 272:2, 274:6, 275:25, 284:6

**confer**
59:25

**conference**
106:8, 179:9, 193:19, 193:20, 196:18, 198:17, 203:4, 204:4

**confidence**
62:7

**confidential**
164:13

**confirm**
59:13, 152:21, 178:12, 192:5,

**computer** (cont.)
204:7, 216:20, 228:9, 235:2, 236:22

**confirmation**
199:1, 245:7, 246:19, 246:21

**confirmed**
237:13

**confirms**
230:25

**confront**
170:21, 170:22

**confused**
84:19, 99:15, 198:18

**congestion**
132:3

**connect**
4:16, 4:17, 80:3

**consider**
14:13, 255:9

**considered**
30:14, 141:1

**consistently**
264:16, 264:20

**constantly**
112:12, 122:17, 124:20, 135:22, 142:25

**consult**
61:12, 61:17, 285:5

**consumed**
126:8

**contact**
76:2, 77:24, 79:17, 79:19, 80:1, 81:23, 202:5, 202:6, 218:6, 219:25, 220:4, 222:5, 247:22, 256:16

**contacted**
257:1

**contacting**
81:10, 81:18

**contempt**
61:22

**contentions**
64:19

**context**
121:11

**continue**
45:19, 62:1, 88:20, 88:23, 142:15, 185:12, 228:23, 233:6, 234:8, 261:24, 263:9, 277:15

**continued**
30:10

**continuously**
44:21, 45:3

**contract**
218:25

**contractor**
42:23

**contrary**
171:25

**control**
253:15

**controller**
55:9, 69:1, 69:8, 71:11, 90:14, 91:8, 123:10, 175:15, 208:4, 208:8, 248:12, 264:24

**conversation**
83:2, 94:15, 95:10, 113:6, 116:1, 126:11, 151:1, 172:23, 173:12, 173:22, 202:1, 237:9, 237:17, 237:21, 239:6, 278:20, 280:1, 280:5, 280:7, 280:9

**conversations**
4:13, 117:18, 118:24, 119:1, 119:10, 119:15, 119:17, 119:22, 123:19, 123:25, 125:23, 126:4,

128:23, 135:2,
196:14, 280:10,
282:14, 282:21
**cookies**
227:2
**cooperative**
213:21
**coped**
261:8
**copies**
207:16
**copy**
151:16, 230:16,
283:24
**corner**
65:6, 97:12
**corporate**
5:20, 101:24,
102:1, 192:24
**correct**
19:16, 22:3,
34:13, 61:4,
61:10, 61:24,
69:14, 70:7,
71:20, 75:1,
75:5, 127:22,
138:12, 177:13,
183:6, 190:20,
199:6, 200:23,
203:7, 206:8,
207:7, 217:21,
217:25, 219:24,
221:22, 222:23,
223:1, 223:2,
223:4, 223:6,
231:11, 232:10,
241:15, 241:19,
241:24, 242:22,
242:25, 252:8,
260:14, 262:20,
282:20, 282:25
**correctly**
190:10, 196:25,
235:11
**correspondence**
217:24
**cost**
225:1

**costs**
6:6, 59:18,
64:17, 242:17,
282:16
**cough**
132:3
**could**
16:7, 24:7,
57:13, 67:15,
68:22, 77:18,
78:7, 83:14,
92:25, 97:23,
102:14, 110:3,
110:5, 112:1,
114:22, 120:3,
121:7, 121:22,
133:13, 134:18,
134:22, 142:17,
145:1, 145:16,
145:18, 155:22,
156:3, 161:8,
171:2, 171:3,
171:10, 180:23,
187:9, 189:8,
192:5, 195:12,
197:24, 205:5,
205:8, 206:11,
211:15, 212:17,
213:12, 216:7,
216:19, 226:25,
229:25, 235:10,
236:24, 237:7,
237:15, 237:16,
237:23, 238:19,
239:14, 241:20,
258:4, 258:6,
263:16, 265:1,
266:7, 266:9,
270:25, 271:2
**couldn't**
57:25, 114:6,
121:19, 139:23,
139:24, 145:13,
160:12, 203:20,
209:4, 226:3,
231:19, 233:9,
259:24, 260:1
**counsel**
5:9, 5:25,

18:19, 19:24,
24:20, 28:15,
36:18, 37:20,
52:18, 53:7,
53:19, 54:5,
60:14, 61:8,
61:19, 62:3,
63:7, 63:16,
94:19, 137:7,
137:10, 137:24,
176:5, 176:13,
184:19, 184:20,
184:22, 185:11,
192:7, 196:25,
216:2, 254:8,
256:2, 256:10,
267:24, 270:16,
272:8, 274:3,
274:12, 275:17,
276:5, 276:8,
276:12, 276:15,
277:22, 282:7,
282:14, 283:2,
283:3, 283:5,
283:7, 283:18,
284:4, 284:7,
284:9
**counsel's**
96:6, 281:20,
282:3
**count**
110:18
**counting**
57:15
**county**
1:20, 286:3,
286:9
**couple**
119:16, 152:25,
157:12, 164:4,
212:17, 212:23
**course**
47:1, 233:5,
241:5, 262:11
**courses**
18:2, 18:5,
18:7, 18:10,
18:14, 18:17,

19:8, 20:9,
20:13, 20:16,
20:18, 20:23,
21:11, 21:14
**coursework**
21:3, 21:20
**court**
1:1, 1:26,
4:25, 6:10,
7:17, 8:10,
59:17, 61:23,
61:24, 62:11,
63:23, 64:4,
64:11, 94:21,
96:7, 254:16,
254:20, 269:5,
281:19, 283:15,
286:33
**court's**
281:24
**courtesy**
37:5
**cousin**
14:9
**coverage**
48:18, 50:6,
50:14, 50:22,
51:1, 51:5,
227:10, 231:16,
231:25, 233:4
**covered**
89:11
**covering**
87:20, 87:25
**cpcc**
17:18
**cracks**
227:6
**crawford**
158:11, 278:17
**credit**
102:2, 102:6,
103:6, 103:18,
104:4, 110:4,
114:1, 116:18,
140:21, 152:22,
153:13, 153:15,
154:3, 162:5,

164:21, 165:6,
165:8, 240:4,
240:10, 240:11,
241:3
**crime**
22:9, 22:13
**crr**
1:19, 286:32
**cubicles**
105:9
**current**
12:1, 21:15,
21:21, 23:18,
23:24, 41:3,
63:3, 232:3,
239:18, 239:20,
278:12, 278:16,
279:17, 280:10
**currently**
9:20, 10:20,
23:22, 27:2,
27:5, 59:24
**cursed**
270:24
**customer**
116:23, 244:23,
244:24
**customers**
109:17
**cut**
105:3, 115:7,
163:20
**cutoff**
229:3

---

**D**

---

**daily**
159:19, 264:12
**dakota**
1:20, 286:3,
286:9
**date**
5:3, 10:4,
30:18, 69:19,
69:21, 76:3,
76:13, 99:22,
146:4, 151:3,
151:20, 151:23,

151:24, 168:24,
192:3, 230:17,
232:9, 232:10,
232:18, 253:5,
255:15, 256:8,
257:11, 257:13,
257:23, 257:24,
278:19
**dated**
52:14, 157:23,
158:7, 192:24,
206:1, 207:11,
207:17, 232:14
**dates**
24:8, 24:9,
72:10, 100:4,
100:8, 121:10,
146:7, 184:24,
224:16, 228:25,
236:18
**daughter**
13:7, 13:18
**david**
2:22, 5:17,
6:20, 19:9,
55:22, 56:3,
56:8, 58:24,
71:6, 73:3,
223:4, 223:25,
237:13, 268:14,
268:15
**day**
52:17, 55:2,
56:16, 60:10,
100:14, 112:9,
112:19, 113:2,
119:12, 124:8,
126:17, 151:25,
160:6, 160:7,
161:3, 178:16,
178:17, 178:19,
178:21, 178:24,
179:12, 179:13,
179:15, 179:17,
179:19, 182:1,
183:17, 183:19,
186:1, 187:7,
187:9, 187:11,

187:19, 187:23,
193:11, 204:14,
204:19, 209:24,
211:1, 212:13,
231:10, 243:19,
251:18, 251:22,
252:6, 252:14,
252:16, 256:3,
264:10, 264:13,
272:9, 273:22,
279:15, 281:6,
286:28
**day-to-day**
104:13
**days**
60:7, 119:13,
183:15, 183:21,
184:6, 184:9,
184:12, 184:17,
184:24, 186:9,
186:20, 187:3,
188:4, 188:17,
201:12, 212:18,
212:23, 218:16,
218:19, 219:2,
227:19, 264:14,
284:13
**de**
224:25
**deactivated**
259:16, 259:22
**deactivating**
220:14
**deal**
121:1, 144:21,
180:2, 181:24,
195:4, 213:20
**dealing**
214:2
**december**
10:5, 42:20,
151:21, 157:23,
158:7, 159:2,
173:3, 178:10,
178:24, 179:2,
179:15, 183:8,
183:18, 185:23,
185:25, 186:1,

186:4, 186:5,
186:25, 187:21,
188:4, 188:5,
188:6, 189:18,
191:17, 191:23,
192:1, 192:24,
193:12, 194:10,
195:18, 206:2,
207:11, 207:17,
208:1, 208:25,
209:7, 211:20,
211:24, 212:15,
213:6, 213:14,
215:5, 227:18,
227:22, 228:19,
228:24, 229:2,
229:7, 229:12,
229:20, 230:22,
242:24, 243:4,
247:13, 247:16,
247:24, 251:17,
252:5, 256:3,
256:22, 257:12,
258:7, 260:15,
260:21, 260:25,
278:22, 279:11
**decided**
138:13, 140:1,
252:23, 253:16
**decision**
208:21, 224:7,
225:23
**declaration**
254:17, 257:14,
257:15, 257:19,
270:13
**declarations**
25:11
**decline**
238:24
**dedicated**
263:17
**deep**
114:23
**defendant**
1:12, 2:14,
5:18, 6:21,
61:22, 96:9,

192:12, 192:15,
275:21, 281:17,
282:11, 283:20
**defendant's**
59:11
**defending**
256:13
**defense**
196:11
**define**
27:19, 100:11
**defined**
13:21, 173:1
**degree**
15:13
**deleting**
220:15
**demanding**
60:8, 60:10
**demeanor**
108:25
**demoted**
145:5, 161:23,
183:19, 186:2,
191:23, 192:1,
256:4, 256:22
**demotion**
149:1, 173:3,
204:23, 208:13,
227:19, 228:8,
229:20
**dental**
48:7, 51:1,
221:12
**department**
30:6, 31:13,
31:15, 34:4,
34:7, 34:11,
34:15, 34:18,
34:22, 34:24,
57:11, 57:19,
104:21, 105:17,
105:18, 105:22,
108:5, 109:7,
109:15, 109:18,
109:20, 110:13,
111:23, 118:1,
132:8, 143:3,

143:5, 149:22,
250:18, 250:21,
250:23, 257:5,
263:6
**departments**
30:5, 30:8,
104:2, 104:17,
105:15, 159:24
**depend**
143:16
**depending**
229:1
**depos**
5:6, 6:12
**depose**
59:9
**deposition**
1:16, 1:18,
4:22, 5:21, 6:3,
6:8, 7:3, 7:6,
7:14, 8:2, 8:7,
8:20, 9:3, 11:2,
11:5, 11:7,
28:2, 28:12,
28:18, 37:14,
38:12, 53:19,
59:3, 59:10,
59:16, 59:24,
60:5, 60:9,
60:11, 60:22,
60:24, 61:3,
61:6, 61:16,
61:17, 62:2,
62:12, 63:4,
63:8, 63:14,
63:20, 63:25,
64:7, 64:9,
64:16, 64:22,
138:6, 138:12,
177:6, 200:16,
201:11, 268:17,
273:20, 273:25,
274:2, 276:16,
276:20, 277:16,
277:18, 281:16,
281:23, 282:2,
283:16, 284:23,
285:11, 286:6,

286:21
**depreciation**
91:19, 92:14
**depression**
213:16, 214:14,
215:9, 215:19,
215:25, 233:8,
252:22, 261:4,
261:12, 262:3
**deprived**
265:11
**describe**
106:4
**described**
68:18
**description**
67:24, 68:2,
68:3, 71:14
**desk**
98:5, 151:18,
152:2, 159:6,
159:21, 160:8,
207:24, 251:19
**despite**
53:8, 155:23
**destroyed**
255:25
**detail**
57:2, 60:4,
281:2
**details**
118:4, 121:25,
257:20
**determine**
175:11
**devoted**
21:3
**diagnose**
215:16
**diagnosed**
214:7, 214:13,
215:8, 215:15
**diary**
28:21, 29:2
**diem**
88:24
**different**
24:21, 25:18,

45:6, 49:14,
57:13, 85:2,
102:17, 112:25,
120:22, 154:22,
156:7, 231:5,
239:10, 276:22
**differently**
111:14, 115:11,
136:6, 141:22,
277:5
**difficult**
117:9, 119:19,
120:6, 120:10,
122:3, 128:1,
128:7, 141:20,
142:10, 142:12,
143:22, 171:19
**difficulty**
128:4, 128:12,
128:15, 128:18,
129:5
**direct**
55:18, 56:3,
80:3, 96:17,
144:4, 159:15,
195:3, 198:15,
222:4, 228:5
**directed**
10:3, 137:11,
271:5, 279:10
**direction**
198:10, 286:21
**directions**
195:10
**directly**
12:25, 85:14,
96:21, 109:13
**dirty**
144:23
**disability**
131:24, 213:17,
214:14, 215:9,
233:6, 252:21,
258:1, 266:19,
267:2, 267:9,
267:19, 270:1,
270:9, 275:11
**disabled**
256:23, 256:24

**disagree**
61:25, 63:16,
64:18, 178:9,
185:19, 246:9
**disbelief**
152:18
**discharged**
29:17, 101:6
**disciplined**
150:17, 172:10
**discount**
239:5
**discovered**
160:23, 256:12
**discovery**
59:3, 59:8,
61:23, 63:2,
97:17, 192:10,
192:11, 272:13,
272:25, 277:20
**discriminated**
131:22, 149:10
**discriminating**
195:6
**discrimination**
23:10, 23:15,
145:12, 149:18,
191:7, 266:25
**discriminative**
141:25
**discriminatory**
119:24, 266:17,
267:8, 267:17,
269:12, 269:19,
269:25, 270:8,
270:20, 271:15,
271:22, 272:5,
274:23, 275:10,
276:1
**discuss**
171:2
**discussed**
207:5, 243:5
**discussion**
83:6, 83:11,
83:18, 83:22,
84:7, 84:15,
84:16, 85:1,

85:5, 86:11,
86:14, 87:18,
88:7, 88:11,
89:1, 104:22,
113:5, 121:15,
124:12, 148:1,
152:5, 159:25,
161:1, 161:7,
161:10, 165:23,
173:16, 188:20,
222:20, 237:10,
257:7, 271:13
**discussions**
4:10, 86:12,
123:12, 126:13,
147:13, 147:18,
147:22, 148:5
**dismissal**
253:18
**dismissed**
30:7, 73:16,
73:19, 73:21,
74:2, 142:17,
142:18, 252:21
**dispute**
192:11
**disregard**
118:9
**disregarded**
111:24, 116:6,
116:8, 116:12,
117:8, 118:7,
132:5, 150:5,
156:9, 166:6,
170:23, 171:13,
263:3
**disrespected**
111:20
**disrespectful**
176:9
**distress**
262:13, 262:16,
262:20
**district**
1:1, 1:2, 4:25
**disturbing**
167:21
**division**
1:3

**dklass@fisherphi-**
**llips**
2:20
**doctor**
211:1, 211:2,
211:19, 211:20,
211:22, 211:24,
212:2, 215:22,
233:7
**doctor's**
142:3, 145:7,
145:8, 210:19,
211:5, 211:7,
211:9, 211:11,
211:18, 212:1,
212:13, 214:17,
214:22, 215:4,
231:18, 231:20,
261:10
**doctors**
261:7, 262:8
**document**
36:22, 37:2,
38:5, 52:10,
52:19, 53:14,
53:21, 53:25,
54:3, 54:15,
65:1, 65:6,
65:10, 65:18,
65:22, 66:2,
66:21, 66:24,
67:2, 67:3,
67:8, 67:16,
68:17, 68:19,
69:11, 90:11,
90:17, 92:7,
97:8, 97:9,
97:18, 97:21,
98:3, 98:6,
98:7, 98:11,
99:10, 137:13,
137:15, 146:8,
151:12, 151:20,
157:5, 157:7,
157:13, 157:17,
158:17, 158:23,
162:2, 162:4,
162:14, 162:19,

163:18, 164:20,
165:11, 165:16,
178:11, 188:16,
188:20, 188:24,
192:3, 192:22,
193:24, 206:22,
207:4, 212:8,
216:19, 216:22,
216:25, 217:2,
217:6, 217:7,
217:14, 217:17,
218:2, 230:15,
232:6, 235:2,
236:22, 244:12,
244:14, 244:17,
245:14, 245:15,
249:17, 252:18
**documentation**
29:12
**documented**
167:13
**documents**
7:6, 28:1,
28:4, 28:7,
28:11, 28:12,
60:15, 60:17,
60:18, 60:19,
60:21, 64:10,
64:14, 70:8,
92:15, 102:25,
138:1, 138:6,
190:3, 192:8,
192:16, 192:18,
192:20, 217:20,
257:16, 257:18,
267:23, 272:12
**doing**
7:3, 18:22,
30:5, 57:14,
63:1, 71:17,
87:16, 89:10,
109:10, 123:7,
126:9, 126:17,
134:24, 135:9,
137:25, 141:5,
141:6, 141:11,
141:16, 156:1,
179:21, 198:21,

225:18, 225:20,
225:21, 227:13,
227:15, 268:11
**done**
19:24, 20:2,
56:14, 57:20,
67:18, 68:23,
79:16, 91:16,
91:17, 91:20,
92:10, 94:17,
95:12, 117:12,
136:6, 150:3,
209:19, 209:21,
225:22, 230:11,
239:14, 258:9,
261:25
**door**
124:13, 124:15,
124:16, 124:21,
125:16, 125:19,
126:15
**doors**
132:24
**double**
169:15
**doubt**
155:13
**down**
8:10, 35:8,
36:22, 65:16,
67:17, 68:9,
84:9, 133:24,
134:2, 134:4,
137:22, 152:4,
160:3, 162:9,
162:11, 173:13,
193:20, 196:7,
203:12, 268:2,
268:21
**downsizing**
35:23
**dozens**
182:19
**draft**
108:9
**drive**
253:6, 253:9
**drop**
253:11

**dropped**
253:10, 253:17,
255:14
**drove**
160:12
**drugs**
9:21
**due**
60:25
**duly**
6:15, 286:11,
286:14
**dumbfounded**
198:18, 210:24
**dunbritton**
24:1, 24:24,
25:8, 25:15,
26:22
**duration**
240:12
**during**
8:1, 8:20, 9:3,
48:20, 49:21,
51:13, 60:9,
60:10, 62:11,
71:4, 77:17,
82:3, 83:14,
89:11, 174:4,
179:2, 215:20,
222:12, 222:18,
223:10, 223:17,
237:20, 258:17,
262:11, 264:17,
279:11
**duties**
56:9, 56:17,
57:3, 57:4,
57:6, 57:9,
57:16, 57:17,
58:3, 58:6,
58:9, 65:23,
68:3, 69:11,
83:4, 84:10,
84:17, 85:2,
87:1, 87:21,
88:1, 88:14,
90:23, 93:21,
95:11, 100:20,

107:15, 109:9,
123:4, 135:13,
135:18, 177:20,
193:9, 198:12,
206:5, 222:9,
222:15, 224:4,
226:23, 263:24,
264:6, 265:21,
266:5
**duty**
175:21, 235:5

---

**E**

**e-mail**
59:21, 72:6,
79:6, 79:25,
80:10, 117:13,
117:14, 135:13,
135:17, 145:6,
146:3, 146:16,
146:17, 146:19,
146:21, 146:25,
147:10, 148:24,
152:3, 152:24,
156:25, 157:19,
157:20, 158:3,
158:6, 159:1,
159:8, 162:20,
163:2, 163:3,
163:4, 163:13,
165:12, 166:23,
167:2, 189:13,
189:17, 189:18,
190:13, 190:19,
190:20, 194:7,
194:13, 194:16,
194:18, 194:22,
194:23, 195:13,
195:16, 202:8,
203:12, 204:11,
204:24, 206:21,
207:6, 207:9,
207:10, 207:15,
207:21, 207:22,
208:9, 208:10,
212:5, 212:7,
212:11, 212:24,
213:2, 217:11,

219:18, 220:1,
220:6, 220:24,
220:25, 229:16,
229:23, 229:24,
230:1, 230:8,
230:10, 230:20,
231:1, 243:22,
244:23, 244:24,
245:9, 245:22,
246:20, 250:3,
250:8, 250:12,
250:15, 251:1,
251:2, 251:3,
251:10, 257:2,
257:25, 259:11
**e-mailed**
144:8, 145:25,
191:10, 191:16,
226:3
**e-mails**
116:21, 116:23,
117:1, 118:7,
120:23, 135:21,
135:23, 135:24,
136:11, 136:14,
136:15, 146:5,
157:13, 166:19,
166:21, 167:1,
167:5, 169:25,
170:2, 189:14,
189:16, 189:21,
190:4, 190:12,
190:15, 190:19,
191:1, 191:3,
191:13, 191:19,
194:9, 195:13,
207:7, 220:16,
226:4, 226:16,
246:21, 251:5,
251:9, 251:12,
252:18
**each**
4:18, 41:15,
103:16, 264:1,
264:5
**ear**
205:20
**earlier**
8:23, 13:21,

266:14, 266:23,
275:8
**easier**
103:22
**east**
2:7
**ecuador**
10:13, 130:1
**edgar**
14:3, 14:5,
14:6
**education**
16:20
**eeoc**
22:17, 22:19,
22:21, 23:2,
23:6
**effect**
29:20, 51:23,
120:18, 120:19,
243:10, 274:16
**effective**
230:7
**eight**
52:25, 53:10
**either**
9:22, 28:13,
47:25, 65:20,
73:9, 73:24,
91:20, 112:13,
117:19, 117:21,
123:22, 126:5,
195:23, 196:21,
201:20, 232:4,
261:13
**elaborate**
12:24, 30:17,
44:3, 58:11,
70:25, 95:22,
112:1, 112:6,
116:10, 260:20
**electronic**
283:23
**elevation**
27:9, 27:10,
27:13, 27:16
**eligible**
48:23, 49:9,

50:4, 50:7, 50:8
**eliminate**
154:7
**eliminated**
34:11
**elks**
27:20
**else**
7:9, 8:21,
14:12, 56:24,
86:5, 86:9,
91:23, 92:7,
104:2, 107:17,
108:24, 124:24,
135:12, 135:16,
144:4, 159:12,
160:18, 163:11,
169:24, 179:8,
181:2, 181:5,
204:22, 210:11,
213:11, 223:8,
223:17, 234:11,
243:23, 248:6,
250:8, 250:12,
266:1, 266:7,
273:4, 279:14,
279:19, 279:21,
284:19
**else's**
103:18
**elsewhere**
173:6
**email**
157:9
**emotional**
262:13, 262:16,
262:20
**emotions**
173:4, 194:18,
195:15, 261:23,
281:8
**employed**
18:10, 18:15,
45:18, 47:9,
47:10, 47:13,
93:12, 93:13,
93:16, 219:10,
219:11, 241:2,

242:12, 242:15,
242:16, 250:11
**employee**
73:4, 80:15,
81:19, 99:20,
132:12, 132:14,
132:17, 237:3,
239:7, 279:17
**employee's**
81:14, 175:22,
177:11, 177:18
**employees**
70:23, 73:8,
79:3, 81:24,
83:20, 125:24,
126:4, 130:19,
135:21, 142:21,
144:1, 159:5,
175:12, 177:2,
177:21, 180:6,
182:23, 221:16,
222:11, 222:17,
278:12, 278:16,
280:11
**employer**
22:18, 22:21,
29:19, 32:12,
36:9, 36:14,
39:10, 110:24
**employers**
46:1
**employment**
28:23, 29:4,
29:17, 29:21,
33:14, 35:16,
35:20, 36:1,
36:6, 39:5,
39:8, 41:22,
42:19, 43:14,
45:16, 51:8,
51:19, 51:22,
52:2, 52:3,
52:11, 53:5,
54:18, 54:22,
55:3, 55:21,
69:12, 70:19,
76:1, 78:1,
78:11, 78:14,

78:18, 79:4,
79:21, 80:16,
81:1, 81:12,
81:15, 81:21,
81:25, 93:4,
93:8, 93:21,
94:2, 99:11,
216:18, 217:5,
218:8, 218:15,
218:17, 218:20,
219:3, 219:7,
219:12, 220:3,
222:11, 222:18,
234:17, 252:9,
253:4, 255:20,
261:15, 262:12,
262:17, 264:2,
279:18, 280:12
**enabled**
4:14
**end**
24:7, 57:14,
64:14, 70:19,
76:5, 100:10,
124:7, 195:8,
205:5, 205:9,
205:16, 210:14,
225:19, 228:14,
229:12, 242:24,
261:14, 269:4,
284:23
**ended**
33:14, 35:17,
42:18, 51:8,
133:8, 172:5,
218:15, 218:17,
218:20, 222:11,
222:17, 229:12,
231:16, 262:17
**ending**
35:20, 181:25,
231:25
**ends**
53:1, 63:9,
203:6
**engage**
37:9, 255:15
**engaged**
256:2

engaging
179:7
enough
88:18, 156:4
enroll
48:23, 49:2,
49:19, 50:16,
50:23, 51:1
enrolled
50:13
enrolling
50:21
enrollment
48:20, 49:22
ensure
102:3, 103:20,
226:23, 235:5
ensuring
104:4
entail
56:18
enter
154:1, 177:13
entire
32:24, 44:13,
202:1, 252:6
entities
23:1, 23:6
entitled
19:25, 254:18,
254:23
entries
28:21, 29:2
equipment
209:9, 217:20,
253:19, 253:24,
257:20
erroneously
142:18
especially
59:22, 60:3
esq
2:11, 2:12,
2:22
essentials
219:23, 219:25,
220:5, 220:20,
220:23, 257:22,

260:12
estimate
21:7
ethics
263:13
evaluate
175:12, 175:13
evaluated
260:16, 260:23
eve
60:24
even
19:10, 19:11,
44:6, 59:18,
63:20, 68:1,
68:16, 86:9,
99:15, 110:17,
117:2, 127:2,
132:16, 134:6,
142:5, 144:19,
145:13, 160:11,
161:4, 188:1,
201:13, 203:20,
204:15, 206:17,
228:10, 233:9,
240:20, 258:5,
258:6, 261:18,
263:15, 273:1
evening
18:17, 60:23
evenings
20:11
events
191:5, 262:10,
262:15
every
44:18, 57:2,
126:11, 170:20,
170:21, 172:22,
237:3, 240:23,
271:11, 274:12
everybody
98:10
everyone
4:3, 84:9,
96:23, 101:25,
103:17, 103:18,
103:20, 104:2,

109:1, 110:12,
132:10, 144:3,
145:19, 159:12,
163:11, 179:7,
189:7, 222:21,
228:6, 230:1,
230:3, 237:4,
249:12, 258:18
everyone's
228:20
everything
102:3, 122:24,
145:17, 146:6,
155:22, 156:21,
169:14, 175:18,
189:10, 253:15,
259:10, 259:11,
272:21, 276:19,
279:1, 284:8
evidence
254:19
evident
84:13, 121:7,
131:9, 136:5
exact
25:4, 166:1,
192:11, 202:4,
256:8, 258:21,
280:7
exactly
19:12, 52:23,
135:4, 183:14,
186:19, 236:18,
246:4, 269:5,
277:4
examination
3:5, 6:17
example
104:18, 119:12,
140:2
examples
27:20
except
126:17
exchanged
28:13
excludes
215:1

excuse
178:20, 213:10
excused
170:11
executive
95:22, 95:23
exhibit
138:4, 164:16,
273:2
exhibits
3:8, 138:2,
138:11
exist
200:11, 277:19
existed
79:13
exists
188:25, 215:2
expect
160:17, 208:13,
281:7
expectations
225:14, 225:16
expecting
218:12
expeditiously
60:15
expense
6:2, 115:6,
140:13, 153:24
expenses
103:3, 115:6,
138:20, 139:19
experience
159:22
experienced
281:1
experiencing
196:13, 214:23
explain
49:15, 102:14
explained
104:8, 257:19
explaining
190:9
explanations
121:25
exposure
125:18

express
128:7, 214:5
expressed
128:18, 169:8,
213:23, 213:24,
213:25, 214:4,
215:15
expressions
114:19, 114:20
expressly
283:6
extended
13:24
extent
81:1, 178:3
eye
121:19

**F**

facial
114:20
facilities
34:6, 34:11,
34:22
fact
60:25, 103:5,
116:4, 188:13,
229:17
factor
213:20
facts
29:13, 139:6,
142:6, 270:13
fading
18:20
fail
141:12, 165:9
failed
136:18, 136:24,
138:20, 139:13,
149:21, 152:19,
165:8, 192:13,
224:24
failing
138:24
fair
98:19, 125:22,
126:22, 128:11,

fell
184:6, 222:2,
227:5, 227:24
felt
113:11, 113:23,
114:3, 118:1,
119:23, 136:7,
143:8, 144:17,
144:23, 156:14,
156:15, 170:24,
225:20, 252:25,
254:4, 256:19
female
114:7, 262:23
few
65:11, 99:24,
201:12, 219:7,
227:19, 234:7
field
153:22
fifth
268:9
fight
63:22
file
64:19, 64:20,
157:17, 158:18,
194:20, 195:16,
208:16, 253:16
filed
22:17, 22:19,
23:9, 23:14,
272:24
files
189:25, 191:4
filled
229:8
filling
174:22, 174:23,
226:9
final
284:2
finance
69:2, 69:9,
71:12, 85:12,
85:14, 91:8,
91:24, 123:11,
175:15, 248:12,

264:25
financial
30:23, 31:14,
31:18, 33:5,
34:7, 34:23,
35:3, 35:8,
35:20, 86:21,
91:11, 208:4,
234:4, 234:16,
234:20
financials
265:2
find
76:3, 84:21,
159:20, 160:5,
160:8, 185:7,
224:20, 225:7,
225:9, 260:12,
270:13
finding
225:4, 226:13,
263:7
findings
166:4
fine
227:5
finish
8:13, 8:16,
116:15, 173:23,
276:4, 276:6
fire
127:14, 155:19
fired
71:2, 71:8,
71:9, 73:3,
74:4, 74:9,
74:11, 74:13,
75:8, 75:13,
75:16, 76:9,
76:13, 76:16,
81:7, 82:13,
82:24, 85:3,
93:17, 93:18,
95:17, 96:15,
107:18, 107:21,
108:1, 108:6,
127:2, 127:12,
145:6, 155:25,

fairly
59:19, 133:7,
263:20
fall
70:16, 182:24,
183:21, 184:24,
224:17
familiar
27:22, 102:12,
219:23
family
13:2, 13:3,
13:14, 13:19,
13:24, 129:25,
265:8
far
13:10, 13:13,
26:4, 26:11,
30:16, 191:4,
191:6, 191:7,
273:23
federal
23:9, 23:14
fedexing
255:9
feedback
172:9
feel
8:23, 115:3,
118:17, 119:4,
120:3, 120:4,
143:6, 143:23,
144:22, 145:14,
170:20, 171:15,
171:24, 172:2,
214:10
feeling
114:24, 114:25,
166:10, 215:16
feelings
156:15, 173:4,
194:18
fees
59:17, 64:16,
282:16
feet
106:12

fell
191:14, 191:20

**189:23, 222:21**

**first**
11:17, 24:14,
33:4, 39:10,
50:19, 52:13,
53:8, 60:8,
60:17, 63:20,
63:21, 67:7,
67:23, 68:1,
72:8, 72:17,
76:10, 82:16,
93:5, 113:22,
114:12, 137:20,
137:21, 139:12,
157:6, 185:8,
206:25, 215:18,
217:13, 230:20,
286:14

**fisher**
2:15

**five**
31:24, 44:17,
44:18, 44:19,
45:10, 84:7,
89:8, 159:2,
173:14

**five-minute**
216:4

**fix**
198:3

**fixed**
91:25, 235:10

**fixing**
102:18

**follow**
43:10, 149:21,
150:1, 166:23,
170:3, 261:6,
266:6

**followed**
97:13, 268:18,
274:15

**following**
126:19, 261:14

**follows**
6:16

**followup**
161:21, 161:22,

172:9

**forcing**
210:8

**forgot**
16:11

**form**
24:17, 36:8,
36:17, 37:12,
56:12, 77:2,
77:10, 96:5,
98:24, 99:4,
116:2, 117:14,
125:25, 127:23,
127:24, 176:1,
176:5, 214:16,
248:2, 254:9,
267:20, 272:7,
275:17, 276:25

**formal**
7:11, 173:13

**format**
218:14

**former**
32:11, 93:21,
278:12, 278:16,
279:17, 280:11

**forms**
120:22

**forth**
102:23, 205:2

**fortner**
2:27, 5:6

**forward**
6:6, 83:4,
84:18, 157:17,
195:12, 208:9

**forwarded**
165:13, 190:18,
190:25

**forwarding**
158:2, 191:3,
195:14, 212:12

**found**
47:16, 88:2,
88:15, 160:13

**founded**
159:6

**four**
21:8, 23:23,

96:1, 97:13

**four-week**
85:24

**fourth**
268:9

**frame**
93:1, 99:23,
125:10, 161:3,
181:16, 242:14,
284:1

**free**
8:23, 64:19

**frequently**
265:6

**friday**
60:6, 178:6,
178:7, 183:7,
185:24, 186:6

**friend**
86:10, 108:11,
174:15

**friends**
110:20, 110:21,
196:9, 196:10

**front**
7:7, 7:18,
19:2, 19:14,
25:5, 36:5,
52:11, 54:10,
57:2, 65:1,
66:10, 66:18,
108:22, 130:7,
138:18, 146:9,
150:20, 151:13,
162:5, 192:22,
193:3, 235:1,
254:16, 257:16

**frustrated**
121:24, 122:4,
122:6, 122:10,
123:1

**frustration**
121:24, 122:7

**fulfill**
143:18, 187:16,
214:1, 226:23

**fulfilling**
89:13

**full**
42:10, 49:4,
49:23, 53:25,
93:9, 233:18,
274:5, 282:11

**full-time**
39:20, 40:23,
41:10, 49:8,
49:11, 49:17,
50:9, 50:12,
50:22, 51:3,
51:9

**fully**
132:1

**function**
73:24, 175:11,
177:10, 182:10

**functions**
56:21, 90:8,
101:21, 103:14,
104:15, 109:6

**further**
218:3, 272:1,
275:4, 281:9,
281:12, 283:21

**G**

**g-mail**
157:20, 251:3,
251:10

**gain**
257:2

**gained**
257:9

**galloway**
2:6

**games**
37:6, 272:10,
276:23

**gamesmanship**
63:18, 273:6

**gave**
30:11, 75:24,
79:15, 142:4,
149:17, 152:8,
156:4, 230:11,
253:5, 253:14,
263:14

**general**
11:5, 58:10,
118:24, 140:10
**geographic**
35:5
**geographical**
12:22
**geraghty**
55:7, 55:17,
56:6, 56:7,
69:12, 70:4,
70:6, 70:10,
70:18, 70:22,
71:25, 72:4,
72:12, 72:19,
72:25, 73:5,
82:11, 83:8,
85:2, 85:20,
87:4, 88:20,
90:23, 92:22,
93:19, 94:17,
95:12, 95:17,
96:2, 96:14,
99:25, 123:11,
222:1, 223:6,
223:25, 234:10,
234:14, 234:17,
234:23, 236:4,
236:23, 237:5,
237:12, 247:10,
247:11, 247:14,
266:5
**geraghty's**
86:17, 88:1,
88:14, 90:10,
101:4, 101:12,
222:8, 222:14,
234:2, 240:21,
263:23, 264:6
**geraldine**
98:16, 99:9,
106:24, 106:25,
107:3, 107:5,
108:11, 108:23,
118:2, 119:20,
124:5, 141:7,
143:4, 156:6,
156:20, 156:21,

166:17, 169:7,
169:10, 171:7,
171:11, 171:18,
174:15, 193:17,
193:21, 195:5,
196:10, 198:16,
198:25, 199:23,
203:15, 210:8,
213:20, 229:17,
229:24, 230:23,
232:4, 278:24
**german**
111:20, 111:25,
112:5, 112:7,
112:8, 112:16,
112:22, 113:7,
113:9, 113:17,
113:20, 114:11,
114:13, 114:15,
114:18, 115:14,
115:17, 115:18,
115:20, 115:23,
116:5, 202:23,
204:17, 205:10,
234:5, 271:1
**germany**
85:14, 91:12,
208:5, 208:8,
226:25, 234:9,
234:16, 266:11
**gerri**
106:15, 106:20,
106:23, 107:7,
109:3, 111:9,
119:20, 128:1,
129:24, 181:9,
193:17, 195:18,
196:15, 213:11,
225:11, 226:14,
227:4, 227:11,
228:2, 234:22,
267:14, 279:12
**gessner**
2:11, 5:11,
5:12, 5:22,
18:19, 19:6,
19:9, 19:23,
24:17, 24:20,

36:17, 37:20,
52:18, 52:23,
53:7, 53:18,
58:24, 60:14,
61:8, 61:19,
62:3, 62:18,
63:7, 63:15,
77:2, 77:10,
94:19, 95:6,
96:5, 98:24,
99:2, 99:13,
125:25, 127:23,
129:11, 135:7,
137:2, 137:7,
137:24, 138:8,
138:10, 138:15,
176:1, 176:4,
176:13, 176:16,
184:19, 185:8,
192:7, 214:16,
214:20, 216:2,
216:7, 248:2,
254:9, 255:5,
267:20, 268:13,
272:7, 273:12,
274:12, 275:13,
275:16, 276:2,
276:5, 276:7,
276:11, 276:15,
277:2, 277:11,
281:14, 282:1,
283:2, 283:18,
283:22, 284:5,
284:15
**gessnerlaw**
2:5, 5:15
**getting**
49:3, 104:6,
110:4, 142:24,
160:4, 180:15,
180:20, 181:22,
181:23, 198:25,
225:21, 236:6,
237:23, 238:24,
239:5
**gg**
2:6
**give**
7:15, 35:19,

37:4, 38:4,
53:9, 53:10,
53:25, 65:11,
75:12, 75:15,
78:19, 80:10,
97:7, 149:18,
172:18, 173:21,
174:1, 174:4,
185:2, 195:9,
198:13, 198:24,
203:17, 203:18,
204:5, 204:13,
206:10, 206:14,
209:5, 210:10,
237:15, 254:7
**given**
30:7, 41:14,
49:18, 49:23,
50:3, 62:21,
67:22, 71:10,
76:8, 76:12,
104:16, 109:24,
146:13, 148:3,
152:12, 169:4,
174:9, 181:12,
193:13, 193:16,
195:2, 231:4,
242:1, 247:9,
253:20, 284:6,
286:22
**gives**
169:22
**giving**
7:17, 154:2,
226:18
**glen**
2:27, 5:6
**go**
5:13, 13:11,
30:14, 31:17,
36:5, 56:13,
57:2, 64:1,
73:9, 79:1,
87:12, 101:16,
101:17, 102:20,
113:3, 115:22,
126:21, 131:8,
140:9, 140:11,

142:11, 160:6,
160:7, 166:24,
167:9, 170:12,
170:15, 171:6,
171:8, 171:12,
171:16, 171:17,
173:6, 173:24,
177:10, 194:8,
196:21, 198:20,
202:25, 203:9,
204:10, 206:16,
209:20, 210:10,
221:9, 222:16,
229:21, 231:20,
233:9, 238:2,
242:13, 252:23,
263:5, 264:10,
277:9, 277:12,
284:4, 284:6,
285:3
**goes**
67:9, 90:20
**goins**
107:20, 107:22,
108:13, 123:13,
174:12, 174:24,
174:25, 222:25,
223:24
**gone**
10:17, 132:2
**good**
6:19, 6:24,
113:21, 118:18,
129:9
**google**
186:25
**gopher**
171:17
**gorton**
14:24
**gosh**
16:14
**governmental**
23:1, 23:6
**graduate**
14:19, 14:23,
15:9, 15:11,
16:16, 16:21,

16:23
**graduated**
15:18, 15:22,
16:9
**granted**
88:19, 89:3,
250:21
**great**
66:12, 66:19,
263:13
**group**
27:17, 27:18,
30:1, 30:15,
30:16, 30:19,
30:25, 32:9,
33:14, 34:10,
35:25, 36:16,
38:21, 39:4,
123:16, 214:3,
253:21
**groups**
27:3, 27:6
**grove**
1:28
**growing**
130:4
**guess**
13:16, 96:23,
125:3, 136:4,
139:11, 245:13
**guessing**
134:25, 161:10
**guidance**
281:24
**gut**
114:23, 114:25
**gutter**
270:24
**guys**
180:12

**H**

**hallway**
106:3
**hand**
7:8, 200:2,
200:14, 200:18,
202:24, 286:28

**hand-delivered**
98:4
**handed**
33:25, 54:2,
254:3
**handful**
152:25
**handle**
71:10, 88:18,
103:22, 140:4,
144:19, 150:6,
195:4, 222:2,
248:8, 252:24,
253:1, 253:15,
254:5
**handled**
87:16, 92:5,
109:18, 224:5
**handling**
112:20, 232:4,
247:6
**hands**
103:22, 227:2,
227:25, 252:25,
253:2
**handwriting**
162:12, 162:17
**handy**
25:13
**hangs**
205:3
**happen**
85:19, 86:22,
154:25, 168:23,
172:4, 190:1,
196:20, 196:22,
240:1, 243:9
**happened**
125:12, 166:8,
182:1, 209:15,
230:14, 269:1,
269:6, 279:13
**happening**
180:3, 204:9
**happens**
203:9
**happy**
277:12

**harass**
38:11, 273:19
**harassed**
268:18
**harassing**
266:16, 267:17
**harassment**
23:11, 23:16,
266:25
**hard**
83:12, 121:2,
139:22, 141:20,
144:5, 175:3,
214:1, 226:1,
226:11, 256:16
**hardcopy**
54:3
**harsher**
111:14
**haynes**
2:12, 5:14,
5:15
**head**
57:22, 57:24,
58:1, 69:22
**health**
48:6, 48:17,
48:23, 49:6,
49:9, 49:19,
50:14, 50:17,
50:21, 51:5,
51:7, 124:20,
141:5, 142:2,
221:12, 221:15,
221:19, 221:21,
221:25, 225:2,
228:18, 229:11,
229:14, 231:13,
233:14, 233:22,
260:17, 260:24,
262:3, 262:4
**healthcare**
39:12, 39:14,
40:20, 41:8,
41:20, 43:12,
43:19, 45:14,
45:19, 48:4,
48:11, 48:19,

48:25, 49:7,
49:10, 49:18,
50:13, 50:23,
51:2, 51:3,
51:10, 225:4,
225:25, 229:5,
231:6, 260:19,
262:5
**hear**
8:1, 18:12,
18:18, 18:23,
18:25, 19:15,
19:17, 19:20,
19:21, 19:25,
20:3, 24:13,
31:4, 36:11,
39:24, 50:19,
71:16, 76:10,
89:18, 93:5,
112:2, 122:5,
122:14, 133:17,
138:8, 166:8,
173:10, 178:20,
197:12, 197:14,
197:16, 197:19,
197:22, 197:24,
197:25, 198:1,
198:8, 201:4,
201:6, 201:7,
201:12, 205:5,
205:7, 205:8,
205:10, 205:11,
205:19, 211:13,
219:8, 275:1
**heard**
6:20, 20:4,
84:9, 112:22,
120:1, 130:11,
172:17, 197:15,
201:5, 201:15,
278:21, 279:1,
279:15, 280:4
**heart**
261:23
**heights**
1:28
**held**
36:1, 51:12,

101:24, 102:1,
262:24
**hell**
145:20, 150:10
**help**
4:15, 86:24,
88:21, 110:3,
155:22, 256:1,
265:19, 266:7
**helped**
57:11, 222:6,
274:17
**helpful**
66:25, 102:16
**helping**
57:18, 274:4,
274:10
**here**
4:21, 18:8,
23:22, 30:10,
38:18, 59:2,
68:25, 69:8,
141:15, 148:6,
154:2, 155:4,
167:24, 169:18,
170:18, 171:7,
174:14, 180:19,
190:2, 204:8,
206:11, 206:12,
211:9, 211:12,
211:18, 266:11,
274:21, 282:10
**hereto**
286:25
**heritage**
129:22
**herself**
93:23, 122:18,
170:12
**hi**
5:14
**hickman**
158:13
**hierarchy**
95:23, 96:4,
96:9, 150:2
**high**
11:4, 14:19,

14:22, 14:24,
15:1, 15:18,
71:5, 124:17,
155:23
**higher**
172:20
**himself**
130:21, 149:25,
179:5
**hip**
143:10, 143:11
**hire**
87:8, 169:20
**hired**
39:18, 55:6,
55:10, 55:13,
56:10, 56:22,
57:16, 87:3,
99:21, 100:17,
106:15, 106:23,
107:1, 109:4,
109:10, 110:19,
113:22, 118:2,
174:16
**hiring**
25:12, 86:5,
86:8, 111:2,
265:20
**hispanic**
10:16, 108:16,
108:17, 111:15,
127:9, 133:6,
145:14
**history**
36:6, 39:8
**hold**
30:24, 40:5,
40:6, 42:7, 53:2
**holding**
115:25, 179:10,
246:15, 246:23,
247:4
**holidays**
43:5, 183:10
**home**
145:6, 187:15,
189:9, 189:12,
194:24, 194:25,

195:11, 209:20,
212:20, 213:5,
215:12, 215:13,
227:20, 229:19,
229:21, 243:20,
251:23, 252:1,
252:2, 258:15,
258:22, 259:6,
259:7, 263:15,
263:16, 263:17
**honest**
38:4
**honestly**
16:15, 74:5,
152:14, 175:2
**hoodwinked**
53:23
**hoped**
261:8
**hopefully**
196:25
**hopes**
174:7
**hour**
40:4, 41:7,
42:15, 61:12,
216:5
**hourly**
41:1
**hours**
20:22, 21:2,
21:8, 39:23,
40:1, 40:2,
41:11, 41:13,
41:14, 41:17,
42:12, 44:15,
44:17, 44:18,
44:19, 45:7,
45:10, 45:12,
263:14, 263:25,
264:4, 264:9,
264:13, 264:14,
264:15, 264:16,
265:10, 265:15,
282:11
**house**
2:6, 252:6
**household**
13:15, 26:19

however
6:1, 27:19,
100:11, 147:1,
200:12
hr
70:8, 71:11,
79:17, 85:13,
132:8, 132:15,
149:22, 159:23,
221:5, 225:1,
263:6
human
58:3
husband
13:7, 13:18,
14:16, 51:13,
130:11, 210:18,
233:20, 233:22,
253:10, 265:8,
280:24

I

idea
101:18, 112:18,
155:13, 161:2,
161:20, 179:19,
180:10, 180:17,
196:4, 227:15
identify
4:15, 4:17
ignore
140:18
ignored
117:8, 117:22,
118:7
ignoring
116:13, 116:17,
116:21, 140:15
immediate
13:14, 13:19
immediately
25:16, 82:11,
279:13
important
136:18, 136:25,
138:21, 138:25,
139:14, 141:1,
159:14, 284:8

importantly
131:25
impossible
85:17
improper
37:11, 38:14,
53:17, 185:4,
268:1, 268:5,
268:7, 268:10,
273:10, 277:7,
283:8
improperly
192:16
in-person
15:25, 82:2,
82:9, 147:13,
147:17, 161:7,
161:9
inaccurate
153:3, 154:11
inappropriate
37:11, 254:14
inc
1:10, 4:24,
5:19, 6:22
include
91:7, 136:18,
136:24, 138:21,
138:25, 139:13,
140:8, 140:25,
167:6, 167:10,
167:14, 167:16,
167:17, 182:6,
221:11, 267:22,
272:21
included
85:13, 167:7,
180:21, 183:5
includes
215:1, 217:23
including
72:6, 124:6,
169:14, 220:15,
254:17, 269:3
incorrect
16:11, 192:17
increase
83:7, 87:19,

88:8, 88:12,
88:19, 89:2,
89:3, 89:9,
89:23, 90:2,
156:5, 172:18,
265:18
increased
86:3, 173:18
increasing
84:12, 173:9,
173:17
incurred
246:10
indeed
45:15, 46:2,
65:21
indefinitely
260:1
independent
66:20
index
3:1
indicated
165:7, 240:13
indirect
56:4
individuals
79:20, 80:25,
98:21, 98:23,
99:8, 100:1
infamous
196:2
influence
9:20, 9:22
influencing
268:11
inform
140:3, 215:14
information
10:2, 64:5,
66:17, 91:11,
109:21, 117:12,
117:25, 119:3,
134:21, 136:19,
137:1, 138:22,
139:1, 139:15,
141:9, 162:5,
164:14, 164:22,

166:5, 177:14,
181:25, 198:25,
200:3, 200:19,
203:18, 203:19,
219:16, 226:6,
226:18, 230:12,
233:15, 234:9,
234:22, 234:25,
257:2, 259:13
informed
38:6, 54:24,
179:20, 179:25,
180:2, 229:8
informing
20:2
inherit
240:7
inherited
182:16
initial
260:5
initially
84:14, 87:24
initiated
22:25, 23:5,
279:3
ink
162:15
inquire
225:3
insisted
63:25
insperity
76:2, 77:1,
77:7, 77:14,
77:19, 77:22,
77:24, 78:20,
78:24, 79:2,
79:8, 79:11,
79:13, 79:19,
80:4, 80:15,
81:6, 81:10,
81:13, 81:18,
81:23, 132:15,
133:4, 149:22,
175:14, 177:15,
219:17, 221:3,
221:22, 221:24,

223:20, 224:3,
224:8, 224:11,
224:22, 227:12,
228:4, 228:14,
228:17, 228:19,
228:22, 229:11,
231:24, 232:24
**insperity's**
80:20, 81:2,
229:11
**instance**
167:8
**instances**
119:7, 140:24
**instead**
185:11, 236:5,
258:25
**instruct**
53:20, 254:10
**instructed**
203:1, 282:5,
283:11
**instructing**
255:6
**instruction**
281:20
**instructions**
78:19
**instructs**
9:7
**insulting**
271:2
**insurance**
48:7, 48:10,
48:13, 48:17,
48:18, 49:6,
49:10, 49:19,
50:6, 50:17,
50:22, 50:24,
51:5, 51:7,
51:14, 221:14,
221:15, 221:19,
221:21, 228:18,
228:20, 231:14,
231:19, 232:2,
232:3, 233:10,
233:14, 233:21,
233:23, 261:6,

262:4
**insured**
51:12
**integrity**
108:25
**intended**
262:19
**intentionally**
185:16, 267:25
**intentions**
156:10
**interact**
101:11, 103:5,
103:16
**interacted**
126:23
**interaction**
201:18
**interactions**
101:14, 104:3,
107:14, 201:20
**interested**
255:1, 286:25
**interfere**
277:8
**interim**
86:25, 87:3,
87:21, 88:15,
95:13
**interpret**
200:13, 244:20
**interrupt**
276:14
**interruptions**
4:20
**intervention**
281:19, 283:15
**interview**
159:24
**invalid**
231:19
**inventory**
91:16, 92:2,
92:10, 110:17,
110:18
**inver**
1:28
**invoices**
104:19, 167:9,

217:23, 240:23,
241:1
**involved**
78:10, 123:14,
177:16, 223:14,
224:13
**involvement**
80:20
**involving**
28:23, 29:4,
29:13
**iona**
15:6, 15:17,
15:20, 16:10,
17:9, 17:11,
17:14, 21:10
**iphone**
236:15, 238:5,
239:2, 239:12,
240:2, 241:6,
242:7, 242:10,
242:17, 249:6,
249:23
**irrelevant**
155:14
**isolated**
143:24, 156:16
**issue**
59:17, 59:18,
63:10, 63:12,
111:23, 125:6,
132:20, 134:5,
146:1, 146:17,
170:22, 174:18
**issued**
205:21, 206:4
**issues**
92:17, 92:18,
104:19, 111:22,
115:2, 123:3,
127:1, 127:16,
132:13, 133:5,
134:9, 140:21,
143:4, 143:5,
166:15, 166:17,
233:6
**items**
119:11

**itself**
215:6

### J

**james**
158:11, 158:12,
278:17, 280:3,
280:4, 280:5
**january**
54:19, 54:24,
69:25, 217:7,
222:16, 230:7,
232:15, 232:21,
252:10, 252:15,
264:8, 278:14
**jar**
227:2
**jason**
158:12
**jensen**
1:19, 6:11,
284:16, 286:32
**jeremy**
12:12, 12:14,
150:8
**jersey**
26:16, 35:1,
35:24, 241:11
**job**
43:22, 43:24,
46:4, 47:19,
47:20, 56:9,
56:17, 58:3,
58:6, 58:9,
65:23, 66:13,
67:4, 67:23,
68:2, 68:3,
69:11, 71:14,
73:24, 83:4,
85:2, 86:17,
88:14, 90:8,
90:18, 90:22,
92:23, 93:21,
93:24, 94:16,
95:11, 97:3,
97:5, 100:16,
100:20, 101:21,
103:14, 104:14,

107:15, 109:6,
109:9, 109:22,
110:2, 110:9,
110:10, 116:14,
117:9, 117:21,
120:4, 120:5,
133:8, 135:13,
135:17, 145:15,
150:10, 160:7,
175:11, 175:21,
177:10, 177:20,
182:10, 194:4,
222:15, 233:10,
234:3, 263:18,
263:23, 264:6,
265:12, 265:21,
266:8
**joined**
241:14
**journal**
28:20, 29:1
**judge**
7:13, 7:18,
59:4, 62:9,
62:16, 63:2,
63:10, 63:12,
64:2, 277:10,
277:12
**judge's**
59:12
**july**
70:6
**jury**
7:13, 7:18,
7:19
**justification**
115:6
**justify**
265:17

**K**

**k**
48:7, 49:25,
50:1
**keep**
18:20, 92:8,
93:6, 122:11,
169:13, 170:5,

187:23, 272:8,
274:3, 276:2,
276:8, 276:15
**keeping**
226:9
**keeps**
192:8
**kept**
86:6, 87:15
**kesser**
55:22, 56:3,
56:8, 71:6,
73:3, 73:5,
74:4, 74:13,
74:16, 74:25,
75:4, 75:13,
78:17, 79:4,
81:24, 82:13,
82:25, 85:3,
93:15, 95:16,
96:2, 223:4,
223:25, 237:13
**key**
68:7, 68:17,
90:21, 91:1,
91:5
**kind**
69:5, 121:23,
141:17, 171:15,
172:19, 184:10,
190:16, 210:9,
230:4
**kitchen**
106:8
**kiwanis**
27:20
**knew**
72:13, 80:19,
81:5, 86:23,
110:23, 134:19,
152:11, 166:9,
194:25
**knowledge**
81:2, 112:17,
128:2, 129:4,
135:23, 136:9,
136:12, 172:12
**known**
111:1, 233:16,

233:18, 233:19,
245:25, 286:5
**knows**
38:7

**L**

**l-u-i-s**
11:18
**labor**
100:14
**lack**
63:17, 139:25
**laid**
29:23, 30:14,
39:5
**lancaster**
23:19
**lane**
23:19, 24:1,
24:24, 25:8,
25:15, 26:22
**language**
109:1, 113:17,
205:10, 271:3
**lap**
222:2
**lapse**
227:10
**laptop**
189:5, 189:7,
189:8, 250:1,
251:15, 251:17,
251:19, 251:24,
251:25, 252:3,
252:6, 252:11,
252:12, 253:5,
253:11, 253:23,
254:7, 255:10,
256:6, 256:21,
256:23, 257:9,
258:13, 258:15,
258:16, 258:18,
258:24, 259:1,
259:2, 259:5,
259:9, 259:23,
260:2, 263:16,
281:22, 282:23,
282:24, 283:5

**laptops**
258:12, 259:14
**last**
10:19, 14:4,
17:22, 33:12,
42:20, 55:2,
60:6, 152:22,
189:18, 191:17,
192:15, 194:9,
201:12, 201:15,
211:7, 211:8,
211:10, 211:17,
229:2, 250:5,
260:18, 275:5
**late**
60:23, 230:3
**later**
76:13, 170:19,
198:2, 249:11,
266:6, 281:17
**latin**
129:23, 156:17,
262:23
**latina**
136:4
**latter**
249:11
**laughing**
114:21
**laws**
132:10
**lawsuit**
21:24, 22:6,
22:25, 28:9,
162:25, 214:15,
215:10
**laying**
98:4
**layoff**
30:3, 30:4
**layout**
106:1, 106:4
**learn**
71:13, 85:11,
85:18, 92:1,
92:16, 111:1,
111:4, 195:2
**learned**
225:10

**learning**
46:20, 88:17
**lease**
25:5
**least**
61:11, 268:9
**leave**
70:23, 71:1,
71:2, 71:7,
73:5, 142:14,
155:4, 202:13,
202:25, 203:2,
204:18, 205:4,
209:8, 209:14,
209:23, 210:4,
210:12, 263:8,
264:11
**leaving**
41:21, 71:25,
72:4, 72:12,
72:25, 133:8,
209:16, 210:14
**ledger**
164:3
**left**
31:9, 34:21,
43:14, 45:15,
46:5, 47:21,
47:25, 54:18,
54:22, 69:3,
69:12, 70:4,
70:6, 70:10,
70:13, 70:19,
70:23, 73:9,
73:14, 73:17,
81:19, 83:20,
85:3, 85:20,
85:21, 86:3,
86:22, 90:24,
91:10, 91:22,
91:25, 93:3,
93:7, 93:21,
94:2, 95:19,
96:3, 96:4,
96:14, 100:1,
100:6, 123:15,
151:18, 153:22,
159:21, 163:19,

202:14, 204:14,
222:21, 223:10,
223:17, 234:10,
234:17, 242:8,
247:10, 251:16,
251:22, 252:2,
265:23, 278:10,
278:14, 278:23,
279:18, 280:1,
280:11
**legal**
139:6, 246:14,
246:22, 247:3,
254:21, 254:23,
282:6
**legitimate**
145:9, 155:7
**legitimately**
145:11
**length**
30:17, 44:2,
202:4, 231:21,
261:11
**lengthy**
76:6
**less**
40:2, 42:13,
45:10, 71:8,
89:8
**let's**
82:7, 84:9,
91:23, 157:12,
187:18, 242:13
**letter**
59:13, 60:3,
60:9, 61:18,
75:18, 76:2,
76:17, 108:10,
142:4, 148:12,
148:13, 148:18,
148:21, 153:14,
160:8, 163:11,
165:7, 193:3,
193:5, 193:7,
193:8, 193:10,
193:14, 193:16,
193:21, 193:23,
194:3, 199:2,

199:5, 199:20,
200:2, 200:18,
201:1, 204:23,
205:22, 205:24,
206:1, 206:5,
206:7, 206:14,
215:2, 216:16,
227:19, 228:8,
228:22, 229:21,
232:3, 232:10,
232:11, 232:14,
232:23, 233:1,
249:18, 249:20,
253:18
**letters**
148:15, 148:16
**letting**
8:16, 228:22
**liability**
245:23, 246:6
**liebl**
98:13, 99:1,
99:9, 99:18,
100:7, 101:8,
101:11, 101:23,
103:5, 104:13,
106:15, 106:23,
108:23, 110:19,
111:1, 111:13,
112:16, 112:22,
117:20, 119:1,
126:14, 129:6,
129:24, 130:3,
130:8, 131:20,
135:12, 135:16,
136:17, 136:24,
138:24, 139:13,
142:20, 144:7,
147:3, 147:15,
149:4, 150:12,
150:16, 150:23,
153:9, 154:17,
162:6, 167:25,
168:20, 181:8,
195:18, 195:23,
196:15, 198:9,
200:24, 201:19,
202:2, 203:5,

204:13, 205:17,
205:21, 206:4,
207:25, 208:20,
208:24, 209:12,
213:9, 266:16,
266:24, 267:10,
270:16, 270:18,
271:21, 272:3,
274:22, 275:9
**liebl's**
106:11, 131:14,
156:10
**life**
130:2, 145:19,
173:5, 261:21,
262:10, 262:16
**limit**
165:6
**limited**
77:17, 93:25,
134:15, 149:16
**limiting**
275:18
**line**
181:14, 181:21,
192:13, 205:17,
236:25, 238:3,
240:11, 241:9,
242:10, 242:18,
242:21, 243:2,
243:11, 243:24,
244:18, 245:19,
245:21, 246:10,
246:16, 246:24,
247:12, 247:18,
248:7, 249:1,
271:3, 274:15
**lines**
120:14, 165:20,
247:7, 247:8
**link**
60:18, 60:20
**linkedin**
45:25, 46:2,
65:21
**lions**
27:21
**lips**
19:12

list
56:19, 57:1,
73:11
listed
66:1
listen
136:1, 197:1,
201:10
listening
126:11
literally
277:23
litigation
277:19
little
68:9, 174:8,
179:10
live
12:13, 12:16,
12:20, 14:1,
14:7, 24:3,
25:6, 25:16,
25:24
lived
23:21, 23:22,
24:5, 26:21
lives
12:14, 12:15,
14:12, 266:11
living
25:15, 25:16,
26:22, 130:5,
145:19, 150:10
llp
2:15
located
15:1, 17:25
location
5:8, 27:10,
35:24
locked
257:3, 259:22
log
189:13, 260:3
log-in
259:13
logistics
222:4

logo
192:24
long
23:21, 23:22,
24:5, 27:13,
30:24, 35:3,
35:15, 40:5,
40:6, 42:16,
44:6, 56:19,
66:5, 95:21,
100:6, 125:8,
133:15, 133:18,
133:19, 240:12,
261:12, 264:10,
266:20, 268:23
longer
46:21, 47:17,
83:13, 249:13
look
45:20, 45:24,
121:22, 126:21,
153:7, 157:12,
182:18, 183:13,
183:20, 218:23,
224:7, 224:11,
225:3, 241:1
looked
150:11, 152:20,
152:21, 163:4,
163:15, 170:13
looking
12:17, 38:18,
52:24, 66:21,
67:3, 86:9,
86:18, 90:21,
140:1, 140:2,
141:13, 188:2,
217:13, 230:20,
265:24
looks
65:19, 97:11,
158:17
loop
226:9
loss
235:3
lost
63:22, 265:11

lot
73:8, 75:21,
77:15, 87:10,
93:1, 117:6,
118:6, 119:6,
123:6, 124:25,
125:4, 126:12,
127:1, 128:11,
130:23, 156:5,
187:13, 195:7,
209:17, 209:19,
222:6, 224:23,
226:8, 227:17,
229:6, 270:24,
271:1, 280:14,
280:25
lots
267:21
loud
113:8
love
142:15
loved
263:18, 263:19
low
197:15, 197:17
lower
65:6, 98:15
lowest
230:21
luis
11:16, 13:18,
280:24
lunch
61:10, 61:15,
62:5, 95:1,
95:2, 129:10,
130:17
luncheon
179:10
lunchroom
181:1

**M**

macevedo@teupen--
usa
250:16
machine
167:9

made
9:5, 47:8,
53:16, 61:21,
114:4, 114:17,
117:9, 117:10,
120:3, 120:4,
120:18, 120:20,
121:4, 121:12,
121:16, 132:14,
134:6, 139:4,
140:18, 142:12,
143:23, 144:4,
145:19, 150:9,
153:19, 165:19,
166:16, 168:1,
171:12, 171:15,
172:2, 175:3,
176:2, 182:8,
182:11, 202:1,
257:4, 257:15,
258:25, 268:9,
270:7, 270:17,
270:20, 274:22,
275:20
magistrate
62:15, 63:2,
63:10, 63:12,
277:9
magistrate's
62:5
maiden
10:21, 10:22,
10:23
mail
75:17, 75:18,
76:2, 76:19,
76:20, 76:21,
76:23
mailed
76:17, 76:18
mailing
255:9
main
104:3, 258:19,
259:9
mainly
91:10, 117:14
maintained
112:19

maintenance
100:22, 102:20,
103:24, 105:19,
105:23, 124:25,
127:4, 180:14
major
15:15
majority
65:25
make
5:24, 9:4,
16:6, 20:3,
28:20, 29:1,
29:7, 29:8,
52:8, 62:10,
63:19, 64:3,
86:23, 91:3,
93:23, 94:24,
103:1, 104:10,
171:24, 172:15,
175:9, 177:13,
198:5, 225:23,
242:9, 247:23,
247:25, 252:10,
276:24, 277:3,
285:6, 285:7
making
63:24, 89:22,
116:14, 119:19,
174:12, 174:14,
175:6, 177:2,
246:2, 266:24
male
111:15
man
266:10
manage
244:13
management
98:12
manager
31:6, 31:8,
34:3, 34:4,
34:21, 67:4,
67:20, 68:5,
68:20, 69:7,
69:18, 70:1,
70:3, 90:12,

90:18, 91:1,
91:5, 92:4,
97:6, 100:23,
104:1, 104:20,
105:16, 107:16,
124:8, 127:3,
127:4, 159:25,
169:21, 174:11,
175:10, 236:4,
264:23
manager's
174:10
managing
100:21, 248:17,
248:21
manner
71:3
many
12:8, 13:3,
20:13, 20:22,
21:2, 39:23,
40:1, 42:12,
44:15, 52:19,
57:13, 82:18,
89:13, 105:9,
105:12, 105:14,
106:12, 115:19,
116:25, 120:22,
123:8, 147:1,
147:17, 147:19,
148:7, 227:2,
263:14, 263:25,
264:4, 265:9,
265:15
marjorie
1:5, 1:17, 3:3,
4:23, 6:14,
10:17, 250:4,
284:24, 286:6
mark
138:11
marked
3:10, 137:25,
273:1
marking
138:3
markings
28:21, 29:2,

29:7
marks
284:23
marred
261:21
marriage
12:1
married
11:13, 11:19,
11:20, 12:2
martin
2:25, 5:20,
71:18, 71:19,
72:1, 72:6,
72:9, 72:17,
74:15, 74:22,
86:8, 86:12,
86:17, 87:3,
87:9, 87:19,
88:2, 88:7,
88:24, 89:2,
94:15, 96:16,
96:17, 96:20,
96:21, 98:10,
101:7, 101:9,
105:8, 111:7,
111:8, 132:19,
133:22, 133:24,
133:25, 134:2,
134:8, 142:9,
142:11, 146:4,
149:17, 150:21,
152:11, 156:8,
156:9, 159:9,
161:25, 172:18,
173:9, 173:12,
173:16, 174:16,
186:17, 187:9,
193:25, 194:6,
196:9, 196:16,
198:14, 198:19,
198:22, 199:1,
200:14, 201:9,
203:1, 203:13,
203:23, 204:6,
204:24, 206:10,
206:11, 206:12,
207:22, 209:3,

210:2, 210:4,
212:4, 213:18,
224:21, 225:7,
225:22, 226:7,
227:8, 228:1,
228:5, 243:22,
248:13, 250:19,
250:22, 256:16,
256:23, 265:14,
266:6
martin's
206:9, 257:5
match
151:24
materials
217:20
matter
4:23, 63:2,
229:17
maybe
84:7, 89:16,
94:4, 94:20,
114:5, 130:10,
130:11, 155:24,
197:16, 258:7,
274:5
meaning
136:25, 138:21,
247:5
meaningful
60:3, 64:7
meaningless
170:23
means
8:9, 21:25,
244:20, 261:9
meant
116:11, 220:14,
220:17
measurements
105:7
mechanics
180:14
mediator
160:1
medical
49:3, 49:6,
132:2, 211:6,

212:22, 213:4,
214:6, 214:23,
215:7, 215:22,
215:23
**medications**
9:21
**meet**
72:17, 72:19
**meeting**
82:2, 82:16,
82:21, 83:13,
83:17, 122:8,
134:14, 168:19,
168:23, 169:6,
170:13, 170:18,
171:1, 172:5,
195:17, 195:19,
195:25, 196:2,
196:3, 196:5,
196:7, 198:9,
202:4, 203:4,
203:6, 203:9,
204:23, 206:17,
207:25, 208:20,
208:24, 279:12
**meetings**
82:3, 82:9,
82:14, 82:18,
118:18, 144:13,
263:4
**melissa**
32:21, 33:17,
33:18, 33:20
**member**
27:2, 27:5,
27:8, 27:11,
27:13, 27:17,
27:23
**members**
13:3, 13:23,
26:18
**memo**
157:17, 158:18,
189:25, 191:4,
194:20, 195:16,
208:15
**memories**
118:25

**memorize**
36:21
**memory**
36:24, 38:5,
38:17, 38:25,
66:20, 66:25,
72:23, 107:13,
167:22, 178:13,
180:9, 184:1,
186:8, 187:2,
188:17, 188:22,
217:8, 237:20,
258:6, 281:5
**men**
75:1, 75:5,
128:9, 128:13
**mental**
260:17, 260:24,
262:3
**mentioned**
21:19, 46:6,
58:2, 71:6,
73:3, 89:6,
89:7, 92:13,
96:1, 105:20,
110:19, 111:10,
116:6, 119:16,
120:12, 130:24,
134:18, 134:22,
135:4, 135:5,
140:20, 146:20,
148:17, 148:22,
149:11, 156:25,
159:4, 160:22,
181:19, 182:4,
183:8, 222:22,
223:23, 230:24,
265:16, 270:12,
280:19
**message**
280:1
**mic**
4:12, 93:6,
112:4
**michelle**
2:11, 5:12,
129:8
**michelle@mgessne-
rlaw**
2:10

**microphone**
18:22, 18:24
**middle**
60:4, 61:16,
106:4, 106:9,
162:14, 204:22
**midst**
86:5, 210:12,
210:17, 226:5,
249:9, 262:24
**might**
114:11, 129:9,
131:21, 143:10,
153:7, 173:8,
188:7, 189:2,
233:2, 245:1,
250:25, 252:16,
281:13
**mind**
66:11, 66:18,
255:13, 256:19
**minimal**
134:15
**minnesota**
1:21, 286:1,
286:10
**minute**
19:6, 19:9,
19:23, 46:6,
62:4, 99:3,
137:8, 137:9,
176:4, 184:20,
194:8, 268:14,
273:17, 275:16,
276:7
**minutes**
31:24, 31:25,
32:1, 58:14,
61:11, 65:12,
83:13, 84:8,
89:8, 94:5,
95:3, 99:24,
161:25, 192:15,
219:7, 244:3,
266:12
**mischaracterizes**
185:5
**mislead**
274:8

**mispronounce**
250:5
**miss**
24:13, 116:7
**missed**
24:13, 76:10,
227:9
**missing**
117:25, 166:4
**misstate**
116:7, 259:17
**mistake**
16:6
**mistreated**
145:12
**misty**
107:20, 107:22,
108:7, 108:13,
123:13, 174:12,
174:24, 174:25,
222:25, 223:24
**mixing**
115:8
**mm-hmm**
68:13, 97:15,
157:18, 158:20,
203:8, 241:5
**mn**
1:28
**mobile**
113:1, 245:24,
246:6
**modify**
280:18
**molyn**
98:16, 99:9,
106:15, 106:23,
107:3, 108:23,
109:3, 110:8,
110:20, 111:9,
120:14, 123:1,
123:16, 126:3,
128:1, 129:24,
130:3, 130:8,
147:5, 147:7,
147:11, 147:15,
149:4, 150:12,
165:19, 168:1,

168:20, 171:3,
172:6, 172:15,
175:6, 175:25,
181:9, 195:18,
195:24, 196:15,
196:19, 198:10,
198:11, 200:4,
200:19, 200:25,
201:18, 202:2,
203:5, 204:13,
207:25, 208:20,
208:25, 209:12,
213:11, 230:23,
231:5, 231:9,
267:14, 269:11,
269:18, 269:23,
270:7
**molyn's**
125:23, 168:21
**moment**
6:20, 24:10,
25:14, 67:15,
97:7, 163:4,
165:12, 187:1,
198:7, 205:22,
206:24, 267:13
**monday**
60:25, 186:2,
186:5, 187:21
**money**
88:22, 103:2,
164:9, 172:20,
224:23
**monitor**
5:4
**month**
24:11, 24:15,
26:8, 30:18,
31:18, 42:18,
44:4, 46:13,
51:17, 78:13,
146:10, 169:1,
227:17, 227:22,
228:24, 240:24
**month-end**
226:24
**monthly**
91:23, 116:16,

236:25
**months**
23:23
**more**
17:4, 41:13,
45:11, 56:20,
71:8, 82:21,
84:13, 89:10,
146:16, 147:20,
161:24, 164:16,
165:18, 172:20,
173:20, 173:25,
174:4, 174:8,
174:9, 174:13,
175:9, 186:11,
201:23, 202:16,
257:14, 271:18,
273:23, 277:23,
280:25, 281:3
**morehead**
2:7
**morning**
6:19, 6:23,
151:18, 159:7,
159:20
**morrell**
61:3
**most**
8:24, 69:8,
69:10, 77:20,
95:18, 95:20,
96:3, 106:6,
112:9, 112:18,
113:2, 115:1,
118:11, 123:25,
126:8, 126:16,
126:24, 131:25,
152:1, 178:7,
186:16, 228:10,
261:7
**mostly**
125:15, 125:19
**motive**
175:2, 189:23
**mouth**
270:25, 273:21
**move**
25:17, 26:3,

26:4, 26:10,
26:14, 187:24,
210:11, 254:14,
273:8, 274:10,
274:17
**moved**
18:8, 24:11,
25:19, 26:15,
26:17, 30:9,
30:13, 34:14,
34:17, 35:8,
35:23
**much**
4:20, 20:1,
31:24, 54:3,
85:11, 85:18,
89:21, 142:16,
172:21, 174:14,
175:5, 175:9,
266:13
**muffle**
119:24, 120:25
**muffled**
19:16, 20:4
**multiple**
57:20, 85:12,
121:5, 123:12,
127:20, 132:2,
135:8, 201:6,
267:21
**mumble**
166:7
**mumbled**
271:10
**murmur**
166:7
**mute**
4:12
**myself**
104:8, 114:7,
156:4, 163:2,
187:24, 194:20,
195:16, 243:16,
286:19

**N**

**name**
6:19, 10:19,

10:21, 10:22,
10:23, 11:15,
11:17, 14:2,
14:10, 17:6,
33:12, 36:13,
46:9, 57:21,
57:23, 57:25,
80:4, 80:8,
101:17, 101:18,
107:4, 127:5,
152:10, 164:25,
206:9, 211:3,
219:22, 232:10,
232:17, 232:20,
244:22, 248:14,
250:5, 279:23
**names**
10:18, 12:11,
14:4, 73:10
**national**
10:15, 108:13,
129:19, 131:23,
266:18, 267:1,
267:9, 267:18,
269:13, 270:21,
271:5, 271:15,
271:23
**necessary**
8:13, 269:5
**need**
8:4, 9:11,
31:24, 43:2,
53:20, 58:11,
58:14, 59:7,
59:16, 59:24,
64:13, 67:16,
88:20, 109:21,
110:8, 117:16,
117:25, 141:15,
162:9, 167:17,
168:9, 170:4,
170:5, 170:10,
203:17, 203:18,
209:21, 210:9,
230:3, 237:25,
285:4, 285:5
**needed**
42:24, 60:1,

103:7, 103:10,
104:12, 109:23,
118:4, 118:14,
119:3, 124:8,
126:18, 126:20,
149:11, 167:9,
167:10, 167:13,
175:19, 182:11,
182:17, 185:14,
223:19, 223:20,
226:11, 230:5,
230:10, 233:5,
233:6, 258:4,
259:12, 261:7,
265:13
**needle**
143:10
**needs**
54:4, 209:19,
272:22
**negatively**
196:22
**nervous**
210:13, 210:17,
210:23, 211:25
**nest**
41:25, 42:3,
42:8, 42:16,
42:21, 43:13,
43:17, 43:18,
45:13
**network**
219:23, 219:25,
220:4, 220:19,
220:22, 238:25,
239:9, 257:22,
260:12
**never**
29:18, 29:22,
67:24, 72:3,
77:14, 83:12,
87:9, 90:25,
91:12, 91:13,
91:16, 91:17,
91:19, 92:3,
92:10, 108:18,
125:5, 127:10,
130:2, 131:3,

144:14, 145:2,
150:14, 150:19,
152:4, 161:20,
166:25, 172:8,
172:9, 173:11,
212:19, 218:11,
227:7, 234:15,
243:21, 249:3,
257:9, 273:1
**new**
10:7, 10:8,
10:9, 15:2,
15:7, 26:16,
34:19, 34:25,
35:24, 38:15,
40:21, 87:12,
92:6, 92:16,
124:17, 130:5,
140:3, 141:4,
141:13, 179:24,
180:7, 180:9,
181:12, 182:22,
225:24, 225:25,
227:13, 229:5,
229:14, 231:14,
232:1, 237:2,
237:4, 237:8,
237:25, 238:5,
239:3, 241:6,
241:8, 241:11,
244:22, 244:24,
246:2, 246:3,
253:22
**next**
8:17, 41:5,
53:12, 142:19,
144:9, 146:22,
155:24, 183:11,
187:24
**nice**
177:8
**nicole**
2:12, 5:15
**night**
19:8
**nobody**
69:4, 194:25,
210:21, 248:8

**non-accounting**
57:9
**non-hispanic**
142:20
**none**
3:10
**nonimmediate**
13:24
**nonsense**
154:4
**nonsmokers**
133:13
**nope**
7:8
**normal**
168:5
**north**
1:2, 1:10, 2:8,
2:18, 4:24, 5:1,
5:18, 6:21,
12:14, 12:16,
12:21, 12:25,
13:20, 13:25,
14:8, 14:13,
14:17, 18:9,
22:10, 22:14,
24:2, 25:17,
25:20, 26:3,
26:4, 26:15,
26:17, 26:21,
30:10, 35:9,
35:16, 35:22
**notary**
1:19, 286:8
**note**
53:15, 53:18,
60:5, 60:16,
145:8, 194:20,
212:2, 212:4,
212:13, 214:18,
214:22, 215:4,
215:5
**noted**
63:21, 176:18
**notes**
28:20, 29:1,
29:12, 261:10
**nothing**
155:4, 155:6,

172:2, 271:18,
271:25, 275:3,
284:19, 286:15
**notice**
1:17, 85:24,
133:20, 146:13,
148:2, 151:5,
151:7, 151:13,
151:17, 152:6,
152:9, 152:12,
152:16, 153:6,
153:10, 154:23,
155:9, 157:2,
158:24, 159:16,
159:21, 160:4,
160:21, 161:14,
161:17, 162:7,
163:7, 165:1,
169:3, 178:23,
179:1, 223:22,
229:10, 231:24,
233:2
**noticed**
5:25, 63:20
**notions**
114:22
**november**
40:16, 40:21
**number**
4:22, 5:1,
13:6, 41:14,
45:7, 67:12,
67:14, 68:23,
79:24, 138:4,
193:1, 216:21,
235:22, 241:7,
241:8, 241:10,
241:12, 241:17,
241:21, 242:1,
242:2, 242:4,
242:11, 243:3,
245:17, 245:18,
245:24, 246:6
**numbered**
68:22
**numbers**
52:19, 121:21,
122:1, 122:21

## O

**oath**
7:16, 11:10,
286:12
**object**
24:17, 36:17,
37:12, 37:17,
63:11, 77:2,
77:10, 96:5,
98:24, 99:3,
125:25, 127:23,
127:24, 176:1,
176:5, 214:16,
248:2, 254:9,
267:20, 272:7,
275:13, 275:17,
282:1, 282:21
**objected**
274:13, 282:15
**objection**
5:23, 9:5,
19:24, 37:9,
37:21, 38:14,
53:7, 53:16,
62:13, 62:15,
62:23, 63:1,
63:9, 95:4,
95:5, 99:3,
99:13, 127:24,
135:7, 176:17,
184:21, 185:4,
255:5, 268:8,
268:10, 273:10,
273:18, 276:25,
277:3, 277:7,
283:3
**objections**
9:4, 37:10,
270:17
**obstruct**
38:12, 268:17,
273:20
**obstructing**
64:6
**obstructive**
38:3, 185:16
**obtained**
262:4

**obvious**
129:21, 214:21
**obviously**
133:11, 144:24,
146:14, 180:25,
218:13, 227:23
**occasion**
225:13
**occasions**
115:19, 148:14
**occur**
255:4
**occurred**
93:14, 178:6,
234:15, 241:13,
249:10, 257:23
**occurring**
191:6
**occurs**
8:21
**october**
1:21, 5:3,
46:14, 59:5,
286:7, 286:29
**off-the-record**
4:10
**offend**
171:25
**offensive**
177:3, 270:25
**offer**
46:15, 46:16,
46:19, 47:19
**offered**
46:4, 46:8,
46:10, 236:4,
237:12, 238:4,
238:7, 239:12,
243:11
**offers**
47:20
**office**
7:12, 57:8,
57:18, 58:10,
59:1, 62:5,
62:10, 72:21,
72:23, 78:5,
102:21, 102:22,

104:23, 104:25,
105:2, 105:5,
105:18, 105:19,
105:23, 106:1,
106:10, 106:11,
111:21, 112:8,
112:16, 112:19,
112:23, 113:3,
118:16, 118:21,
123:22, 123:23,
123:24, 124:13,
126:10, 134:15,
142:10, 148:7,
149:13, 150:8,
152:1, 153:1,
153:11, 155:23,
160:16, 162:20,
162:21, 163:12,
171:7, 171:11,
171:20, 178:17,
179:2, 180:23,
181:18, 183:17,
183:24, 184:1,
187:5, 187:14,
188:14, 189:24,
193:11, 193:17,
195:2, 202:23,
203:2, 203:10,
203:11, 205:1,
209:8, 210:14,
210:19, 211:5,
226:2, 229:22,
230:2, 251:20,
251:21, 251:25,
254:12, 254:22,
265:5, 282:6
**offices**
7:13, 94:1,
105:10, 105:11,
105:13, 106:2,
106:5, 251:16,
253:12, 259:6
**often**
72:22, 78:5,
109:19, 110:3,
111:20, 120:21,
121:18, 124:16,
127:16, 131:4,

131:18, 134:11,
134:13, 166:6,
167:15, 226:2,
252:2, 271:9
**oh**
16:11, 16:14,
106:18, 118:11,
125:10, 127:1,
127:13, 127:15,
141:15, 154:21,
166:25, 169:11,
170:18
**okay**
7:22, 9:14,
9:18, 11:24,
12:19, 13:3,
13:10, 17:4,
31:25, 32:2,
33:7, 33:13,
37:20, 45:1,
50:21, 52:13,
52:22, 54:14,
54:18, 55:5,
58:14, 61:8,
62:18, 63:15,
65:13, 65:17,
66:3, 67:7,
67:18, 69:10,
69:17, 70:3,
81:10, 88:6,
90:17, 90:25,
92:9, 92:21,
94:5, 94:7,
95:6, 99:18,
107:2, 129:11,
130:16, 138:15,
139:17, 140:20,
146:15, 146:25,
149:21, 150:15,
157:4, 157:16,
158:6, 159:1,
162:10, 163:17,
168:10, 168:12,
173:25, 181:8,
183:5, 185:8,
187:5, 188:12,
188:15, 192:6,
193:10, 194:2,

194:8, 197:3,
198:2, 200:7,
200:14, 200:17,
202:19, 203:3,
207:6, 212:15,
214:20, 216:6,
228:17, 230:15,
231:1, 231:4,
231:9, 231:13,
232:14, 251:14,
271:19, 272:2,
275:5, 277:11,
284:10, 284:15,
285:9
**old**
106:4, 239:2,
239:15
**onboarding**
175:20
**once**
9:5, 63:8,
202:17, 239:23,
240:1, 253:15,
272:9, 273:18
**one**
4:6, 8:11,
8:22, 11:6,
17:4, 20:13,
20:15, 21:24,
24:23, 33:4,
47:19, 70:19,
73:24, 79:25,
82:21, 94:4,
96:13, 98:5,
122:8, 123:25,
124:1, 124:3,
124:4, 128:17,
130:13, 132:24,
140:4, 142:23,
142:25, 144:11,
144:18, 146:16,
147:20, 148:10,
148:22, 148:23,
148:25, 149:19,
151:18, 153:7,
155:24, 159:20,
160:6, 160:7,
164:16, 166:20,

169:19, 172:7,
172:13, 175:16,
180:16, 182:3,
182:8, 187:11,
187:16, 195:9,
206:6, 207:5,
216:9, 222:22,
223:21, 230:21,
234:12, 243:8,
243:11, 243:19,
245:4, 248:23,
263:5, 264:15,
264:22, 274:5,
275:5, 277:23,
279:22, 280:19,
282:3, 284:22,
285:7
**one-off**
18:7
**ones**
28:5, 57:23,
79:16, 246:1
**ongoing**
76:6
**online**
18:2
**only**
8:10, 9:14,
13:2, 53:8,
62:25, 85:10,
88:13, 96:23,
96:24, 128:10,
166:22, 170:3,
175:9, 196:11,
224:25, 244:20,
266:11, 268:16,
270:23, 275:18,
279:10, 280:22,
282:4, 282:15,
283:10, 283:24
**open**
48:20, 49:22,
84:8, 124:15,
124:16, 173:14
**opening**
164:3
**operations**
98:12, 100:23

**opinion**
134:7
**opportunities**
227:9
**opportunity**
30:7, 49:18,
49:25, 53:10,
53:13, 54:1,
89:8, 149:15,
209:5, 215:11,
238:23, 243:25
**oppose**
282:16
**opposed**
37:2, 38:5,
95:13, 274:2,
276:20
**opposing**
284:7
**option**
231:4
**ordaz**
14:5
**order**
59:12, 61:23,
110:9, 245:7,
246:18, 246:21,
283:23, 284:21,
285:6
**ordered**
59:4, 61:24,
64:11, 96:8
**ordering**
103:1
**orders**
109:23
**org**
96:7, 96:8
**organization**
64:6, 246:23,
247:4
**organizational**
98:20
**organizations**
27:24
**origin**
10:15, 74:18,
74:20, 74:24,

108:13, 127:8,
129:19, 131:23,
266:18, 267:1,
267:9, 267:18,
269:13, 270:21,
271:6, 271:16,
271:24
**original**
33:18
**originally**
129:25, 242:5
**others**
136:6, 143:17,
212:12
**otherwise**
59:15, 63:11,
272:22
**out**
18:20, 47:16,
62:9, 73:12,
75:17, 76:2,
76:3, 78:6,
83:15, 84:8,
84:21, 104:23,
110:16, 111:13,
126:17, 142:2,
143:7, 143:13,
143:23, 144:22,
145:2, 148:23,
150:7, 150:22,
153:7, 153:12,
153:13, 153:21,
154:9, 154:12,
155:22, 156:8,
157:14, 162:6,
167:9, 170:15,
173:14, 180:7,
181:18, 182:12,
184:17, 187:17,
188:9, 188:10,
188:13, 189:24,
199:25, 202:21,
205:2, 208:12,
223:22, 226:9,
228:7, 228:21,
230:1, 233:10,
233:20, 238:6,
243:15, 253:2,

255:13, 256:15,
256:18, 257:4,
259:22, 260:12,
261:9, 271:3,
279:22
**outcome**
118:18, 286:25
**outside**
13:14, 22:14,
106:7, 112:24,
131:9, 262:10
**outstanding**
59:3
**over**
4:6, 12:6,
12:9, 36:6,
41:17, 56:13,
57:2, 90:11,
94:16, 101:4,
102:5, 200:2,
200:4, 200:14,
200:18, 206:12,
222:8, 222:14,
227:12, 229:6,
236:17, 240:20,
241:12, 243:8,
243:24, 246:2,
254:4, 263:23,
273:17, 276:10
**overhear**
126:6
**overheard**
112:25
**overtime**
41:18, 145:17
**overwhelming**
281:6
**overworked**
145:1
**own**
112:19, 123:22,
143:24, 238:19
**owner**
149:23

**P**

**p-a-c-h-e-c-o**
250:6

**pacheco**
10:24
**pacheco@gmail**
250:6
**package**
30:12, 43:23,
49:4, 49:23,
141:5
**page**
3:5, 53:8,
67:7, 67:11,
67:13, 137:20,
141:10, 157:6,
157:7, 158:16,
206:25, 207:1,
207:7, 207:21,
216:23, 217:13,
217:15, 217:16,
217:19, 235:12,
260:5
**pages**
52:20, 52:25,
53:10, 67:9,
90:19
**paid**
41:1, 41:7,
41:18, 152:22,
152:23, 153:20,
153:21, 154:15,
154:20, 162:15,
172:16, 174:19,
175:25, 177:22,
183:2, 183:4,
218:19, 219:1,
237:8, 237:24,
239:20, 239:23,
240:5, 240:8,
240:9, 240:18,
240:24, 242:8,
242:19, 243:15
**pamela**
33:10, 33:11,
33:13, 33:19
**paper**
102:22, 117:15,
195:15, 221:1
**papers**
7:7

**paperwork**
25:12, 66:7,
71:10, 222:7,
223:19, 231:14
**paragraph**
52:13, 52:15,
137:3, 137:23,
138:17, 139:3,
142:19, 182:5,
200:1
**parents**
10:10, 10:11
**parker**
78:6, 78:9,
256:11, 256:13
**parking**
21:25
**part**
12:21, 13:20,
13:25, 14:7,
14:12, 14:17,
24:14, 50:19,
68:24, 76:11,
77:20, 93:5,
112:18, 115:1,
132:4, 138:19,
163:9, 165:11,
165:17, 177:10,
177:20, 179:23,
224:4, 247:22,
254:15
**part-time**
39:20, 39:22,
40:11, 40:14,
40:19, 42:10,
42:11, 43:22,
45:18, 48:14
**partially**
163:21
**participant**
221:18, 235:18,
235:20
**participants**
5:7
**participate**
48:13
**participated**
63:18

**participation**
48:8
**particular**
11:6, 209:11
**particularly**
6:2
**parties**
178:7, 286:25
**parts**
13:1, 57:11,
57:15, 57:19,
92:4, 98:16,
100:21, 103:24,
104:20, 105:16,
105:21, 105:23,
107:12, 107:16,
108:4, 109:7,
109:11, 109:15,
109:17, 109:18,
109:19, 110:13,
111:22, 116:24,
118:1, 127:3,
143:3, 169:21,
169:22, 174:11,
175:10
**party**
21:23, 22:1,
22:2, 22:5,
178:1, 178:10,
179:3, 179:8,
183:7, 183:18,
186:4
**password**
210:10, 259:25,
260:9
**passwords**
198:11, 198:14,
200:3, 200:19,
202:24, 204:1,
204:3, 204:5,
204:14
**past**
32:11, 81:14,
111:7, 111:9,
111:11
**patrick**
97:1, 128:20,
129:5, 130:25,

131:2, 158:12,
213:10, 213:24
**patrick's**
131:6
**pause**
115:20
**pausing**
197:11
**pay**
40:3, 40:24,
41:3, 41:5,
42:14, 83:7,
84:12, 84:15,
87:18, 88:19,
88:24, 89:3,
89:10, 89:11,
102:4, 165:8,
165:9, 172:18,
175:22, 177:11,
177:18, 182:14,
182:25, 218:16,
220:12, 233:10,
236:24, 239:21,
242:16, 265:18
**payable**
56:23, 167:12,
182:13, 182:25,
240:19, 240:22,
248:11
**payables**
199:14, 220:13,
220:18, 240:18
**paychecks**
79:15
**paying**
154:3, 182:21,
224:22, 224:23,
233:17, 235:24,
236:2, 239:21,
240:16
**payments**
242:10
**payroll**
58:7, 79:17,
80:2, 85:13,
141:13, 221:6,
225:2, 225:5,
225:25, 229:2

**pdf**
158:17, 163:7,
165:12
**peace**
256:20
**peeper**
23:19
**peggy**
14:3, 14:5,
14:6
**pen**
102:21
**penalties**
7:16
**pencil**
102:22
**people**
81:7, 87:11,
87:13, 95:18,
96:1, 96:4,
96:15, 99:11,
113:9, 120:15,
121:13, 123:20,
124:18, 125:1,
128:6, 128:12,
128:16, 128:25,
145:15, 152:25,
153:1, 153:5,
157:1, 159:3,
160:16, 165:21,
177:2, 179:12,
180:24, 196:6,
199:23, 214:3,
223:13, 223:16,
223:23
**people's**
81:11, 136:10,
136:13
**per-diem**
42:22
**perceived**
267:7, 270:8
**percent**
124:3, 124:4,
124:5, 233:13,
283:7
**perform**
56:22, 61:15,

66:2, 92:23,
93:20, 110:9,
110:10, 135:13,
135:17, 198:12
**performed**
36:10, 36:14,
38:20, 57:4,
57:10, 68:20
**performing**
43:1, 90:9,
92:2, 104:14,
123:3
**perhaps**
59:18, 84:8,
199:13, 239:5
**period**
24:3, 24:5,
34:18, 73:7,
82:4, 82:5,
222:12, 222:19,
223:11, 223:18,
264:17
**perjury**
7:16
**permanent**
87:22, 94:18,
95:13
**permission**
250:20, 250:21
**person**
18:3, 18:4,
29:11, 54:2,
80:1, 82:19,
83:18, 86:21,
88:24, 96:24,
103:10, 117:19,
122:22, 128:17,
149:2, 186:11,
208:4, 215:17,
247:6, 247:22,
265:20, 279:22,
279:24, 280:22
**person's**
8:11, 80:4,
80:8, 80:10
**personal**
97:19, 115:9,
130:2, 134:9,

157:20, 158:2,
189:17, 190:12,
190:20, 194:12,
194:16, 194:23,
195:13, 207:10,
208:10, 242:9,
243:24, 245:22,
246:11, 249:6,
250:3, 251:3,
251:10
**personally**
10:3, 131:3,
133:11, 252:19
**peter**
11:1
**phillips**
2:15
**phone**
4:17, 92:18,
93:24, 112:13,
113:1, 113:10,
115:21, 117:19,
130:12, 140:3,
147:2, 147:8,
147:9, 180:1,
181:12, 181:14,
181:20, 181:23,
195:22, 202:11,
204:16, 205:3,
205:6, 205:9,
209:13, 235:13,
235:14, 235:19,
235:21, 235:23,
235:25, 236:2,
236:5, 236:6,
236:7, 236:9,
236:13, 237:2,
237:3, 237:4,
237:8, 237:11,
237:15, 237:16,
237:25, 238:1,
238:3, 238:20,
238:24, 238:25,
239:3, 239:8,
239:15, 239:18,
239:20, 240:3,
240:4, 240:5,
240:6, 240:9,

240:10, 241:3,
241:7, 241:8,
241:10, 242:4,
242:9, 242:11,
242:18, 242:21,
243:2, 243:3,
243:11, 243:14,
243:15, 243:24,
245:19, 245:21,
245:24, 246:6,
247:12, 247:18,
248:7, 249:1,
249:6, 249:7,
249:15, 279:5
**phones**
140:23, 180:7,
180:9, 182:16,
182:19, 217:24,
238:6
**phonetic**
14:5, 14:11,
107:20, 158:13
**physically**
69:4
**pick**
91:15, 113:5,
202:11
**picked**
69:5, 91:21,
92:1, 129:1
**pickup**
254:3
**picture**
105:14
**piece**
268:2
**pieces**
190:11
**piedmont**
17:20, 17:24,
18:6, 20:10,
20:24, 21:4,
21:10
**piggy-backed**
167:1
**pineville**
27:1, 238:14
**pinpoint**
261:16

**place**
30:13, 81:18,
173:6
**plaintiff**
1:6, 2:3, 5:13,
6:6, 96:6,
136:25, 138:21
**plaintiff's**
281:19
**plaintiffs**
10:2
**plan**
49:19, 50:14,
50:24, 51:12,
156:2, 156:7,
221:15, 221:19,
221:21, 221:24,
221:25, 229:11,
229:14, 230:4,
231:11, 231:14,
235:19, 236:11,
236:16, 237:16,
239:4
**planet**
5:6, 6:12
**planned**
144:15
**planning**
138:5
**plans**
48:11, 48:13,
48:24, 221:12,
231:6
**play**
196:23, 272:10,
276:23
**played**
132:4
**player**
123:5, 213:22
**players**
118:22
**playing**
37:6, 197:5,
197:9, 197:18
**pleading**
254:16
**pleadings**
272:23

**please**
4:5, 4:7, 4:12,
4:14, 4:17, 5:9,
6:13, 8:23,
9:12, 18:24,
19:16, 20:3,
22:4, 34:20,
44:3, 52:20,
54:5, 59:13,
84:20, 93:9,
105:4, 135:9,
135:15, 176:24,
185:10, 187:4,
188:21, 191:15,
192:5, 200:2,
200:8, 200:9,
211:15, 224:9,
230:13, 248:20,
268:2, 273:7,
274:17, 276:6,
278:1
**plenty**
282:11
**pllc**
2:5
**plotting**
199:24, 227:23
**pls**
200:9
**plugging**
259:1
**pocket**
233:11
**poe**
78:6, 78:9,
256:11, 256:13
**point**
8:20, 9:11,
15:19, 34:25,
35:4, 35:7,
67:20, 73:12,
77:18, 87:6,
88:6, 93:16,
115:12, 121:19,
122:8, 127:18,
138:14, 141:4,
144:18, 148:11,
150:22, 157:14,

163:17, 203:6,
203:21, 203:25,
210:6, 210:22,
211:3, 224:6,
224:10, 226:12,
235:14, 235:18,
235:21, 236:1,
240:16, 243:12,
251:7, 254:21,
280:19, 281:10
**point-of-contact**
79:11
**pointed**
143:6
**points**
68:25, 69:10,
113:23
**policy**
125:5
**pop**
148:7
**portion**
110:6
**position**
30:21, 30:24,
31:7, 32:22,
33:1, 33:2,
33:3, 33:7,
33:23, 34:2,
34:5, 34:8,
39:18, 39:20,
39:21, 40:5,
40:6, 40:21,
42:7, 42:10,
46:8, 46:11,
55:8, 55:10,
55:13, 55:23,
71:22, 73:20,
77:16, 86:6,
87:14, 100:16,
107:10, 120:2,
150:9, 156:21,
171:13, 174:11,
200:5, 262:23,
263:19
**positions**
120:16, 121:13,
165:21

possession
36:23, 38:7,
38:8, 97:19,
98:2, 192:4,
194:19, 217:21,
221:2
possibility
84:12
postage
253:25
postal
75:18
posted
132:24
postgraduate
16:20
postpone
59:16, 64:15
power
156:19
preceded
165:24
preexisting
241:7
preface
272:18, 273:7
prefacing
276:16
prejudiced
59:11
premises
29:10, 117:5,
243:6
premium
233:14, 233:18
prep
91:24
prepare
28:1, 28:11,
64:8, 201:11
preparing
234:4
prepay
92:11
presence
134:14
present
2:25, 7:14,

45:2, 61:20,
72:24, 123:20,
124:1, 126:13,
150:19, 180:4,
218:14, 226:1,
247:19, 282:9,
283:24
presented
67:24, 152:4,
227:8, 267:23,
282:3
presenting
91:4, 283:12
president
55:24
president's
105:18
pretty
125:12, 172:21
prevented
212:22, 213:5
previous
31:15, 110:25
previously
50:3, 196:16,
243:5, 269:13
primarily
123:1
printed
153:12, 153:13,
154:12, 162:6,
163:10
prior
12:1, 23:24,
25:6, 25:7,
25:15, 25:16,
25:19, 26:22,
31:15, 35:25,
36:1, 36:9,
36:15, 38:19,
38:20, 48:24,
49:10, 49:17,
60:21, 71:25,
72:4, 72:11,
72:19, 72:24,
79:7, 80:8,
81:10, 89:23,
91:14, 111:2,

121:15, 130:17,
138:1, 176:22,
215:13, 233:25,
260:15, 260:21,
260:22, 260:25,
272:24
prioritized
170:25
privately
173:13
privilege
8:16, 255:3,
282:8
probably
65:19, 182:3,
201:16, 227:9,
262:25, 285:7
problem
174:18, 175:5,
175:7, 276:17
procedure
268:19
proceed
62:6, 64:12,
64:21
proceeding
4:3, 4:8, 63:5
process
81:17, 86:8,
153:25, 224:13,
228:3
processed
109:24
processing
219:15, 223:14,
226:14
produce
64:10, 64:11,
96:10, 139:24,
192:13
produced
59:4, 59:6,
97:17, 162:24,
197:7, 272:12
production
96:8
profanity
271:4

profession
21:16, 21:21
professionalism
63:17
professionally
54:6, 274:7
profit
235:3
prohibit
9:23
promoted
31:2, 31:3,
31:5, 31:8,
31:16, 33:9,
33:24, 69:7,
70:5, 236:3
promotion
237:23
proof
153:12, 196:12,
208:11, 208:17
proper
53:19, 274:16,
282:13
properly
5:25
property
209:9, 254:3
prove
145:15, 155:16
proved
156:3
provide
9:16, 21:7,
24:7, 59:25,
61:12, 61:23,
77:21, 93:19,
97:21, 117:11,
119:2, 134:21,
153:24, 190:13,
198:11, 212:2,
221:3, 234:8,
240:4, 254:1,
265:1
provided
16:8, 47:12,
49:5, 60:5,
93:11, 98:1,

117:22, 119:6,
188:3, 190:14,
191:2, 192:19,
199:2, 214:18,
214:22, 215:5,
219:2, 221:16,
221:21, 233:1,
236:20, 237:10,
240:10, 240:11,
254:20, 254:22,
276:21
**provider**
215:23, 219:21,
225:25, 227:13,
235:23, 236:10,
260:17, 260:19,
260:24
**providers**
227:14
**providing**
9:24, 59:21,
116:13, 118:3,
256:9
**psychiatrist**
260:16, 260:23
**psychologist**
260:17, 260:24
**ptl**
50:5
**public**
1:19, 286:9
**pull**
137:18, 151:8
**pulled**
186:24
**purchase**
57:8, 102:21
**purchased**
117:3
**purchases**
104:5
**purchasing**
57:18
**purposes**
4:9, 6:5,
103:1, 109:25
**pursuant**
1:17

**pursued**
202:22
**pushed**
144:23
**pushing**
142:14
**put**
85:21, 85:23,
132:16, 133:1,
133:2, 133:4,
133:9, 133:23,
134:5, 134:19,
141:23, 142:6,
142:16, 145:13,
167:13, 173:5,
182:2, 186:14,
190:11, 230:13,
238:3, 261:20,
264:9, 264:16,
267:12, 273:21
**putting**
142:7, 171:18,
265:9

**Q**

**questioning**
156:22, 166:2,
167:4, 175:8
**questions**
8:14, 8:22,
9:4, 9:23,
11:10, 19:20,
36:25, 37:3,
37:15, 38:11,
39:7, 53:24,
58:25, 75:23,
94:3, 114:2,
122:11, 122:12,
122:16, 122:20,
122:25, 123:2,
123:8, 137:14,
140:12, 165:18,
169:12, 185:6,
185:13, 192:14,
197:2, 214:10,
254:19, 268:1,
270:16, 280:14,
280:16, 281:12,

281:13, 281:14,
281:21, 282:12,
283:10, 283:21
**quick**
160:15
**quickly**
71:13, 136:14,
152:20
**quit**
155:19
**quite**
66:23
**quote**
246:19

**R**

**race**
108:14
**raise**
83:18, 83:23,
84:1, 84:6
**raised**
63:11, 149:20
**ralph**
127:6, 219:11,
222:22, 223:24
**ran**
110:13, 143:2
**range**
89:25
**rarely**
161:24, 266:9
**rate**
40:3, 40:24,
41:3, 42:14
**raven's**
41:25, 42:3,
42:8, 42:16,
42:21, 43:13,
43:17, 43:18,
45:13
**rd**
186:4, 187:21,
188:4, 188:10
**re-asked**
45:4
**re-depose**
282:17

**reach**
62:9, 202:21,
203:23, 208:12,
208:16, 209:3,
256:15, 279:19
**reached**
148:23, 228:7,
279:22
**reaching**
78:6, 198:22
**reaction**
160:15
**read**
19:11, 52:20,
53:10, 53:13,
65:11, 67:6,
68:6, 94:21,
182:5, 199:17,
283:22
**reading**
92:8
**reads**
138:18
**real**
156:15
**realistic**
60:11
**realize**
201:13, 224:24
**realized**
224:22, 258:10
**really**
83:12, 115:9,
116:3, 123:14,
143:6, 143:8,
178:18, 194:25,
195:9, 197:19,
199:17, 209:20,
230:3
**reask**
269:8
**reason**
35:19, 37:6,
73:6, 109:14,
110:1, 110:7,
113:4, 115:24,
150:18, 154:10,
182:16, 183:24,

189:22, 202:20,
265:17
**reasoning**
254:25
**reasons**
103:4, 104:12,
190:6, 267:21
**receipts**
110:4, 114:2,
153:24
**receivable**
56:23, 109:25,
167:12
**receive**
49:9, 59:14,
151:16, 152:1,
153:7, 189:14,
193:10, 215:18,
216:16, 217:6,
217:11, 217:16,
229:10, 229:16,
231:13, 233:15
**received**
47:20, 59:14,
59:20, 60:23,
147:24, 148:12,
151:22, 151:23,
152:16, 153:2,
153:6, 153:19,
159:6, 160:18,
162:7, 166:25,
178:23, 196:24,
200:25, 204:16,
217:9, 218:2,
228:7, 230:10,
232:2, 253:18
**receiving**
229:23, 231:23,
232:23, 232:25
**recognize**
54:12, 65:10,
65:18, 97:9,
151:12, 157:9,
162:11, 164:19,
193:2, 193:5,
199:8, 205:12,
205:16, 207:3,
216:24, 217:2,

244:16
**recollect**
69:21, 168:25,
184:5, 199:9
**recollection**
100:3, 119:13,
119:14, 127:19,
184:18, 191:5,
251:13
**reconciliation**
91:16, 91:17,
91:18, 91:19,
92:11, 92:12
**reconvened**
281:17
**record**
5:23, 8:25,
9:5, 32:3, 32:7,
37:21, 52:20,
58:17, 58:20,
64:3, 90:25,
94:9, 94:12,
129:13, 129:16,
151:9, 157:5,
161:12, 164:17,
168:14, 168:17,
170:5, 182:3,
184:8, 184:10,
184:12, 184:21,
192:8, 192:25,
196:5, 197:7,
202:3, 206:24,
209:2, 212:9,
216:5, 216:10,
216:14, 216:21,
230:18, 232:8,
244:6, 244:9,
247:15, 272:17,
273:24, 274:5,
278:5, 278:8,
282:20, 284:4,
284:6, 284:25,
285:2, 286:22
**recorded**
6:5, 8:8,
196:3, 196:14,
201:17, 286:19
**recording**
4:8, 195:24,

196:1, 269:3,
269:4
**records**
211:6, 261:11
**red**
162:15
**redundant**
226:21
**refer**
100:24, 164:6
**referring**
32:11, 82:5,
136:22, 137:3,
137:13, 148:16,
151:14, 157:14,
162:13, 164:24,
181:16, 184:4,
190:17, 205:24,
207:23, 211:19,
214:17, 231:2,
238:8, 242:14,
245:2, 249:20,
257:18, 259:18,
260:6
**reflect**
65:22, 184:21,
191:11, 261:11,
280:17
**reflected**
190:5, 191:11,
191:18
**reflects**
194:4
**refresh**
66:25, 186:8,
188:17, 188:21,
237:19, 281:5
**refreshes**
187:2
**refreshing**
258:6
**refusal**
59:11
**refuse**
64:10, 283:4
**refused**
38:1, 96:10,
204:5

**refusing**
38:8, 61:23,
184:22, 185:1
**regarding**
21:20, 28:22,
29:3, 29:9,
75:16, 75:20,
75:23, 75:25,
77:1, 77:25,
78:23, 79:3,
79:20, 81:11,
81:14, 81:23,
83:3, 83:7,
83:18, 99:24,
140:21, 147:5,
182:11, 193:8,
220:5, 231:24,
233:7, 255:16,
266:25, 270:18,
279:11, 281:19,
281:21, 282:22
**regards**
80:1, 132:3
**register**
91:25
**regular**
76:19, 103:12,
103:13, 164:11,
199:11
**relate**
63:3, 63:13,
113:10, 131:21,
165:1, 165:4,
271:14, 279:13
**related**
21:15, 56:24,
58:3, 58:6,
58:9, 72:9,
75:12, 77:7,
78:20, 79:14,
81:2, 103:24,
104:4, 104:14,
109:10, 117:21,
123:3, 215:8,
219:14, 267:18,
269:12, 269:19,
270:1, 275:11,
286:24

**relates**
99:19, 275:22
**relation**
106:10
**relationship**
81:6, 113:22,
228:14
**relationships**
128:1
**relative**
14:14, 286:16
**relatives**
12:20, 14:7,
14:16
**release**
245:23, 246:5
**relevant**
8:22, 136:19,
137:1, 138:22,
139:1, 139:14
**remain**
246:9
**remained**
251:24
**remark**
8:11
**remember**
4:5, 4:12,
25:21, 38:25,
39:1, 56:25,
72:14, 76:17,
86:7, 97:24,
100:18, 100:19,
128:23, 134:16,
134:24, 140:25,
146:2, 146:10,
156:22, 161:4,
161:9, 161:13,
161:16, 163:1,
169:1, 183:15,
187:20, 201:8,
220:22, 224:15,
231:17, 239:11,
245:12, 280:7
**remembered**
201:14
**remind**
33:23

**reminiscing**
261:19
**remote**
1:16, 286:5
**remotely**
4:4, 5:7, 7:3,
15:20, 30:11,
35:13, 35:15
**remove**
220:12, 243:2,
247:12, 247:17,
248:25
**removed**
24:15, 242:21
**removing**
247:8
**rep**
71:11
**repeat**
8:4, 13:12,
16:7, 19:1,
21:17, 22:4,
23:3, 23:12,
27:4, 28:25,
34:20, 45:5,
50:20, 55:1,
55:12, 68:14,
70:21, 84:20,
93:9, 94:23,
95:8, 95:25,
105:4, 106:18,
122:17, 135:14,
176:24, 177:8,
191:15, 206:3,
211:16, 214:11,
222:13, 224:9,
241:20, 248:20,
259:19, 264:3,
266:20, 278:13
**repeated**
253:13
**repeatedly**
37:24, 38:1,
96:7, 136:24,
138:20, 138:24,
139:13, 192:9,
268:4, 268:22,
277:13

**repeating**
187:23
**rephrase**
16:22, 52:1,
56:15, 58:12,
126:2, 176:7,
190:18, 214:24,
248:20, 250:17,
270:5
**rephrasing**
176:14, 176:21
**replace**
174:11
**replaced**
107:17, 107:19
**replacement**
86:18, 87:4,
87:8, 88:3,
88:16, 234:14
**replacing**
140:22, 174:24
**replied**
230:11
**report**
55:15, 56:7,
96:15, 96:20,
101:3, 101:8,
103:19, 109:3,
115:7, 166:4,
166:13, 208:5,
208:7
**reported**
56:6, 96:21,
98:10, 101:9,
155:11, 248:24
**reporter**
4:15, 6:11,
6:13, 8:10,
46:25, 47:5,
94:21, 163:24,
205:14, 284:10,
284:17, 284:20,
285:1, 285:9,
286:33
**reporters**
1:26
**reporting**
91:13, 98:9,

**123:7, 123:13**
**reportings**
85:14
**reports**
96:18, 110:15,
110:16, 121:20,
122:2, 208:6,
208:8, 234:5
**represent**
5:10, 5:12,
5:18, 6:21,
97:16, 246:13,
246:22, 247:3,
255:16
**representative**
5:21, 79:18
**representing**
5:6, 5:16, 6:12
**reprimanded**
150:17
**request**
6:7, 38:22,
95:1, 137:12,
246:20, 257:6
**requested**
89:4, 89:15,
89:17, 89:19,
116:14, 170:6,
186:14, 188:3
**requester**
245:8
**requesting**
253:19
**requests**
116:9, 117:10,
117:12
**required**
53:24, 101:22,
102:25, 103:15,
200:3, 234:9
**requisition**
175:18
**rescinded**
46:19, 52:4
**research**
141:6, 225:6
**resend**
208:7

resending
208:6
reserve
283:14
reserving
281:18
resign
29:20
resignation
85:22, 85:23
resigned
82:8, 82:11,
83:8, 95:17,
223:6
resigning
72:20
resolve
120:9
resolved
171:4
resources
58:4
respect
77:1, 77:7
respond
60:12, 61:7,
62:8, 129:2,
135:21, 139:4,
198:23, 202:11,
204:12, 256:17
responded
136:13, 136:14,
169:16, 231:9
responding
135:24, 139:8,
143:14
response
8:24, 59:22,
60:10, 117:22,
131:6, 131:14,
139:2, 142:24,
148:24, 154:19,
166:24, 166:25,
168:3, 168:5,
170:7, 194:7,
198:20, 201:3,
208:17, 209:22,
212:20

responses
59:7, 59:15,
61:13, 61:24,
136:10, 272:13,
272:25
responsibilities
56:11, 68:8,
68:18, 68:19,
68:24, 69:6,
71:13, 75:11,
84:14, 86:3,
86:24, 90:13,
90:16, 90:22,
91:1, 91:6,
91:9, 101:5,
101:13, 187:13,
187:17, 206:1,
208:21, 209:1,
214:2, 234:3,
266:2
responsibility
85:6, 102:2,
102:5, 110:6,
149:25, 219:14,
242:20, 244:19
responsible
182:21, 233:13,
234:4, 234:6,
234:11, 240:16,
246:9
rest
204:19, 209:24,
252:25, 256:19
result
172:11, 212:1
resume
92:17, 173:2
resumed
69:1, 77:16,
91:24, 175:14
resumes
92:19
retaliated
131:22
retaliating
113:24, 142:8
retaliation
23:10, 23:15,

115:3, 267:1,
280:25
retaliatory
266:17, 267:17
retract
154:23
return
116:24, 212:17,
212:24, 213:12,
217:19, 252:11,
252:19, 253:20,
253:24, 281:21,
282:23, 282:24,
283:5
returned
213:2, 243:21,
249:15, 249:24,
256:6
returning
212:3, 212:23,
213:5
review
28:1, 54:1,
54:4, 56:13,
60:2, 60:7,
66:3, 67:15,
98:6, 138:19,
187:1, 201:10
reviewed
28:11, 60:15,
68:2
rid
143:12, 227:24,
263:1
ridiculous
64:1
right
15:18, 15:23,
16:15, 25:21,
32:17, 33:21,
34:12, 34:16,
35:10, 37:17,
46:9, 50:14,
54:15, 55:5,
64:24, 67:1,
68:13, 69:15,
88:4, 88:9,
91:5, 92:24,

98:16, 102:7,
104:6, 113:6,
114:13, 114:15,
116:4, 130:14,
137:17, 144:1,
148:4, 150:24,
156:13, 157:2,
157:13, 157:21,
157:25, 158:3,
158:4, 158:6,
158:9, 162:3,
164:2, 164:18,
173:10, 177:14,
179:16, 186:18,
186:23, 187:11,
187:18, 188:8,
188:15, 192:25,
195:10, 197:11,
200:22, 203:12,
204:2, 207:13,
210:19, 219:4,
230:6, 230:11,
231:7, 236:21,
241:23, 245:10,
247:18, 251:14,
252:7, 266:4,
270:15, 278:1,
278:23, 281:18,
283:15, 284:14,
284:18
right-hand
65:6, 97:12
rights
233:2
river
1:27
road
1:27
robust
273:24
rodriguez
32:21, 33:17
rogers
158:12
role
36:2, 67:19,
71:15, 71:17,
74:1, 80:6,

81:2, 86:10,
88:18, 90:10,
91:8, 101:12,
102:5, 107:15,
143:18, 150:15,
172:25, 173:2,
175:21, 177:1,
177:17, 182:24,
224:19
**roles**
84:13, 85:13,
89:13, 175:14,
214:2, 228:9,
240:21
**rolling**
175:19
**room**
5:19, 7:4, 7:9,
62:21, 106:9,
118:16, 179:9,
193:19, 193:20,
196:19, 198:17,
203:4, 204:4
**rotary**
27:20
**rpr**
1:19, 286:32
**rude**
176:5, 176:9,
185:16, 273:20
**rule**
37:11
**rules**
268:19, 276:25,
277:7
**run**
4:4, 110:14,
121:20
**runaround**
169:23
**running**
110:16
**résumé**
31:2, 33:25,
36:5, 36:19,
37:25, 38:19,
38:23, 47:12

**S**

**sabotaged**
191:8, 210:7,

261:25
**sabotaging**
203:16
**salaries**
175:12, 177:22
**salary**
88:8, 88:12,
89:2, 89:14,
89:23, 90:2,
173:9, 173:17,
174:17
**sales**
43:7, 73:25,
74:3, 91:23,
97:4, 97:6,
105:17, 109:16,
109:23
**salespeople**
180:11, 238:8
**same**
7:4, 7:16,
26:1, 26:19,
28:5, 41:5,
45:4, 50:10,
50:16, 50:18,
50:24, 60:10,
62:20, 62:21,
68:19, 70:12,
70:18, 70:22,
73:6, 75:23,
78:13, 84:2,
99:13, 119:4,
126:14, 141:10,
141:11, 141:14,
141:18, 147:5,
161:3, 176:17,
211:22, 212:4,
225:14, 225:18,
231:10, 234:22,
235:11, 242:2,
255:5, 258:21,
259:12, 259:13,
267:14, 270:15,
275:3, 275:14,
284:12
**sanctions**
59:18, 282:17
**sanitizer**
7:8

**sat**
11:9, 152:4,
203:12, 225:19,
227:7
**satisfied**
117:23
**saw**
165:12, 211:20,
266:9
**say**
10:14, 11:24,
30:4, 41:10,
54:7, 70:17,
71:4, 78:3,
78:22, 83:12,
98:19, 99:8,
106:14, 106:17,
110:23, 111:25,
112:5, 114:10,
116:17, 120:1,
120:25, 121:12,
122:9, 122:13,
122:15, 124:2,
125:22, 126:22,
128:11, 128:21,
131:19, 135:9,
136:2, 136:23,
142:19, 144:20,
147:23, 147:25,
149:14, 153:17,
154:12, 154:24,
155:4, 164:23,
165:19, 166:24,
167:15, 167:16,
168:1, 171:11,
172:17, 173:7,
182:2, 182:8,
202:5, 210:22,
214:7, 221:11,
238:7, 240:1,
245:1, 249:19,
256:24, 259:15,
261:13, 271:18,
272:1, 275:4,
277:15, 277:17
**saying**
19:13, 148:11,
152:18, 176:6,

179:8, 230:2,
260:8, 272:8,
284:11
**says**
52:16, 52:17,
54:15, 65:7,
67:4, 97:13,
152:10, 155:1,
158:18, 162:15,
163:20, 164:3,
193:8, 194:1,
199:7, 200:2,
205:4, 209:23,
217:7, 217:22,
218:1, 218:22,
231:8, 244:13,
245:6, 245:8,
246:19
**scenes**
251:8
**schedule**
159:24
**school**
14:20, 14:22,
14:24, 15:1,
15:18, 16:21
**schools**
16:24
**screen**
52:7, 54:10,
58:22, 64:25,
186:23, 206:23
**scroll**
53:12, 65:14,
65:16, 67:17,
67:18, 137:22,
162:9, 162:11,
165:14
**scrolling**
53:9, 53:11
**seal**
286:28
**searching**
141:4, 278:25
**season**
70:15
**second**
53:16, 67:11,

94:20, 138:18,
148:23, 148:25,
157:7, 158:16,
198:5, 200:1,
207:1, 216:9,
216:23, 217:15,
217:16, 217:19,
284:22
**secondary**
56:4
**secondhand**
125:18
**section**
90:22
**see**
6:24, 18:21,
19:10, 19:11,
52:8, 52:10,
52:13, 52:15,
52:16, 53:8,
54:9, 54:14,
65:1, 65:5,
67:10, 67:11,
67:12, 67:14,
68:7, 73:12,
91:23, 97:12,
98:11, 98:15,
98:17, 121:19,
126:19, 133:1,
134:2, 137:15,
138:3, 138:17,
139:4, 152:20,
157:16, 158:16,
158:21, 162:14,
163:19, 163:22,
164:2, 180:5,
182:18, 183:13,
184:23, 185:6,
186:12, 186:22,
189:2, 193:24,
198:2, 199:4,
199:10, 199:17,
200:1, 200:5,
207:19, 211:2,
211:4, 211:22,
216:19, 230:21,
232:14, 232:16,
232:17, 236:22,

241:2, 245:6,
245:11, 246:18,
247:1, 247:2,
261:17
**seeing**
215:22
**seek**
59:17, 64:16,
281:18, 282:16,
283:15
**seeking**
249:23, 256:1,
282:13
**seeks**
283:6
**seemed**
128:7
**seems**
37:5, 38:2,
185:15, 267:24,
272:9
**seen**
65:20, 67:23,
68:1, 68:17,
90:25, 131:3,
233:7, 240:23
**select**
225:24
**selecting**
246:19
**selection**
231:10
**sell**
109:17
**send**
46:1, 60:18,
76:22, 135:23,
146:15, 159:1,
160:15, 166:23,
167:1, 167:5,
167:16, 169:25,
170:1, 189:14,
189:21, 194:15,
194:21, 223:22,
234:5, 234:16,
234:21, 234:23
**sending**
60:8, 60:16,

75:17, 91:12,
166:21, 189:3,
189:16, 194:6,
194:12, 194:17,
204:24, 226:16,
228:21, 230:1,
230:2, 251:2,
253:23
**senior**
95:18, 95:20,
96:3
**seniority**
95:21, 96:24
**sense**
80:24, 95:20,
116:12
**sent**
59:1, 79:25,
120:23, 145:6,
146:2, 147:1,
152:2, 152:24,
156:25, 157:11,
162:21, 163:1,
166:19, 190:4,
190:12, 190:15,
191:12, 191:19,
194:9, 198:3,
201:14, 201:16,
202:3, 202:8,
203:12, 207:23,
212:4, 212:20,
215:12, 215:13,
226:5, 227:20,
229:18, 235:6,
235:7, 243:20,
249:18, 251:6,
251:11, 254:2
**sentence**
138:18, 142:19,
272:19
**sentences**
149:19
**separate**
105:10, 105:11,
105:13, 233:22
**separated**
78:13, 78:18,
80:15, 80:25,

145:11, 156:16,
219:12, 255:19
**separation**
54:20, 54:24,
75:25, 78:10,
79:21, 81:15,
81:25, 216:17,
219:6, 223:15
**separations**
78:20, 78:23,
79:3, 81:12
**september**
42:4
**sequence**
84:24
**series**
190:18
**served**
173:3, 193:23,
208:13, 218:13,
227:18, 229:20
**service**
143:5, 182:22,
236:2, 236:9,
236:25, 237:24
**serviced**
237:16
**services**
43:23, 221:3,
224:23, 225:1,
228:23, 235:15
**session**
216:8
**set**
41:14, 59:8,
171:1, 182:22,
235:21
**setting**
7:12, 123:17,
175:21, 177:17
**seven**
282:10
**several**
36:20, 60:7,
66:8, 185:11,
277:13
**severance**
30:12, 54:20

**severely**
59:10
**sex**
131:23, 266:18,
267:2, 267:9,
267:19, 269:20,
272:6, 274:24
**shall**
190:1
**share**
52:7, 56:12,
58:22, 64:24,
67:1, 69:20,
97:7, 160:16,
162:1, 186:23,
188:21, 192:5,
206:22, 212:8,
227:16, 232:6
**shared**
28:5, 28:8,
80:9, 163:2,
163:11
**sharedrive**
189:11, 259:11
**shareholder**
72:13, 149:24
**sharing**
66:11, 66:18,
86:19, 90:17
**she'd**
122:1
**she'll**
227:5
**sheri**
55:7, 55:17,
56:6, 56:7,
69:3, 69:12,
70:4, 70:6,
70:10, 70:18,
70:22, 71:25,
72:4, 72:12,
72:19, 72:25,
80:9, 80:10,
80:13, 82:6,
82:7, 82:8,
85:2, 85:7,
85:8, 85:10,
85:17, 86:3,

86:11, 87:4,
88:1, 88:20,
88:22, 90:10,
90:23, 91:10,
91:14, 91:21,
91:25, 93:19,
94:17, 95:12,
99:25, 100:5,
100:6, 101:4,
101:12, 106:17,
106:20, 123:9,
123:10, 123:11,
123:15, 222:1,
223:6, 223:25,
234:6, 234:14,
234:17, 234:23,
236:4, 236:23,
237:5, 237:12,
240:21, 247:10,
247:11, 247:14,
263:23, 264:6,
265:23, 266:5
**sheri's**
86:6, 87:21
**shifts**
66:9
**shock**
160:9
**shocked**
210:24
**shoes**
174:24
**short**
42:17, 231:17,
231:22
**shortly**
204:24
**shots**
96:25, 228:12
**should**
4:11, 25:10,
34:1, 74:22,
105:8, 106:13,
146:5, 150:3,
153:20, 159:17,
167:6, 182:7,
232:2, 235:7,
236:19, 245:25,

277:20
**show**
36:20, 37:24,
38:8, 38:22,
53:20, 53:25,
66:24, 91:17,
92:12, 96:9,
137:12, 154:14,
154:17, 157:4,
164:16, 178:11,
184:3, 184:8,
184:12, 184:16,
184:22, 185:1,
185:10, 185:22,
192:11, 196:12,
199:2, 208:11,
230:15, 234:7,
244:11, 269:5
**showed**
85:7, 85:9,
92:25, 101:10,
107:12, 122:7,
156:5, 162:6,
165:8, 205:22
**showing**
37:2, 137:20,
185:12
**shred**
162:23
**shredded**
162:25
**siblings**
14:1
**sic**
7:11, 21:25,
90:20, 92:20,
101:20, 114:3,
118:10, 135:24,
156:20, 164:9,
215:16
**side**
106:13, 279:2
**sides**
106:5
**sight**
255:13, 256:18
**sign**
48:17, 49:25,

51:19, 54:19,
133:9, 133:15,
133:18, 133:21,
134:2, 186:17,
229:14, 283:22
**sign-on**
260:5
**signature**
39:12, 39:13,
40:20, 41:8,
41:20, 43:12,
43:19, 45:14,
45:19, 48:4,
48:11, 48:18,
48:25, 49:7,
49:10, 49:17,
50:13, 50:23,
51:2, 51:3,
51:9, 54:9,
54:12, 199:8,
199:10, 199:18,
262:5
**signature-onxrw**
286:30
**signed**
48:10, 52:2,
186:15, 193:25,
199:13, 199:20,
233:3
**signing**
155:2
**silent**
38:12
**similar**
36:2, 106:21
**similarly**
8:15
**simple**
64:5, 184:22
**simply**
37:12, 142:6,
146:21, 214:7
**since**
7:12, 18:8,
26:17, 31:12,
41:21, 43:14,
43:20, 45:1,
45:8, 45:15,

46:5, 59:2,
77:16, 103:23,
104:20, 137:11,
137:13, 241:11,
262:4, 262:16,
278:10, 278:14
**single**
273:2, 279:7,
283:11
**singled**
111:13, 143:13,
143:23, 144:22
**sir**
7:10, 51:14,
58:2, 76:10,
122:5, 122:14,
219:8
**sit**
38:18, 84:9,
144:16, 160:2,
211:9, 211:11,
211:18, 274:21
**sitting**
19:2, 126:8,
173:13, 193:20,
196:7, 199:23
**situation**
135:2, 170:21,
171:19, 280:23
**situations**
140:5, 142:10
**six**
42:13
**skin**
129:21, 263:8
**sleep**
265:11
**slow**
43:5
**slowly**
4:5
**small**
56:19, 110:11,
118:21, 135:1,
148:5, 149:7,
180:23
**smell**
125:1, 131:19,

132:13
**smelled**
130:22, 132:5
**smoke**
125:17, 131:2,
131:10, 132:24,
133:10
**smoked**
125:4
**smoker**
125:11, 131:1,
131:4, 133:24
**smokers**
124:19, 124:22,
125:1, 125:5,
131:10, 133:12
**smoking**
125:6, 125:9,
130:16, 130:19,
130:23, 131:15,
131:20, 132:20,
133:5, 134:5,
134:9
**smoothly**
4:5
**socializing**
126:10
**sole**
149:23, 248:9
**solving**
92:18
**some**
10:1, 35:7,
36:7, 37:6,
59:3, 66:23,
67:20, 86:23,
87:6, 88:6,
88:22, 113:4,
115:5, 116:1,
116:2, 117:22,
118:3, 121:19,
145:23, 146:23,
150:22, 153:7,
154:6, 159:4,
165:18, 166:4,
179:15, 179:17,
180:12, 182:15,
196:12, 197:2,

199:19, 203:6,
221:1, 225:6,
235:14, 235:18,
235:21, 236:1,
240:16, 258:9,
265:21, 280:16
**somebody**
86:20, 132:23,
150:2, 216:7
**somehow**
65:15, 174:3
**someone**
86:5, 86:9,
86:10, 107:17,
112:12, 114:6,
114:7, 135:22,
160:2, 182:17,
209:10, 220:8,
234:11, 265:24,
266:1, 266:7,
279:19
**someone's**
150:1, 174:2
**something**
8:21, 36:21,
49:14, 85:25,
92:16, 102:21,
114:24, 117:17,
117:21, 120:14,
120:19, 122:19,
150:3, 152:2,
152:19, 155:16,
155:17, 160:24,
167:10, 167:19,
174:5, 175:1,
180:25, 196:22,
197:16, 215:1,
233:20, 238:16,
271:13, 280:6
**sometime**
48:15, 78:14
**sometimes**
124:1, 258:16
**someway**
174:2
**somewhat**
7:11
**somewhere**
112:24, 143:15,

181:1, 206:16,
210:11
**son's**
230:12
**soon**
125:12, 285:8
**sorry**
13:11, 16:6,
16:11, 18:13,
22:1, 31:4,
36:12, 39:25,
50:19, 55:12,
65:9, 68:14,
70:21, 71:16,
75:2, 76:12,
89:19, 90:5,
98:23, 99:14,
105:22, 106:18,
106:20, 107:9,
112:2, 112:5,
113:18, 122:6,
133:17, 139:24,
148:15, 165:15,
173:23, 178:21,
181:15, 190:22,
205:8, 219:9,
221:9, 221:10,
222:13, 229:25,
241:20, 248:19,
250:4, 264:3,
267:3, 278:13,
281:7, 285:2
**sort**
29:13, 42:22,
84:23, 101:21,
102:24, 109:21,
144:20
**sought**
261:9, 262:2
**sound**
106:20, 219:23
**sounds**
45:4, 50:10
**south**
12:15, 23:20,
26:18, 238:18
**space**
105:2, 105:5

span
234:7
spanish
108:18, 108:20,
108:22, 108:25,
127:10, 129:21,
130:7, 130:10
spare
83:15, 251:25,
252:3, 252:5,
258:13, 258:15,
259:10
speak
4:5, 18:25,
20:5, 28:17,
108:20, 108:22,
109:1, 110:8,
112:7, 112:11,
112:22, 114:13,
115:17, 115:21,
126:21, 130:7,
130:9, 149:16,
193:18, 198:19,
201:9, 202:22,
204:6, 209:6,
213:8, 213:9,
215:11, 215:12,
243:19, 243:25,
257:8, 284:12
speaker
205:18
speaking
4:15, 4:18,
18:24, 37:10,
38:14, 53:16,
111:20, 112:4,
112:10, 113:9,
114:11, 114:18,
115:14, 115:17,
115:22, 118:23,
130:11, 185:4,
205:2, 268:8,
268:10, 268:25,
273:10, 273:13,
273:16, 273:18,
277:6, 279:20
speaks
215:6

specific
24:9, 32:25,
33:2, 45:11,
100:8, 105:1,
118:25, 119:10,
119:11, 119:12,
119:13, 119:14,
119:21, 128:6,
137:14, 140:11,
184:1, 211:19,
228:25, 237:17,
238:11, 252:16,
278:19
specifically
9:7, 78:3,
83:16, 134:24,
181:9, 217:23,
236:23, 247:11,
249:20
specificity
100:12
specifics
146:24, 149:6
speculating
156:12, 156:14
speeding
22:9, 22:13
spell
10:25, 11:17
spend
21:2
spoke
108:18, 111:19,
111:25, 112:5,
112:8, 112:16,
130:2, 130:9,
226:8, 249:3,
271:1, 280:22
spoken
127:10, 280:3,
280:20
spouse
11:15
spring
23:19, 70:16
st
228:19, 230:9,
230:22, 230:25

stamp
151:10, 206:25
stand
17:19
standing
19:14, 204:25
start
15:17, 24:7,
30:18, 44:4,
46:17, 58:25,
82:7, 113:6,
125:9, 140:1
started
5:23, 30:22,
44:9, 45:9,
90:9, 100:7,
113:21, 113:23,
115:4, 115:7,
115:10, 125:6,
125:8, 175:1,
216:8, 225:3,
225:5, 225:10,
226:14
starts
53:1, 90:19
state
1:20, 5:10,
10:8, 10:9,
15:7, 22:10,
22:14, 23:9,
23:14, 25:18,
26:12, 26:13,
26:14, 286:1,
286:10
stated
269:14, 273:4
statement
37:21, 62:1,
120:17, 120:20,
121:4, 139:12,
153:13, 153:14,
154:13, 154:14,
163:10, 164:7,
165:19, 165:25,
166:1, 267:11,
269:10
statements
25:11, 172:15,

190:14, 190:16,
191:1, 191:10,
191:16, 234:16,
234:20, 235:3,
266:15, 266:24,
267:5, 267:15,
269:1, 269:17,
269:23, 269:24,
270:7, 270:19,
271:21, 272:2,
274:19, 274:21,
275:9, 275:22,
275:25
states
1:1, 4:25,
154:5, 165:5
stay
204:15
stenographic
8:9
stenotype
286:19
step
223:14
steps
282:23
still
34:19, 34:25,
40:8, 40:9,
40:11, 41:1,
41:7, 42:1,
44:23, 47:3,
47:9, 47:13,
48:1, 86:19,
88:13, 93:12,
93:13, 93:15,
162:19, 163:13,
184:25, 211:4,
233:7, 261:3,
261:17, 277:1
stop
40:14, 42:21,
42:25, 135:9,
273:7, 273:17
stopped
40:19, 43:20,
132:6, 222:10,
226:12, 264:7,

264:18
**store**
238:11, 238:13,
238:15, 238:17
**stormed**
170:16
**story**
254:15
**street**
2:7, 2:16
**stress**
213:19, 215:25
**stressed**
214:8
**strike**
20:16, 43:17,
44:20, 44:22,
51:6, 66:4,
80:6, 86:14,
113:16, 131:13,
152:7, 167:19,
177:25, 189:4,
234:1, 235:15,
246:17, 269:16
**strong**
263:8
**structure**
98:7, 98:8,
98:9, 98:20
**struggle**
118:20
**stuff**
77:15, 123:13,
140:6, 198:17,
204:18, 205:4,
206:13, 210:10,
278:25
**stupid**
271:9
**subject**
7:15, 192:10
**submit**
153:25, 177:14,
219:16, 223:20,
223:21, 226:25
**submitted**
175:16
**submitting**
175:13, 256:10

**sudden**
124:18, 145:3
**suffered**
213:16, 261:13
**suffering**
261:17
**suggest**
176:7
**suite**
2:17
**summaries**
190:13
**summarized**
191:2
**summer**
70:16, 70:17,
71:25, 72:4,
72:25, 82:4,
100:9, 100:10,
173:18, 222:9,
222:15, 234:3,
263:24, 264:7,
264:17
**supervised**
33:19, 33:20
**supervisor**
32:19, 32:23,
32:24, 33:8,
33:13, 33:16,
33:18, 55:18,
56:3, 56:5,
108:8, 159:15
**supervisors**
55:20, 55:25
**supplement**
59:25
**supplements**
60:6
**supplies**
57:8, 57:18,
102:23
**support**
169:19, 189:25,
244:13
**supporting**
190:3
**supportive**
145:18

**supposed**
169:19, 228:20,
234:12, 234:13
**sure**
12:22, 19:17,
20:3, 31:22,
58:15, 63:19,
64:3, 69:19,
74:17, 75:10,
75:21, 86:23,
91:3, 94:24,
100:4, 103:1,
105:7, 105:20,
130:15, 133:19,
135:5, 135:16,
146:6, 164:15,
177:13, 178:11,
179:4, 191:16,
197:4, 201:5,
202:15, 208:23,
221:1, 226:4,
227:5, 233:19,
244:3, 257:13,
264:4, 265:16,
266:22, 271:7,
277:3, 278:3
**surface**
262:1
**surprise**
193:21
**surrendered**
252:12
**survive**
195:1, 195:2
**suspend**
281:16, 281:23
**suspended**
283:16
**suspending**
282:2
**swear**
6:13
**switching**
182:17
**sworn**
6:16, 286:14
**system**
154:1

| **T** |
| --- |

**taft**
73:17, 74:9,
74:14, 74:19,
74:25, 75:4,
75:23, 76:7,
76:8, 76:13,
76:16, 77:1,
78:10, 78:13,
79:5, 81:24,
82:12, 82:25,
85:4, 93:15,
95:16, 96:2,
223:2, 223:24
**taft's**
73:20, 75:25,
77:8, 77:25
**tagged**
166:12
**take**
8:10, 9:11,
9:16, 18:2,
18:5, 18:10,
18:14, 19:5,
20:13, 31:21,
53:19, 58:13,
59:16, 61:9,
62:19, 64:2,
64:7, 67:15,
67:19, 71:12,
86:5, 86:10,
93:1, 94:4,
95:1, 121:22,
129:10, 134:2,
150:9, 168:9,
173:1, 181:15,
183:11, 187:1,
187:18, 200:4,
204:19, 209:23,
210:10, 216:3,
227:4, 229:6,
244:2, 251:22,
258:20, 258:21,
258:25, 266:2,
277:25, 278:2,
282:24
**taken**
1:17, 1:18,

1:21, 6:3, 11:2,
11:4, 11:7,
21:11, 21:14,
21:19, 32:5,
58:18, 94:10,
129:14, 168:15,
187:14, 189:24,
190:7, 192:12,
216:12, 244:7,
278:6
**taking**
1:18, 59:10,
63:14, 85:6,
88:14, 95:11
**talk**
4:6, 84:10,
102:9, 104:13,
104:17, 108:24,
109:19, 118:12,
118:15, 118:16,
119:8, 120:8,
120:23, 130:3,
134:8, 134:12,
135:1, 142:9,
142:11, 144:9,
144:16, 146:22,
147:2, 147:6,
148:6, 148:11,
148:18, 149:7,
149:11, 153:9,
160:3, 160:10,
160:14, 160:20,
160:24, 161:18,
168:4, 168:5,
168:6, 170:19,
171:20, 172:6,
173:8, 173:15,
178:19, 178:21,
181:3, 181:5,
205:10, 208:19,
208:23, 209:4,
261:24, 265:14,
273:17, 276:9,
276:10, 276:14,
278:17, 279:16,
279:24
**talked**
72:1, 87:9,

123:23, 123:24,
145:21, 148:17,
149:2, 167:25,
200:21
**talking**
24:23, 90:1,
99:23, 112:13,
113:11, 113:13,
113:20, 114:12,
114:17, 115:13,
115:16, 116:18,
116:20, 130:16,
134:16, 148:13,
166:18, 167:20,
178:15, 178:18,
178:25, 181:8,
204:17, 204:20,
261:18, 261:19,
263:4, 279:16
**tamala**
14:11
**tape**
4:21
**targeted**
135:25
**task**
75:15, 75:19,
91:7
**tasks**
57:21, 75:11,
75:24, 76:8,
76:12, 86:17,
87:17, 91:21,
92:23, 94:16,
266:8
**tax**
91:24
**team**
118:22, 123:5,
141:18, 143:21,
156:24, 169:18,
196:9, 213:21
**teamed**
196:11
**tech**
2:26
**technical-related**
4:19

**technician**
4:2
**technology**
239:10
**tell**
43:3, 47:2,
47:16, 47:24,
53:12, 68:23,
80:13, 81:22,
82:24, 90:14,
105:16, 108:6,
111:6, 114:22,
128:25, 129:18,
129:24, 130:21,
132:9, 133:3,
141:12, 143:1,
144:8, 149:9,
156:18, 169:7,
180:23, 185:23,
185:24, 187:22,
194:11, 194:24,
195:12, 195:23,
200:8, 200:24,
203:1, 205:21,
206:4, 210:16,
210:20, 212:16,
212:21, 213:15,
214:12, 215:6,
215:21, 216:8,
228:1, 230:3,
236:23, 237:1,
237:7, 239:13,
243:17, 249:5
**telling**
86:7, 149:5,
150:1, 169:13,
203:16, 210:3,
210:9, 254:6,
254:12
**tells**
205:1
**temporarily**
260:1
**temporary**
88:2
**ten**
31:25, 32:1,
58:14, 83:13,

84:7, 94:5,
244:3, 260:18,
260:21, 284:13
**ten-day**
284:12
**ten-minute**
168:10, 173:14
**term**
42:17, 43:5,
149:1, 231:17
**terminate**
220:9, 220:10,
228:13, 228:21
**terminated**
29:21, 142:3,
218:7, 220:4,
220:8, 228:19,
243:13, 249:12,
252:9, 253:4,
257:25, 264:2
**terminating**
224:25, 225:1
**termination**
75:18, 76:4,
77:8, 77:25,
108:9, 108:10,
217:4, 219:15,
249:18, 257:23,
257:24
**terminology**
102:11, 102:13
**terms**
41:11, 95:23,
96:3, 99:23,
118:24, 214:5,
248:17
**testified**
6:16, 16:9,
150:21, 248:3,
266:14, 266:22,
267:16, 269:20,
269:24, 270:22,
271:20, 272:4,
272:8, 274:20,
275:7
**testify**
268:11, 272:16,
272:22, 286:14

testifying
286:13
testimony
7:14, 7:18,
119:6, 163:6,
185:2, 185:6,
207:23, 275:18,
277:9, 286:18,
286:22
teupen's
28:15, 77:22,
81:6, 81:21,
94:1, 105:2,
105:5, 164:12,
182:23, 219:21,
234:5, 235:19,
235:22, 236:9,
236:11, 236:17,
237:16, 243:3,
245:22, 247:12,
248:21, 249:7,
252:3, 253:12
text
212:6
th
5:3, 52:14,
52:17, 59:5,
178:10, 179:2,
183:8, 185:23,
186:1, 186:5,
187:6, 188:6,
188:9, 188:10,
191:23, 192:1,
192:24, 195:18,
206:2, 207:11,
207:17, 208:1,
208:25, 209:7,
211:20, 211:24,
212:15, 213:6,
213:14, 215:5,
218:11, 229:20,
230:22, 251:17,
252:5, 252:17,
256:3, 256:22,
257:12, 258:7,
278:22, 279:11,
286:28
thank
4:2, 4:20,

20:7, 31:23,
37:8, 38:13,
39:3, 92:21,
94:6, 95:6,
168:11, 188:15,
244:4, 269:7,
273:9, 274:9,
282:19, 284:15,
285:10
thanking
274:3
themselves
5:10
therefore
8:12, 194:5
thereof
286:11
thing
45:5, 126:14,
137:16, 141:14,
141:18, 194:17,
270:23
things
69:5, 115:5,
116:17, 117:7,
117:11, 118:17,
119:25, 120:9,
120:25, 128:22,
134:13, 141:12,
144:16, 146:23,
149:12, 149:14,
150:6, 166:7,
167:6, 182:4,
185:17, 209:21,
214:9, 220:25,
225:14, 225:15,
225:17, 225:21,
226:8, 229:7,
249:10, 266:12,
272:16
think
16:13, 17:22,
17:23, 36:19,
60:1, 79:22,
80:2, 88:13,
89:17, 89:19,
89:24, 92:13,
92:19, 98:4,

106:16, 107:12,
114:17, 115:16,
119:16, 127:12,
135:25, 137:25,
138:2, 143:13,
147:1, 159:14,
161:5, 163:6,
163:19, 169:11,
173:7, 175:24,
177:3, 185:5,
185:9, 196:19,
199:20, 203:20,
206:23, 207:5,
216:4, 219:1,
223:8, 254:23,
268:8, 279:19,
279:21, 280:2,
280:19
thinking
155:24
thorn
143:11
thought
87:20, 114:11,
155:15, 169:17,
169:18, 170:17,
174:21
thoughts
173:5
three
13:5, 45:12,
46:5, 75:7,
79:3, 79:20,
80:25, 81:7,
81:11, 81:24,
96:14, 100:1,
128:10, 186:20,
231:5
through
8:9, 28:14,
43:5, 46:2,
48:11, 48:18,
49:10, 51:12,
149:21, 150:2,
155:15, 170:24,
186:5, 206:13,
221:22, 227:6,
228:18, 261:20,

262:5, 273:2,
280:23
throughout
51:23, 111:21,
112:8, 113:1,
126:10, 275:21,
284:7
thursday
157:23
ticket
22:10, 22:14
tie
122:2, 122:23,
122:24
tim
158:13
time's
126:8
timeline
125:10
timely
102:4, 135:20
times
36:20, 113:11,
116:14, 116:25,
118:6, 118:11,
118:14, 120:1,
121:5, 121:9,
121:10, 135:8,
146:8, 147:17,
147:19, 148:8,
182:7, 182:9,
185:11, 201:6,
258:20, 259:9,
265:4, 277:13
timing
84:23, 202:4
tissues
7:8
title
65:2, 66:13,
66:21, 67:4,
67:22, 73:22,
73:24, 90:18,
97:5, 100:18,
100:19, 101:2
titles
66:9

**today**
5:5, 6:11,
9:23, 38:18,
59:15, 59:22,
61:7, 62:12,
62:22, 64:9,
167:24, 190:3,
201:11, 208:17,
211:9, 211:14,
211:18, 263:22,
266:15, 267:7,
267:16, 268:16,
269:2, 269:6,
269:14, 269:21,
269:25, 270:11,
270:22, 271:20,
272:4, 272:9,
273:5, 273:25,
274:20, 274:22,
275:8, 275:19,
276:19, 277:14,
280:14, 281:2,
282:11, 283:12

**today's**
4:22, 5:3

**together**
7:4, 110:5,
110:11, 110:12,
110:18, 111:11,
122:24, 123:6,
143:17, 156:23,
169:19, 190:11

**told**
30:2, 86:2,
86:4, 110:22,
111:5, 130:22,
130:24, 133:20,
133:22, 133:25,
144:19, 150:6,
150:21, 153:18,
154:21, 156:8,
160:23, 163:9,
166:15, 166:17,
166:18, 178:9,
179:23, 185:13,
198:22, 203:22,
206:7, 210:18,
213:3, 213:18,

213:19, 220:22,
224:20, 225:12,
227:3, 237:5,
239:7, 243:8,
249:3, 254:12,
259:17, 262:7,
267:6, 268:22,
270:10, 271:19,
276:19, 277:13,
282:7, 283:7

**tomorrow**
59:9, 64:8

**tony**
73:14, 73:16,
74:1, 223:4,
223:25

**took**
17:22, 18:7,
63:19, 84:13,
87:1, 89:7,
90:9, 90:23,
94:16, 101:4,
101:12, 133:23,
145:3, 174:10,
183:9, 183:14,
183:15, 184:9,
184:13, 186:9,
186:19, 187:3,
188:18, 222:8,
222:14, 227:19,
240:20, 242:19,
243:15, 263:16,
263:23, 286:5

**tools**
117:2

**top**
52:10, 57:22,
57:23, 57:25,
65:3, 67:5,
69:22, 90:19,
157:16, 163:18,
163:19, 192:23,
207:6, 207:9,
244:12

**topic**
83:23, 275:6,
277:23, 278:20

**topics**
20:18, 20:20

**totally**
84:19, 136:3,
150:7, 154:8,
166:10, 214:3

**towards**
111:17, 119:24,
135:25, 141:25,
163:17, 168:21,
271:1

**town**
12:18, 144:10,
146:22, 266:10

**track**
166:22

**trade**
2:16, 91:17,
92:11

**trade-in**
239:16

**traded**
240:9

**trail**
117:15, 154:6,
221:1

**train**
85:10, 88:23,
93:19, 94:2

**trained**
86:16, 92:22

**trainer**
73:14, 73:16,
74:11, 74:14,
74:21, 74:25,
75:4, 75:16,
75:20, 78:17,
79:4, 82:12,
82:25, 85:4,
93:15, 95:16,
96:2, 223:4,
223:25

**trainer's**
74:1, 81:25

**training**
21:14, 21:20,
85:16, 85:19,
93:10, 93:14

**trans**
238:2

**transactions**
102:10, 102:15,
103:7, 116:19,
182:15, 249:9

**transcribed**
286:20

**transcript**
283:23, 284:2

**transfer**
17:11

**transferred**
230:17, 241:22,
245:21, 246:11,
246:16, 246:24

**transferring**
244:18

**transition**
71:23, 76:14,
82:4, 87:11,
174:23, 227:10,
229:4, 241:16,
246:2, 262:25

**transitioned**
243:20

**transitioning**
228:2, 243:8

**travieso**
132:18, 132:23

**treat**
115:11, 140:16,
142:20, 171:14

**treated**
111:13, 133:7,
136:5, 141:21,
143:25, 167:23,
211:23, 260:16,
260:23, 261:3,
262:1, 262:21,
263:3, 263:5,
263:20, 278:22

**treatment**
113:10, 215:18,
262:2

**tremendous**
272:11

**trick**
11:23, 104:9,
272:11

**tried**
93:23, 115:10,
120:21, 134:13,
142:9, 142:16,
166:18, 172:22,
173:8, 194:6,
198:22, 202:5,
204:10, 204:11,
208:12, 208:16,
209:3, 225:3,
234:7, 256:15,
279:19
**true**
126:14, 142:6,
199:1, 286:21
**truly**
142:13
**truth**
262:7, 286:15
**truthful**
9:24
**try**
38:11, 77:18,
110:16, 155:16,
196:23, 198:2,
218:6, 220:25,
227:24, 233:20,
265:7, 273:19,
274:7, 284:11
**trying**
84:21, 135:8,
145:15, 171:22,
202:21, 203:22,
218:24, 258:9,
265:12, 265:13,
267:25, 272:10,
272:15, 273:3
**turn**
217:14, 239:17,
260:4
**turnaround**
284:13
**turned**
239:24, 240:2,
241:4, 242:7
**turning**
55:5, 192:22,
219:6, 219:9

**turnover**
71:5, 124:17,
155:23, 258:24
**two**
12:10, 17:5,
17:6, 24:21,
67:9, 85:10,
85:11, 85:16,
90:19, 92:22,
93:10, 98:21,
99:11, 103:15,
146:25, 148:18,
149:19, 157:13,
165:24, 186:20,
187:11, 196:6,
198:4, 199:23,
207:6, 214:10,
258:12, 266:12
**two-minute**
84:11
**two-page**
157:7, 216:22
**two-week**
85:24
**two-weeks**
93:1
**type**
50:2, 50:6,
54:20, 56:21,
154:6, 191:1,
196:12, 214:13,
215:22, 233:2,
234:20, 234:25,
235:5, 236:13,
244:22
**typed**
260:8
**typewriting**
286:20
**typical**
56:16

**U**

**ulf**
207:16, 208:3,
234:24, 235:8
**ultimate**
225:23

**ultimately**
103:19
**um-hmm**
98:14, 162:16,
163:23, 164:5,
180:8, 190:21,
207:20, 232:19
**unable**
4:16, 116:15
**uncalled**
153:4
**uncomfortable**
136:7, 171:24
**under**
9:20, 11:10,
37:11, 69:6,
98:16, 157:17,
182:24, 195:7,
232:9, 232:17,
232:20, 233:12,
235:22, 236:9,
236:11, 237:16,
238:3, 241:22,
244:22, 244:23,
245:17, 246:18,
252:21, 253:14,
258:1, 276:25,
277:7, 286:20
**undergraduate**
17:1
**underneath**
98:12, 103:18
**understand**
7:20, 7:21,
7:23, 8:18, 9:9,
9:22, 19:12,
28:10, 37:23,
41:5, 43:16,
50:11, 50:25,
51:25, 71:21,
75:2, 77:5,
80:22, 81:4,
87:23, 91:3,
96:19, 104:10,
107:15, 108:16,
109:8, 113:15,
114:15, 115:18,
123:18, 124:9,

152:8, 166:16,
177:9, 190:8,
191:24, 193:6,
194:3, 201:22,
204:7, 220:2,
232:12, 235:17,
238:22, 248:19,
267:4, 268:23,
284:1
**understanding**
80:18, 87:7,
87:25, 102:7,
107:16, 186:7,
273:23, 282:25
**understands**
277:4
**understood**
109:2, 271:11,
277:14
**uneasy**
116:15
**unfair**
263:21
**unfairly**
141:22, 167:23,
262:21
**unfortunately**
156:8, 230:16
**united**
1:1, 4:24,
231:6
**universities**
17:15
**university**
21:12
**unless**
9:6, 94:22
**unnecessarily**
37:7
**unnecessary**
6:2, 170:9,
269:2
**unplugging**
259:1
**unprompted**
268:24
**unquote**
246:25

**until**
49:4, 60:23,
62:7, 69:12,
69:24, 87:3,
88:15, 90:20,
101:5, 115:2,
123:14, 125:6,
142:17, 200:21,
201:13, 246:10,
264:1, 264:12,
264:18, 281:16
**updating**
140:22
**upgrade**
238:4, 238:7,
238:24, 239:17
**upgraded**
239:12
**upper**
97:12
**ups**
253:25, 254:2
**upset**
213:18, 265:8
**use**
88:20, 185:14,
189:8, 236:6,
237:11, 237:25,
238:24, 258:2,
258:25, 259:2,
259:4, 259:6,
259:23, 277:17
**uses**
239:9
**using**
61:14, 224:8,
224:11
**usually**
159:22, 220:25

**V**

**vacation**
145:3, 183:23,
184:6, 184:9,
184:12, 209:18
**vendor**
243:6, 246:3
**vendors**
140:5

**verbal**
117:18, 118:24
**verbally**
47:3, 47:25,
117:13, 148:23
**verizon**
181:25, 183:2,
183:5, 238:3,
238:9, 238:11,
238:17, 238:20,
238:25, 239:7,
239:9, 239:13,
239:24, 240:1,
240:4, 240:7,
240:11, 240:14,
240:17, 241:14,
241:19, 241:23,
242:8, 243:13,
244:13, 244:19,
245:3, 246:14,
247:7, 248:9,
248:21
**verizon-branded**
238:15
**via**
75:18, 76:22,
79:6, 220:25,
257:25
**video**
4:14, 4:16, 5:4
**video-recorded**
8:8
**videographer**
2:27, 4:21,
5:5, 6:1, 6:9,
6:10, 32:3,
32:6, 58:16,
58:19, 94:8,
94:11, 129:12,
129:15, 168:13,
168:16, 216:9,
216:13, 244:5,
244:8, 278:4,
278:7, 284:3,
284:18, 284:22
**videos**
201:24
**videotape**
6:8

**videotaped**
1:16, 4:22,
5:25, 6:9, 286:6
**view**
38:23
**viewed**
266:16
**violation**
132:10
**virtue**
286:10
**visible**
6:25
**visit**
212:1
**visits**
132:2
**visual**
186:11
**visually**
210:22
**voice**
197:24, 197:25,
205:5, 205:8,
205:13, 205:16
**voice-identify**
5:9
**voiced**
134:6
**voicemail**
202:13, 202:14
**vp**
69:2, 69:9,
71:11, 85:12,
91:8, 91:24,
123:11, 175:15,
248:12, 264:24
**vs**
1:7

**W**

**wait**
19:6, 19:9,
19:23, 62:3,
99:2, 137:8,
176:4, 184:19,
184:20, 203:23,
210:1, 268:13,

**waited**
212:19
**waiting**
202:23, 203:22,
210:4
**walk**
113:3, 113:7,
120:24, 125:2,
131:8, 131:17,
166:6
**walks**
205:2
**want**
7:5, 62:16,
64:3, 64:20,
88:24, 91:2,
94:22, 94:24,
100:24, 103:1,
114:3, 116:7,
121:1, 136:1,
144:20, 144:25,
146:22, 149:24,
154:7, 156:16,
156:17, 165:18,
166:11, 167:5,
169:23, 171:8,
188:19, 194:8,
198:21, 200:21,
243:14, 253:9,
254:20, 255:2,
257:6, 259:17,
268:2, 268:20,
272:20, 274:6,
277:5
**wanted**
86:23, 88:22,
108:11, 128:22,
129:2, 132:11,
142:14, 143:7,
143:11, 144:9,
148:18, 150:7,
150:8, 153:3,
153:5, 154:5,
154:6, 154:9,
155:17, 155:18,
155:19, 156:7,

156:19, 156:20,
159:4, 159:12,
160:22, 170:21,
172:1, 172:17,
172:20, 172:25,
173:1, 173:2,
174:7, 182:2,
189:24, 206:10,
206:13, 220:17,
224:21, 225:24,
226:6, 228:6,
237:14, 238:20,
250:1, 253:22,
255:13, 257:1,
262:25, 263:9,
280:21, 285:1
**wants**
171:20
**warehouse**
105:24, 125:2,
180:13
**warning**
142:4, 146:13,
147:24, 148:2,
148:20, 148:22,
151:5, 151:7,
151:13, 151:16,
152:6, 152:9,
152:12, 152:16,
153:2, 153:10,
154:2, 154:23,
155:9, 157:2,
158:24, 159:16,
159:20, 160:8,
160:21, 161:14,
161:17, 162:7,
163:7, 165:1,
165:7, 169:3,
178:23, 179:1,
227:18
**warranted**
142:5
**warranty**
91:18, 92:12,
92:15
**wasting**
141:11
**way**
6:7, 36:7,

52:5, 57:12,
88:21, 92:2,
111:18, 111:19,
116:2, 128:22,
130:13, 140:16,
142:21, 149:17,
165:2, 165:14,
165:15, 166:22,
170:3, 172:7,
172:13, 177:8,
190:1, 205:19,
236:7, 239:4,
254:5, 263:3,
266:20, 267:8,
267:18, 269:12,
269:19, 270:1,
271:3, 271:23,
272:5, 274:14,
275:10, 277:16,
281:8
**wayne**
14:11
**ways**
57:13, 263:7
**we'll**
62:9, 62:18,
62:19, 64:2,
64:12, 64:13,
94:21, 174:4,
269:2, 285:7
**we're**
7:3, 7:4, 7:12,
58:16, 62:4,
62:6, 62:21,
94:8, 129:12,
129:15, 167:24,
203:23, 216:10,
224:22, 278:4,
284:24
**we've**
117:1, 118:18,
135:1, 192:9,
216:4
**wednesday**
185:25
**week**
20:22, 21:2,
39:23, 40:1,

41:12, 41:13,
41:15, 41:17,
42:12, 44:15,
44:18, 44:19,
45:8, 145:3,
145:4, 161:3,
183:10, 183:11,
184:2, 186:3,
186:20, 187:3,
188:14, 189:18,
191:17, 194:10,
229:18, 258:8,
264:1, 264:5,
264:14, 264:15
**weekend**
206:12
**weekends**
265:3, 265:5
**weekly**
44:19
**weeks**
85:10, 85:11,
85:16, 92:22,
93:10, 234:7
**went**
31:13, 98:5,
132:7, 134:3,
134:4, 142:3,
145:7, 153:11,
170:24, 171:17,
193:19, 201:8,
207:24, 210:18,
211:1, 211:23,
229:19, 236:9,
236:10, 237:18,
238:2, 251:7,
252:24, 264:22,
273:2, 278:23,
278:24
**weren't**
126:16, 126:24,
141:10, 180:25,
225:21
**west**
2:16, 13:1
**westchester**
17:8, 17:13,
21:9

**western**
1:2, 4:25,
12:21, 12:23,
13:20, 13:25,
14:7, 14:12,
14:17
**what'd**
162:22
**whatever**
62:16, 64:20,
73:6, 92:25,
132:11, 140:8,
140:12, 140:13,
149:24, 172:1,
175:18, 182:22,
223:19, 242:8,
267:11, 282:12
**whatnot**
180:15
**whenever**
42:24, 83:14,
148:6
**whether**
87:7, 124:10,
136:13, 138:14,
150:16, 152:11,
152:21, 168:7,
172:7, 186:8,
213:1, 213:3,
255:2, 273:3
**whichever**
37:15
**white**
74:16, 74:19,
74:21, 122:23,
127:7, 129:22
**who've**
79:16
**whoever**
115:20
**whole**
57:1, 111:21,
112:8, 137:15,
144:15, 186:20,
188:14, 201:17,
227:9, 227:22,
254:15, 262:25,
264:15, 286:15

winchester
2:26
windows
106:7
winter
70:15
wireless
245:17, 245:18
wish
177:4
withhold
192:16
withholding
64:5
within
92:25, 112:19,
114:23, 234:7
without
66:20, 156:22,
198:25, 218:14,
243:14, 254:6,
254:11
witness
3:3, 6:13,
6:15, 21:23,
22:5, 25:1,
37:22, 47:6,
53:21, 64:9,
99:4, 99:5,
99:14, 125:22,
137:10, 137:12,
150:14, 159:5,
163:25, 176:2,
176:6, 176:10,
176:14, 196:8,
197:19, 268:1,
268:11, 268:18,
273:21, 274:8,
275:14, 277:8,
277:25, 278:21,
281:20, 282:9,
283:3, 283:9,
283:13, 283:25,
286:13, 286:18,
286:22, 286:28
witnessed
53:23
witnesses
153:4

women
128:9, 128:10
word
54:7, 201:7,
237:18, 271:11
wording
259:16
words
29:19, 145:14,
191:1, 273:21
work-related
117:24
worked
16:3, 20:24,
30:6, 30:9,
31:14, 32:19,
32:25, 33:1,
34:19, 35:15,
39:8, 39:11,
41:11, 41:21,
42:20, 43:13,
43:19, 44:6,
44:13, 45:2,
45:8, 45:14,
47:17, 48:1,
67:21, 69:24,
79:8, 91:13,
97:4, 105:6,
107:3, 110:24,
111:7, 111:8,
111:11, 123:5,
125:15, 125:19,
126:15, 129:19,
151:17, 156:23,
159:23, 187:15,
189:6, 233:20,
235:10, 249:13,
258:14, 263:15
working
16:16, 21:3,
21:5, 32:15,
34:22, 35:7,
35:12, 35:21,
35:25, 36:15,
38:21, 39:13,
40:8, 40:9,
40:11, 40:14,
40:19, 42:3,

42:21, 43:18,
43:21, 44:4,
44:7, 44:9,
45:1, 45:9,
46:17, 46:20,
47:3, 47:21,
48:14, 49:11,
49:17, 51:15,
51:20, 69:23,
91:2, 98:21,
100:7, 109:7,
110:15, 114:6,
122:3, 125:6,
125:8, 128:4,
128:12, 128:15,
128:18, 129:5,
141:7, 141:10,
141:17, 143:15,
143:21, 187:20,
189:12, 194:24,
222:10, 225:11,
225:13, 225:15,
225:16, 226:10,
226:13, 226:19,
226:20, 252:1,
253:21, 256:9,
264:8, 264:18,
265:15, 278:10,
278:14
works
277:20
worth
265:10
wouldn't
53:20, 66:11,
136:16, 139:19,
141:9, 150:19,
167:6, 167:14,
198:24, 204:12,
206:20, 209:3,
227:16, 233:16,
239:8, 260:9,
261:11, 264:11
write
186:14, 189:25,
284:11
writing
46:23, 47:4,

47:25, 186:15,
194:19, 267:12
writings
28:22, 29:3
written
29:12, 36:22,
195:15, 217:4,
284:2
wrong
104:7
wrote
157:11, 191:4,
206:7

## Y

yeah
24:7, 52:16,
105:22, 106:22,
120:19, 171:9,
192:1
year
14:22, 15:11,
16:6, 16:7,
16:12, 25:3,
25:4, 26:5,
27:15, 30:18,
31:19, 39:16,
44:10, 57:15,
69:25, 70:13,
90:4, 90:6,
173:18
years
260:18, 260:22
yep
158:22, 276:11,
284:17
yesterday
60:23
york
10:7, 10:8,
10:9, 15:2,
15:7, 34:19,
34:25, 35:24,
130:5, 253:22
yourself
4:17, 54:6,
62:10, 63:24,
83:8, 165:13,

190:4, 191:11, 191:17, 255:10, 274:6

**Z**

**zeroes**
97:13
**zoom**
6:4, 7:2, 269:3

**$**

**$20**
42:15
**$26**
40:4, 41:7
**$60,000**
174:13
**$72,000**
90:4, 90:6
**$73,000**
174:17
**$84,000**
89:20
**$9,932.17**
165:6

**.**

**.4565**
2:19
**.7637**
2:9

**0**

**00**
59:15, 59:22, 61:10, 64:15, 94:25, 264:11, 264:12
**00001**
67:8
**000010**
162:3
**000011**
164:18
**00002**
67:9
**000039**
207:1

**000040**
207:2
**000047**
212:10
**00006**
65:7
**000060**
157:6
**000061**
157:8
**000070**
151:10
**00009**
53:1
**0001**
90:20
**00012**
232:7
**00016**
53:2, 54:16
**000194**
197:8
**00024**
216:22
**00025**
216:23
**00027**
193:1
**00086**
244:15
**00364**
230:19
**00518**
1:8, 5:2
**08**
1:22, 5:5

**1**

**10**
94:9, 94:12, 157:24, 161:25
**100**
233:13, 283:7
**11**
59:5, 94:25, 129:13, 230:22
**12**
61:10, 94:25,

95:2, 129:8, 129:16, 158:19, 162:15, 264:9, 264:13
**13**
168:14, 168:17
**14**
1:21, 5:3, 216:11, 216:14, 286:7
**14015**
24:1
**15**
161:25, 244:6, 244:9, 244:15
**16**
162:15, 278:5, 278:8, 284:25
**18**
12:6, 12:9, 40:2, 41:13, 151:21
**19**
157:23, 158:7, 158:19, 159:2, 162:15, 168:14, 178:10, 178:24, 185:23, 211:21
**1973**
10:5
**1991**
14:25
**1st**
230:7
**1teupen**
53:1, 53:2, 54:16, 65:7, 67:8, 67:9, 90:20, 193:1, 216:22, 216:23, 230:19

**2**

**2-0-1-8**
16:10
**20**
1:8, 5:2, 158:7, 178:10,

179:2, 183:8, 185:23, 232:7, 252:17
**201**
241:9, 242:4, 242:6
**2012**
11:22, 11:25, 30:20, 32:16
**2016**
26:7
**2017**
51:16, 52:14, 52:17, 69:24
**2018**
15:12, 15:22, 16:10, 44:11, 44:22, 45:2, 45:9, 236:21
**2019**
17:23, 70:2, 70:7, 70:14, 72:1, 72:5, 73:1, 82:4, 100:9, 100:14, 151:21, 157:24, 158:7, 173:19, 178:2, 178:10, 183:16, 184:5, 184:7, 184:13, 184:23, 185:23, 186:10, 186:25, 187:21, 189:19, 191:17, 191:23, 192:2, 192:25, 193:12, 207:11, 207:17, 211:24, 215:5, 221:16, 222:9, 222:15, 224:8, 224:10, 224:17, 228:15, 228:19, 229:12, 230:22, 231:24, 234:3, 242:25, 243:4, 247:13, 247:16, 247:24, 251:17, 252:5, 256:22, 257:12,

260:15, 260:21,
260:25, 263:24,
264:7, 264:17,
278:22
**2020**
2:17, 39:17,
40:17, 40:21,
42:5, 42:20,
46:12, 54:19,
54:25, 69:25,
211:21, 217:7,
222:16, 229:15,
232:15, 232:21,
252:10, 264:8,
278:15
**2021**
1:21, 5:3,
48:22, 48:24,
49:4, 49:22,
50:7, 286:7,
286:29
**22**
157:24
**227**
2:16
**23**
137:3, 137:23,
138:17, 139:3,
142:19, 186:4,
187:21, 188:4,
188:10
**24**
52:14, 52:17,
188:10
**25**
97:14, 185:25,
187:6, 188:6,
278:5
**26**
188:9
**27**
186:5, 188:5,
188:9, 207:12,
286:28
**28**
244:6
**28202**
2:8, 2:18

**28277**
24:2
**29**
173:3
**29720**
23:20

---
**3**
---
**30**
37:11, 61:10,
99:5, 168:17,
186:1, 191:23,
192:1, 192:15,
192:24, 193:12,
195:18, 206:2,
207:11, 207:17,
208:1, 208:25,
209:7, 211:20,
211:24, 212:15,
213:6, 213:14,
215:5, 218:11,
218:16, 218:19,
219:1, 229:20,
230:22, 247:24,
251:17, 252:5,
256:3, 256:22,
257:12, 258:7,
278:22, 279:11
**31**
129:16, 228:19,
230:9, 230:22,
230:25
**32**
207:18
**338**
1:29
**35**
216:11, 278:8
**38**
58:17
**3:-cv--fdw-dsc**
1:8, 5:2
**3rd**
10:5, 54:24,
217:7

---
**4**
---
**4**
59:15, 59:22,

64:15, 285:11
**40**
41:17, 244:9
**401**
48:7, 49:25,
50:1
**42**
230:22
**4348**
1:29
**44**
94:9, 129:8,
129:13, 284:25,
285:11
**45**
32:4, 61:11,
95:2
**46**
216:14
**48**
58:20

---
**5**
---
**50**
124:2, 124:3,
124:4, 124:5
**54**
158:8, 159:2
**5506**
242:6
**55076**
1:28
**56**
94:12, 94:25
**57**
32:7

---
**6**
---
**60**
264:14
**60,000**
89:24
**602**
2:7
**612**
1:29
**617**
242:3

**6877**
23:19
**6880**
1:27

---
**7**
---
**704**
241:12, 241:17,
241:21, 242:1,
242:3
**704.334**
2:19
**71**
250:6
**72**
173:21, 174:1
**72,000**
173:18
**75**
89:16

---
**8**
---
**8**
1:22, 5:5,
32:4, 32:7
**80**
89:16, 264:15
**800**
79:24
**844.437**
2:9
**89**
16:14

---
**9**
---
**9**
16:14, 58:17,
58:20, 158:8,
159:2, 207:12,
207:18, 264:11,
264:12
**912**
242:6
**9493**
242:3